[FILED]

MAY 2 1 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

2001 MAY 21  P 3: 16

| | |
|---|---|
| CHRISTOPHER BARBOUR<br>AIS ~7556<br><br>Petitioner,<br><br>-vs-<br><br>MICHAEL HALEY, Commissioner<br>Alabama Department of Corrections,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)  No. CV-01-T-612-N<br>)<br>)<br>)  DEATH PENALTY<br>)<br>)<br>) |

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**

**THIS IS A CAPITAL CASE
Mr. Barbour is presently scheduled to be executed
Friday, MAY 25, 2001**

**George H. Kendall
Miriam Gohara**

99 Hudson Street
Suite 1600
New York, New York 10013
(212) 965-2200

Attorneys for Mr. Barbour

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

CHRISTOPHER BARBOUR                    )
                                       )
              Petitioner,              )
                                       )
       -vs-                            )      No. _CV-01-T-612-N_
                                       )
MICHAEL HALEY, Commissioner            )
Alabama Department of Corrections,     )
                                       )
              Respondent.              )

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

### THIS IS A CAPITAL CASE
### Mr. Barbour is scheduled to be executed
### Friday, MAY 25, 2001

CHRISTOPHER BARBOUR, an indigent prisoner confined on death row in

Holman Prison, Atmore, Alabama, by and through counsel, petitions this Honorable

Court for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254 *et. seq.* The allegations

of this petition are in the form dictated by the Model Rules for Use in Application for

Habeas Corpus under the Habeas Corpus statute, prescribed the Rules Governing Section

2254 Cases in the United States District Courts.

Paragraphs 1 through 9 state the history of prior proceedings; paragraphs 10

through 77 present the statement of the case, and paragraphs 78 through 173 state the

constitutional grounds upon which Mr. Barbour claims that the judgment and sentence imposed upon him are unlawful.  In the paragraphs setting forth his constitutional grounds, Mr. Barbour has stated the basis for his claim in the first paragraph under each hearing, and has set out the facts supporting the claim in the following paragraphs.

I.      HISTORY OF PRIOR PROCEEDINGS

1.      The name and location of the court which entered the judgment of conviction and sentence under attack are:

> Fifteenth Judicial Circuit Court in and for Montgomery County,
> Montgomery, Alabama

2.      The date of the judgment of conviction is June 24, 1993.

3.      The date of the judgment of sentence is February 2, 1994; the sentence was that Mr. Barbour be put to death for the crime of murder during the commission of a rape, a burglary, and an arson, in violation of § 13A-5-40(a)(3), (a) (4), and (a)(9), Ala. Code 1975.

4.      The nature of the offense involved is that Mr. Barbour was convicted of murder during the commission of a rape, a burglary, and an arson, in violation of § 13A-5-40(a)(3), (a) (4), and (a)(9), Ala. Code 1975.

5.      At his trial, Mr. Barbour pleaded not guilty.

6.      The trial on the issue of guilt or innocence and on the issue of penalty was had before a jury.

7.      Mr. Barbour did not testify at either phase of this capital trial.

2

8.    Mr. Barbour appealed his conviction and sentence of death.

9.    The facts of Mr. Barbour's appeal are as follows:

a. Mr. Barbour's conviction and sentence were affirmed on direct review, *Barbour v. State*, 673 So.2d 461 (Ala. Crim. App. 1994); *Ex Parte Barbour*, 673 So.2d 473 (Ala. 1995).

b. Thereafter, a timely filed petition for writ of certiorari was denied. *Barbour v. Alabama*, 518 U.S. 1020 (1996).

c. Mr. Barbour timely sought post-conviction relief in the Alabama state courts. This application under Ala. R. Crim. P. 32. was denied in an unpublished order dated April 21, 1998. *See Barbour v. State*, Case No. CC-92-1544.60-WRG, Order Dated April 21, 1998.

d. Before entry of the court's judgment, Mr. Barbour's court-appointed counsel, Joseph Espy, Esq., of Montgomery, Alabama, orally notified Mr. Barbour that he would no longer represent him. Mr. Espy did not inform Mr. Barbour of his rights to amend his petition prior to judgment or to appeal an adverse judgment. He also did not provide Mr. Barbour with a copy of his file or the record. No notice of appeal was filed and no further post-conviction actions were taken on the matter until the following.

e. On September 8, 2000, the State moved the Alabama Supreme Court to set an execution date for Mr. Barbour. In January, 2001, undersigned counsel agreed to represent Mr. Barbour, and on April 4, 2001, Mr. Barbour moved the Circuit Court of

3

Montgomery County to reopen his Rule 32 proceeding. On April 20, 2001, the Alabama
Supreme Court entered an order that set May 25, 2001, as Mr. Barbour's execution date.
On April 24, 2001, the State moved the circuit court to dismiss Mr. Barbour's Motion to
Reopen. On May 3, 2001, the State filed with the court a proposed order summarily
dismissing Mr. Barbour's petition. On May 4, 2001, Mr. Barbour proffered evidence in
support of his motion and on May 10, 2001, filed a detailed reply to the State's request for
summary dismissal and proffered additional evidence. On May 14, 2001, the circuit court
summarily dismissed all of Mr. Barbour's claims by adopting the State's proposed order.

f. On May 18, 2001, Mr. Barbour filed a motion for stay of his execution in the
Supreme Court of Alabama. On May 21, 2001, he filed a Notice of Appeal in the
Montgomery County Circuit Court so that he may appeal the dismissal of his Motion to
Reopen and denial of all requested relief.

II. STATEMENT OF THE CASE

    a.   **The Crime and It's Investigation**

10. This case presents substantial questions and issues of innocence, coerced
custodial statements, and suppression of exculpatory material. A detailed understanding
of the factual record is necessary for an informed review of these and other issues
asserted herein.

11. On March 21, 1992, the body of Montgomery resident Thelma Roberts was
found in her Manley Drive home by her two teenage children. She had been stabbed

several times and sexually assaulted. Soot covering the walls and floors of Roberts's home suggested that her assailant(s) had attempted to burn the house prior to his/her/their departure.

12. Initial police interviews with the children, William and Lola Roberts, extended family and neighbors revealed that the victim's husband, Melvin, had been with the victim after the children departed the night of March 20. Neighbors reported that his car was in the driveway until at least 11:00 p.m., and that his car was again seen at the house as early as 5:00 am the following morning.[1] These circumstances, along with the absence of any evidence of a break-in, led police to focus their investigation upon Melvin Roberts.

13. This investigation promptly identified factors and circumstances that suggested that Melvin Roberts likely was involved in the crime. Neighbors and family members told police that the victim was trying to end their marriage because Mr. Roberts would not pay bills and they were no longer getting along. Mrs. Roberts had only recently moved to Manley Drive to begin this process but Mr. Roberts continued to visit persistently.[2] A family member told investigators that the marriage had failed because "he was involved in extra-curricular marital activity and had beaten and abused" Mrs. Roberts.[3] Moreover, police learned that Mr. Roberts was living in a house owned by his wife's relatives, and

---

[1] Appendix B at 15-16. This appendix contains police reports made during the course of the crime investigation.

[2] Appendix B at 17.

[3] Appendix B at 21.

5

was supposed to have vacated it early in March but had not yet done so. He and Mrs. Roberts had argued about this for weeks; he had advised her he had no place to live but she refused to take him in.[4]

14. Other evidence suggested that while he had visited Mrs. Roberts on the evening of the 20th, and again appeared early the next morning, he did not return home during the meantime. One of Mr. Roberts's neighbors told police that his (Roberts) car was loud and always would awaken her when he came and went. She was sure that she did not hear him come home on the 20th or leave early on the morning of the 21st.[5]

15. A long-time friend of Mr. Roberts, Matthew Norman, who lived near the victim on Manley Drive, told police that Mr. Roberts had visited at his house on the evening of the 20th, and had unexpectedly returned at roughly 6:30 a.m. the next morning.[6] At this early hour, Roberts said that he was very worried about his wife and children as he had called the house twice and gotten no answer. Norman told police that he had not previously seen Mr. Roberts this upset. *Id.* Roberts was on the verge of tears and told Norman he was going to call the police. One officer noted, "Matthew Norman stated that something was very wrong with this subject at this time, due to the fact that he was upset." *Id.* While Mr. Roberts told Mr. Norman he was going to the police station and

---

[4] Id.

[5] Id.

[6] Appendix B at 18-19.

6

then to work, police learned he did neither.

16. Police suspicion of Mr. Roberts grew significantly when they spoke with him on the afternoon of March 21st. He appeared at his wife's home a few hours after her death had been reported and agreed to go with the police for an interview. While still at the scene, he cried and denied having anything to do with his wife's death. This behavior struck some officers as odd. As one noted, Mr. Roberts was "crying profusely, and made statements that he did not know what happened to his wife, and could not believe that the police were trying to put the blame on him for her death. He further stated that he was not in town at the time of the offense, and that he did not have anything to do with her death. . . ."[7] The officer concluded "it was believed by this detective that the subject was intentionally attempting to cry in front of this detective." *Id.*

17. Once at the station house, Mr. Roberts gave a statement that conflicted sharply with the confirmed facts provided by other witnesses. This further strengthened police resolve that Roberts killed his wife. As summarized in a later report:

> "There are a lot of discrepancies in Melvin's statement based on the people he implicated as his alibies. The main reason we are looking at the victim's husband, Melvin Roberts, as the prime suspect, is due to the fact that he had access to the house, and if he did not leave the house until the morning he could have killed Ms. Roberts, could have possibly staged the scene, and when he later returned to the residence acted like it was the first time hearing about the offense. During his interview he was very nervous, and it seemed as though he could not remember the things he told me, but when other detectives questioned him he changed his statement. Based on the witnesses' statements, Matthew Norman, Deidre Scott, Jacqueline Adams,

---

[7] Appendix B at 23.

and Ms. Spencer, it appears that Melvin Roberts is the only subject capable of committing the offense at the time."[8]

18.  As the investigation continued, the police began to suspect that the victim's son, William, might have been involved as well. During their third or fourth interview with him, police learned for the first time that Mrs. Roberts had just received a substantial tax refund check. She had given $250 each to William and Lola, kept some for herself and placed the remainder in the bank. William had showed some of his friends this money and told them about the refund check.[9] They also learned that William was a member of a gang, the Disciples, that he wanted to get out of it but to do so, he had to kill a parent. This information led police to conclude "we did get enough information from him to still hold him as a suspect, but not the prime suspect."[10]

19.  With the new information of the tax refund, police returned to Mrs. Roberts's home and again searched her bedroom. In an unlocked  foot locker in her bedroom, they found not only money but a check that Melvin Roberts had  left for her. This discovery further lessened the likelihood that the crime's motive was robbery.

20.  Not long thereafter, police became aware of forensic evidence that altered the focus of the investigation. "We learned upon examination of the body a white or Caucasian pubic hair was found on the sheet that she was wrapped in. This Caucasian hair

---

[8]  Appendix B at 33-34.

[9]  Appendix B at 41.

[10]  Id.

was found in the proximity of the area where her genitalia would have been located on the sheet. <u>With this new evidence, we are confounded.</u> Extensive talks were held with the Department of Forensic Sciences regarding this information." (emphasis added)[11] While this evidence lessened interest in Melvin and William Roberts, it did not altogether end it. The focus of the investigation shifted toward developing new suspects.

21. Soon, informants and others began to provide leads to the police. One informant told police that a high school student, Van Shun Traywick, had boasted about knowing about the killing. When questioned, Traywick denied any knowledge but asserted that another student, 15-year-old Tony Holmes knew about the killing.[12] An elderly citizen, Mary Johnson, called police and reported that she had been told that William Roberts, and three or four other youths who hung out at a deserted gas station on Lower Wetumpka Road, had committed the crime. She knew the first names of only two of these young men. Their first names were Marvin, aged 20 or 21; Emmett, aged 19, and a third unknown male. Police soon learned the source of Ms. Johnson's information was a woman named Mary Humphrey. When police interviewed Ms. Humphrey, she denied knowing any information.[13]

22. A neighbor of Mrs. Roberts – Juanita Jones –  also reported that she had

---

[11]    Appendix B at 42.

[12]    Id. at 43.

[13]    Id. at 45.

9

received a disturbing note under her door after she had appeared on a TV news story about the crime. This letter threatened her death and said she had been seen on TV about the murder. She reported to police that she had seen a white male in a red and white pickup truck hanging around the house for several days. He had binoculars and a camera. He had blond hair and wore sunglasses.  He would lie down in the seat when he saw her looking in his direction.[14] Police collected this threatening note.

23. Other neighbors reported still other possible suspects. On April 2, police spoke with Bonnie Davis, Robert Davis, their son Aswanta Davis and their nephew David Blair. They reported their suspicion that a white postal worker had a romantic interest in Mrs. Roberts. Also, they did not believe that Mrs. Roberts had told her husband about her tax refund check. They also reported that Mrs. Roberts would meet a black male at a club, King's Lounge, in the Bottom (section of Montgomery).

24. Moreover, at this same time, police continued to investigate Melvin Roberts. Mrs. Roberts's brother told police that Mrs. Roberts's daughter, Lola, had given her father a key to Mrs. Roberts's house. Although Melvin Roberts had told police "a long story about how he lost the key," an inspection of Mr. Roberts's key ring revealed a key that matched the house key.[15]

---

[14] The police collected this note. There is no indication from the police investigation file that any effort was made to identify the white male in the truck. Moreover, no link was ever established between this note, the pickup truck and Christopher Barbour. Mr. Barbour did not own or operate a truck and has dark hair.

[15] Appendix B at 46.

25. The medical examiner reported additional forensic analysis to police. His examination did not reveal any trauma to Mrs. Roberts's genitalia; indeed he was unable to say whether the sexual conduct took place prior to or after death.[16]

26. In the first month after the crime, the best and only real suspect police had was Melvin Roberts. Other evidence suggested that neighborhood gang members could have been involved, once William Roberts revealed that his mother had just cashed her refund check. The recovery of the Caucasian pubic hair suggested that one of Mrs. Roberts's attackers was a white male.

27. On April 21, a white gang member, Wayne Freeman, gave police the names of several gang members, including a Christopher Franklin, "a known burglar . . . [who] broke into the residence of [a police officer]."[17] In a subsequent interview, Franklin told police that Christopher Hester (a co-defendant in this case) had told him that a George Lake had said he was present during Mrs. Roberts's murder. Franklin also told police that a Jeremy Jones also had knowledge of the crime.

