ORIGINAL

RECEIVED IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

2001 SEP 10  A 11: 30

[ F I L E D ]

SEP 1 0 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

|                                              |     |
| -------------------------------------------- | --- |
| CHRISTOPHER BARBOUR                           | )   |
|                                              | )   |
| Petitioner,                                  | )   |
|                                              | )   |
| -vs-                                         | )   |
|                                              | )   |
| MICHAEL HALEY, Commissioner                   | )   |
| Alabama Department of Corrections,            | )   |
|                                              | )   |
| Respondent.                                  | )   |

CV NO. 01-T-0612-N

**DEATH PENALTY**

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR PRESERVATION OF DNA EVIDENCE

### BACKGROUND FACTS

Petitioner, Christopher Barbour, is an Alabama death-row inmate.  In June 1993, Barbour was convicted of the March 1992 rape and murder of Thelma Roberts.  He was sentenced to death by the Montgomery County Circuit Court, Judge William Gordon, on February 2, 1994.  The facts relevant to this motion follow.

At trial, the State's case rested almost exclusively on Mr. Barbour's videotaped confession in which he implicated himself, co-defendant Christopher Hester, and Michael Mitchell, a juvenile who was never prosecuted, in Roberts's rape and murder.  No physical evidence linked Mr. Barbour, Mr. Hester or Mr. Mitchell to the crime, despite the collection of fingerprints, trace evidence and semen from the crime scene and the victim.  According to the State's account of the crime, based

1

42

on the events Mr. Barbour reported in his confession, Hester, Barbour, and Mitchell were driving around on March 20, 1992 looking for a place to drink beer. After they went to the home of one of Ms. Roberts's neighbors, a friend of theirs who was not home, Mr. Hester, who was allegedly acquainted with Ms. Roberts, knocked on her door.[1] She invited the trio inside. They all drank together for some time, after which Ms. Roberts and Chris Hester went into her bedroom. A few minutes later, Barbour and Mitchell, who were still in the living room drinking, heard Hester and Roberts fighting. They went into the bedroom where they helped Hester beat Roberts unconscious. Hester then raped Roberts while Barbour and Mitchell held her down. After the rape, Mr. Barbour and the others panicked that Ms. Roberts would be able to identify them, so Mr. Barbour fetched a kitchen knife which he used to stab the victim to death.

In his confession, adopted by the State as the definitive account of the crime, Mr. Barbour stated unequivocally that he was certain that Mr. Hester ejaculated during the rape. TR at 147. He also reported that neither he nor Mike Mitchell raped Thelma Roberts after Hester finished. TR at 168. At no point has the State alleged that Mr. Barbour was the rapist. Mr. Barbour's confession was the cornerstone of the prosecution's evidence against him.

## RELEVANT PROCEDURAL HISTORY

Mr. Barbour incorporates by reference the procedural history outlined in his initial Motion for Preservation of DNA Evidence, filed with this Court on May 21, 2001. Since the filing of that motion, the Court, Magistrate Judge Susan Russ Walker has ordered the State to inventory all "blood

---

[1] Christopher Hester pled guilty to this murder in 1994. Despite his guilty plea, Mr. Hester has claimed from the outset that he is innocent and that he has never seen Thelma Roberts. The plea was part of a package deal resolving several cases against Hester, most of which were property crimes. Hester was aware of the outcome of Barbour's trial and therefore understood the risk of contesting the charges in this case.

2

and semen evidence relating to the crime forming the basis of the prosecution of [Christopher Barbour that] remains within the custody of the State of Alabama...." *See* Order, 6/15/01.  The State complied with this order by providing property inventory lists from the Montgomery Police Department related to this case.  *Respondent's Notification of Evidence Relating to Barbour's Motion for Preservation of DNA Evidence* at 2.  The State contends that a box containing the evidence remains in the MPD's possession.  Among the items contained in the box are envelopes with undisclosed contents and one envelope containing slides.  *Id.*  The State asserts that these envelopes contain the blood and semen evidence.  *Id.*

In light of this information provided by the State and recent, relevant federal precedent, Mr. Barbour now renews his request that this Court order preservation of any and all biological evidence collected in this case.

## RECENT FEDERAL PRECEDENT SUPPORTS MR. BARBOUR'S MOTION FOR PRESERVATION OF DNA EVIDENCE

The recently-decided case of *Braxton v. Cherrix*, 258 F.3d 250 (4th Cir. 2001) (decided July 9, 2001)[2] applies directly to Mr. Barbour's case.  In *Cherrix*, the Fourth Circuit upheld the district court's grant of the petitioner's motion to preserve DNA evidence which was submitted in conjunction with his federal habeas petition.  "Without passing on Cherrix's claims of innocence, the district court determined that, at the very least, 'the habeas petition raises disturbing questions regarding the constitutionality of Cherrix's trial proceedings that are heretofore unanswered.'" *Id.* at 255.  This holding aptly applies to Mr. Barbour's case.  Mr.

---

[2] A copy of the Fourth Circuit's decision in *Cherrix* is attached to this motion as Appendix A.

3

Barbour's habeas petition raises serious constitutional claims and claims of innocence.  Pending resolution of those claims, the State should be ordered to preserve the biological evidence.

Moreover, the district court in *Cherrix* recognized that "'[o]rdering a new DNA test has the potential of producing three different outcomes.  First, the test can prove inconclusive, in which case no newly- discovered evidence would be before the Court, and the [Herrera v. Collins, 506 U.S. 390 (1993)] inquiry [and, relatedly, the [Schlup v. Delo, 513 U.S. 298 (1995)] inquiry,] would be futile. Second, the test results can show that Cherrix sodomized [the victim] and deposited the seminal fluid into her body, in which case the evidence would moot his claims of innocence. Third, the test results can show a third party deposited the seminal fluid into [the victim's] body. If the test results implicate a third party, then the issue would be placed before the Court of whether such evidence, coupled with other allegations of constitutional error, would be sufficient to grant Cherrix federal habeas relief. However, the DNA evidence must first be brought before the Court in discovery prior to consideration of the habeas corpus petition on the merits.'" *Id.* at 256(citing *Cherrix v. Braxton*, 131 F.Supp.2d 756 (E.D.Va. 2000)).

The possible results the district court cited in *Cherrix* are practically identical to the possible results in Mr. Barbour's case.  In the first scenario, DNA results in Mr. Barbour's case may be inconclusive, in which case Mr. Barbour will need to establish his claims of innocence by some means other than biological testing.  In the second scenario, the DNA tests will identify Mr. Barbour as the source of the semen found on the victim and will remove doubts as to his guilt.  In

the third scenario, the DNA tests will implicate a third party (not Hester or Barbour) as the source of the semen, which will corroborate Mr. Barbour's claims of innocence.[3]

Another recently-decided federal case also supports Mr. Barbour's request for preservation of biological evidence. In *Godschalk v. Montgomery Co. District Attorney, et al.*, – F.Supp. –, (E.D. Pa. August 27, 2001)[4], the United States District Court for the Eastern District of Pennsylvania issued an injunction requiring the State to release biological evidence for DNA testing upon the motion of an inmate convicted of rape. The state courts had previously denied Godschalk's petition to inspect and test biological evidence on the grounds that he had confessed to the crime and his confession represented "'overwhelming evidence of [Godschalk's] guilt, completely separate from any identification testimony [and that the conviction rested] largely on [Godschalk's] own confession which contains details of the rapes which were not available to the public.'" *See id.* (Order at 3) (citing *Commonwealth v. Godschalk*, 451 Pa. Super. 425, 679 A.2d 1295 (1996)). The State also argued before the federal court that DNA testing in Godschalk's

---

[3] In *Cherrix*, the Fourth Circuit and the district court recognized that "because the prosecution's theory of the case at trial was that a lone assailant murdered and sodomized [the victim], it is reasonable to infer that the person whose seminal fluid was recovered from [the victim] is her killer." *Cherrix*, 258 F.3d at 254.

In Mr. Barbour's case, the prosecution repeatedly asserted at trial that Christopher Hester was the sole rapist of Thelma Roberts and that Mr. Barbour murdered her. When the DNA evidence excluded Mr. Hester as the source of the semen, the prosecution nevertheless allowed the jury to believe that the crime took place as described in Mr. Barbour's counsel-less incriminating statements, which remain the only evidence implicating him in this crime. In this case, as in *Cherrix*, the prosecution's theory asserts that the same group of people sexually assaulted and then murdered the victim. Therefore, evidence that neither Mr. Barbour, nor Mr. Hester, who has already been ruled out as a source, deposited the semen on the victim, will cast further major doubt on the prosecution's theory of this case and either identify a third party or leave open the identity of the real assailant(s).