28. This led police to round up alleged gang members and bring them to the station house for interviews. One such meeting involved four individuals, Nichole Phrakonkhan, Kevin Turrentine, Eric Gray and Shannon Jordon. Each claimed to have no information about the crime but "stated that probably Christopher Barber (sic) knew something about

---

[16] Id. at 47.

[17] Id. at 59.

11

it." [18] This was the first time that police heard Barbour's name in connection with the Roberts homicide.

29. Later that day, police picked up two men who would later be charged along with Barbour with Mrs. Roberts's murder – Christopher Hester and Michael Mitchell. Hester had been wanted on charges of passing bad checks and statutory rape, and Mitchell on a burglary. Hester readily admitted to both the rape and fraud offenses but denied any involvement in the Roberts murder. [19]

30.  Also on April 21, the police also picked up Ranzy Young, a teen age female whom they believed might have some information about the crime. Despite considerable effort, the police obtained no productive information from Young. Det. Carmichael characterized the Roberts investigation's status at this moment as one of considerable frustration: "after great screaming, crying, and gnashing of teeth we still were no further along in this investigation that we were to start with." *Id*. (Emphasis added).

31.  On the following day, Fire Department Investigator Davis and Det. Carmichael searched for Christopher Barbour, as, in the words of the report, "the roundup continues."[20] Davis had interest in Barbour because of a fire investigation he was pursuing involving small fires set at area Winn-Dixie supermarket, and Carmichael had heard only

---

[18] Id. at 61.

[19]  Id. at 62.

[20]  Id.  at 70.

generally that he might have some information about the Roberts homicide. They located Barbour at the food court at the Eastdale Mall. At this time, Barbour was 22 years old and had no criminal record. He was homeless and living in the woods behind the mall. His mother had committed suicide six months prior and he had become quite depressed and dependent on alcohol.  He was brought back to police headquarters and questioned "intently with regard to his association with . . . Ramsay Young." *Id.* Barbour cooperated fully and told police that he and Young knew each other and had recently passed some bad checks. Davis and Carmichael asked about numerous gang members; Barbour said he knew only one and that was Christopher Hester. After questioning, Barbour was released. While Carmichael concluded "we did not get anything concrete from [Barbour]," he would likely be easy to get information from in the future. He described Barbour as "a whimpie little thing, and scares real easy." (emphasis added)[21]

32.  Three days later, Carmichael got his first clue that Hester and Barbour might have been involved in the Roberts case. Nicky Langley, a sixteen year old informant, told Carmichael that Hester and Barbour attended her birthday party on March 19, 1992, one day prior to the crime. Hester and Barbour were present at the party for about an hour during the afternoon and then left. Langley did not again see them until the following evening, March 20 at roughly 11:30 to midnight at another party. They appeared with beer

----

[21]  Appendix B at 71, 70. Barbour subsequently told his grandfather that Carmichael had beaten him and scared him half to death. Both Barbour and his grandfather testified about this fear at the subsequent suppression hearing.

13

and liquor and possessed $500 in cash. They told Langley that they had cashed some checks from the account of Hester's aunt, Angela McDougald. Langley told police she saw the checkbook and the name printed on the checks was Angela McDougald. She also said she saw a large butcher knife in the trunk of Hester's car. After staying only a short time, Hester and Barbour left. Langley slept over at the house where the party was held. When she awoke the next morning, she saw Hester and Barbour asleep and "apparently drunk."[22] When they awoke, neither made any statement about what they had done after leaving the party.[23]

33. Langley told police she did not see either Hester or Barbour for two weeks, and first saw them again at yet another party. After many had left the party that night, in the presence of Ranzy Young, Kevin Turrentine and Langley, she told police that Hester and Barbour "started bragging about killing a lady and cutting off her head and putting it in a box. Hester (not Barbour) advised that they had broken into a house, cut a lady's head off, put it in a box, taken several of her things, including a checkbook, broke several pictures,

---

[22]  This account presents no incriminating information of value concerning the Roberts homicide. It provides the well-known fact that Hester and Barbour were engaging in passing bad checks, but the money they possessed that night apparently came from the McDougald account. Most importantly, Langley never describes seeing any blood on either Hester or Barbour, nor seeing any item from the Roberts home in their possession. Moreover, the knife used to kill Thelma Roberts was found in her chest. *See* Trial Tr. at 189. Thus, even if Langley saw a knife in Mr. Barbour's car, it could not have been the murder weapon.

[23]  Appendix B at 76.

14

and left.[24] Langley attributed these statements to Hester, not Barbour.[25]

34. The police next interviewed Jeffrey Defee, the host of the March 20 party, after he was arrested on a theft charge. Defee offered information seeking a deal on his charges. He told Investigator Jones that during March, Barbour came by his house late one night, was scared and asked for a place to stay. Defee said he could sleep in a shed behind a trailer, and went to see Barbour an hour later. At that time, Barbour told Defee that he and Hester "had killed a female after they raped her." Jones left, and when he returned, Defee said he had lied about Barbour, that Barbour had never come to his house and never said anything about a murder. He said he made that story up.[26] Carmichael later interviewed Defee and concluded Defee "is a little crook trying to get any help (on his charges) that he can get."[27]

35. At the same time, still other suspects were brought to police attention. Cedric Evans, a neighbor of the Roberts's, told police that he believed Keith Gunter, Andre Gunter and a third person he knew only as "Quincey" were involved in the crime.[28]

---

[24] This account is substantially inconsistent with the known facts about the crime. There was no evidence of break-in to house, Mrs. Roberts's body was not decapitated; there was no report of Mrs. Roberts's checkbook being stolen or missing.

[25] Appendix B at 77. In a later interview, Langley confirms that it was Hester, not Barbour, who made such boasts, and that when he did so he was drunk. Appendix A at 97.

[26] Id. at 79.

[27] Id. at 83.

[28] Id. at 81.

15

36. On April 28, Davis and Carmichael again located Barbour and spoke to him about the Roberts crime. Barbour gave them no new information. Davis persuaded Barbour to submit to a polygraph test concerning the *store* arson investigation on May 1.[29] Davis also instructed Barbour to call him every day at 8:00AM until the day of the polygraph or else he would "beat him within an inch of his life." Trial Tr. at 68.

b.   **Police Secure Incriminating Custodial Statements from Mr. Barbour on May 1, 1992**

37. Barbour was taken to a fire station to undergo the polygraph examination onf May 1. At some point prior to this examination, police changed the focus of the test from store fires to the fire on Manley Dr. (the Roberts crime). On May 1, 1992, the examination was conducted, and at its conclusion, the examiner, Fire Department Lieutenant McKee, told Barbour that his answers produced "some irregularities." McKee thereby led Barbour to believe that the results of the exam incriminated him in the murder, and that those results would be admissible against Barbour in court.[30] Later that afternoon, Barbour was questioned by Lt. Davis, the man who had threatened to "beat him within an inch of his life" if he did not cooperate with the investigation. Confronted with the supposedly incriminating results of the polygraph test and intimidated by McKee's representation that those results would prove him guilty in a court of law, Barbour began to answer Davis's

---

[29] Id. at 83.

[30] Both assertions were misleading. The polygraph exam results did not reveal a link between Mr. Barbour and the crime and surely were not admissible in court.

16

questions about Manley Drive. Bit by bit, as Davis reported details of the crime scene, he

instructed Barbour how to adopt those into his answers. This interrogation session ended

when Davis produced a tape-recorder and directed Mr. Barbour to give a voice-recorded

statement in which he confessed involvement in the crime, using information which

comported generally with what investigators discovered at 3575 Manley Drive on March

21, 1992.

38.  Davis next extended Barbour unusual treatment for a suspected murderer. He

made sure that Barbour was fed dinner at the fire station, that he was given a tour of the

building, and was allowed to sit on the fire truck prior to being transported, at Det.

Carmichael's request, to police headquarters. There, after speaking with Det. Carmichael

and other detectives about his statement to Lt. Davis, Mr. Barbour again reviewed his story

with them. If he left out any details, Carmichael or Davis would prompt him to include

them.  Finally, after "rehearsal," Davis and Carmichael placed Mr. Barbour in "the video

room" and a video-recorded statement was produced.

39. Again, in a question-and-answer format, Barbour explained the crime in the

following narrative: On the evening of March 20, he was riding around town with two

acquaintances: Christopher Hester and Michael Mitchell looking for a place to drink a

twelve-pack of Milwaukee's Best beer they had purchased. At some point, they traveled to

Manley Drive to visit Cedric Evans.  Evans's mother answered the door and said that her

son was not at home. Hester then told Barbour and Mitchell to wait in the car. Shortly

17

thereafter, Hester returned to the car and announced that they could take their beer and

drink in Mrs. Roberts's home. Barbour said he brought a twelve pack of Milwaukee's Best

beer into the house, sat down in the living room with Mitchell, Hester and Roberts and

each drank some beer. Thereafter, first Mrs. Roberts, and then Hester, retreated to the rear

of the house. A short time later, Barbour and Mitchell heard Hester and Mrs. Roberts

arguing; when they found the two in Mrs. Roberts's bedroom, she was nude and Hester

was wearing only in his pants. Shortly thereafter, the three men overwhelmed Mrs. Roberts

and beat her. As Mitchell and Barbour held her down, Hester sexually assaulted Mrs.

Roberts. Thereafter, Barbour said that he ran to the kitchen, grabbed a large knife, returned

to the bedroom, and stabbed Mrs. Roberts several times in the chest area. He then

assembled some papers and clothing and lit fires in the bedroom. He and the others left

the house, and he was dropped off and spent the night in his car behind the mall where he

was living.

40. Shortly after he gave this statement, Mr. Barbour was arrested and charged with

capital murder.

c.     **Police Cannot Corroborate Mr. Barbour's Confession**

41. After securing the in-custody statements, police were unable to collect any

corroborating evidence. The only other evidence that the State possessed that suggested

Mr. Barbour's involvement was preliminary and inexact DNA testing of seminal fluid

recovered from Mrs. Roberts. As discussed more fully in paragraphs 56 through 59, *infra*,

18

the results of this testing contradicted a key aspect of Mr. Barbour's confession: it definitively excluded Mr. Hester as the individual who sexually assaulted Mrs. Roberts.

42. No physical evidence linking Mr. Barbour, or any of his alleged accomplices, was found in the Roberts home: no fingerprints, no blood, no fibers, and no beer cans. Similarly, no items linking Mrs. Roberts were found on Barbour, Hester, or Mitchell. Despite the fact that Mr. Barbour was living in his car at the time of the murder, no clothing, blood, hair, or items taken from the Roberts home were recovered from his person or his vehicle.

43. Moreover, no eyewitnesses placed Mr. Barbour or Hester or Mitchell in the Manley Drive area on the night of the crime. In a predominantly African-American, tightly-knit neighborhood, with small streets and closely-spaced homes, this fact is quite significant; three unfamiliar white boys spending an hour in the vicinity on the night a 40-year-old mother of two was murdered surely would have caught someone's attention.[31] In fact, Cedric Evans's mother, Ruth Evans, though questioned by police immediately after discovery of Thelma Roberts's body, did not report Hester or anyone else visiting her home on March 20, 1992. Appendix B at 15.

---

[31] On the day Mrs. Roberts's body was discovered, police canvassed the neighborhood and specifically inquired about unfamiliar cars or person in the area on the prior evening. None of the neighbors police spoke to reported any such person or vehicle. Appendix B at 15-17.

d.    **Relevant Pretrial Proceedings**

1. Challenge to Inadequate Defense Resources

44. The circuit court appointed two Montgomery attorneys - civil practitioners Frank Riggs and Clifford Heard – to represent Mr. Barbour. Once counsel realized Alabama's $1,000 cap on compensation for court-appointed counsel was wholly unreasonable, counsel attacked this system and alleged it was wholly unreasonable and would prevent an effective defense. In June 1992, counsel filed a Motion to Require the State to Pay Reasonable Attorney's Fees. Trial Record at 16. On August 10, 1992, trial counsel again filed a motion to require the State to pay reasonable fees. Trial R. 38-39. In an affidavit filed in support therein, counsel Riggs stated that "[t]he fee of $20.00 per hour for out-of-court time and $40.00 per hour for in court time is not sufficient to pay my share of the overhead expense of my law office." Affidavit of Frank Riggs at 1. He continued:

> I am the senior partner in my firm and have 36 years of experience as a trial lawyer. I am 62 years of age. My partner and I have agreed that I am responsible for producing at least $600.00 per working day for us to have comfortable incomes. When I am force to expend large amounts of time on an appointed criminal case which pays me only $20.00 per hour, I feel that I am less able to provide quality legal service that I should be. I have a real personal conflict over being force to spend my time on such cases for such an unreasonable amount of compensation, especially when the State of Alabama pays millions of dollars each year for private attorneys in civil cases. This conflict affects my ability to deliver quality service and affects my client's rights to adequate counsel and a fair trial. Id., at 2.

45. The trial court denied the motion on December 23, 1992. Trial R. at 61. On March 5, 1993, trial counsel filed a Motion for Writ of Mandamus for Approval of Fees to

20

the Court of Criminal Appeals.  Trial R. at 68-76.  On March 9, the Court of Criminal

Appeals denied trial counsel's motion for the Writ of Mandamus.  Trial R. at 77.  On May

4, 1993, the Alabama Supreme Court affirmed that decision.  Trial R. at 81.

46.  Although theses motions were ultimately rejected by the courts, neither the

State nor the courts challenged counsel's assertions or defended Alabama's system as

adequate.  In fact, the circuit court's order denying the motion for reasonable attorney's

fees reads "[a]lthough the Court is in complete agreement with counsel that the hourly fees

which are statutorily approved to reimburse appointed counsel are too low, this Court is

without any authority to order the comptroller of this state to pay an hourly fee in excess of

that provided by law."  Trial R. at 61.

### 2.  Motions to Suppress Mr. Barbour's Custodial Statements

47.  On July 10, 1992, Mr. Barbour was indicted on four counts of capital murder:

(1) murder during rape; (2) murder during arson; (3) murder during burglary; and (4)

murder during robbery. The state offered Mr. Barbour no plea bargain.  Mr. Barbour's

counsel focused a significant amount of their pre-trial efforts on suppressing his May 1st

statements.