[4] A copy of *Godschalk* is attached as Appendix B.

case was unnecessary because "his confession was not coerced and contained details of the rapes which were not known to the public and would only be known by the perpetrator." *Godschalk*, – F.Supp.-- (Order at 4). As in Mr. Barbour's case, Mr. Godschalk's confession was taped and transcribed.

The district court in *Godschalk* concluded that despite the presence of a seemingly uncoerced, detailed confession, DNA testing should be allowed. "[I]f by some chance no matter how remote, DNA testing on the biological evidence excludes [Godschalk] as the source of the genetic material from the victims, a jury would have to weigh this result against [Godschalk's] uncoerced detailed confessions to the rapes." *Id.* (Order at 7). The Court went on to explain that although the confession is "powerful inculpatory evidence," so is DNA testing that excludes the inmate as the source of genetic material found on the victims. Thus, "[s]uch contradictory results could well raise reasonable doubts in the minds of jurors as to [Godschalk's] guilt." *Id.* (Order at 8). The Court also concluded that "[g]iven the well-known powerful exculpatory effect of DNA testing, confidence in the jury's finding of [Godschalk's] guilt at his past trial, where such evidence was not considered, would be undermined." *Id.* Moreover, the availability of exculpatory DNA test results created a reasonable likelihood that the result of Godschalk's trial would have been different. *Id.* Thus, the Court determined that Mr. Godschalk has a due process right of access to the genetic material to allow for DNA testing. *Id.*

In this case, as in *Godschalk*, the State has argued that Mr. Barbour's confession obviates the need for DNA testing.[5] The precedent of *Godschalk* bolsters Mr. Barbour's contention that

---

[5] However, unlike in *Godschalk*, Mr. Barbour has alleged from the moment of his arrest that his confession was coerced.

regardless of the presence of a confession, and in Mr. Godschalk's case even the identification of eye-witnesses, the two rape victims, DNA testing is appropriate where it would significantly undermine the State's case by contradicting the accused's own incriminating statements.  In Mr. Barbour's case, the exclusion of him and Christopher Hester as sources of the semen recovered from the victim would have dismantled the prosecution's theory of the case and likely would have altered the outcome of his trial.  At the very least, exclusionary DNA results "could indeed provide *material exculpatory evidence* for a jury to consider along with the inculpatory evidence of [a] detailed confession."  *Godschalk,* – F.Supp. – (Order at 8).

Such DNA testing will only be possible in Mr. Barbour's case if this Court orders all state agencies holding relevant biological materials to preserve such materials indefinitely.

## **RELIEF REQUESTED**

Wherefore, Petitioner respectfully requests that this court order preservation of the contents of the box and the envelopes identified in the State's notification of biological evidence and preservation of any as yet undisclosed biological materials collected in this case.  Petitioner respectfully requests that this order be directed to the Montgomery Police Department, the Montgomery District Attorney's Office, and all investigating agencies and other entities in possession of evidence subject to DNA testing in this case.

Respectfully Submitted,

*Miriam Gohara*

George H. Kendall
Miriam Gohara
99 Hudson St., Suite 1600
New York, NY 10013
(212) 965-2200

7

## CERTIFICATE OF SERVICE

I hereby certify that this ___7th___ day of September, 2001, a copy of the foregoing pleading was sent via first-class mail, postage paid, to:

Assistant Attorney General J. Clayton Crenshaw
Alabama Attorney General's Office
11 South Union St.
Montgomery, AL 36130

**APPENDIX A**

258 F.3d 250
**(Cite as: 258 F.3d 250, 2001 WL 789070 (4th Cir.(Va.)))**
**H**

United States Court of Appeals,
Fourth Circuit.

In re Daniel BRAXTON, Warden, Sussex I State
Prison;  Mark L. Earley, Attorney
General of Virginia;  Samuel H. Cooper, Clerk,
Accomack County Circuit Court,
Petitioners.
Brian Lee Cherrix, Petitioner-Appellee,
v.
Daniel Braxton, Warden, Sussex I State Prison,
Respondent-Appellant.

Nos. 01-1, 01-2.

Argued June 5, 2001.
Decided July 9, 2001.

After state capital murder conviction was upheld on direct appeal, 513 S.E.2d 642, petition for federal habeas relief was brought. The United States District Court for the Eastern District of Virginia, Gerald Bruce Lee, J., granted injunctive relief to petitioner, ordering state to make evidence available for DNA retesting. See 131 F.Supp.2d 756. State sought interlocutory appeal from order, and alternatively sought writ of mandamus to vacate order. The Court of Appeals, King, Circuit Judge, held that: (1) state failed to show "irreparable consequences" justifying interlocutory appeal, and (2) writ of mandamus was likewise unwarranted since retesting order could be adequately reviewed on appeal from final judgment in habeas proceeding.

Appeal dismissed; petition for mandamus denied.

Traxler, Circuit Judge, filed concurring opinion.

West Headnotes

**[1] Federal Courts ☞572.1**
170Bk572.1 Most Cited Cases

Non-final order of district court generally is not subject to interlocutory appeal if it is not directed to merits of underlying action, e.g. is order compelling discovery, regardless of fact that violator of order may be held in contempt.  28 U.S.C.A. § 1292(a)(1).

**[2] Federal Courts ☞572.1**
170Bk572.1 Most Cited Cases

Interlocutory order by district court may be appealable if appellant can show that order might have serious, perhaps irreparable, consequence, and that order can be effectually challenged only by immediate appeal.  28 U.S.C.A. § 1292(a)(1).

**[3] Habeas Corpus ☞814**
197k814 Most Cited Cases

State failed to meet "irreparable consequences" burden justifying interlocutory appeal from district court's order in habeas proceeding that state turn over evidence for DNA retesting, and that funds be made available for retesting: state's concern about destruction of evidence was premature, since order was not for testing itself but rather for discovery; district court intended to protect chain of custody; order did not upset finality of state-court conviction but only carried potential to do so someday; and order could be adequately reviewed on appeal from final judgment, if district court ultimately awarded habeas relief based on retesting. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(q), 21 U.S.C.A. §848(q);  28 U.S.C.A. §§ 1292(a)(1), 2254(2)(A)(ii), (2)(B).

**[4] Mandamus ☞4(4)**
250k4(4) Most Cited Cases

State was not entitled to writ of mandamus requiring vacatur of district court's order in habeas proceeding that state turn over evidence for DNA retesting, and that funds be made available for retesting, since order could be adequately reviewed on appeal from final judgment, in event that district court ultimately awarded habeas relief based on retesting. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(q), 21 U.S.C.A. §848(q);  28 U.S.C.A. §§ 1651, 2254(2)(A)(ii), (2)(B).

**[5] Mandamus ☞1**
250k1 Most Cited Cases

Party seeking writ of mandamus must demonstrate that: (1) he has clear and indisputable right to relief sought; (2) responding party has clear duty to do specific act requested; (3) act requested is an official act or duty;

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(4) there are no other adequate means to attain relief he desires; and (5) issuance of writ will effect right and justice in the circumstances. 28 U.S.C.A. § 1651.

**\*252 ARGUED:** Pamela Anne Rumpz, Assistant Attorney General, Office of the Attorney General, Richmond, VA, for Appellant. Michele Jill Brace, Virginia Capital Representation Resource Center, Charlottesville, VA, for Appellee. **ON BRIEF:** Robert L. Jenkins, Jr., Bynum & Jenkins, P.L.L.C., Alexandria, VA; Peter Neufeld, Barry Scheck, The Innocence Project, Benjamin Cardozo School of Law, New York, NY, for Appellee.

Before MOTZ, TRAXLER, and KING, Circuit Judges.

Appeal dismissed and petition for mandamus denied by published opinion. Judge KING wrote the opinion, in which Judge DIANA GRIBBON MOTZ joined. Judge TRAXLER wrote a concurring opinion.

## OPINION

KING, Circuit Judge:

**\*\*1** Daniel Braxton, the Warden of Sussex I State Prison in Virginia (the "Warden"), appeals from the district court's order granting the motion of Brian Lee Cherrix, a death row inmate seeking federal habeas relief, for preservation and deoxyribonucleic acid ("DNA") retesting of the prosecution's evidence in his capital murder case. Alternatively, the Warden, along with Mark L. Earley, Attorney General for Virginia, and Samuel H. Cooper, Clerk of the Accomack County Circuit Court (collectively, the "Commonwealth"), seeks a writ of mandamus to compel the court to vacate its order. For reasons explained below, we dismiss the Warden's interlocutory appeal for lack of jurisdiction, and we deny the Commonwealth's petition for extraordinary relief as unjustified.