48.  On August 21, 1992, a suppression hearing was held in Montgomery County

Circuit Court before trial judge William Gordon.  Another was held on December 29,

1992.  At both hearings, Mr. Barbour moved the court to suppress his in-custody

statements on the basis that the police physically abused and psychologically intimidated

21

Mr. Barbour until he falsely incriminated himself in the Roberts murder. At the August

hearing, Mr. Riggs, a former prosecutor, described Mr. Barbour's interrogation and

subsequent confession as "nickel and dime" questioning tactics whereby police "[got Mr.

Barbour] to agree to a little something and he agreed to that. And then you get him to

agree to a little something more, and pretty soon he has committed himself to the point

where he just can't say no anymore." Trial Tr. at 4.

49. Counsel also argued the coercive effect of the polygraph: "[Nobody] explained

to [Mr. Barbour] what the polygraph was and what its effect was, and nobody gave him a

fair opportunity to make an intelligent informed decision to whether he would agree to

take the polygraph test . . . extracting a confession out of [Mr. Barbour] by means of a

polygraph examination is just as coercive as [beating him with] a rubber hose except that it

is psychological and not physical. Because you reel a person in to a point where they have

already made a sufficient commitment that it is impossible for them not to make a little bit

more of a commitment." Trial Tr. at 4. Mr. Riggs also noted the centrality of the

confession to the prosecution's case, ". . . in this case to the best of my knowledge this

boy's life hangs on whether we are correct on this point or not. He has made alleged

confessions which are very incriminating. And we don't think the State has any other

evidence that would be sufficient to prove his guilt." Trial Tr. at 5.

50. At the December hearing, Mr. Barbour's grandfather, John Brown, testified

that Mr. Barbour told him before his arrest that Detective Carmichael and Inspector Davis

had physically abused Mr. Barbour during the custodial interrogations. Trial Tr. at 98-99.
Mr. Brown also testified that he knew of others who had complained that Detective
Carmichael had abused them as well.

51.  At the same hearing, Mr. Barbour testified about the circumstances of the
repeated interrogations by Carmichael and Davis during the last week of April, 1992. He
testified that during his interrogations, usually one of the officers would leave the other
alone with Mr. Barbour. He reported that they would be "verbally abusive" at times, and
that sometimes that abuse would escalate to physical. Trial Tr. at 67. Mr. Barbour also
described in detail Det. Carmichael's slapping his face repeatedly with the front and back
of his hand when Barbour was unable to answer his questions. Trial Tr. at 67. Mr.
Barbour further reported that Lt. Davis had "threatened to beat [him] within an inch of
[his] life" if he did not cooperate with them. Trial Tr. at 68. Such threats caused Mr.
Barbour to be "very" afraid of Davis. Trial Tr. at 68.

52.  Besides the physical abuse and threats, Mr. Barbour also testified to the
deception leading up to the administration of the polygraph test and its coercive effect on
him. Trial Tr. at 69-71. He reported that no one apprized him of the change in the subject
of the polygraph until he had arrived at the fire department. Trial Tr. at 70. Before and
during the administration of the test, he was frightened that Davis and others would
physically harm him if he did not cooperate or if he asked for a lawyer. Trial Tr. at 70, 77.

53. At the conclusion of testimony, Mr. Barbour moved the court to grant discovery
of law enforcement records which would tend to show that these officers had engaged in a

23

pattern of abusing suspects. On January 13, 1993, the court denied Mr. Barbour's motions and ruled his May 1st statements admissible at trial. Trial R. at 65.

e.     **Trial Proceedings**

54. This case was tried in June, 1993. The State's case against Mr. Barbour consisted entirely of his May 1st statements to police.

55.  During the guilt-phase no lay witnesses testified for the State.  No physical evidence linked Mr. Barbour, Mr. Hester, or Mr. Mitchell to the crime scene.  The State's only evidence linking Mr. Barbour to the murder consisted of his in-custody incriminating statements and the testimony of Det. Carmichael and Lt. Davis describing Mr. Barbour's confession.  Although counsel was plainly aware of law enforcement's coercion of Mr. Barbour as evinced by their arguments at the suppression hearings, counsel made no attempt to impeach the trial testimony of Carmichael or Davis or the credibility of Mr. Barbour's in-custody statements by raising the abuse issue in cross-examination.

1.     Emerging Evidence of Impeachment: Physical Evidence/DNA

56.  To the prosecution's frustration, evidence contradicting Barbour's confession appeared at trial. During the course of their investigation, police collected blood from Mr. Barbour, Mr. Hester, and the victim's estranged husband, Melvin Roberts.  TR at 349. They also collected semen from vaginal and anal swabs taken from the victim.  The State conducted DNA tests, HLA DQ alpha analysis, comparing the semen retrieved from the victim's vaginal swab to the blood of Melvin Roberts, Mr. Hester and Mr. Barbour.  TR at 350.

57. During Mr. Barbour's trial, defense counsel objected to the admission of the DNA evidence on the grounds that the test conducted was not specific enough to be probative. TR at 356. In an *in camera* conference in Judge Gordon's chambers, the State's DNA expert, serologist Larry Huys, explained that his tests excluded Mr. Hester as the donor of the semen taken from Thelma Roberts.[32] According to Mr. Huys, the semen collected from the vaginal swab contained four possible genetic characteristics: 1.1, 3, 4, and possibly 1.2. TR at 360. Mr. Hester's blood contained both the 4 characteristic and a 2 characteristic not found in the semen collected from the vaginal swab. TR at 261. Mr. Huys testified that the absence of the 2 trait from the sample taken from the victim certainly excluded Mr. Hester as the donor of the semen. TR at 361. This news apparently caught the prosecution by surprise.

58. Mr. Huys also stated that Mr. Barbour's blood contained both the 4 and 1.1 traits found in the vaginal swab; his blood did not contain any characteristics absent from the swab. TR at 362. Mr. Huys told the court, and the prosecution acknowledged, that one in three Caucasian men might have been the donor of semen with the characteristics found in the vaginal swab.[33] TR at 364-65, 357. While the prosecutors told the judge that the DNA evidence would show that the semen found on Ms. Roberts could have been

---

[32] The police cooled their pursuit of Melvin Roberts, once a prime suspect in his wife's murder, upon discovery of the blond pubic hair, which could not have been Mr. Roberts's, at the crime scene.

[33] The specimen also might have included an undisclosed number of African-American men, but Huys did not so notify the court.

25

*either* Mr. Barbour's or Christopher Hester's, Huys contradicted this and confirmed that

the evidence definitively excluded Mr. Hester as a source of the semen. Trial Tr. at 356,

361-62. The prosecution's theory of the case relied on Mr. Barbour's custodial statements

in which he said that Mr. Hester was the only person who had sexual contact with the

victim. When the DNA evidence seemed to contradict this account, the prosecution

decided *not* to present the results of the HLA DQ alpha test to the jury, despite the judge's

ruling the evidence admissible. Trial Tr. at 367-68.

59. Mr. Huys did conclude his testimony in front of the jury, without ever stating

whether the serological evidence linked Mr. Barbour to the victim. Despite the absence of

scientific evidence linking Mr. Barbour, or Mr. Hester, to the victim, the only conclusion

the jury could draw from Mr. Huys's appearance and testimony was that powerful

scientific evidence incriminated Mr. Barbour. Mr. Barbour's trial counsel did not exploit

this major flaw in the prosecution's evidence and use to undermine the credibility of Mr.

Barbour's in-custody statements. In fact, trial counsel never cross-examined Mr. Huys at

all after the *in camera* conference. The jury therefore never learned that the DNA

evidence flatly contradicted a key assertion in the prosecution's theory of the case.

60. In addition to the fluid evidence collected from the crime scene, police also

found a single Caucasian blond pubic hair on or near the victim's body. Trial Tr. at 304.

The prosecution's forensic hair analyst, Mary Holt, testified that such hair was dissimilar

26

to that of Mr. Barbour.  Trial Tr. at 304.[34]

61.  Additional inconsistencies between the physical evidence and Mr. Barbour's May 1st statements abound. For example, although the victim was discovered with a plastic bag over her head (Trial Tr. at 189), Mr. Barbour's statements never include any attempted suffocation and do not mention this significant detail.

### f.    Conviction and Sentence

62.  On June 24, 1993, the jury convicted Mr. Barbour of three counts of capital murder.  After a sentencing hearing, the jury recommended, by a 10-2 vote, that Mr. Barbour be sentenced to death. On August 10, 1993, Mr. Barbour's sentencing hearing was held in the trial court.  On January 31, 1994, the court sentenced Mr. Barbour to death. The court found two aggravating circumstances, several mitigating circumstances, and concluded the aggravating circumstances outweighed the mitigation.

### g.    Resolution of Christopher Hester's Case

63.  Three months after Barbour's sentencing, the State agreed to a generous plea agreement with Christopher Hester that is inconsistent with a belief that he was a central actor in a capital murder case. While awaiting trial, he had already pleaded guilty to two other crimes – passing bad checks and statutory rape – and received a sentence of ten years to life.  On April 14, 1994, he entered a plea of guilty to felony murder, and received a sentence of ten years to life.

---

[34] Mr. Barbour has dark brown hair.  Christopher Hester is blond, but the prosecution made no attempt to link the hair to him.

64. At the plea hearing, Mr. Hester provided an account of the crime that bore no resemblance to the evidence the State presented at Barbour's trial. In Hester's version, Michael Mitchell was not present at all; a young female, Angela Stykes, was present.[35] Hester did not gain voluntary entrance to the house, as Barbour's confession had stated, but instead he, Barbour and Stykes broke into the house. He denied seeing or touching Mrs. Roberts.[36] He stated that only Mr. Barbour went to the area of the house near Mrs. Roberts's bedroom, and he learned that she might have been harmed only days after when Barbour said he had run into a problem.[37]

65. Thus, before two different fact-finders, two fundamentally different versions of the crime were put forward. Mr. Barbour's jury was urged to find that Mike Mitchell aided and abetted the rape and murder while Hester's account identified Angela Stykes as the third participant. Mr. Barbour's jury was told it should conclude that Christopher Hester raped Mrs. Roberts; Hester's judge was asked to conclude that only Mr. Barbour sexually assaulted the victim. Barbour's jury was asked to find, given the lack of any evidence of a break-in, that Mrs. Roberts had invited Mitchell, Hester and Barbour into her home; Hester

---

[35] State of Alabama v. Christopher Hester, In the Fifteenth Judicial Circuit, Montgomery County, Montgomery, Alabama, No. cc-92-1680, Transcript of April 14, 1994 hearing at 4.

[36] *Id.*, at 5.

[37] *Id.* This account is highly unlikely. Mrs. Roberts's house was quite small. It would have been next to impossible for one person to beat up, sexually assault, run to the kitchen and retrieve a butcher knife, repeatedly stab Mrs. Roberts to death *and* set the house on fire and not be noticed by others in the house at the same time.

said the method of entry was by force and not invitation.[38]

H. **Direct Appeal**

66. Mr. Barbour timely appealed his convictions and sentence to the Court of

Criminal Appeals with the aid of counselors Riggs and Heard. On December 29, 1994,

that Court affirmed his convictions and sentence. *Barbour v. State*, 673 So.2d 461. Of

relevance to this petition, that Court concluded that (1) the trial court did not err in

refusing to require the state to disclose information regarding lead police investigator

Carmichael's treatment of other suspects during arrest and interrogation, *id.*, at 465; and

(2) the admission of the videotaped confession was lawful despite Barbour's complaints

that Carmichael had  assaulted him and otherwise manipulated the statement, *id.*, at 465-

67. The Court further determined that the sentencing court did not abuse its discretion in

refusing to consider a letter from the victim's family asking that a death sentence not be

imposed because it would inflict further injury to the family, *id.*, at 468-69; and that the

$1000 limit on attorney's fees for trial counsel did not unconstitutionally inhibit Mr.

Barbour's defense, *id.*, at 464. The Alabama Supreme Court affirmed on all issues on the

basis of the Court of Criminal Appeals' rationale, and wrote separately only on the

proportionality issue. *Ex parte Barbour*, 673 So.2d 473.

67. After the decision of the Alabama Supreme Court, appointed counsel Riggs and

---

[38] Incidentally, this forced entry theory contradicts William Roberts's testimony that he
used his key to open the locked front door when he returned home on March 21, 1992.  Trial Tr.
at 183. Moreover, police found no evidence of forced entry.

Heard left Mr. Barbour's case. Because he was indigent, Mr. Barbour was unable on his own to retain or otherwise secure new counsel. He sought and received aid in securing new legal representation from the Equal Justice Initiative, a privately-funded, Alabama-based, non-profit public interest law firm (herein EJI). After a time-consuming search, an attorney from Boston, Massachusetts, volunteered to prepare and file a petition for writ of *certiorari* in the United States Supreme Court. Such a petition was filed; it was denied on June 24, 1996. *Barbour v. Alabama*, 518 U.S. 1020 (1996).

### c.    Post Conviction Proceedings

68.  With the denial of *certiorari*, Mr. Barbour's conviction became final, and the one-year federal statute of limitations applicable to post-conviction petitions began to run on June 24, 1996. Alabama's two-year statute on Rule 32 applications had already begun to run on November 7, 1995, the date the Alabama Supreme Court entered certificate of judgment denying Mr. Barbour's petition for rehearing.

69.  With the denial of certiorari, however,  Mr. Barbour found himself entirely without the means to pursue Rule 32 remedies. His *pro bono* Boston attorney could not continue to represent him after the Supreme Court denied review. Because Mr. Barbour is wholly untrained in the law, had no access to his trial transcript, had limited access to Holman Prison's incomplete death row law library, could not phone attorneys and request that they take his case, and had no funds to hire either an attorney or investigator, he was unable to represent himself.

70. Alabama employs no public defender or appointment mechanism to provide

counsel services to indigent, condemned inmates for the purpose of pursuing Rule 32

remedies. Nor does the Alabama State Bar or any state-funded office provide such

services. For the past several years, the privately-funded EJI has shouldered the burden of

locating attorneys willing to represent such inmates. At the time Mr. Barbour required

such representation, EJI was facing an intractable problem: a large and *growing* number of

indigent inmates required counsel services but only a small and *shrinking* pool of

volunteer counsel were available to provide such services.  After six months had run on

the federal statute of limitation and nearly a year on the state statute, EJI had located no

attorney in Alabama, or anywhere else in the country, able to represent Mr. Barbour in

Rule 32 proceedings.  Finally, EJI found a law professor in the University of Michigan

School of Law,  Sam Gross, who was willing to review Mr. Barbour's record and identify

issues to be raised in a Rule 32 proceedings. EJI obtained copies of Mr. Barbour's trial

transcript and immediately forwarded that record to Prof. Gross. Without traveling to

Alabama or meeting Mr. Barbour, Prof. Gross produced a draft Rule 32 petition and sent it

to Mr. Barbour in early March, 1997.  Having  no other alternative, and lacking resources

to perform any investigation into the claims alleged in the petition, Mr. Barbour submitted

this petition, without change, to the Montgomery County Circuit Court on March 4, 1997

as a *pro se* application for relief.  He also requested that the court appoint counsel.