### I.

### A.

Cherrix was sentenced to death for the January 27, 1994 capital murder of Tessa Van Hart. [FN1] Van Hart, then twenty-three, was sodomized and shot twice in the head after being dispatched for a pizza delivery on Chincoteague Island. *See* Cherrix v. Commonwealth, 257 Va. 292, 513 S.E.2d 642, 645-46

(1999) (setting forth a detailed factual history of the crime). Her murder went unsolved for more than two years. On June 3, 1996, while Cherrix was incarcerated in the Accomack County Jail on unrelated charges, he offered to share information with police about the Van Hart murder in exchange for leniency with respect to his pending sentencing. Cherrix initially told authorities that his cousin, Robert Birch, III, had divulged to Cherrix in February 1994 that Birch had killed Van Hart--first luring her to an unoccupied residence by ordering a pizza, then raping and shooting her, and finally ditching his gun in a nearby creek.

> **FN1.** Cherrix was also convicted of forcible sodomy, using a firearm in the commission of a felony (two counts), and possessing a firearm after being convicted of a felony, all arising from the same incident.

Birch, who had died in 1995, was ruled out as a suspect. However, when Cherrix led investigators to the spot in the creek where Birch had supposedly told him the murder weapon was discarded, divers searching that location recovered a .22 caliber Marlin rifle. (This gun's patterns were consistent with the bullets recovered from Van Hart's body, although the prosecution's firearms experts could not identify this rifle specifically as the murder weapon.) **\*253** Cherrix occasionally lapsed into use of the first person in describing how and where the gun ended up in the creek. Moreover, later the day the gun was recovered, during a police interview, Cherrix gave several differing versions of Birch's alleged disclosures, and he used hand and arm gestures to demonstrate how Birch had purportedly claimed to have dumped the rifle. Then, on April 16, 1997, while being transported back to Accomack County Jail on still different charges, Cherrix told police yet another version of Birch's supposed description of the murder. Finally, according to authorities, on April 25, 1997, Cherrix orally confessed to Edward Lewis, Chincoteague's Assistant Police Chief, that he, Cherrix, had murdered and sodomized Van Hart. Accompanied to Chincoteague by Lewis and an Accomack County Sheriff's

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Deputy, Cherrix then pointed out various spots that he had described in his confession.

1.

**\*\*2** Cherrix's confession was reduced to handwriting by Lewis, purportedly as dictated by Cherrix, who later refused to sign it. The Commonwealth emphasizes that Cherrix has variously, and inconsistently, suggested that his confession was false, inaccurately transcribed, coerced, and obtained in violation of his right to counsel. Cherrix counters that even if he did confess, it is not unprecedented for an accused to confess to a crime that he did not actually commit.

According to Cherrix, the only evidence connecting him to Van Hart's murder, other than his confession, was the .22 caliber Marlin rifle. Witnesses testified at trial that Cherrix had owned just such a gun, that he no longer possessed it several days after the crime, and that his gun had a broken, taped stock like the rifle recovered from the creek. There was also testimony, however, that Cherrix's gun had a squirrel carved on the stock. There is no indication in the record that the rifle recovered from the creek bore such a carving. [FN2]

FN2. The Commonwealth maintains that the lack of reference in the record to any squirrel carving on the rifle recovered from the creek supports the inference that there was such a carving on that gun; Cherrix contends, conversely, that the record's silence suggests that no such carving was evident. The Commonwealth responded at oral argument that if the suspected murder weapon did not bear a squirrel carving, this marking must have eroded from the rifle after "years and years and years" in the saltwater creek. Actually, the rifle was recovered from the creek only two years after the murder. And it is unclear, in any event, what effect the saltwater might have had on the gun's wooden stock.

Cherrix pleaded not guilty to the charges against him, presenting an alibi defense at trial. Cherrix maintained that, at the time Van Hart was killed, he was caring for his six-week-old daughter at his grandmother's home while speaking on the telephone with his wife, who had undergone an emergency appendectomy earlier that day. This defense was refuted at trial by Cherrix's then-estranged wife, who testified that Cherrix did not call her at the hospital until after 9 o'clock that night--outside the window of time in which Van Hart's murder occurred. The alibi was supported, however, by Cherrix's grandmother, who testified that the phone call occurred at about 8 o'clock or 8:15. In state habeas proceedings, Cherrix presented additional evidence that it had been the hospital's policy to terminate all patient telephone conversations at 9 o'clock.

2.

In 1994, some two years before Cherrix's confession, DNA testing was conducted on seminal fluid collected from Van Hart's anus. In conjunction with her autopsy, the medical examiner divided the **\*254** material taken from her body into spermatozoa and non-spermatozoa fractions, which were then subjected to a type of DNA analysis termed polymerase chain reaction ("PCR") testing. The non-spermatozoa fractions were consistent with the DNA collected from Van Hart. Due to an inability to amplify the spermatozoa fractions, however, the PCR test results on those fractions were inconclusive.

In authorizing the DNA retesting now in dispute, the district court acknowledged that, because the prosecution's theory of the case at trial was that a lone assailant murdered and sodomized Van Hart, it is reasonable to infer that the person whose seminal fluid was recovered from Van Hart's anus is her killer. The court also recognized that DNA technology has advanced since the PCR tests were conducted in this case in 1994, and that, according to Cherrix, the newer short tandem repeat ("STR") and mitochondrial tests can conclusively identify the donor of the seminal fluid by evaluating substances other than spermatozoa, such as epithelial cells and white blood cells. [FN3]

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**FN3.** The Commonwealth has continued to maintain, through oral argument, that it has no plans to voluntarily retest the evidence. In fact, Cherrix initially sought DNA retesting in the state laboratory, but the Commonwealth refused this request. The district court then authorized testing in a private laboratory. Moreover, though a new Virginia statute provides for DNA testing in certain cases, *see* S. 1366, 2001 Sess. (Va.2001) (enacted), it is not clear whether Cherrix qualifies for retesting under this measure. According to the district court, "this legislation comes too late for this habeas petitioner, and the federal court is his last resort." Cherrix v. Braxton, 131 F.Supp.2d 756, 787 (E.D.Va.2000).

### B.

**\*\*3** This is the first time in any proceeding that Cherrix has requested DNA retesting. Previously, the Supreme Court of Virginia upheld Cherrix's convictions and death sentence on direct appeal, concluding, inter alia, that his confession was admissible, *see* Cherrix, 257 Va. 292, 513 S.E.2d 642, and the court subsequently denied Cherrix's request for rehearing. The Supreme Court of the United States then denied his petition for a writ of certiorari. *See* Cherrix v. Virginia, 528 U.S. 873, 120 S.Ct. 177, 145 L.Ed.2d 149 (1999). Cherrix filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on December 3, 1999, which the court dismissed on April 4, 2000.

Following the state supreme court's denial of rehearing on June 9, 2000, the trial court scheduled Cherrix's execution for August 16, 2000. The day before, however, the district court for the Eastern District of Virginia stayed Cherrix's execution and granted his motion for appointment of counsel.

### 1.

Prior to filing his federal petition for a writ of habeas corpus, Cherrix moved the district court for DNA retesting of the seminal fluid collected from Van Hart's body. While this motion was pending, Cherrix filed another motion for the retention and preservation of evidence, asking the court to order ten separate state agencies to preserve the evidence pertaining to Van Hart's murder and Cherrix's prosecution. The Warden objected to the court ordering any state agencies to act. On December 12, 2000, the district court conditionally granted Cherrix's motion for the retention and preservation of evidence, directing the Commonwealth to preserve all evidence, including any bodily fluids collected from Van Hart.

Cherrix then filed his petition in the district court for a writ of habeas corpus **\*255** on December 28, 2000. The court subsequently authorized funding of DNA retesting and directed the Commonwealth to make the requisite evidence available for analysis. *See* Cherrix v. Taylor, No. 00-1377 (E.D.Va. Jan. 9, 2001) ("January 9, 2001 Order"). The following day, the court denied the Warden's oral motion to stay this order, ruling that the Warden had set forth no basis for his request. That same day, the Commonwealth filed in this Court: (1) an application for an emergency stay of the January 9, 2001 Order; (2) a Petition for a Writ of Mandamus and/or Prohibition; and (3) the Warden's appeal of the January 9, 2001 Order. On February 5, 2001, we granted the Commonwealth's application for an emergency stay pending appeal.