71. The trial judge, William Gordon, reviewed the petition and concluded that it

contained non-frivolous matters and that Barbour could not prosecute the case without

professional assistance. He chose to exercise his discretion under Rule 32 and appointed

counsel.[39] After Barbour's first appointed counsel was forced to withdraw because of a

conflict of interest, Judge Gordon appointed Joseph Espy, a Montgomery attorney, to

represent Mr. Barbour.

72. Mr. Espy filed an amended Rule 32 petition, secured funding for a mental

health evaluation, and consulted briefly with Mr. Barbour. However, Mr. Espy's

amendments to the original petition were largely cosmetic and not substantive. An

evidentiary hearing was conducted on March 18, 1998, and focused entirely upon the

ineffective assistance of trial counsel claim. The hearing transcript reveals the Mr. Espy

exerted little effort on behalf of Mr. Barbour and asserted no viable theories for relief. Mr.

Espy called only two witnesses, trial counsel Riggs and Heard, and questioned each only

briefly and almost exclusively about their prior professional experience. Espy barely

questioned trial counsel on the ineffectiveness claim, even after counsel had challenged

the statutory fee limits as prohibiting effective representation. He offered no additional

evidence in support of the petition. Thereafter, he submitted neither a post-hearing brief

nor a proposed order. After the hearing, the State filed a proposed order; and on April 21,

1998, Judge Gordon denied all requested relief in an order that in all relevant respects was

identical to the State's proposed order.

73. Shortly after the evidentiary hearing but prior to the entry of judgment, Mr.

Espy met briefly with Mr. Barbour and explained that he would not represent Mr. Barbour

---

[39] Rule 32 provides no right to counsel for indigent prisoners seeking aid in pre-filing
matters. But once a petition for relief is filed, the court possesses the discretion to appoint
counsel if the court determines that claims in the petition are not frivolous.

further. He did not advise Mr. Barbour of his rights to amend the petition, nor of the steps

he would need to take if he wished to appeal in the event that Judge Gordon denied relief.

Mr. Espy also failed to provide Mr. Barbour with copies of his file and his case record.

74. Judge Gordon denied relief on April 21, 1998, and Espy did not file a notice of

appeal. Neither did Mr. Barbour. Moreover, Mr. Barbour found himself without the

services of counsel in a case in which the Rule 32 court had determined required counsel.

No further papers were filed in any court concerning Mr. Barbour's case until September

8, 2000 when the State filed a motion to set an execution date. On October 5, 2000, as

*amicus curiae*, the EJI urged the Court to not grant the State's motions in Barbour's and a

second case because neither had exhausted his post-conviction remedies solely because

volunteer counsel could not be found to assist either. EJI cited a crisis in which the

demand for available capital post-conviction counsel in Alabama far exceeded the supply

of such attorneys.

75. The State next moved to strike EJI's memorandum and renewed its motion to

set an execution date in December 2000. Thereafter, EJI finally contacted undersigned

counsel and informed counsel that Mr. Barbour did not have counsel and that the State was

seeking an execution date. These circumstances persuaded undersigned counsel to agree to

represent Mr. Barbour in January 2001.

76. On April 4, 2001, Mr. Barbour, by and through undersigned counsel, filed in

the Montgomery County Circuit Court a motion to reopen his state post-conviction

proceedings, and argued that those proceedings were incomplete because, through no fault

33

of his own, he never had an opportunity to amend his petition or appeal the denial of his

original petition.  In his motion to reopen Mr. Barbour: (1) requested DNA testing because

the results would likely exonerate him; (2) requested disclosure of *Brady* materials related

to the investigating officers in his case; (3) he also challenged the legality of Alabama's

capital sentencing structure under a new rule of criminal procedure established by the

United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000);  and (4)

advanced the claims that Alabama's use of the electric chair violates the Eighth

Amendment as does its failure to recognize a right to post-conviction counsel for

condemned inmates.  In his motion to reopen, Mr. Barbour requested a hearing on these

issues and moved for alternative relief in the form of reissuing the April 21, 1998

judgment so that an out-of-time appeal could be taken.

77.  On April 20, 2001, the Alabama Supreme Court set a May 25, 2001 execution

date for Mr. Barbour. Four days later, the State moved the Circuit Court to deny Mr.

Barbour's motion to reopen and on May 3, 2001, submitted a proposed order summarily

dismissing the motion.  On May 4, 2001, Mr. Barbour moved the court to defer entry of

judgment until he had filed a detailed reply to the State's motion.  The court granted his

motion. Mr. Barbour filed his detailed reply with the court on May 10, 2001.  May 15, the

State responded and moved the court to strike all Mr. Barbour's pleadings on the basis that

his counsel is not admitted to practice law in Alabama and had not moved the court for

permission to practice pro hac vice.  May 16, Mr. Barbour's counsel filed their pro hac

vice motions.  Unbeknownst to counsel, on May 14, the circuit court signed the State's

proposed order and dismissed Mr. Barbour's petition without acknowledging his newly

proffered evidence. On May 18, Mr. Barbour filed his motion for a stay of the execution

in the Alabama Supreme Court. On May 21 he timely filed a notice of appeal in the

Montgomery County circuit court to appeal the denial of his motion to reopen in the

Alabama Court of Criminal Appeals.

III. RESPECTS IN WHICH MR. BARBOUR'S' RIGHTS HAVE BEEN VIOLATED

78. Mr. Barbour has been convicted and sentenced to death in violation of the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in the

following respects:

## CLAIM A

**Mr. Barbour Is Not Guilty Of This Crime; The State's Refusal to Grant
Access to Mr. Barbour to Perform Sensitive DNA Testing On Biological
Evidence Collected From The Victim Violates the Eighth And
Fourteenth Amendments**

79. Mr. Barbour has moved for DNA testing so that he can establish that the

centerpiece of the State's case against him – that he or Christopher Hester - assaulted and

killed Mrs. Roberts is wrong and that another, unknown person is responsible for the

crime. The state court's refusal to grant such testing and holding that even an exoneration

would not lead to a different verdict is erroneous and unreasonable and violates Mr.

Barbour's rights under the Eighth and Fourteenth Amendments.

80. Although DNA tests were performed on fluid evidence collected from the

victim prior to Mr. Barbour's trial, those tests were unsophisticated compared to the

technology presently available. In fact, in recognition of the constant evolution of DNA science, the United States Department of Justice has issued recommendations for handling DNA test requests aimed at courts, attorneys, and forensic laboratories. *See Postconviction DNA Testing: Recommendations for Handling Requests* (Dep't of Justice September 1999) (herein cited as *Recommendations*).[40]

81. The HLA-DQ Alpha DNA tests performed at the time of Mr. Barbour's arrest and trial were limited in what they could conclusively determine. The tests could not definitively identify the source of the semen collected from the crime scene. Far more discriminating DNA tests are available today: (1) Restriction Fragment Length Polymorphism (RFLP) testing has a "high degree of discrimination such that falsely accused individuals will likely be excluded with testing [with very small samples]"[41]; (2) Polymerase Chain Reaction (PCR) testing of several short tandem repeats (STR) produces the most reliable identification of sources of biological evidence and is likely to replace RFLP testing in most labs across the country. *See Recommendations* at 28. Thus, although the HLA DQ Alpha test performed on Mr. Barbour and Mr. Hester in 1992 was able to definitively exclude particular people as the source of the semen, it could not pinpoint the characteristics of the actual donor, and thereby positively identify the source to the exclusion of all others. Today, DNA technology has evolved so that it is capable of

---

[40] This report is found in Appendix A to Mr. Barbour's Motion for Preservation of DNA evidence, filed with this petition.

[41] *See Recommendations* at 27.

36

determining the precise genetic characteristics of Thelma Roberts's assailant. *See*

*Recommendations* at 24-25 (recognizing the limitations of HLA DQ alpha testing and

recommending that more discriminatory DNA testing capable of pinpointing the source of

the evidence be permitted when it is available and stating that "changes in expertise and

technology available for forensic DNA testing may require the reexamination of

previously inconclusive test results and/or retesting of [previously collected] samples").

82.   A DNA test result which pinpoints the characteristics of Ms. Roberts's sexual

assailant and definitively excludes Mr. Barbour and Mr. Hester as that assailant, is exactly

the type of evidence which casts reasonable doubt in the minds of jurors.  A result which

excludes two of Mrs. Roberts's alleged assailants seriously undermines Mr. Barbour's

confession and creates a reasonable likelihood that the result of each phase of the trial

would have been different had the jury learned this fact.

83.   Such testing has demonstrated that other offenders *who also had confessed to*

*having committed the crime* had confessed falsely.  For example, Ronald Jones was

accused of the 1985 rape and murder of Debra Smith, a 28-year-old mother of three.[42]

Jones was 34 years old at the time; he was an alcoholic who lived in the neighborhood

where the crime took place.[43]  Jones gave a signed confession after 10 hours in police

---

[42]  Barry Scheck et al., Actual Innocence, 220 (2000).

[43]  MacArthur Justice Center web site,
<http://www.macarthurjusticecenter.com/jones.html>.

custody.[44] Jones said he signed the confession because he had been beaten by two Chicago

Police Detectives.[45] The police denied any wrong-doing. The confession was suspect

because Jones claimed that Smith was a prostitute when there was no evidence of that

fact.[46] Nonetheless, it was admitted at trial. Jones was convicted and sentenced to death.[47]

84. In 1994, the trial judge who sentenced Jones refused to approve new DNA

testing that was not available at the time of the trial.[48] On appeal, the Illinois Supreme

Court ordered the DNA testing, which established conclusively that Jones was not the

source of the semen recovered from the victim.[49] Jones was finally released in May of

1999 when prosecutors dropped all charges against him.[50]

85. Robert Miller was convicted and sentenced to death for the rape and murder of

two elderly women in Oklahoma in 1988.[51] The conviction was based on Miller's

"confession," a 12-hour police interrogation in which he claimed to have channeled the

---

[44] Scheck, *supra*, at 220.

[45] MacArthur Justice Center web site,
<http://www.macarthurjusticecenter.com/jones.html>

[46] Scheck, *supra*, at 220.

[47] MacArthur Justice Center web site,
<http://www.macarthurjusticecenter.com/jones.html>

[48] Scheck, *supra*, at 220.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 84.

38

vision of the killer by powers sent to him from his Choctaw grandmother.[52] In 1991, DNA evidence was found that pointed to another defendant who was already incarcerated on similar charges.[53] Miller remained in prison based on a prosecution theory that he did not commit the rapes, but was the look-out.[54] When the real rapist refused to testify that Miller was involved in the crimes, the prosecution decided to drop all charges.[55] Miller was released in 1998.[56]

86.  Anthony Gray, Jr. was arrested with two other people in 1991 for the rape and murder of Linda May Pellicano.[57] After hours of interrogation by police officers, Gray confessed to aiding the others in the commission of the crime.  Gray's attorney claims that the investigators told Gray  to confess or he would face the death penalty.[58] Gray later pleaded guilty to first-degree murder and rape and was sentenced to life in prison. Another man, Anthony Fleming, was arrested in 1997 for an unrelated crime.[59] After indicating that he knew something about the Pellicano murder, prosecutors had Fleming's

---

[52]  *Id*. at.80-82.

[53]  *Id*. at 87.

[54]  *Id*. at 105.

[55]  *Id*. at 105-106.

[56]  *Id*. at 106.

[57] Man Freed After 7 Years of Living Hell, Baltimore Sun, February 9, 1999, at 1A.

[58] *Id*.

[59]  *Id*.

DNA tested; it matched the DNA recovered from the Pellicano crime scene.[60]  Fleming

pleaded guilty to first-degree murder.  Gray was released on February 1999 after spending

seven years in prison.[61]

87. Christopher Ochoa was arrested in 1988 for the rape and murder of Nancy

DePriest in Austin, Texas.[62]  After two days of questioning, Ochoa confessed to the crime

and implicated his friend Richard Danzinger.[63]  His confession was detailed and specific.

Ochoa's attorney claimed that police officers told Ochoa he would get "the needle" if he

didn't confess, then fed him details of the crime.[64]  He pleaded guilty in exchange for a life

sentence; Danzinger was convicted based on Ochoa's testimony and sentenced to 99 years

in prison.[65]

88. From 1996 to 1998, Achim Josef Marino wrote a series of letter to the Austin

police, the district attorney and Governor George Bush stating that he killed Nancy

DePriest.[66]  After the Wisconsin Innocence Project became involved on Ochoa's behalf,

---

[60]  *Id.*

[61]  Cathy Young, Do We Have Right to Change Miranda?, The Detroit News, February 17, 1999, at A13.

[62]  Richard Willing, DNA Tests Free Texas Man in Rape-and-Murder Case, USA Today, January 17, 2001, at 3A.

[63]  *Id.*

[64]  *Id.*

[65]  Paul Duggan, Falsely Accused Texas Man Freed From Life Term, Washington Post, January 17, 2001, at A3.

[66]  *Id.*

the district attorney agreed to have DNA testing done on evidence from the crime.[67]   The

DNA testing proved the Ochoa and Danzinger could not have committed the crime.[68]

Ochoa was released on January 16, 2001, after spending 12 years in prison.[69]

89.  Moreover, DNA tests which pinpoint particular genetic characteristics have the

capacity to identify the real killer in this case.  Alabama has maintained since 1994 a

statewide DNA database, including DNA from all persons convicted of felonies after May

6, 1994 and persons incarcerated as of May 6, 1994 as a result of felony convictions.  *See*

§§ 36-18-20 through 39, Ala. Code 1975; *see also Hammonds v. State*, 777 So.2d 750,

756-57 (Ala. Crim. App. 1999).  The murder of Thelma Roberts took place in March 1992.

There is an excellent chance that her assailant has since been convicted of another felony

and his DNA is contained in the State's DNA database.  Thus, additional testing of the

Roberts specimens will likely both definitively exclude Chris Barbour as the sexual

assailant and result in an identification of the real killer.  Such identification would simply

exonerate Mr. Barbour.