Pursuant to Rule 21(b)(4) of the Federal Rules of Appellate Procedure, we invited the district court to submit a response to the petition for a writ of mandamus. The district court responded, on February 28, 2000, with a seventy-five-page supplemental memorandum opinion. *See* Cherrix v. Braxton, 131 F.Supp.2d 756 (E.D.Va.2000) ("Supplemental Opinion"). Therein, the court "clarif[ies] and reaffirm[s]" its nine-page January 9, 2001 Order. *See* id. at 759. **[FN4]**

**FN4.** The Commonwealth contends that we should not consider this Supplemental Opinion because, in part, it "appears to be just a *post facto* attempt to justify its January 9 action on entirely new grounds which were ... entirely omitted from the district court's January 9 order." Reply in Support of Petition

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

for Writ of Mandamus, at 15. We reject the assertion that the Supplemental Opinion should not be considered, because this submission was filed at our request and aids us in our consideration of not only the Commonwealth's mandamus petition, but also the Warden's appeal. *See* Fed. R.App. P. 21(b)(4) ("The court of appeals may invite or order the trial-court judge to address the petition [for a writ of mandamus.]"); In re Grand Jury Proceedings Under Seal, 947 F.2d 1188, 1189 (4th Cir.1991) ("[A] district court does not lose jurisdiction to proceed as to matters in aid of the appeal."). Moreover, though the Supplemental Opinion is certainly more detailed than the January 9, 2001 Order, these documents do not, as the Commonwealth contends, conflict with each other.

2.

**4 In its Supplemental Opinion, the district court expounded that its January 9, 2001 Order "granted the habeas petitioner's request for funds, and ordered that the custodians of the evidence make it available for testing, for three reasons." Cherrix, 131 F.Supp.2d at 759. First, the court determined that it was authorized, pursuant to 21 U.S.C. § 848(q), to provide funding for services which are reasonably necessary to support a petition for habeas corpus. Second, the court concluded that DNA retesting is reasonably necessary to support Cherrix's claims of actual innocence, *see* Herrera v. Collins, 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (assuming without deciding "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional"), and innocence as a "gateway" to proving other constitutional claims, *see* Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (permitting a habeas petitioner to show that a constitutional violation probably resulted in his conviction, despite his innocence, by establishing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence"), as well as a potential clemency petition. Third, the court ruled that Cherrix showed good cause

for DNA retesting, entitling him to discovery pursuant to Rule 6(a) of the Rules Governing § 2254 Cases and 28 U.S .C. § 2254(2)(A)(ii), (2)(B).

*256 Without passing on Cherrix's claims of innocence, the district court determined that, at the very least, "the habeas petition raises disturbing questions regarding the constitutionality of Cherrix's trial proceedings that are heretofore unanswered." Cherrix, 131 F.Supp.2d at 786. The court also recognized that

[o]rdering a new DNA test has the potential of producing three different outcomes. First, the test can prove inconclusive, in which case no newly-discovered evidence would be before the Court, and the Herrera inquiry[and, relatedly, the Schlup inquiry,] would be futile. Second, the test results can show that Cherrix sodomized Ms. Van Hart and deposited the seminal fluid into her body, in which case the evidence would moot his claims of innocence. Third, the test results can show a third party deposited the seminal fluid in Ms. Van Hart's body. If the test results implicate a third party, then the issue would be placed before the Court of whether such evidence, coupled with other allegations of constitutional error, would be sufficient to grant Cherrix federal habeas relief. However, the DNA evidence must first be brought before the Court in discovery prior to consideration of the habeas corpus petition on the merits.

Id. at 765-66 (internal citations omitted).

II.

The Warden asks us, first, to reverse the district court's January 9, 2001 Order pursuant to an exercise of our jurisdiction under 28 U.S.C. § 1292(a)(1) (providing "jurisdiction of appeals from [i]nterlocutory orders of the district courts of the United States ... granting injunctions"). Alternatively, the Commonwealth seeks a writ of mandamus, under the All Writs Act, 28 U .S.C. § 1651, compelling the district court to vacate its order. [FN5]

> FN5. The Commonwealth captioned its pleading as a "Petition for a Writ of Mandamus and/or Prohibition." Because the terms "mandamus" and "prohibition" have come to be used interchangeably with regard to writs, we will, for the sake of simplicity,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

refer to the Commonwealth's petition as one seeking a writ of mandamus. *See, e.g.,* In re Sch. Asbestos Litig., 921 F.2d 1310, 1313 (3d Cir.1990) ("Although a writ of mandamus may appear more appropriate when the request is for an order mandating action, and a writ of prohibition may be more accurate when the request is to prohibit action, modern courts have shown little concern for the technical and historic differences between the two writs. Under the All Writs Act, the form is less important than the substantive question of whether an extraordinary remedy is available .") (internal citations, quotation marks, and alteration omitted).

**5 We cannot overemphasize the extraordinary nature of the remedies sought here, stemming from the federal court system's longstanding disapproval of piecemeal appellate review. *See, e.g.,* Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc., 385 U.S. 23, 25 n. 3, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966) (recognizing that interlocutory review of pretrial orders is "an intolerable burden for us, an improper and uncertain interference with trial court discretion, and a confusing invitation to indiscriminate appeals in the future") (quoting Peter Pan Fabrics, Inc. v. Dixon Textile Corp., 280 F.2d 800, 806 (2d Cir.1960) (Clark, J., dissenting)); Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967) (acknowledging that "only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of" the writ of mandamus, an "extraordinary remedy").

A.

We first address whether, pursuant to 28 U.S.C. § 1292(a)(1), we possess jurisdiction *257 over the Warden's appeal from the district court's January 9, 2001 Order. This order, the Warden insists, "has the practical effect of an injunction in that it commands specific conduct from the Warden, Attorney General and Clerk of the trial court." Appellant's Br., at 11. Moreover, the Warden emphasizes, failure to comply with the order is punishable by contempt.

[1] However, a non-final order generally is not subject to interlocutory appeal under § 1292(a)(1)if it is not directed to the merits of the underlying action. *See, e.g.,* Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 279, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) ("An order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)."); Lewis v. Bloomsburg Mills, Inc., 608 F.2d 971, 973 (4th Cir.1979) (holding that where "[t]he district court's order ... regulates the conduct of discovery" and, thus, "is merely a step in the litigation process and is in no way directed to the merits of the underlying action[,] ... the order is not appealable under § 1292(a)(1)"). It is irrelevant to this analysis that a violator of the order may be held in contempt. *See* United States ex rel. Rahman v. Oncology Assocs., P.C., 198 F.3d 502, 507 (4th Cir.1999) ("[A]n order compelling discovery involves an interlocutory command that may be subject to the contempt power of the court, yet such an order is not thought to be cognizable under § 1292(a)(1).").

In this case, the district court's January 9, 2001 Order allows Cherrix to engage in discovery potentially supportive of his habeas petition, while recognizing that, even if the results of the DNA retesting exclude Cherrix as the semen donor, he still is not necessarily entitled to relief. As the court explained in its Supplemental Opinion, "The new DNA testing methods *could possibly* procure conclusive evidence demonstrating that a third person committed the murder and sodomy which *may* ultimately exonerate the habeas petitioner of capital murder." Cherrix, 131 F.Supp.2d at 759 (emphasis added); *see also* id. at 786 ("This Court was called upon to make a judgment about the reasonable necessity of DNA testing services to a condemned habeas petitioner's case. This Court made no proclamation or judgment about Cherrix's claims of innocence."). Clearly, the January 9, 2001 Order is just a step in the litigation process that is not directed to the merits of the underlying habeas action. At this juncture, the district court has not yet even been presented with the question

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

of the admissibility of the DNA retesting results.

**6 [2] Nonetheless, an interlocutory order may be appealable pursuant to § 1292(a)(1) if the appellant "can show that [this order] of the district court might have a 'serious, perhaps irreparable, consequence,' and that the order can be 'effectually challenged' only by immediate appeal[.]' " Carson v. Am. Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981); *see also* Gulfstream Aerospace, 485 U.S. at 287-88, 108 S.Ct. 1133 (recognizing that this analysis applies to "orders that have the practical effect of granting or denying injunctions"); Oncology Assocs., 198 F.3d at 507 (same).

1.

[3] The Warden maintains that the "serious, perhaps irreparable, consequences" of permitting the DNA testing to go forward include: (1) "the potential destruction of the Commonwealth's evidence"; (2) "a guaranteed loss of the chain of custody"; (3)"the undeniable damage to federalism and finality that has 'special *258 importance' in the context of federal review of state court convictions"; and (4) "an opening of the floodgates to a host of similar ill-advised demands upon the federal district courts." Appellant's Br., at 12- 13. We address these purported consequences in turn.