90.  Sophisticated DNA testing with the capacity to pinpoint the genetic

characteristics of Ms. Roberts's assailant could either seriously undermine Mr. Barbour's

confession or exonerate him outright.  The State's refusal to allow access to the biological

material that could lead to new, reliable evidence that destroys the heart of the State's case

---

[67] Willing, *supra*, at 3A.

[68] *Id.*

[69] *Id.*

of guilt – that Hester, or Barbour, or both sexually assaulted and murdered Mrs. Roberts –

violates the Eighth and Fourteenth Amendments to the United States Constitution.

## CLAIM B

### The Non-Disclosure of Police Records Showing That Detective Carmichael and Inspector Davis Used Coercive and Abusive Tactics to Gain Custodial Statements Violated The Eighth and Fourteenth Amendments

91. Prior to trial, the defense moved for discovery of impeachment material,

including evidence in the State's possession that would tend to show that officers who

interrogated Mr. Barbour were then subjects of an investigation for abusing other suspects.

Specifically, Mr. Barbour requested, *inter alia*, disclosure of the names of all other persons

interviewed by Detective Danny Carmichael during the two years prior to Mr. Barbour's

arrest.  The trial prosecutors conceded that some type of misconduct investigation of

members of the Montgomery Police Department was underway but disclosed no

information about any such investigation, or material about any law enforcement officer

involved in this investigation.  The trial court did not require the disclosure to the defense

of material related to either Det. Carmichael specifically or practices of the Montgomery

Police Department generally, and never reviewed the material to determine whether it

should be disclosed. When police witnesses testified against Mr. Barbour, the defense did

not possess any such material for impeachment.

92. Mr. Barbour asserted on direct appeal that the failure to disclose such material

violated the rule of *Brady v. Maryland*, 373 U.S. 83(1963) and progeny. There, the State

did not assert that no such information exists. Instead, it argued that the information was

not sufficiently material to establish a due process violation. Brief of Attorney General in

*Barbour v. State of Alabama*, No. 1940820, Supreme Court of Alabama, at 20 ("[No error]

because the information would not have affected the outcome of the trial;" "None of the

non-disclosed evidence was exculpatory . . . or prejudicial to Barbour's defense."). The

Alabama Court of Criminal Appeals denied Mr. Barbour's claim. 673 So.2d at 465.  Like

the trial court, that court also did not review the undisclosed material.  *Id.*

93.  Given the centrality of the confession to Mr. Barbour's conviction– it was the

cornerstone of the State's case – evidence tending to show that the confession was illegally

obtained, including evidence which would undermine Det. Carmichael's or Lt. Davis's

credibility, should have been made available to Barbour. *See United States v. Bowie*, 198

F.3d 905, 909 (D.C. Cir. 1999).  Mr. Barbour's access to Carmichael's police department

file and to Davis's fire department file and to any other relevant records are imperative to

his demonstrating that he was denied a fair trial when the court denied his motion to

suppress his confession. *See Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000).

94.  Evidence Mr. Barbour has recently obtained from four citizens interrogated by

Carmichael and Davis in this case further supports this claim. Melvin Roberts, the victim's

husband, was subjected to three weeks of humiliating  and physically abusive interrogation

that nearly broke him. He has stated: "[d]uring these interrogations, sometimes the

officers would yell and shout at me and tell me I would spend the rest of my life in prison.

On other occasions, they were very quiet. On at least on occasion, one officer, Detective

43

Carmichael, kicked me because he thought I was refusing to tell him that I was involved in this crime. These meetings left me exhausted, confused and very upset. I simply could not understand how the police would believe that I killed my wife." *See* Appendix D; Melvin Roberts Affidavit at paragraph 5.

95. Mr. Roberts's son William, who discovered his mother's body and called the police, endured similar treatment. He recalled:

> 6. Within a few days after the murder, the police began to tell me that I was responsible for her death and that I had better come clean with them. They also told me that they suspected my father played a significant role in her death. I repeatedly claimed my innocence as well as my father's. At times, officers were become angry with me because I was not giving them the answers they wanted.

> 7. During these interrogations, I was subjected to physical abuse and threats. On one occasion, Detective Carmichael slapped me hard while I was sitting on a small stool in a small, windowless room at the police station. He was mad that I was not confessing to the crime. He also threatened that I would spend a long time in the county jail. Fire Inspector Davis also took me to the fire station, put me in a small room, and told me I should admit the crime. I became mad and told him he was accusing me of this crime because I was black. At that, Davis picked me up and slammed me against the wall.

> 8. Both officers told me that if they did not charge others with the crime within the next few days, I and my father would be formally charged with my mother's murder. They said they had plenty of evidence against us both. Both pressed me hard to admit my guilt as well as my father's.

> 9. During these sessions, my will was nearly overcome. But what kept me from giving up was the anger I felt that these officers were working hard to get me, an innocent person, to confess to this horrible crime. I was subjected to unwarranted abuse and brutality by the police as was my father.

*See* Appendix F; William Roberts Affidavit at 1-2.

96. Lola Roberts, the victim's daughter, has recalled that she (1) was threatened

44

with jail by officers if she did not tell them who killed her mother, and (2) was wrongly accused of embarrassing and humiliating conduct: having sex with several young men in her neighborhood and of being in a gang. *See* Appendix E; Lola Roberts Affidavit at 1-2. Cedric Evans has recently revealed that he was questioned on several occasions about the crime, and during one interrogation, Det. Carmichael "put his gun on the table and many pictures of the crime scene, and ask me if I was going to let these white boys get away with the murder of a black woman. When I told him I did not know who killed Mrs. Roberts and could not help him, he said he would tell me what to say. I said I cannot do that. Carmichael got mad, picked up the gun and pictures, and left." *See* Appendix G; Cedric Evans Affidavit at 1.

97. These accounts describe chilling police tactics employed during the questioning of witnesses and suspects. The witnesses were physically abused, yelled at, humiliated, scared to death, and told police would tell them what to testify about if they agreed to testify. They corroborate Mr. Barbour's account, made prior to trial, that he involuntarily made incriminating statements only because he was terrified of Officers Davis and Carmichael. They even corroborate Carmichael's own description of Mr. Barbour after their first meeting: "a whimpie little thing, and scares real easy." *See* Appendix A at 71. They make clear the types of material that Mr. Barbour seeks from police and fire department files concerning the interrogation tactics of Davis and Carmichael, including but not limited to: complaints/statements from other witnesses interviewed by Carmichael that he employed abusive or coercive tactics during

45

interrogations, including the contents of his personnel file and/or internal investigations

into his conduct; official internal or external investigations of the Montgomery Police

Department's employment of such tactics.

98.  Detective Carmichael retired from the Montgomery Police Department, shortly

after the conclusion of Mr. Barbour's trial. He is no longer a public servant.  Therefore,

the State has no legitimate interest in the suppression of records in its possession that

suggests he abused other suspects.  Any disclosure of such records will have no effect on

pending criminal investigations or prosecutions.  The importance of determining whether

Mr. Barbour received a fair trial far outweighs any interest in protecting a public servant or

the integrity of ongoing police investigations.

### CLAIM C

**The Admission at Trial of Mr. Barbour's Coerced and Unreliable May 1
Custodial Statements Violated the Eighth and Fourteenth Amendments**

99.  Prior to trial, counsel moved to suppress the videotaped confession on the

grounds that Det. Carmichael physically abused Mr. Barbour and thereby coerced him into

confessing.[70]  According to Mr. Barbour's contemporaneous accounts of the abuse he

suffered, in the days prior to his confession, Det. Carmichael and Lt. Davis took turns

playing "good cop/bad cop."  On April 22, Davis and Carmichael picked up Barbour at the

Eastdale Mall in Montgomery.  They took him to the police department where they

---

[70]  After the December 29, 1992 suppression hearing at which Barbour, Davis and
Carmichael testified, Judge Gordon denied the motion.

showed him pictures of suspects and questioned him about which of them he knew. Det. Carmichael repeatedly slapped Mr. Barbour's face when he claimed that he did not know the answers to Det. Carmichael's questions. Lt. Davis was present during this assault. Mr. Barbour reported that after this episode, he was understandably terrified not to tell Det. Carmichael and Lt. Davis "what they wanted to hear."

100.   On April 28, 1992, Lt. Davis asked Mr. Barbour to submit to a polygraph on an unrelated crime. He gave Mr. Barbour a list of phone numbers and explicit instructions to call him every morning at 8:00 until the day of the test. Mr. Barbour testified that Lt. Davis told him that if he failed to do this, Davis would beat him "within an inch of [his] life." This threat heightened Mr. Barbour's fear that if he did not deliver the information the police wanted to hear, he would suffer serious reprisal. Mr. Barbour's well-founded fear of physical punishment continued throughout the administration of the polygraph and the recording of the confession.

101.   Mr. Barbour agreed to take a polygraph test on the subject of arsons at area Winn-Dixie supermarkets. On May 1, 1992, Mr. Barbour took a polygraph, but the subject had changed to the Manley Drive murder.[71]   Once Mr. Barbour was in custody, he believed

---

[71] Inconsistencies abound in Lt. Davis's accounts regarding when and how Mr. Barbour was notified about the changing subject matter of the polygraph: (1) according to Davis's 8/21/92 testimony, he notified Barbour that the polygraph would relate to the incident on Manley Dr. rather than to the Winn-Dixie fires a couple of days before the polygraph in order to give Barbour "timely notice" of the change; (2) according to Davis's 12/29/92 account, Lt. Deaton and Lt. Springer of the MFD notified Barbour of the change when they picked him up to take him to the polygraph test; (3) also on 12/29/92 Davis attempted to explain the inconsistency by saying that he overlooked a phone call he had made to Barbour's father's home a couple of days before the polygraph. There is no record of this phone call; (4) in both of Davis's accounts, Barbour was

he had no choice but to take the polygraph, no matter the subject matter, and, under the circumstances, he agreed to be questioned and polygraphed regarding the fire on Manley Dr. During the polygraph, Fire Department Lieutenant McKee, who administered the polygraph, questioned Mr. Barbour about the fires at Manley Dr. After Mr. Barbour took the polygraph, Lt. McKee told him that his answers produced "some irregularities" reflected on the polygraph chart and that Lt. McKee thought Mr. Barbour was lying based on the results of the test. Lt. McKee made certain that Mr. Barbour was under the erroneous impression that the results of the polygraph were conclusive and admissible against him in court.

102. When confronted with the evidence, Mr. Barbour was overcome. This is a typical response of those whose will is overcome in a custodial setting. *See* Welsh S. White, <u>False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions,</u> 32 Harv. C.R.-C.L. L. Rev. 105, 143 (1997)(hereinafter <u>False Confessions</u>) at 130 ("A suspect who believes that the police will be able to present incontrovertible evidence of his guilt and that he will obtain leniency only if he confesses could rationally conclude that confessing is in his best interest even though he is not guilty."). Moreover, Mr. Barbour implicated Mr. Hester and Mr. Mitchell, which was of great help to the police because both had been arrested for unrelated offenses but neither had confessed any involvement in the Manley Dr. murder.

---

not advised of his rights when he was notified that the subject matter of the polygraph was changing.

103. Mr. Barbour was susceptible to police pressure; indeed mental health experts who examined him for this case observed that he is socially immature. *See* Evaluation of State Psychologist Dr. Karl Kirkland, Record on Appeal at 6 ("Barbour suffered from marginal social adjustment"); Testimony of Psychologist Dr. Patrick Daniel Slattery, Trial Tr. at 594 ("My opinion is that Christopher is immature for a young male twenty-two years of age. Possibly several years socially immature in the sense that he has dependencies and sensitivities that are often seen in persons who are in their mid adolescence.") The State psychologist stated that Barbour suffered from "chronic low self-esteem" and was a "rather shy passive individual." Record on Appeal at 3. Barbour is very eager to please others and is easily influenced. *See* Trial Tr. at 593-594, 600-601. Detective Carmichael recognized this when he described Barbour as "a whimpie (sic) little thing [who] scares real easy." This personality trait rendered Barbour more likely to submit to police pressure and eventually tell the officers what they wanted to hear, even if it was not the truth. *See* False Confessions at 126-127 (describing an individual with above-average intelligence that was easily influenced by others whose false confession could be "partially attributed to his compliant personality, evidenced by his eagerness to please his interrogators by supplying the details they were looking for").

104. The police had no independent reason to believe that Mr. Barbour committed the crime; no physical evidence pointed to Barbour, Hester or Mitchell. By employing physical abuse, falsely manipulating unreliable lie detector results, reciting facts consistent with the crime, and exploiting Mr. Barbour's compliant personality, the police were able to

49

produce a false confession. Without any significant leads after a month of investigation, the police needed a confession to solve the case. See False Confessions at 133 ("When the police are investigating a murder or other high-profile case with a dearth of viable suspects, they often feel considerable pressure to solve the crime....Interrogators' zeal to solve a high-profile case may also lead them to employ interrogation methods likely to precipitate untrustworthy confessions."). Whether or not the confession was true or whether it fit with the established facts was not important.

105. Moreover, the police investigation failed to develop evidence corroborating Mr. Barbour's account. On the day Mrs. Roberts's body was recovered, a neighborhood canvass was conducted. While several neighbors recall seeing Mr. Roberts's car at 3575 Manley Drive, none reported the presence of a strange or unfamiliar car parked in the vicinity. Thus, no one confirmed Mr. Barbour's account that Michael Mitchell's car was parked outside the house for several hours while they were in the house.

106. Mr. Barbour reported that neither he nor Mitchell knew Mrs. Roberts and that it was Chris Hester who seemed to know her. Police investigation failed to develop any evidence that Mr. Hester knew Mrs. Roberts, or had previously been to her home. In fact, when police showed Ms. Roberts's children photos of Barbour, Hester, and Mitchell, they were unable to identify any of the men as people they had seen before in the neighborhood, much less in their mother's home.

107. Mr. Barbour told police that after arriving at Manley Drive, Hester got out of the car and spoke to someone at Cedric Evans's house at 3572 Manley Drive. When police

spoke to Ruth Evans, a.k.a. Ruth Jackson, Evans's mother, the following day, she made no mention of Hester stopping by the house late the prior evening. Ms. Evans has recently reiterated that she does not recall Mr. Hester and the others stopping by her home the night of the murder. Ms. Evans was never called as a witness at Mr. Barbour's trial, which is unusual considering that her testimony could have corroborated Barbour's confession by placing him in the neighborhood on the night of the crime.