First, the Warden's concern about destruction of the evidence is, at best, premature. As the district court made clear, its January 9, 2001 Order
did not provide for the final testing of the evidence, only for its preservation and for testing funds. At the time of the Court's January 9 Order--and presently--the Court intended to conduct a hearing to determine how the DNA testing would proceed. The Court expected both the Commonwealth and the parties to participate in structuring conditions for the testing of the requested evidence in order to protect the integrity of the evidence and to ensure equal access to all parties.
The procedure the Court adopts for the analysis of the evidence will address the Petitioners' concern that Cherrix may consume the remaining forensic

evidence and that the integrity of the evidence be maintained.
Cherrix, 131 F.Supp.2d at 771-72 (internal citations omitted). Indeed, the district court went on to discuss at length the procedural issues related to post-conviction DNA testing identified in a 1999 report sponsored by the Attorney General of the United States, [FN6] including the type of DNA analysis to be utilized, the choice of laboratory to perform the testing, and the amount of sample to be available for testing and replicate testing. *See* id. at 772-73.

> FN6. *See* National Commission on the Future of DNA Evidence, Postconviction DNA Testing: Recommendations for Handling Requests (1999).

> Furthermore, even if the Commonwealth's supposition were realized and the evidence were destroyed, it is doubtful that harm would flow to anyone other than Cherrix. That is, as Cherrix aptly points out, he
already stands convicted and condemned, and the Commonwealth does not need the biological evidence in order to carry out his death sentence.... [This] evidence has been sitting in some storage box(es) for years, and that is where it will remain, untested and unused, unless the[Commonwealth] is compelled to make it available.
**7 Appellee's Br., at 15. The Warden counters that, if the evidence is consumed during retesting, the Commonwealth might lose the ability to use it "on retrial if necessary or during clemency proceedings." Appellant's Reply Br., at 7. The Warden does not explain, however, how this would lead to irreparable harm to the Commonwealth, i.e., why it would need the evidence for even more retesting. Most significantly, the district court has stated its intention to protect the evidence's integrity and to conduct the DNA testing in an objective manner with the participation of all parties. If the evidence is depleted during this testing, these results could be used--or challenged--by the Commonwealth upon any retrial or clemency proceeding.

Second, and similarly, with regard to the custody of the evidence to be retested, the district court declared that it "fully intends to impose procedures to protect the chain of custody when the Court actually orders that the evidence be moved to permit the DNA testing." Cherrix, 131 F.Supp.2d at 772 n. 13 (citing for

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

comparison In re Warden, Kentucky State Penitentiary v. Gall, 865 F.2d 786, 788 n. 1 (6th Cir.1989) *259 (stating that mandamus petitioner's fears regarding integrity of evidence and chain of custody appeared to be "vastly overblown" because petitioner was free to send representative to monitor retesting, and petitioner could argue the vitiating effects of time if retesting produced different results)).

In support of his third purported consequence, the "undeniable" damage to, in particular, the finality of state court convictions, the Warden relies on the Supreme Court's decision in McCleskey v. Zant, 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In McCleskey, during a discussion of the doctrines of procedural default and abuse of the writ, the Court illuminated the potential risks of reexamining state convictions on federal habeas review. Though we recognize the ramifications of, inter alia, granting a habeas petitioner a new trial, we fail to comprehend how McCleskey supports the Warden's challenge to an interlocutory order that has only the potential to someday upset the finality of Virginia's conviction of Cherrix. Moreover, as the district court acknowledged, "[T]his Court, by statute [28 U.S.C. § 2254], has the duty to examine actions taken by the Commonwealth to make sure that the final result obtained is one in keeping with Cherrix's constitutional rights." Cherrix, 131 F.Supp.2d at 784; see also id. (citing Jackson v. Virginia, 443 U.S. 307, 323, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) for the proposition that "[a]lthough the notion of 'finality' is important, such finality is not desirable when the result is the 'finality' of the deprivation of liberty at the expense of a constitutional right").

Finally, though the Warden asserts that the district court's January 9, 2001 Order will "open the floodgates" to similar requests, he offers no support for this stark assertion. Moreover, he fails to explain how, if there were an influx of motions for DNA testing and preservation of evidence in the district courts, this would result in "serious, perhaps irreparable consequences," where the courts presumably would dispose of the motions on their merits in the regular course of business.

2.

**8 In next addressing why the January 9, 2001 Order can be "effectually challenged" only by immediate appeal, the Warden asserts that "[a]bsent an immediate appeal, the Commonwealth will have to turn over its

evidence [ ] with all the dangers attendant to that action[.]" Appellant's Br., at 14.  We are not at all persuaded by this contention, which merely revisits the purported "serious, perhaps irreparable" consequences of tendering the evidence.  If a discovery order could be challenged under § 1292(a)(1) any time there was the remotest possibility, despite the best efforts of the issuing court, that evidence could be destroyed or the chain of custody broken, we would be inundated with the very piecemeal appeals that our system so disfavors. In essence, the Warden asks us to rewrite the rules for appellate review of interlocutory orders so that "almost every pretrial ... order might be called 'effectually unreviewable' [on appeal from final judgment] in the sense that relief from error can never extend to rewriting history." Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 872, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994). [FN7]  This we are unwilling and unable to do.

FN7. The Warden also objects to providing evidence "in furtherance of Cherrix's frivolous and legally impossible free-standing claim of actual innocence." Appellant's Br., at 14.  The Warden relies on our unpublished order in Poyner v. Murray, No. 93-6052 (4th Cir. Jan. 19, 1993), reversing the district court's eleventh-hour decree permitting Poyner's expert to observe the autopsy of and collect brain tissue samples from an executed inmate in support of Poyner's habeas claim that execution by electrocution was cruel and unusual punishment.  In Poyner, because it was already well-settled that electrocution was not an unconstitutional means of execution, we reversed the discovery order on the ground that "the basic premise in the underlying case in the district court is entirely without merit." Poyner, No. 93-6052, at 5. This decision is not helpful to the Warden, however, for several reasons.  First, it is an unpublished order of no precedential value.  See Local Rule 36(c).  Second, and more importantly, even assuming that the appealability of a discovery order under § 1292(a)(1) can depend on whether the underlying claim is cognizable, the Warden attacks only one of Cherrix's grounds for habeas relief. That is, though the Warden is correct insofar as he asserts that actual innocence alone is not a colorable ground for such relief in our Circuit, he fails to acknowledge that Cherrix also

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

asserts other, cognizable bases for relief. *See infra,* Part II.B.

**\*260** Rather, we are constrained to agree with Cherrix that the propriety of the district court's January 9, 2001 Order can be adequately reviewed on appeal from final judgment. If, for example, the district court awards habeas relief to Cherrix based on the findings of the DNA analysis, the Warden may appeal that decision on the ground that, inter alia, the retesting was unlawfully authorized by the court. This same contention may also be proffered by the Warden if Cherrix appeals the denial of habeas relief.

In summary, because the Warden has failed to establish that the district court's January 9, 2001 Order might have "serious, perhaps irreparable, consequences," and because this order cannot be "effectually challenged" only by immediate appeal, we must dismiss the Warden's appeal for lack of § 1292(a)(1) jurisdiction. **[FN8]**

**FN8.** Because we dismiss this appeal for lack of jurisdiction, we decline to address Cherrix's assertion that the Warden lacked standing to bring the appeal.

## B.

**[4]** We now consider whether the Commonwealth is entitled to a writ of mandamus, pursuant to the All Writs Act, 28 U.S.C. § 1651, directing the district court to vacate its January 9, 2001 Order. The Commonwealth maintains that the district court lacked authority to: (1) direct the Commonwealth, pursuant to 21 U.S.C. § 848(q), to make its evidence available for DNA retesting; **[FN9]** (2) authorize funding under § 848(q) for investigation of Cherrix's Herrera claim, *see supra* Part I.B.2, because we do not recognize free-standing habeas claims of actual innocence where, as in Virginia, state clemency proceedings are available, *see* Royal v. Taylor, 188 F.3d 239, 243 (4th Cir.1999); (3) order DNA retesting in support of any Schlup claims, *see supra*

**FN9.** The basic premise of this contention--that the district court actually relied on § 848(q) for authority to direct the Commonwealth to proffer the evidence for analysis--is belied by the court's January 9, 2001 Order and its Supplemental Opinion. The order plainly cites the Federal Rules of Civil Procedure, as applicable through the Rules Governing § 2254 Cases, and constitutional principles as authority for ordering the retention and preservation of evidence. Moreover, the court referenced § 848(q) for only the specific conclusion that Cherrix was entitled to funding for DNA testing. In its Supplemental Opinion, the court reiterates that it relied on § 848(q) solely to authorize funding for this analysis. In the alternative, the Commonwealth insists that no authority supports the court's discovery order.