108. According to Mr. Barbour's confession, he took a twelve pack of Milwaukee's Best into the Roberts home and several beers were consumed in the livingroom. Mr. Barbour also said that he and the others left the house rather quickly after setting the fires, yet he made no mention of someone picking up the *empty* cans on the way out. No empty Milwaukee's Best beer cans were found in the Roberts home.

109. There is further indication that the State today doubts Mr. Barbour's account of how this crime took place or even who was involved. In Barbour's custodial statement, which the State asked his jury to accept as the truth, he describes Christopher Hester as a full participant in the crime and the only one to sexually assault the victim. He further describes Michael Mitchell as fully aiding Mr. Hester's attacking Mrs. Roberts.

110. Upon information and belief, Mr. Mitchell was never prosecuted for this crime. Nor was he required to be witness for the State against either Mr. Barbour or Mr. Hester. It is highly unusual for an active participant in a capital murder to face no charges whatsoever. As already described, the State dealt leniently with Mr. Hester as well.

111. Moreover, Mr. Hester's account of how the crime took place differs

51

significantly from the evidence the State presented at Mr. Barbour's trial. In Mr. Hester's

version, Michael Mitchell was not present at all; a young female, Angela Stykes, was

present.[72] Hester did not gain voluntary entrance to the house but instead he, Barbour and

Stykes broke into the house, and he never saw or laid a hand on Mrs. Roberts.[73] He stated

that only Mr. Barbour went to the area of the house near Mrs. Roberts's bedroom, and he

learned that she might have been harmed only days after the burglary when Barbour said

he had run into a problem.[74]

112.  Mr. Barbour was denied a fundamentally fair and constitutional trial when the

trial court declined to suppress his coerced, in-custody statements.  The state court

decisions finding no violation of the federal constitutional is contrary to and is an

unreasonable application of clearly established federal law.

### CLAIM D

**The Failure to Remove Venireperson Smith for Cause Violated the Fourteenth Amendment**

113.  During voir dire, the trial court failed to exclude a veniremember who

expressed bias against Mr. Barbour because of her prior knowledge of the case.  In

response to questioning by the prosecution as to whether she had any outside knowledge of

the case, veniremember Nancy Smith engaged in the following exchange with the

---

[72]  State of Alabama v. Christopher Hester, In the Fifteenth Judicial Circuit, Montgomery County, Montgomery, Alabama, No. cc-92-1680, Transcript of April 14, 1994 hearing at 4.

[73]  *Id.*, at 5.

[74]  *Id.*

52

prosecutor:

> JUROR SMITH: I have heard through my husband.
>
> MR. MCNEILL: What you have heard from Steve, Ms. Smith, can you put
> that aside if you were selected as a juror and base your verdict upon the
> evidence as it is presented to you and the testimony and the law as given to
> you by Judge Gordon?
>
> JUROR SMITH: It would be difficult.
>
> MR. MCNEILL: It would be?
>
> JUROR SMITH: I will tell you the truth, it would be.
>
> Trial Tr. at 103.

114. Veniremember Smith further expressed bias toward Mr. Barbour created by the fact that her husband was a Montgomery County Police Officer. In response to prosecution questions, Ms. Smith said, "I don't know how to explain this. Being married to a police officer affects your judgment on some things, just the background itself." Trial Tr. at 110.

115. Finally, veniremember Nancy Smith stated that she personally knew three of the police officers listed as witnesses for the prosecution. Trial Tr. at 98-100.

116. Mr. Barbour challenged veniremember Smith for cause. The trial court improperly denied this challenge on the ground that Ms. Smith's comments did not rise to the level required to grant a challenge for cause. Trial Tr. at 132. The denial of this challenge was error, and deprived Mr. Barbour of his constitutional right to a fair and

impartial jury.

## CLAIM E

### The Removal of Juror Bush Because of Reluctance To Impose The Death Penalty Violated the Eighth and Fourteenth Amendments

117. During voir dire, veniremember Sara Bush stated that she was uncomfortable imposing the death penalty. However, she did not say that she would refuse to impose death, nor did she state that the availability of death would affect her deliberations on guilt or innocence. Trial Tr. at 19, 60-61. Nevertheless, the trial court granted the prosecution's challenge of Ms. Bush for cause. Trial Tr. at 60. This challenge was improper under *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Witt v. Wainright*, 469 U.S. 412 (1985).

## CLAIM F

### Mr. Barbour's Death Sentence Must Be Vacated Because The Judge, Not the Jury Made the Crucial Findings of Fact That Rendered Him Eligible for a Capital Sentence

118. In June 2000, the United States Supreme Court announced a landmark ruling of criminal procedure in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The decision set forth a new and clarified rule for the imposition of criminal sanctions. Justice Stevens's majority opinion held that "'any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" *Id.* at 2355 (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999)). Thus, the Court ruled that a New Jersey hate crime law which

enhanced a sentence based on a judicial finding of racial motivation was unconstitutional because the existence of racial motivation was not determined by a jury beyond a reasonable doubt. Although *Apprendi* addressed a hate crime statute, the decision has since been applied to other types of sentencing enhancement structures. *See United States v. Rogers*, 228 F.3d 1318 (11th Cir. 2000)(applying *Apprendi* to sentence enhancement under federal drug law 21 U.S.C. 841); *Illinois v. Taylor*, 739 N.E.2d 594 (Ill. App. 2000)(applying *Apprendi* to Illinois sentencing law which allows for the imposition of a life sentence or death penalty). The Supreme Court explained that the labels "sentencing factor" or "sentencing enhancement" were not relevant. *Apprendi*, 530 U.S. at 494. The principle announced applied to those legislative schemes "that remov[e] the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 2359.

119. *Apprendi's* application to Mr. Barbour's sentence is straightforward. Under Alabama law, a defendant convicted of capital murder is entitled to a sentencing hearing before the trial jury. Ala. Code § 13A-5-46. The State presents evidence of statutory aggravating factors and the defense may present mitigating factors. Ala. Code § 13A-5-45(g). The jury then renders an *advisory* opinion, *recommending* death if at least 10 jurors find the aggravating factors outweigh the mitigating factors. Ala. Code § 13A-5-46(e), (f). In doing so, the jury does not make any specific findings on the existence of aggravating factors. The judge considers the jury opinion and all evidence and imposes a sentence.

Ala. Code § 13A-5-47(e).

120.   A judge cannot impose a death sentence without independently finding the existence of one of the statutory aggravating factors.  Ala. Code § 13A-5-47(e).  A death sentence cannot be imposed on the basis of the jury verdict alone; the jury is never instructed to find the existence of an aggravating circumstance beyond a reasonable doubt. Thus, the defendant is rendered eligible for a greater punishment (death) if, and only if, the judge makes certain factual findings.  As a result, Alabama's capital sentencing scheme falls squarely within the *Apprendi* rule.  *See Apprendi*, 530 U.S. at 494 ("The relevant inquiry is one not of form, but of effect – does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?").

121.   Illinois courts have recently examined the effect of *Apprendi* on an Illinois sentencing scheme.  Like Alabama law, Illinois does not permit the imposition of a life sentence or the death penalty without the court's finding of aggravating circumstances. *See* 720 Ill. Comp. Stat. 5/9-1(b)(2000); 730 Ill. Comp. Stat. 5/5-8-1(a)(2000).  The Illinois courts have held that pursuant to *Apprendi*, aggravating circumstances must be proven beyond a reasonable doubt.  *See People v. Beachem*, 2000 Ill. App. LEXIS 868 (November 8, 2000)(holding that, in the context of a sentence extended to 90 years' imprisonment, the aggravating circumstances must be found beyond a reasonable doubt). *See also People v. Kaczmarek*, 2000 Ill. App. LEXIS 999 (December 17, 2000); *People v. Armstrong*, 2000 Ill. App. LEXIS 1015 (December 29, 2000); *People v. Thurow*, 2001 Ill. App. LEXIS 2 (January 5, 2001).

122. In general, new rules of criminal procedure pronounced by the Supreme Court are not applicable to cases on collateral review. However, an exception to that rule exists for "watershed rules of criminal procedure." *Teague v. Lane*, 489 U.S. 288, 310 (1989). Such rules "address a 'substantive categorical guarante[e] accorded by the Constitution….'" *Saffle v. Parks*, 494 U.S. 484 (1990), at 494(quoting *Penry v. Lynaugh*, 492 U.S. 329, 330, (1989)). Although the *Teague* court was not addressing a capital case, it added that the watershed exception was equally applicable to all aspects of criminal judgment, including capital sentencing. *Teague*, 489 U.S. at 314 n. 2.

123. The *Apprendi* majority pronounced a watershed rule of criminal law. The rule established the proper role of the jury within our criminal justice system, exactly the kind of rule the Court envisioned in *Teague* when it declared that "all 'new' constitutional rules which significantly improve the pre-existing fact-finding procedures are to be retroactively applied on habeas." *Teague*, 489 U.S. at 312 (quoting *Desist v. United States*, 394 U.S. 244, 262 (1969)(J. Harlan, dissenting)). Justice O'Connor recognized that the rule announced in *Apprendi* "will be remembered as a watershed change in constitutional law…." *See* 120 S.Ct. at 2380. Lower courts have held that *Apprendi* applies retroactively to cases on collateral review. *See, e.g., Darity v. United States*, 2000 U.S. Dist. LEXIS 18403 (W.Dist. N.C., December 4, 2000)(holding that because *Apprendi* implicates procedures implicit in the concept of ordered liberty, it applies retroactively); *People v. Beachem*, 2000 Ill. App. LEXIS 868, *16-17 (November 8, 2000)("We take *Apprendi* to mean that once the defendant serves the prescribed maximum sentence, he or

57

she remains in prison on a charge never made and never proved....Such a conviction, and

its concomitant sentence, are repugnant to our notions of fundamental fairness"); *United

States v. Murphy*, 109 F.Supp. 2d 1059, 1064 (Dist. Minn. 2000)("There can be little doubt

that the sweeping new requirement announced by the Court in *Apprendi* is so grounded in

fundamental fairness that it may be considered of watershed importance. Accordingly, the

court concludes that the *Apprendi* decision falls under the second exception to the *Teague*

nonretroactivity principle....").

124. Mr. Barbour's prior counsel's failure to raise this issue previously does not

foreclose its consideration here. *Apprendi* was not decided until June 2000; Mr. Barbour's

direct appeal ended in August 1995. The claim was not available to former counsel.

According to the Supreme Court, "where a constitutional claim is so novel that its legal

basis is not reasonably available to counsel, a defendant has cause for his failure to raise

the claim in accordance with applicable state procedures." *Reed v. Ross*, 468 U.S. 1, 16

(1984). The inquiry thus becomes whether the law at the time of Mr. Barbour's direct

appeal offered a reasonable basis upon which to challenge the Alabama capital sentencing

scheme.

125. In August 1995, the Supreme Court's capital jurisprudence on this point was

clear. In 1990, the Court held that capital sentencing schemes that provided for judicial

finding of aggravating circumstances did not violate the Constitution. *See Walton v.

Arizona*, 497 U.S. 639, 649 (1990). In *Walton*, the Court examined the Arizona capital

sentencing scheme and decided, "we cannot conclude that a State is required to

58

denominate aggravating circumstances 'elements' of the offense or permit only a jury to

determine the existence of such circumstances." 497 U.S. at 649. In light of *Walton*, Mr.

Barbour had no basis upon which to challenge Alabama's sentencing scheme. Nor were

cases in the non-capital area helpful. The leading case on the issue of judicially determined

facts a that time was *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), where the court held

that a factual finding that did not raise the range of possible punishment could be made by

a judge. The court had not yet addressed factual findings that expose a defendant to

greater punishment. *McMillan* rested on previous Supreme Court cases that addressed the

burden of proof in criminal cases. *In Re Winship*, 397 U.S. 358 (1970), and *Mullaney v.*

*Wilbur*, 421 U.S. 684 (1975), established the notion that a defendant may not be required

to rebut statutory presumptions of elements of crimes. Until *McMillan*, no cases had dealt

with facts that affected the sentence imposed rather than the determination of guilt or

innocence.

126. Although Mr. Barbour had no Supreme Court jurisprudence on which to raise

his claim in 1995, he must also show that a "'new' constitutional rule, representing 'a clear

break from the past'" has since emerged from the Court. *Reed*, 468 U.S. 17 (quoting

*United States v. Johnson*, 457 U.S. 537, 549 (1982)). One of the ways to show the

existence of such a rule is that the new decision disapproved of a practice that the Supreme

Court "arguably has sanctioned in prior cases." *Id*. Clearly *Apprendi* disapproves of the

practice of judicial fact-finding in sentencing enhancement. Moreover, in 1995, the

Supreme Court held that Alabama's capital sentencing scheme did not violate the Eighth

Amendment by failing to specify the weight that a judge is required to give to a jury's

sentencing recommendation. *See Harris v. Alabama*, 513 U.S. 504 (1995).

127. *Harris* was decided after petitioner had filed his petitions in the direct appeal

process. However, *Harris* was based on earlier cases in which the Court upheld a similar

capital sentencing scheme in Florida. *See Spaziano v. Florida*,468 U.S. 447 (1984);

*Profitt v. Florida*, 428 U.S. 242 (1976). In so ruling, the Court clearly "sanctioned" the

practice of judicial finding of aggravating factors in capital sentencing procedures.

128. The state of the law in 1995 provided no reasonable basis upon which Mr.

Barbour could challenge the constitutionality of Alabama's capital sentencing scheme.

*Apprendi* established a new jurisprudence in the area of sentencing enhancement that was

previously unavailable to criminal defendants. Therefore, Mr. Barbour has cause for not

raising the claim in earlier proceedings, and is entitled to relief.

## CLAIM G

### The Exclusion of Evidence from the Victim's Family That Imposition of A Capital Sentence Upon Mr. Barbour Would Exascerbate The Injury of Mrs. Roberts's Murder Violated the Eighth and Fourteenth Amendments

129. At Mr. Barbour's sentencing hearing before the court, the family of Thelma

Roberts submitted a letter to the trial court, formally requesting the court to resist the

jury's 10 -2 recommendation that Mr. Barbour be sentenced to death. The letter from Ms.

Roberts's family was unavailable at the time of Mr. Barbour's jury sentencing hearing, and

it was therefore not considered by the jury when it decided to recommend a death

sentence.