Part I.B.2, before the Warden had an opportunity to respond to Cherrix's habeas petition and assert the defense of procedural default; and (4) grant Cherrix's request for DNA analysis in spite of his failure to request such testing in state court.

**\*261 \*\*9 [5]** The party seeking a writ of mandamus must satisfy the conditions of a rigorous test, demonstrating each and every one of the following requirements: (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances. Oncology Assocs., 198 F.3d at 511 (citing, inter alia, Kerr v. United States Dist. Court, 426 U.S. 394, 403, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (recognizing that, in order to ensure "the writ will issue only in extraordinary circumstances, ... the party seeking issuance of the writ [must] have no other adequate means to attain the relief" sought)).

The Commonwealth faces the same problem in seeking a writ of mandamus that the Warden faced in bringing an interlocutory appeal--other adequate means exist to attain the relief it desires. That is, the district court's January 9, 2001 Order may be reviewed on appeal from

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

final judgment, with no conceivable risk of harm to the Commonwealth. We have consistently held, as we are constrained to do today, that we will not issue a writ of mandamus under such circumstances. *See, e.g.,* In re Catawba Indian Tribe of South Carolina, 973 F.2d 1133, 1137 (4th Cir.1992) (denying a writ of mandamus to compel the district court to grant a class certification where the issue was reviewable on appeal from final judgment); In re Int'l Precious Metals Corp., 917 F.2d 792, 792, 794 (4th Cir.1990) (declining to issue a writ requiring the district court to transfer the case in order to enforce a forum selection clause, because the petitioner could "appeal the ... court's denial of transfer after final judgment"). Moreover, we are cognizant of the potential danger in permitting a party to use a petition for a writ of mandamus as an end-run around our appellate rules. *See* Catawba Indian Tribe, 973 F.2d at 1135 ("The very power of the writ of mandamus demands that its availability be limited to narrow circumstances lest it quickly become a shortcut by which disappointed litigants might circumvent the requirements of appellate procedure mandated by Congress."); *see also* id. at 1137 (acknowledging that "[w]e must be reluctant indeed" to permit the petitioner from accomplishing by mandamus that which is prohibited by interlocutory appeal). Therefore, we deny the Commonwealth's mandamus petition. [FN10]

> **FN10.** Because the Commonwealth has other adequate means to challenge the January 9, 2001 Order, i.e., appeal from final judgment on Cherrix's habeas petition, we need not address the other prongs of the test for issuing a writ of mandamus. Likewise, we do not consider Cherrix's contention that the Commonwealth lacked standing to seek the writ.

### III.

For all of the foregoing reasons, we dismiss the Warden's interlocutory appeal for lack of jurisdiction, and we deny the Commonwealth's petition for a writ of mandamus. [FN11]

> **FN11.** Accordingly, we lift our stay of the January 9, 2001 Order. We also dispose of the following pending motions in this case:

(1) we deny the Warden's motion for expedition of the adjudication of this case, as it had already been placed on an expedited briefing and argument schedule; (2) we deny his motion for reconsideration of the Clerk's Order of June 11, 2001, filing under seal certain supplemental authority submitted by Cherrix;   and (3) we grant Cherrix's unopposed motion to amend his brief.

*APPEAL DISMISSED AND PETITION FOR MANDAMUS DENIED.*

**\*262** TRAXLER, Circuit Judge, concurring:

I concur in the results reached in the opinion of my friend Judge King. I write separately because my reasoning is somewhat different.

### I.

**\*\*10** This appeal began with Cherrix's motion for an order, *solely under the authority of* 21 U.S.C. § 848(q), directing the Commonwealth to make the seminal fluid available for DNA retesting. At the time of the motion, Cherrix had yet to file a petition for relief under § 2254. After a hearing on the merits of the motion filed by Cherrix, and after Cherrix filed his petition for relief under § 2254, the district court issued its January 9, 2001 Order which granted the motion. In my estimation, the legal basis for this order directing retesting of the evidence was not particularly clear; by contrast, it was clear that the court was granting funding pursuant to § 848(q). Indeed, although the January 9, 2001 Order contained a general citation to Rule 11 of the Rules Governing Section 2254 Cases, the district court appeared to draw its authority to direct the Commonwealth in this regard primarily from § 848(q), a statute aimed at providing adequate legal services for indigent capital defendants.   Given the language of the January 9, 2001 Order and the fact that § 848(q) was the sole basis for Cherrix's belief that the district court acted beyond its power is understandable.   And, apart from the substantial legal questions regarding the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

propriety of retesting in the first place, the order was of substantial concern to the Commonwealth because in very general terms it ordered the assistant attorney general and the state clerk of court to "make available to Petitioner any bodily fluids or swabs seized from Tessa Van Hart, or the Petitioner for testing to the laboratory as directed by the Court." The Commonwealth feared a loss of the chain of custody and contamination or destruction of this evidence. The January 9, 2001 Order did not incorporate any safeguards that would diminish these risks.

In light of these concerns, the Commonwealth immediately appealed the district court's order under 28 U.S.C.A. § 1292(a)(1), while at the same time petitioning this court for a writ of mandamus to "vacate the district court's January 9th order entered pursuant to 21 U.S.C. § 848(q) directing state officials to locate, preserve and turn over for DNA testing bodily fluids taken from the victim and Cherrix."

Under Rule 21(b)(4) of the Federal Rules of Appellate Procedure, we invited the district court to submit a response to the Commonwealth's petition for a writ of mandamus. This rule provides as follows: The court of appeals may invite or order the trial-court judge to address the petition or may invite an amicus curiae to do so. The trial-court judge may request permission to address the petition but may not do so unless invited or ordered to do so by the court of appeals.

We thereafter received from the district court a very detailed statement expanding upon the factual bases and the legal reasoning for its decision ("the Supplemental Opinion"). In the Supplemental Opinion, the district court explained that it was not issuing its order solely under the authority of 21 U.S.C. § 848(q), stating that its order directing DNA re-testing was issued pursuant to the "good cause" standard contained in Habeas Rule 6(a). Unlike the January 9, 2001 Order, the Supplemental Opinion identified various protective measures the district court intended to employ to maintain the physical integrity of the evidence and safeguard the chain of custody.

**\*263 \*\*11** Were it not for the information in the Supplemental Order, however, I would hold that the January 9, 2001 Order, standing alone, was immediately appealable. Without clarification from the Supplemental Opinion, the January 9, 2001 Order, literally interpreted, required the Commonwealth to turn over the samples directly to the defendant for testing. This would have broken the chain of custody and created a situation, if only in testing, in which Cherrix could have contaminated and even destroyed the evidence. In my judgment, the dangers attendant to an apparently uncontrolled release of the evidence would have fully warranted an interlocutory appeal and would have mandated our intervention.

The Commonwealth urges us not to consider the Supplemental Opinion on the grounds that the district court essentially amended its opinion and substituted new legal grounds for its conclusions, even after we had granted the Commonwealth a stay pending appeal. Considering the fact that this panel specifically invited the district court to address the Commonwealth's petition for a writ of mandamus, it would be strange indeed if the district court overstepped its bounds by doing just that. Furthermore, although Appellate Rule 21(b)(4) pertains only to "Writs of Mandamus and Prohibition, and Other Extraordinary Writs," I believe that it is appropriate for us to consider the Supplemental Opinion with respect to the Commonwealth's appeal under 28 U.S.C. § 1292(a)(1) as well. As Judge King explained, the district court retained jurisdiction to act on matters "in aid of the appeal." Fobian v. Storage Tech. Corp., 164 F.3d 887, 890 (4th Cir.1999) (internal quotation marks omitted); In re Grand Jury Proceedings Under Seal, 947 F.2d 1188, 1190 (4th Cir.1991). This principle is based on notions of judicial economy and efficiency. See id. We considered the mandamus issue simultaneously with the appeal question, and thereby had before us the Supplemental Opinion. We now understand the district judge has considered a number of safeguards that he intends to implement in order to protect the evidence. It makes little sense to consider the Supplemental Order for purposes of resolving the petition for a writ of mandamus but then close our eyes to it concerning whether review is available under 28 U.S.C.A. § 1292(a)(1). I believe the information in the Supplemental Order should be considered if for no other reason than because, as a practical matter, it answers the questions of the Commonwealth and assures that the handling of this evidence will be commensurate with the needs of both parties.