130.  The letter states that a capital sentence would inflict more injury upon Ms. Roberts's family. It said "[i]t is now a time for healing on both side of the families." *See* 6/27/93 Letter from David Bishop, Tr. R. at 176.  It further stated that Mrs. Roberts " would not have wished Mr. Barbour's life be taken even though he took hers." *Id.*

131.  At the sentencing hearing before the trial court, the judge stated that he recognized that the victim's family's letter would have "a powerful effect on the sentencing authority." Trial Tr. at 222.  Nevertheless, despite his role as the "sentencing authority," the trial judge refused to consider any portion of this letter in his decision on Mr. Barbour's penalty.

132.  The trial court's refusal to consider the victim's family's letter violated Mr. Barbour's right under the Eighth Amendment to consideration by the capital sentencer of any evidence about the offender or the crime that could weigh against a sentence of death. *See Lockett v. Ohio*, 438 U.S. 586 (1978).  Just as a "victim impact statement" from surviving family members that provides evidence that might persuade the sentencer to impose a sentence of death is admissible against a capital defendant, *Payne v. Tennessee*, 501 U.S. 808 (1991), so a statement from the victim's family that a capital sentence will inflict additional injury must be admissible on behalf of a capital defendant, and may not be constitutionally excluded.  Thus, the trial court's refusal to admit or consider the victim's family's letter when imposing Mr. Barbour's death sentence violated his Eighth Amendment right to a reliable, non-arbitrary sentence.

## CLAIM H

### Alabama's Use of the Electric Chair Violates the Eighth and Fourteenth Amendments

133.  Today, Alabama and Nebraska are the only states in the country that provide

electrocution as the sole method of execution. During the past decade, several jurisdictions

have abandoned its use and adopted lethal injection because lethal injection is considered to

be a more humane and a less painful method of execution. Given the near-total

abandonment of electrocution as an accepted method of execution, Alabama would violate

Mr. Barbour's constitutional rights if it carries out the judgment of the sentencing court by

electrocution.

134.   The Eighth Amendment requires states to take all feasible measures to

minimize the risk of cruelty in administering capital punishment. *Zant v. Stephens*, 462

U.S. 862, 874 (1983). Justice Powell noted that "no court would approve any method of

implementation of the death sentence found to involve unnecessary cruelty in light of

presently available alternatives." *Furman v. Georgia*, 408 U.S. 238, 430 (1972) (dissenting

opinion). Alabama's method of execution has likewise become unconstitutional, as the

standards of decent punishment have evolved and thereby encouraged widespread

abandonment of this practice.

135.   The Eighth Amendment "embodies 'broad and idealistic concepts of dignity,

civilized standards, humanity and decency'" against which forms of punishment must be

measured. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop*, 404

F.2d 571, 579 (8th Cir. 1968)).  Its restrictions on the ability of a state to impose
punishment "aim . . . to protect the condemned from fear and pain . . . or to protect the
dignity of society itself from the barbarity of exacting mindless vengeance."  *Ford v.
Wainwright*, 477 U.S. 399, 410 (1986) (plurality opinion).

136.  A long line of Supreme Court cases clearly holds that an inquiry into evolving
standards of decency is required under Eighth Amendment jurisprudence.  *See, e.g.,
Hudson v. McMillan*, 503 U.S. 1, 8 (1992) (holding that Eighth Amendment prohibition on
cruel and unusual punishment "draws its meaning from the evolving standards of decency
that mark the progress of a maturing society") (citing *Rhodes v. Chapman*, 452 U.S. 337,
346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion))); *Estelle v.
Gamble*, 429 U.S. 97, 102 (1976) ("we have held repugnant to the Eighth Amendment
punishments which are incompatible with 'the evolving standards of decency that mark the
progress of a maturing society'") (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality
opinion)); *see also Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart,
Powell & Stevens, JJ.) (noting that assessment of contemporary values concerning
infliction of challenged sanction is relevant to application of Eighth Amendment); *Weeks v.
United States*, 217 U.S. 349, 378 (1910) (holding that Eighth Amendment is "not fastened
to the obsolete, but may acquire meaning as public opinion becomes enlightened by a
humane justice").

137.  This Court has recognized that "[t]he clearest and most reliable objective
evidence of the contemporary values is the legislation enacted by the country's legislatures."

*Penry v. Lynaugh*, 492 U.S. 302, 331 (1989); *accord Gregg v. Georgia*, 428 U.S. at 181. Thus, the Court has held punishments to be violative of the Eighth Amendment based, in part, on evidence of a legislative consensus rejecting the type of punishment at issue. *See, e.g., Thompson v. Oklahoma*, 487 U.S. 815, 826-30 (1988) (invalidating capital punishment for offender under age sixteen where nineteen of thirty-seven state legislatures rejected the practice); *Enmund v. Florida*, 458 U.S. 782, 788-96 (1982) (holding death penalty unconstitutional for certain type of felony-murder where, of thirty-six death penalty jurisdictions, "only" eight, a "small minority," allowed capital punishment for such offense); *Coker v. Georgia*, 433 U.S. 584, 593-97 (1977) (invalidating capital punishment for rape where only one state imposed death for rape of adult victim and only three imposed it for any rape).

138.   Twenty-six states at one time authorized execution by electrocution. Of the twenty-six, twenty-four have abandoned electrocution completely or as the sole method of execution. No state has introduced judicial execution by electrocution as a new method of execution since 1949.  No jurisdiction outside the United States uses judicial electrocution to administer capital punishment.

139.   In the last two years, the states of Kentucky, Tennessee, Florida, and Georgia have enacted laws rejecting judicial electrocution as the sole method of execution. See 1998 Kentucky Laws H.B. 27 (approved by the Governor on Mar. 31, 1998); T.C.A. § 40-23-114, amended by SB2477/HB2085 (1998) (approved by the Governor on May 18, 1998); Florida Death Penalty Reform Act of 2000, SB10A (approved by the Governor on

January 14, 2000); 2000 Ga. Laws (H.B. 1284(1)&(6)) (approved by the Governor on April 28, 2000). These states now provide a lethal injection option for those sentenced before a certain date and lethal injection only for persons sentenced after that date. At this point, *only two (2) states* -- Alabama and Nebraska -- require execution by electrocution. Accordingly, it is clear that Alabama's present use of judicial electrocution is inconsistent with society's evolving standards of decency.

140. Given that there are only *two* states remaining that *require* electrocution as a means of execution, Mr. Barbour contends that a national consensus has emerged rejecting the practice. The Alabama legislature has in the past, as well as this session, approved legislation changing the method to lethal injection. A recent poll revealed that 66% of the Alabama citizens polled preferred lethal injection as the method of execution, as compared with 10% who preferred electrocution. "Poll: Alabamians Favor Death Penalty, Lethal Injection," Associated Press, July 2, 2000. Although Alabama has yet to embrace such a law, such proposals, combined with the fact that every death penalty jurisdiction except Alabama and Nebraska have statutorily rejected the use of the electric chair as the sole method of execution, together demonstrate that electrocution no longer comports with evolving standards of decency and is therefore unconstitutional.

141. The Eighth Amendment prohibits the infliction of cruel, unnecessary, or needless pain. *Estelle v. Gamble*, 429 U.S. at 102. Alabama's antiquated electric chair violates this basic constitutional prohibition by inflicting unnecessary pain and torment to the condemned inmate. *See Gregg v. Georgia*, 428 U.S. at 173 (opinion of Stewart,

65

Powell, and Stevens, JJ.) (execution must not cause unnecessary pain or "torture or a lingering death"). Mutilation, burns, and botched executions characterize Alabama's use of the electric chair, which through its history has established a pattern of cruel, torturous, painful, and protracted executions. This history of electrocutions in Alabama's electric chair is the result of both characteristics inherent to the method of execution, and to the decrepit condition and inept operation of chair.

142. The Eighth Amendment can no longer be construed to uphold the kind of punishment that attends executions in Alabama. If Mr. Barbour is electrocuted in Alabama's electric chair, his death likely will be slow and excruciating, his body burned and mutilated. Such executions have become truly unusual, occurring in only two of the forty jurisdictions that deploy capital punishment. This Court should accordingly hear this claim because any execution by electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## CLAIM I

### Alabama's Failure to Recognize a Right to Counsel in Post-Conviction Proceedings Violates the Fourteenth Amendment.

143. After Mr. Barbour's case was affirmed by the Alabama Supreme Court on direct review, his court-appointed attorneys told him they could not represent him any longer. Although he had the right to ask the United States Supreme Court to review the lawfulness of his conviction and sentence, and then, if necessary to pursue state and federal post-conviction proceedings, if he was to pursue these remedies, he would have had to do

66

so *pro se* or with counsel recruited to provide services on a *pro bono* basis. This is

because Alabama provides no right to counsel to indigent condemned inmates after direct

appeal.

144. To file a petition for writ of certiorari, Mr. Barbour was forced to depend upon

charity. The EJI found the *pro bono* Boston attorney who agreed to draft such a petition. To

pursue his Rule 32, state post-conviction, remedies, Mr. Barbour again accepted assistance

from an out-of-state attorney in the review of his record and identification of issues for

presentation in such a petition. Even when the Rule 32 court determined that Mr. Barbour's

petition presented claims that warranted a hearing and appointed counsel, this appointment

proved largely meaningless because (1) state policy, by then limiting payment to $600,

reduced the case to charity work; (2) the appointed counsel lacked experience in capital

post-conviction practice and rendered little substantive assistance; and (3) counsel failed to

protect Mr. Barbour's right to appeal.

145. As the EJI has warned, the present charity system for linking needy inmates to

attorneys willing to properly represent condemned clients has collapsed under the weight of

a growing number of cases and the increasing complexity of the work.

146. Rule 32 proceedings are crucial in the capital review process. Often, they are

the first time when prisoners can raise claims such as the adequacy of their trial counsel's

performance, the suppression of exculpatory material, or evidence suggesting their

innocence. It is now virtually impossible for most indigent, incarcerated inmates, (and it

was impossible for Mr. Barbour), without the assistance of counsel with adequate resources

at their disposal, to properly investigate and present such claims.

147.  When the Supreme Court decided *Murray v. Giarratano*, 492 U.S. 1 (1989), several Justices noted that capital post-conviction procedure was already complicated and well beyond the ability of most condemned inmates to navigate effectively without the aid of counsel. If the "Court's death penalty jurisprudence unquestionably [was] difficult for a trained lawyer to master,"[75] then, as Justice Kennedy's concurrence noted, its "complexity... [made] it unlikely that capital defendants [would] be able to file successful petitions for collateral relief without the assistance of persons learned in the law."[76]

148.  Not long thereafter, the Court squarely recognized as much. In *McFarland v. Scott*, the Court held that the complexity of the *federal* habeas process could require the appointment of counsel for indigent capital prisoners even *before* a petition is filed.[77] McFarland had been convicted of capital murder and had repeatedly filed unsuccessful requests to stay his execution date in state court to allow time to locate volunteer counsel to represent him in post-conviction appeals.[78]  The state court refused to appoint counsel, and McFarland's skeletal *pro se* motion in federal district court seeking a stay of execution and

---

[75]  *Murray v. Giarratano*, 492 U.S. 1, 27 (1989) (Stevens, J., dissenting).

[76]  *Id.*, at 14 (joined by O'Connor, J., concurring in the judgment); *see Murray v. Carrier*, 447 U.S. 478, 496 (1986)(habeas review has become a "procedural maze of enormous complexity.")(Stevens, J., concurring).

[77]  512 U.S. 849, 858 (1994).

[78]  *Id.*, at 851-52.

the appointment of counsel to prepare a habeas petition was denied.[79] Reversing the Fifth

Circuit, the Court adopted the reasoning of Justice Kennedy's *Giarratano* concurrence and

held that "[a]n attorney's assistance prior to the filing of a capital defendant's habeas

corpus petition is crucial," because "[t]he complexity of our jurisprudence in this area ...

makes it unlikely that capital defendants will be able to file successful petitions for

collateral relief without the assistance of persons learned in the law."[80] Mindful of the

exceedingly intricate habeas jurisprudence and strict default rules, six Justices

acknowledged that "[r]equiring an indigent capital petitioner to proceed without counsel in

order to obtain counsel ... would expose him to the substantial risk that his habeas claims

never would be heard on the merits."[81]

149. As the *McFarland* Court observed, since 1989 the system has become

considerably more difficult for attorneys to navigate effectively, and certainly much more

so for indigent capital prisoners. During the last decade decisions from the Supreme Court

as well as Congressional amendments to federal habeas law, have reconfigured the post-

conviction remedy so that it works faster, is more complicated, is more final, and is less

forgiving of litigants uninformed mistakes standard of heightened reliability required in

capital cases.

150. Mr. Barbour surely was prejudiced by the absence of a constitutionally-

---

[79] *Id.*, at 852-53.

[80] *Id.*, at 855-56, *citing Giarratano*, 492 U.S. at 14 (Kennedy, J., concurring).

[81] *McFarland*, 512 U.S. at 856.

adequate counsel system in Alabama. His appointed attorney had no prior experience in

capital post-conviction proceedings, and compensation was limited to $600. The transcript

of the April, 1998 hearing gives little indication that counsel had any theory to aid Mr.

Barbour. His examination of trial counsel is brief and focused largely on experience and

very little on their performance in Mr. Barbour's case. Moreover, no evidence was

presented in addition to this testimony.

**CLAIM J**

**Ineffective Assistance of Counsel at Trial**

151. Mr. Barbour's court-appointed attorneys received insufficient funding from the

State of Alabama in compensation for their services and for their expenses and therefore

were unable to provide a constitutionally adequate defense. As discussed in paragraphs 44

through 46, *supra*, trial counsel recognized that they could not perform adequately with the

funds provided by the state of Alabama, and they filed several motions requesting increases

in their fees.

152. Because of Alabama's refusal to provide adequate compensation for court-

appointed counsel, Mr. Barbour's attorneys were unable to provide him with effective

assistance of counsel at his trial, as required by the Sixth Amendment of the United States

Constitution. As described in the ensuing paragraphs, trial counsel's performance fell

below the constitutional standard in many respects.

153. Trial counsel's numerous errors and omissions at both phases of the capital trial

denied Mr. Barbour his Sixth and Fourteenth Amendment rights to effective assistance of

70

counsel.  These errors and omissions, singly and collectively, resulted in representation well

below that required by constitutional standards and actual prejudice to Mr. Barbour at each

phase of his trial.  Counsel's errors and omissions include, but are not limited to, the

following:

154.  Trial counsel failed to make sufficient preparation for trial in a number of key

respects.

155. Counsel failed to conduct a constitutionally adequate investigation into both the

state's case against Mr. Barbour and possible defenses that could be asserted on Mr.