In light of the Supplemental Opinion, I am satisfied the order of the district court will not result in "serious, perhaps irreparable, consequence" and I do not believe

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

that the order can be "effectually challenged" only by an immediate appeal. Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (internal quotation marks omitted). Thus, the Commonwealth is not entitled to immediate review.

II.

**\*\*12** Likewise, I concur that the Commonwealth is not entitled to a writ of mandamus. In addition to the reasons stated by Judge King, mandamus relief is not appropriate because the district court was acting on a matter entrusted to its discretion. As the majority opinion rightly points out, the relief provided by the issuance of a writ of mandamus is extraordinary in nature, and I agree the Commonwealth is not entitled to it. The traditional use of the writ of mandamus has been "to confine an inferior court to a lawful exercise of its prescribed jurisdiction." **\*264**Kerr v. United States Dist. Ct. for the N. Dist. of Cal., 426 U.S. 394, 402, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (internal quotation marks omitted). Although writs of mandamus or prohibition may of course be employed to compel or prohibit action by those outside of the judiciary, such as executive agencies or officials, see United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 502, 515 (4th Cir.1999) (affirming in part the issuance of a writ of mandamus to the Health Care Financing Administration), additional concerns arise when mandamus relief is sought against a lower court, particularly when it is sought in conjunction with an ongoing case.

Perhaps the most obvious concern in this context is that parties will use a writ of mandamus as a surrogate for the appellate process. See Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 382-83, 74 S.Ct. 145, 98 L.Ed. 106 (1953). Even if the district court issues an interlocutory order that is wrong on the merits and that results in substantial inconvenience, something more is required to justify mandamus relief. If not, "then every interlocutory order which is wrong might be reviewed under the All Writs Act" and the function of the writ of mandamus "would be enlarged to actually control the decision of the trial court rather than used in its traditional function of confining a court to its prescribed jurisdiction." Id. at 383, 74 S.Ct. 145. The other major reason that mandamus relief is discouraged in the context of ongoing litigation is that such petitions tend to pit the petitioner and the district court against each other. In essence, the district court becomes a litigant, cast in an adversarial role against the mandamus petitioner, who remains a litigant in the

pending lawsuit. See Kerr, 426 U.S. at 402, 96 S.Ct. 2119.

Accordingly, a mandamus petitioner can show he is entitled to the writ only by demonstrating the lower court committed a "clear abuse of discretion or conduct amounting to usurpation of the judicial power." Mallard v. United States Dist. Ct. for the S. Dist. of Iowa, 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) (internal citations, alterations and quotation marks omitted). And, as Judge King makes clear, even if the petitioner can demonstrate an abuse or usurpation of judicial power, there are additional hurdles to make certain that mandamus relief is available only in extraordinary circumstances: there must be no "adequate alternative means to obtain the relief" sought in the mandamus petition and the "right to issuance of the writ [must be] clear and indisputable." Id. (internal quotation marks omitted).

**\*\*13** It is substantially more difficult to demonstrate the court usurped power beyond its authority when the mandamus petition is directed at a matter committed to the discretion of the district court. See In re Catawba Indian Tribe of South Carolina, 973 F.2d 1133, 1136 (4th Cir.1992) (en banc). Almost by definition, a court that is deciding a matter within its discretion is acting within its prescribed authority, even if the court technically makes the wrong decision. Thus, "[t]he writ of mandamus is not to be used when the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction." Schlagenhauf v. Holder, 379 U.S. 104, 112, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (internal quotation marks omitted).

The Supplemental Opinion indicates that the court granted only Cherrix's request for funding pursuant to 21 U.S.C. § 848(q), but that it ordered the Commonwealth to make the forensic evidence available for testing for "good cause" under Habeas Rule 6(a). Rule 6(a) permits a party "to invoke the processes of discovery available under the Federal Rules of Civil **\*265** Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so." The district court's decision to permit or deny the discovery of evidence under Rule 6(a) is clearly an exercise of the court's discretion. Even if the court erroneously determined that "good cause" exists, the court has merely "erred in ruling on [a] matter[ ] within [its] jurisdiction," Schlagenhauf, 379 U.S. at 112, 85 S.Ct. 234 (internal quotation marks omitted), and mandamus relief is not available.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Again, it bears noting that, in my view, the Commonwealth's belief that the district court acted beyond its power was not entirely misplaced, especially before the district court issued its Supplemental Opinion. Indeed, the January 9, 2001 Order does not specifically cite Rule 6(a) and it does not use the phrase "good cause," although it does contain a general reference to the applicability of the Federal Rules of Civil Procedure through Habeas Rule 11. And, Cherrix's motion for DNA retesting and for funding to accomplish the retesting was made entirely under the auspices of § 848(q), not Habeas Rule 6(a). Indeed, at the time that Cherrix filed his motion, the district court would have had no authority to grant it under Rule 6 because Cherrix had not yet filed his § 2254 petition. Thus, prior to the issuance of the district court's Supplemental Opinion, the Commonwealth's belief that § 848(q) was the basis for the entire January 9, 2001 Order--not just the portions related to funding--was not unreasonable.    Of course, § 848(q) may provide authority for the court to authorize the release of federal funds for services in conjunction with Cherrix's § 2254 petition, but it grants no authority whatsoever for a district court to issue a discovery-type order.

In the final analysis, however, if "good cause" does not support DNA retesting, the Commonwealth can have its concerns effectively addressed on appeal after the district court's decision on the merits has become final. I therefore concur that we cannot issue a writ of mandamus under the circumstances.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**APPENDIX B**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


BRUCE GODSCHALK



VS.                                                    C.A. NO. 00-5925


                                    !    FILED   AUG 2 7 2001

MONTGOMERY COUNTY DISTRICT
ATTORNEY'S OFFICE and
BRUCE L. CASTOR, JR., DISTRICT ATTORNEY,
MONTGOMERY COUNTY, in his official capacity



MEMORANDUM OPINION AND ORDER


WEINER, J.                                             AUGUST 27, 2001


        The plaintiff brought this action under 42 U.S.C. § 1983 for access to biological

evidence for DNA testing that is currently in the possession of the Office of the District Attorney of

Montgomery County and which plaintiff contends can conclusively determine whether he is guilty

of two rapes for which he was convicted in state court in May, 1987. Plaintiff requests that this court

issue an injunction requiring the defendants to release the biological evidence for DNA testing.

Presently before the court is the motion of the plaintiff for summary judgment. For the reasons which

follow, the motion is granted.

        Summary judgment is appropriate when there are no genuine issues as to any material

                                    ENTERED

                                    AUG 2 8 2001

                                    CLERK OF COURT

facts. See Fed.R.Civ.P. 56(c). In such a case, a trial is unnecessary because a reasonable fact finder could not enter a judgment for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We must construe all evidence and resolve all doubts raised by affidavits, depositions, answers to interrogatories, and admissions on file in favor of the non-moving party.

The material facts necessary for disposition of the plaintiff's motion are mainly taken from the state court record and are undisputed.

Plaintiff was charged with two rapes that occurred in 1986. A rape test kit examination of both victims, Elizabeth Bednar and Patricia Morrissey, proved positive for seminal residua. At trial, the Commonwealth relied on the identification testimony of one of the victims (the other victim could not make an identification) and a confession made by the plaintiff.

Following his conviction by a jury on both counts of rape as well as two counts of burglary, plaintiff was sentenced to a total term of imprisonment of 10 to 20 years. Plaintiff filed a post-trial motion, claiming, inter alia, that the trial court erred in not suppressing his confession. The motion was denied. Plaintiff appealed to the Superior Court of Pennsylvania again contending, inter alia, that the trial court had erred in not suppressing his confession. The Superior Court ruled that plaintiff's confession was voluntary and that the trial court properly refused to suppress his inculpatory statements. Commonwealth v. Godschalk, 560 A.2d 826 (1989). Plaintiff's petition for allocatur was denied by the Pennsylvania Supreme Court on August 15, 1989. See Commonwealth v. Godschalk, 564 A.2d 915 (1989).

Almost six years later, plaintiff filed in the Court of Common Pleas of Montgomery County a Petition to Inspect and Test Evidence, seeking to have the Montgomery District Attorney's Office turn over seminal residue samples obtained from the two rape victims in order to conduct

2

DNA tests. The petition was denied by the Montgomery Court of Common Pleas and by the Superior Court. Commonwealth v. Godschalk, 451 Pa.Super. 425, 679 A.2d 1295 (1996).