Barbour's behalf.  This lack of investigation left the defense unprepared to confront the

state's case against Mr. Barbour, and to assert a defense on his behalf.

156. Though appointed not long after Mr. Barbour was arrested, counsel failed to

use the months before trial to pursue the most basic investigation.  For example, despite

their receipt of hundreds of pages of police investigation and witness interview reports, trial

counsel did not contact a single person interviewed by police in connection with the

Roberts murder.

157. Trial counsel also failed to research, prepare and argue defense motions

adequately.

158. Counsel also failed to uncover facts that were essential to the successful

prosecution of motions filed and heard pretrial.  For example, with regard to the motion to

suppress Mr. Barbour's confession, despite John Brown's testimony at the suppression

hearing that he knew of other people who had complained of abuse by Det. Carmichael,

trial counsel made no attempt to locate these people so that they could testify at the hearing. Nor did trial counsel conduct their own search of witnesses, even those interviewed during the course of the Roberts investigation, who might have corroborated Mr. Barbour's accounts of police coercion. Mr. Barbour was prejudiced by the absence of proof supporting this motion.

159. In fact, after the court's denial of the suppression motion, defense counsel essentially gave up on and failed to assert to the jury that Mr. Barbour's statements had been coerced. In this regard, counsel utterly failed to cross-examine Det. Carmichael or Lt. Davis regarding their treatment of Mr. Barbour during his interrogation.

160. Trial counsel rendered ineffective assistance during the jury selection process, as described in paragraphs 113 through 117, *supra*. Counsel's ineffectiveness included, but was not limited to, the following:

(a). Counsel failed to rebut the prosecution's challenge for cause of veniremember Sara Bush although that challenge did not rise to the level required by *Witherspoon* or *Witt*. *See* paragraph 117, supra.

(b). Counsel ignored plain indications by a veniremember that she did not understand the law regarding mitigating circumstances and would therefore be unable to properly consider mitigation in Mr. Barbour's case.

MR. RIGGS: . . . If he had no significant history of prior criminal activity, would you be willing to consider that as a mitigating circumstance?

JUROR: Mitigating meaning?

72

MR. RIGGS: You only get mitigating if you are in the penalty phase where

you are deciding life or death in the electric chair.

Trial Tr. at 114.

(c). Counsel did not take advantage of the right to determine the views of

veniremembers who favored the death penalty, as required by *Morgan v. Illinois*, 504 U.S.

119 (1992). As a result, any jurors who would vote for death in any case in which it is

available, regardless of any evidence in mitigation, were not identified and struck for cause.

161. Notably, the jury's 10-2 vote recommending Mr. Barbour's death sentence was

the bare minimum needed for that recommendation. In other words, at least ten votes are

needed to secure a death sentence. In light of this, trial counsel's ineffectiveness during

jury selection undoubtedly impacted the outcome of both phases of Mr. Barbour's trial, but

particularly the penalty phase. Further factual development and an evidentiary hearing are

necessary to enable Mr. Barbour to demonstrate the extent of the deficiencies of trial

counsel during jury selection, and to show how Mr. Barbour was prejudiced by their

deficient performance.

162. Trial counsel's inexperience defending capital cases was evident from the

beginning of the trial proceedings, and continued throughout. Trial counsel repeatedly

referred to the penalty phase of the trial during the guilt phase, as if it were a foregone

conclusion that Mr. Barbour would be convicted. For example, in his opening statement,

Counsel stated, ". . . you have got to hear a lot of evidence about the circumstances of [Mr.

Barbour's] life before you decide what your recommendation should be about punishment."

73

Trial Tr. at 173.  These references were extremely prejudicial to Mr. Barbour because they

implied to the jury, before a single witness was sworn, that Mr. Barbour was guilty and

would be found guilty, and that *his own lawyers* believed him to be guilty.

163.  Counsel failed to conduct any meaningful cross-examination of several critical

prosecution witnesses, including Police Officer G.D. Salum (Trial Tr. 213) and Fire

Investigator James Deaton (Trial Tr. 269), and state forensic scientists Craig Bailey (Trial

Tr. 298), Bill Landrum (Trial Tr. 340) and Larry Huys (Trial Tr. at 368).  The testimony of

these witnesses went unchallenged before the jury because of trial counsel's failure to

cross-examine them; Mr. Barbour was prejudiced by this failure.

164.  Counsel also failed to object to inflammatory evidence the prosecution

introduced at trial.  For example, a videotape of the crime scene, including footage of the

victim's body which zoomed in to highlight specific injuries, was admitted into evidence.

A detective narrated the tape and described its contents to the jury.  (Trial Tr. 249-55).

Despite the cumulative, prejudicial, and inflammatory nature of the video, trial counsel

failed to object to its introduction.

165. Counsel failed to acquaint themselves with the facts the prosecution would

attempt to prove at the guilt phase, or prepare themselves to highlight the many

inconsistencies and gaps in the prosecution's case through cross-examination.  As

discussed in Paragraphs 155 through 159, *supra*, counsel's failure to investigate the facts of

this case resulted in their almost wholesale acceptance of the prosecution's theory of the

case and inability to cross-examine key witnesses about inconsistencies in that case.

Counsel's ignorance of the facts of this case is painfully highlighted by his statement to the jury "I still have trouble distinguishing between Chris Hester and Barbour." Trial Tr. at 170. Moreover, this statement was highly prejudicial to Mr. Barbour in that it equated him with his co-defendant, the alleged ringleader of this crime.

166. Trial counsel failed to request an acquittal on the capital charge of arson-murder, pursuant to Ala. Code § 13A-5-39, despite the utter lack of evidence to support a finding that Mr. Barbour formed the intent to commit arson while the victim was still alive. Trial counsel's ineffectiveness in failing to move for a directed verdict on this charge was even more egregious considering the judge's statement, in the presence of counsel, that "this is about as mere afterthought a case as you can get where you say that arson was committed to cover up the crime." Trial Tr. at 399. Despite this statement, showing the court's willingness to consider a directed verdict on this charge, trial counsel, out of inexperience or simple incompetence, neglected to seize this opportunity.

167. Trial counsel's closing argument demonstrated a lack of professionalism and inadequate trial preparation. First, counsel undermined his own credibility by suggesting that his job as Mr. Barbour's defense counsel demanded that he distort the true facts of the case. Counsel stated: "I know I'm prejudiced about the facts of this case. And I invite you to take anything I say about it in light of the fact that I have a client to represent here. And naturally I am trying to represent his case to you in the best possible light." Trial Tr. at 445. This comment hardly could have been more prejudicial. It essentially asks the jury to disbelieve the defense's version of events or account of the facts. Second, counsel made

75

statements conceding Mr. Barbour's guilt on the robbery-murder charge.  Counsel stated:
"An I hope that in remarks I am going to make to you in the next few minutes I can get you
to agree with me that even if something was taken from this house– this was not a crime
committed for money."  Trial Tr. at 438.  This comment prejudiced Mr. Barbour by
suggesting that his own attorney believed him guilty.  Such remarks were particularly
egregious in light of the fact that there was very little evidence that any property had been
stolen from the victim.

168. Counsel prejudiced Mr. Barbour in the eyes of the jury by making unfavorable
comparisons between Mr. Barbour's alleged actions and the Biblical betrayal of Jesus by
Judas Iscariot.  Counsel stated: "And yet it is very clear in the Bible that even Judas
Escariot [sic] felt remorse for what he had done, because he later committed suicide. He
could not stand that thought of what he had done, and he committed suicide . . . and I have
to agree that looking at that videotape [of Mr. Barbour's confession] that you saw
yesterday, you might not see any remorse there."  Trial Tr. at 438-39.  These comments, by
Mr. Barbour's own defense attorney, essentially conceded Mr. Barbour's guilt at the
conclusion of the guilt phase of the trial.  They also severely prejudiced Mr. Barbour by
comparing him to the Christian icon of evil.  Moreover, instead of suggesting reasons why
Mr. Barbour may not have exhibited remorse in the videotaped confession, for example, it
was coerced, or well-rehearsed before taped, counsel's comments  suggested that Mr.
Barbour actually did not feel remorse for his actions and simply conceded that he did not
see signs of remorse in Mr. Barbour.

169. Trial counsel also failed to object to the prosecutors' improper remarks during opening and closing statements. For example, the District Attorney made impermissible comments during both opening and closing statements about Mr. Barbour's failure to testify at trial. Trial Tr. at 162, 431. In addition, in his closing argument, the District Attorney improperly commented on the suffering of the victim's family, an irrelevant issue on which there was no evidence in the record. Mr. Barbour was prejudiced by the insinuation that such factors ought to influence the jury's verdict regarding his guilt or innocence. The prosecution also improperly instructed the jury during closing arguments at the guilt phase that it was responsible for making sure Mr. Barbour was "penalized." Trial Tr. at 434. This comment wrongly insinuated the issue of penalty into the jury's deliberations on guilt or innocence. Trial counsel's failure to object to the prosecution's improper remarks prejudiced Mr. Barbour by allowing the jury to assume that such remarks were appropriate and worthy of consideration.

170. Trial counsel was ineffective in declining the trial court's offer to instruct the jury on the proper interpretation of a defendant's failure to testify. Trial Tr. at 421. Such an instruction was particularly critical in Mr. Barbour's case considering the prosecution's repeated comments on Mr. Barbour's failure to testify.

171. For these and other reasons in the record, Mr. Barbour was prejudiced by his trial counsel's ineffective assistance at the guilt phase of his trial. Further factual development and an evidentiary hearing are warranted to allow Mr. Barbour to demonstrate the extent of the deficiencies of trial counsel's representation and to show how he was

77

prejudiced at the guilt or innocence phase of his trial.

172. Mr. Barbour's trial counsel also failed to provide a constitutionally adequate defense at the penalty phase of his trial. Specifically, trial counsel provided ineffective assistance by the acts and omissions described herein, and by the following acts and omissions, among others:

(a) Trial counsel failed to obtain independent defense medical and mental health experts who could have testified to Mr. Barbour's neurological, mental and emotional disabilities as evidence in mitigation of his punishment.

(b) Trial counsel failed to conduct thorough, in-depth interviews with family members and friends of Mr. Barbour, and with other witnesses who could have provided mitigating evidence.

(c) Trial counsel failed to present adequate evidence to the jury and the judge on Mr. Barbour's long history of extreme dependence on alcohol, his low mental age, his anti-social personality disorder, his chronically low self-esteem, and the long-term consequences of a head injury he suffered at age 10.

(d) Trial counsel failed to present evidence to the jury and the judge that because of his psychological and neurological disabilities and inadequacies, Mr. Barbour was anxious to please and easily dominated by more powerful personalities.

(e) Trial counsel presented only cursory evidence on the fact that Mr. Barbour's mother committed suicide just four months before the crimes for which he was convicted. The jury and the judge therefore did not hear sufficient evidence to allow them to

78

appreciate the extent to which this catastrophic event in Mr. Barbour's life exacerbated his chronic alcoholism and made him even more abnormally dependent on and subject to the domination of others. Had the jury known of the tragedy and psychological impairments that marked Mr. Barbour's life, its view of the state's evidence would without question have been different, and its judgment of Mr. Barbour more compassionate.

(f) Trial counsel failed to object to improper evidence, argument, and conduct by the prosecutors during the penalty phase of Mr. Barbour's trial, including, but not limited to:

(I) The prosecution's improper argument that the jury should sentence Mr. Barbour to death in order to keep the death penalty in use. The prosecution analogized the death penalty to someone's limb and said: "If you have something that is working, say like your arm, and it is a perfectly healthy arm, but you never use it and keep it in a sling, as you well know, months later you are going to have totally destroyed use of this arm." Trial Tr. at 649. This statement commanded the jury to sentence Mr. Barbour to death not because it was an appropriate punishment in his particular case, but for reasons of general social and political policy and so that use of the death penalty would not atrophy. Despite the highly inappropriate and prejudicial nature of this statement, trial counsel failed to object to it.

(II) Trial counsel also failed to object to the prosecutors' improper commentary about Mr. Barbour's failure to testify at his trial. During closing argument, the prosecutor repeatedly referred to Mr. Barbour's failure to "apologize" in front of the jury. Trial Tr. at 634, 636. This amounted to improper commentary on his failure to testify on his own behalf, in violation of his Fifth Amendment privilege against self-incrimination.

79

Nevertheless, trial counsel failed to object to these statements and such failure prejudiced Mr. Barbour.

(g) Trial counsel was unprepared and disorganized throughout the penalty phase of Mr. Barbour's trial. Their lack of preparation and disorganization is illustrated by the following events, among others:

(I) Counsel was unable to remember the nature of his previous objections to inflammatory photographs introduced into evidence or which exhibits he had objected to, and he was therefore obliged to admit this in front of the jury in the process of renewing his objections. Trial Tr. at 531-32.

(II) Counsel forgot to question a witness during the witness's testimony and was obliged to renew his questioning after the witness stepped down from the stand. Trial Tr. at 568.

(III) Counsel attempted to withdraw evidence of Mr. Barbour's antisocial personality disorder as a mitigating circumstance, until the judge advised him otherwise. Trial Tr. at 622.

(IV) Counsel repeatedly made statements about his ignorance of the case, including, "I am so guilty at this point I'm not sure whether . . . " Trial Tr. at 628, and "I can't specifically remember at this moment which ones we objected to previously. But if we could just renew the objections. . . ." Trial Tr. at 531-32.

(h) Finally, and remarkably, trial counsel failed to articulate to the jury or the judge any reasons why Mr. Barbour's life should be spared.

80

173. For these reasons and other reasons in the record, Mr. Barbour was prejudiced by his trial counsel's inadequate preparation and ineffective assistance during the penalty phase of his trial.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Barbour prays that this Court:

1. Grant an immediate stay of execution;

2. Issue a writ of habeas corpus to have him brought before it, so that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

3. Conduct a hearing at which proof may be offered concerning the allegations of his petition, including the testimony of experts;

4. Permit him, because of his indigency, to proceed without prepayment of costs or fees;

5. Grant him sufficient funds to secure expert and lay testimony necessary to prove the facts as alleged in his petition;

6. Grant such other relief as may be necessary and appropriate.

81

Respectfully submitted,


George H. Kendall
Miriam Gohara
99 Hudson Street
Suite 1600
New York, New York 10013
(212) 965-2200

BY _____
Counsel for Petitioner


82

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was delivered by hand to the Office of the Alabama Attorney General this 21st day of May, 2001.

Miriam Gohara