In denying the Petition, the Montgomery Court of Common Pleas found that plaintiff's confession, which was deemed valid and admissible by the Superior Court, represented "overwhelming evidence of the appellant's guilt, completely separate from any identification testimony." The Superior Court also found that plaintiff's conviction "rests largely on his own confession which contains details of the rapes which were not available to the public." 679 A.2d at 1297.

Plaintiff's claims for relief in this action are that by refusing to release the biological evidence for DNA testing, defendants have: (1) deprived plaintiff of Due Process of Law; (2) deprived plaintiff of the opportunity to make a conclusive showing that he is innocent of the crime for which he is incarcerated, in violation of the Due Process Clause of the Fourteenth Amendment; (3) deprived plaintiff of the opportunity to make a conclusive showing of actual innocence, in violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment; (4) deprived plaintiff of his right to present evidence of innocence in State Court, Federal Court, or before the Pennsylvania State Board of Pardons, in violation of the Confrontation and Compulsory Process Clauses of the Sixth Amendment; (5) deprived plaintiff of the opportunity to effectively litigate his claim that he is innocent of the crime for which he is currently incarcerated, thereby preventing plaintiff from access to the state and federal court to obtain legal relief, in violation of the Due Process and Equal Protection guarantees of the Fourteenth Amendment and (6) deprived plaintiff of his right to avail himself of the opportunity to apply for executive clemency and the function that executive clemency serves in preventing the violation of his constitutional rights that would arise

3

from continued incarceration of an inmate who can make an actual showing of innocence. See Complaint at 5-7.

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

Plaintiff contends that DNA testing on the genetic material would exonerate him because only the assailant could have left this DNA material and if the DNA does not match, he could not be the assailant. Defendants respond that there is no need to do DNA testing on the genetic material since plaintiff's confession was not coerced and contained details of the rapes which were were not known to the public and would only be known by the perpetrator.

Plaintiff made a confession which was taped and transcribed. Plaintiff acknowledged at trial that it was his voice on the tape. In that confession, plaintiff confessed to details of both rapes which were not available to the public. In the case of Bednar, plaintiff stated the following:

1. He watched the victim while she was in the recreation room reading a book. (pg. 7, lines 16 thru 22).

2. He said the victim was wearing a robe. (pg. 7, lines 23 thru 26)

3. He said he entered through a rec-room window. (pg. 6, lines 24 thru 28).

4

4. He waited until the victim went upstairs before entering the townhouse. (pg. 7, lines 27 thru 32)

5. He went up two sets of stairs before finding the victim's bedroom. (pg. 7, line 12).

6. He took a pillow from another room before entering her room. The room that the pillow was removed from was on the same level as the victim's bedroom. (pg. 8, lines 13 thru 20)

7. He said the victim told him other people lived in the home and that someone could come home. (pg. 9, lines 5 thru 7 and line 19)

8. He said she was nude. (pg. 9, lines 10 thru 15).

9. He said he had been drinking prior to the incident and that he normally drank beer. (pg. 7, line 14 and pg. 18, lines 16 thru 19).

10. He said he had sex with the victim while she was on her back on the floor. (pg. 9, lines 17 thru 23).

These details, which were not released to the press, matched those in the statement given to the police by Bednar.

In the case of Morrissey, plaintiff stated the following:

1. He was outside of the bedroom window watching the victim. (pg. 2 lines 10 thru 17)

2. He said the victim was reading a magazine while she was lying in bed. (pg. 2 lines 15 thru 22).

3. He said there was a light next to her bed, which was on, allowing him to see the victim. (pg. 2, line 23 and pg. 3 lines 2 and 3)

4. He had sex with the victim on her bed. (pg. 4, line 6).

5

5. He said the victim was wearing underpants. (pg. 6 lines 11 thru 14).

6. The victim was on her stomach during the intercourse. (pg. 4, lines 11 thru 14).

7. Prior to having sex, plaintiff removed the victim's tampon and tossed it to the side. (pg. 4, line 8 and lines 19 thru 24).

8. He described the victim as a brunette with a medium build. (pg. 5, line 6)

9. He said he was gentle with the victim. (pg. 5, line 18).

10. He said he left the apartment by going out the door. (Pg. 5, line 4).

11. He remembered being chased off the patio by a man prior to the assault. (pg. 5, lines 25 thru 28 and pg. 6, lines 1 thru 8).

Again, these details matched those contained in the statement given by Morrissey to the police. Before making these statements, plaintiff was read his Miranda rights. (pg. 1, lines 1 thru 9). Plaintiff stated that he was willing to make a statement, that he was there on his own free will and that he had been treated "very well". (pg. 1, lines 11 thru 20, pg. 2, line 1). There is absolutely no evidence in the transcript that plaintiff's confession was obtained through coercion, undue pressure or other improper police interrogation techniques. There is no evidence that the interrogating detective put words in plaintiff's mouth.

In denying defendant's Petition to Inspect and Test Evidence, the Court of Common Pleas of Montgomery County found plaintiff's confession to be valid and admissible and that it presented "overwhelming evidence of the appellant's guilt" completely separate from any identification testimony. The Superior Court of Pennsylvania also found plaintiff's conviction rested largely on his own confession which contained details of the rapes which were not available to the public.

6

However, in considering whether plaintiff is entitled to the biological evidence under the Due Process Clause of the Fourteenth Amendment, we must employ the standard set by the Supreme Court in Brady and Bagley, supra. The one district court decision which applied this standard to a request for genetic material for DNA testing in a § 1983 action, Harvey v. Horan, 119 F.Supp. 2d 581 (E.D.Va. 2000)(decision on motion to dismiss); 2001 WL 419142 (E.D.Va. April 16, 2001)(decision on motion for summary judgment), ordered disclosure of the evidence. The district court based its decision on the lack of positive identification of the plaintiff as one of the culprits and doubts as to the credibility of the state's witnesses.

In the case sub judice, however, we also have the uncoerced, detailed confession of the plaintiff. In addition, the defendants point out that the DNA taken from Bednar is incapable of being tested because of an insufficient amount of product, except to reach the conclusion that the DNA comes from a male. See affidavit of Charlotte J. Word, Ph.D. In addition, defendants argue that even if DNA testing of genetic material in the Morrissey case took place, the results could not be completely exculpatory since Morrissey stated that she had sexual relations with her fiancé the night before the assault and therefore the genetic material might be that of the fiance.

Nevertheless,  if by some chance no matter how remote, DNA testing on the biological evidence excludes plaintiff as the source of the genetic material from the victims, a jury would have to weigh this result against plaintiff's uncoerced detailed confessions to the rapes. While plaintiff's detailed confessions to the rapes are powerful inculpatory evidence, so to any DNA testing that would exclude plaintiff as the source of the genetic material taken from the victims would be

7

powerful exculpatory evidence.[1] Such contradictive results could well raise reasonable doubts in the minds of jurors as to plaintiff's guilt. Given the well-known powerful exculpatory effect of DNA testing, confidence in the jury's finding of plaintiff's guilt at his past trial, where such evidence was not considered, would be undermined. Even though Dr. Word has averred that the Bednar material is incapable of being tested, the parties have nevertheless agreed to have the material tested by plaintiff's expert in California. With respect to the Morrissey material, since the genetic material was obtained shortly after the rape, DNA results which excluded the plaintiff would still be evidence of his innocence for the jury to consider. The fiancé could also be tested to see if he was the source of the genetic material. Thus, we find that there is indeed a reasonable probability that had DNA evidence which showed plaintiff was not the source of the genetic material found on the victims been disclosed to the defense, the result of the proceeding would have been different. Of course, the ultimate decision as to whether the results of the DNA testing would warrant an acquittal or a retrial is for the state trial court to make.

Since DNA testing of the genetic material could indeed provide material exculpatory evidence for a jury to consider along with the inculpatory evidence of plaintiff's detailed confession, we find that plaintiff has a due process right of access to the genetic material for the limited purpose of DNA testing.

---

[1] Of course, DNA testing might also reveal that plaintiff was indeed the source of the genetic material, thereby providing further inculpatory evidence to bolster the jury's verdict.

8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


BRUCE GODSCHALK

    VS.                                            C.A. NO. 00-5925

MONTGOMERY COUNTY DISTRICT
ATTORNEY'S OFFICE and
BRUCE L. CASTOR, JR., DISTRICT ATTORNEY,
MONTGOMERY COUNTY,
in his official capacity

## ORDER

The motion of the plaintiff for summary judgment is GRANTED.

The parties shall follow the testing protocol to which they agreed and which was approved by the court.

Judgment is ENTERED in favor of the plaintiff and against the defendants.

IT IS SO ORDERED.

_____

CHARLES R. WEINER

9

TOTAL P.10