IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHRISTOPHER BARBOUR,                )
                                    )
            Petitioner,             )
                                    )
v.                                  )      CIVIL CASE NO. 2:01-cv-612-ECM
                                    )                  (WO)
JEFFERSON S. DUNN,[1] *Commissioner*, )
*Alabama Department of Corrections*,  )
                                    )
            Respondent.             )

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

Christopher Barbour is a death row inmate in the custody of the Alabama Department of Corrections. He has filed a habeas corpus petition, pursuant to 28 U.S.C. § 2254, challenging his 1993 capital murder conviction in the Montgomery County Circuit Court and resulting death sentence. Barbour claims that his conviction and death sentence were obtained in violation of his rights under the United States Constitution—he asserts that he is actually innocent.

This matter is before the Court on respondent's motion to dismiss Barbour's habeas petition as untimely. (Doc. 51).[2] This case was originally filed on May 21, 2001 and assigned to District Judge Myron H. Thompson. (Doc. 1). On March 1, 2007, Magistrate

---

[1] Pursuant to the Federal Rules of Civil Procedure, Jefferson S. Dunn, the present Commissioner of the Alabama Department of Corrections, is automatically substituted in his official capacity as a party to this action, replacing the former Commissioner, Kim T. Thomas. *See* Fed. R. Civ. P. 25(d)(1).

[2] The Court will refer to the page numbers generated by CM/ECF.

Judge Susan R. Walker entered a Report and Recommendation that the motion to dismiss be granted with prejudice. (Doc. 98).  On July 19, 2016, this case was reassigned to then Chief District Judge W. Keith Watkins, (doc. 144), and, on August 7, 2018, this case was reassigned to the undersigned district judge, (doc. 151).

Given the age of this case, the Court conducted a status conference on November 27, 2018.  The Parties subsequently filed supplemental briefs on (1) the AEDPA one-year limitation period in cases involving claims of actual innocence where application of the time bar would result in a "miscarriage of justice" and (2) the petitioner's Federal Habeas Corpus Rule 6 request for discovery. (Docs. 163, 164, and 165).  The Magistrate Judge subsequently vacated her previous Report and Recommendation on November 3, 2020. (Doc. 167).  The pending motions and request for discovery are now ripe for review.[3]

For the following reasons, Barbour's discovery request embodied in petitioner's Supplemental Response, (doc. 163), will be GRANTED in part.  Barbour has successfully established good cause for further discovery in the form of DNA testing.  Furthermore, respondent's motion to dismiss Barbour's second amended habeas petition as untimely, (doc. 51), will be DENIED without prejudice.

## II.    BACKGROUND

Barbour and Christopher Hester were charged in separate capital cases in respect to the rape and murder of Thelma Roberts in March 1992.  Barbour was charged first, and he

---

[3] On February 6, 2020, the petitioner filed a motion for status conference. (Doc. 166).  The motion will be denied as moot.

confessed to the murder prior to his indictment.  In that confession, Barbour stated that he,

Hester, and Michael Mitchell were all involved in the crimes.  The Alabama Court of

Criminal Appeals described the facts of the case as follows:

> The appellant, Christopher Barbour, was convicted of murder made capital because the murder was committed during the commission of a rape, burglary, and arson.  See §§ 13A-5-40(a)(3), 13A-5-40(a)(4), and 13A-5-40(a)(9), Code of Alabama 1975.  The jury, by a vote of 10 to 2, recommended that the appellant be sentenced to death.  The court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
>
> The state's evidence tended to show that on March 21, 1992, 16-year-old William Roberts found the naked and partially burned body of his mother, Thelma Bishop Roberts, lying on the floor of her bedroom.  There was a white plastic trash bag over her head and a knife protruding from her chest. William Roberts testified that when he saw his mother's body he removed the knife out from her chest and threw it across the room. He also removed the trash bag from her head and called the emergency police telephone number.  William Roberts also testified that the jewelry his mother always wore was missing.
>
> Dr. Alan Stilwell, medical examiner for the Alabama Department of Forensic Sciences, performed an autopsy on the victim. It was his opinion that Thelma Roberts died as a result of nine stab wounds to her chest, one of which penetrated her left lung, and one of which penetrated her heart, causing extensive internal bleeding.  Two of the wounds had been inflicted with such force that they pierced her back. Dr. Stilwell further testified that the victim's eyes were swollen from repeated blows to her head.

*Barbour v. State*, 673 So.2d 461, 462–63 (Ala. Crim. App. 1994).  The court also outlined

Barbour's confession:

> Barbour confessed and gave a detailed account of the facts surrounding Robert[s]'s murder.  Barbour told police that on March 20, 1992, he, Chris Hester, and Mike Mitchell went

to see, "Koon," who was a friend of Hester's and who lived on Manley Drive in Montgomery. Hester talked with someone at the door and discovered that Koon was not home. The three then went across the street to the victim's house. Barbour stated that they entered the house, sat down in the living room, and started drinking beer. Hester and the victim started talking. Later, the victim left the living room and went to the back of the house. A few minutes later, Hester also went to the back of the house. Hester and the victim remained there for several minutes while Mitchell and Barbour stayed in the living room. A short while later, Barbour and Mitchell heard loud noises coming from the back and went to investigate. They entered the bedroom and saw that the victim was naked and that Hester was wearing only his pants. Hester then hit the victim, and Barbour and Mitchell started hitting her about the head. The victim fell to the floor. Barbour and Mitchell got on either side of her and held her down while Hester had sex with her. After Hester got up and pulled on his pants, Barbour told the others that they could not leave because she could identify them. Barbour confessed that he then went to the kitchen, grabbed a knife, and returned to the bedroom. He got on his knees and forcibly stabbed the victim several times. He left the knife in her body, stood up, walked to the closet, threw some things from the closet around her body, and set them on fire. As they fled from the house Barbour grabbed the smoke detector off the wall in the hallway and threw it in the living room.

*Id.* at 463. Although he pleaded not guilty at trial, Barbour was convicted of capital murder committed during the commission of a rape, a burglary, and an arson, and sentenced to death. (Doc. 59 at 2).

In his second amended habeas petition, Barbour challenges his conviction and asserts that (1) he is not guilty of the murder and related felonies, and the State's refusal to perform DNA testing violates the Fifth, Eighth, and Fourteenth Amendments, (*id.* at 38); (2) the failure to disclose police records violates the Fifth, Eighth, and Fourteenth Amendments, (*id.* at 45); (3) the admission of Barbour's custodial statements at trial

violated the Fifth, Eighth, and Fourteenth Amendments, (*id.* at 50); (4) the failure at trial to remove a veniremember violated the Sixth, Eighth, and Fourteenth Amendments, (*id.* at 57); (5) the removal of a juror member violated the Sixth, Eighth, and Fourteenth Amendments, (*id.* at 58); (6) the exclusion of evidence from the victim's family during the sentencing phase violated the Eighth and Fourteenth Amendments, (*id.*); (7) Alabama's method of execution violates the Eighth and Fourteenth Amendments, (*id.* at 60); (8) the denial of a right to counsel in post-conviction cases violated the Sixth and Fourteenth Amendments, (*id.* at 64); and (9) ineffective assistance of counsel at trial violated the Sixth, Eighth, and Fourteenth Amendments, (*id.* at 68).

The Court turns first to Barbour's discovery request and then will address the pending motion to dismiss.

## III.   SUPPLEMENTAL DISCOVERY REQUEST

Barbour requests further discovery in the form of DNA testing, inspection of evidence, and review of files and tapes to support his habeas petition. (Doc. 163). Respondent opposes Barbour's discovery request. (Doc. 164).  Respondent contends that Barbour is not entitled to discovery because he has failed to show good cause, or that he has not established that, if the facts were fully developed, they could establish his innocence.  The Court disagrees.

Barbour need only establish good cause for discovery, according to the standard set out in *Bracy v. Gramley*, 520 U.S. 899 (1997).  *Bracy* requires the Court to consider (1) the essential elements of Barbour's actual innocence claim pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995); and (2) whether the specific allegations—if fully developed and proved—

would entitle Barbour to relief for his actual innocence claim.  If the specific allegations would entitle him to relief, he has established good cause.  The Court finds that Barbour has presented specific allegations that establish good cause for further discovery.

### A. Barbour must satisfy the good cause discovery standard set out by the Supreme Court in *Bracy v. Gramley*.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy*, 520 U.S. at 904.  A habeas petitioner must instead meet the requirements of Rule 6(a) of the Rules Governing § 2254 Cases in the United States District Courts to warrant discovery.  Rule 6(a) provides in relevant part: "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."

The Supreme Court's holding in *Bracy* provides the framework for supplemental discovery permitted in § 2254 cases under Rule 6(a).  In 1981, William Bracy was convicted of capital offenses, tried before then-Judge Thomas J. Maloney, and sentenced to death for his role in an execution-style triple murder.  Later, in 1993, Judge Maloney himself was convicted in federal district court of conspiracy, racketeering, extortion, and obstructing justice.  Thereafter, Bracy filed a federal habeas petition claiming "he was denied a fair trial because 'in order to cover up the fact that [Judge Maloney] accepted bribes from defendants in some cases, [Judge Maloney] was prosecution oriented in other cases.'" *Bracy*, 520 U.S. at 902 (quoting *United States ex rel. Collins v. Welborn,* 868 F.Supp. 950, 990 (N.D. Ill. 1994)).  Bracy sought discovery to support his claim.  The district court rejected Bracy's fair-trial claim and denied his supplemental motion for

discovery, concluding that "[petitioner's] allegations contain insufficient specificity or good cause to justify further discovery." *Id*. at 902–03 (quoting *Welborn,* 868 F.Supp. at 991). A divided panel of the Seventh Circuit Court of Appeals affirmed. *Bracy v. Gramley*, 81 F.3d 684 (7th Cir. 1996).

The Supreme Court reversed, holding that the district court abused its discretion in denying Bracy's discovery request. Bracy's judicial bias claim stemmed from the fact that Judge Maloney did not take bribes in all criminal cases. Bracy contended that "Maloney's taking of bribes from some criminal defendants not only rendered him biased against the *State* in those cases, but also induced a sort of compensatory bias against *defendants* who did *not* bribe Maloney." *Bracy*, 520 U.S. at 905. Upon review, the Supreme Court first turned to the essential elements of Bracy's claim and considered whether his allegations could support that claim. *Id.* at 904. The Court determined that the allegations did provide the necessary support. *Id.* at 905. The Court reasoned, "there is no question that, *if it could be proved*, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Id.* (emphasis added).

Even though Bracy's "compensatory bias" theory was unsupported by proof, the Court concluded that he had shown "good cause" for discovery under Rule 6(a). *Id.* at 908. The Court emphasized,

> petitioner supports his discovery request by pointing not only
> to Maloney's conviction for bribe taking in other cases, but
> also to additional evidence . . . that lends support to his claim
> that Maloney was actually biased *in petitioner's own case.*
> That is, he presents "specific allegations" that his trial attorney,

a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged . . . cases might attract. It may well be, . . . that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case, but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish "good cause" for discovery. Although, given the facts of this particular case, it would be an abuse of discretion not to permit any discovery, Rule 6(a) makes it clear that the scope and extent of such discovery is a matter confided to the discretion of the District Court.

*Id*. at 909. Crucially, *Bracy* reaffirmed that, "where specific allegations before the court show reason to believe that the petitioner may, *if the facts are fully developed*, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (emphasis added). In addition, the Eleventh Circuit has emphasized that "good cause for discovery cannot arise from mere speculation," or "pure hypothesis." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006). Specific allegations should be based on evidence such as credible affidavits. *Id.*

To summarize, the Supreme Court held that specific allegations demonstrating good cause are sufficient for supplemental discovery under Habeas Corpus Rule 6. So a district court confronted with a federal habeas petitioner's request for further discovery should (1) review the essential elements of the petitioner's claim and then (2) consider whether the petitioner's specific allegations establish good cause for discovery under that claim. If good cause exists, supplemental discovery must be allowed. In Barbour's case, if Barbour presents specific allegations that are credible and concrete enough to support the essential

elements of his actual innocence claim, he will have established good cause for supplemental discovery. *See id.* at 1311.

### 1. The essential elements of Barbour's actual innocence claim

In his second amended habeas petition, Barbour asserts that the State has violated his constitutional rights because he is factually innocent of the underlying offenses, and supplemental discovery will prove his innocence. (Docs. 59 at 38; 163 at 11). Accordingly, the Court first turns to the essential elements of an actual innocence claim. But it bears repeating that Barbour does not need to establish success on the *merits* of his actual innocence claim at this juncture. Instead, Barbour only needs to establish good cause for *discovery*.

An actual innocence claim functions as a "gateway" claim, through which a petitioner must pass before the court can review the petitioner's underlying constitutional claims. *Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."). The Supreme Court outlined essential elements of the actual innocence "gateway" in *Schlup v. Delo*, 513 U.S. 298 (1995). In *Schlup*, the Supreme Court established that a habeas petitioner who asserts actual innocence must present new evidence to show it is "more likely than not that no reasonable juror would have found the defendant guilty beyond a reasonable doubt" after a review of the whole record. *Id.* at 327. This rule "ensures that petitioner's case is truly 'extraordinary,' . . . while still providing petitioner a

meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

The *Schlup* Court explained, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. As such, the Court recognized that the burden of establishing actual innocence is high:

> The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather *that no reasonable juror would have found the defendant guilty*. . . . Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Id.* at 329 (emphasis added). Moreover, "[t]he word 'reasonable' . . . is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.* And this actual innocence "gateway" "should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that that the trial was free of nonharmless constitutional error.'" *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013) (quoting *Schlup*, 513 U.S. at 316).

Nine years after *Schlup*, in *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court held that a court should review the total record, including new evidence, to make "'a

probablistic determination about what reasonable, properly instructed jurors would do.' . . . The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* at 538 (quoting *Schlup*, 513 U.S. at 329).

Therefore, *Schlup* and *House* set out the essential elements of an actual innocence claim, which functions as the gateway to presenting a constitutional claim: (1) a petitioner asserting an actual innocence claim must proffer new evidence; and (2) the court must find that it is more likely than not that no reasonable juror would have found the petitioner guilty upon review of the record as a whole.

### 2. Barbour's specific allegations

The Court now considers the specific allegations set forth by Barbour to determine whether his new evidence would—if fully developed and proved true—make it more likely than not that no reasonable juror would have voted to convict him. *See Bracy*, 520 U.S. at 905, 909; *see also Schlup*, 513 U.S. at 329. The Court will find good cause for discovery when a petitioner's specific allegations support the essential elements of the actual innocence claim. *See id.*

Barbour's second amended petition specifically alleges, "Mr. Barbour has moved for DNA testing so that he can establish that the centerpiece of the State's case against him – that he or Christopher Hester assaulted and killed Mrs. Roberts – is wrong and that another, unknown person is responsible for the crime." (Doc. 59 at 38). His new evidence includes affidavits from the victim's children, which state that an alternate suspect (1) had threatened their mother prior to her death, (2) was in close proximity to her the night of her

murder, (3) had access to keys to her home, and (4) was seen shaking, upset, and apologizing in the hours after the murder. None of this evidence was presented at trial.

Furthermore, Barbour's specific allegations in support of his actual innocence claim include:

- **Barbour's supplemental affidavits identify new potential suspects and an alternate theory of the crime.** In October 2018, Barbour supplemented his affidavit evidence with updated affidavits from the victim's son[4] and daughter,[5] signed on September 20, 2018. Their new affidavits provide additional information not contained in their affidavits from 2001. Barbour also proffered affidavits from Lakeshia Hall,[6] dated September 20, 2018, and Niquita Smith, dated May 18, 2017.[7] The affidavits all point to Tyrone Jackson and Cedric

---

[4] William Roberts states that during the course of the investigation, he told the police several times that he thought the neighbors across the street, Cedric Evans and Tyrone Jackson, were involved in his mother's murder, but the police never gave him the opportunity to explain his thoughts. (Doc. 155-2 at 2). Instead, the police kept telling him that he and his father were going to be charged with her murder. (*Id.*). Roberts also implies that he suspects that while he was asleep at Lakeisha Hall's house after the party, Tyrone Jackson removed his house keys from his pants pocket, enabling him to gain access to his mother's residence with a key. (*Id.* at 3). Roberts states that the next morning "[Tyrone] was nervous, visibly upset, crying and he kept apologizing. I asked him what was wrong, but he would not tell me." (*Id.*). Roberts further states, "[o]n several occasions prior to my mother's murder, Tyrone would say to me and Lola that 'he was going to get our mama.' I never understood what he meant." (*Id.*).

[5] Lola Roberts states that (1) she was and continues to be traumatized and grief-stricken by her mother's death, and (2) the investigating police scared her so much that she was unable to share with them the detailed information about Tyrone Jackson and why, based on his behavior the night of Lakeisha Hall's party and other reasons, she suspects he was involved in her mother's murder. (Doc. 155-2 at 5).

[6] Lakeisha Hall testified that on March 20, 1992, Lola Roberts and William Roberts attended a party at her house and spent the night there, along with Tyrone Jackson. Hall's affidavit reads, "Tyrone left my house in the early morning hours and returned a couple of hours later. When Tyrone arrived back at my house he looked scared and was shaking. . . . We all asked him what was wrong, but he would not tell us." (Doc. 155-2 at 7). Hall also states that when questioned by the police on March 21, 1992, about the Roberts murder, she did not tell them the specific details about what occurred in the evening or the early morning hours before the murder was discovered. (*Id.*).

[7] Niquita Smith testified that (1) she met Tyrone Jackson in 1996, after he moved to Florence, Alabama, from Montgomery, Alabama, (2) she and Jackson dated during some of 1996 and 1997, and (3) they are the parents of a son born in July 1998. (Doc. 155-2 at 9). Ms. Smith further stated:

> 4. Tyrone is presently serving a life sentence for murder. The victim was a female who lived in Florence. She was killed in her home.
> 5. I came to know other members of Tyrone's family that live in the Florence area. Through conversations with some family members and

Evans, the victim's neighbors, as potential perpetrators of this crime. (Doc. 155-2 at 3, 5–6, 7, and 9).

- **Barbour's confession conflicts with the evidence.**[8]  The version of events to which Barbour confessed is not compatible with crime scene evidence and with the pretrial DNA test results from blood samples and rape kit evidence.  For example,

  o Barbour's confession asserts that among the three alleged assailants, only Hester sexually assaulted Mrs. Roberts.  Barbour stated that he and Mitchell held the victim down while Hester raped her. (Doc. 59 at 19, para. 39).  However, the State's pretrial DNA testing of the rape kit evidence excluded Hester as the depositor of male DNA recovered from Mrs. Roberts. (*Id.* at 20, para. 41).

  o In Barbour's confession, he made no reference to placing a plastic bag over the victim's head and stated that the sole lethal acts were stabbing

---

others, I learned of the murder of Thelma Roberts, a woman who lived in Montgomery.

6.  From what I heard, I believe Tyrone and his brother Cedric Evans are responsible for Ms. Roberts' death.  I am convinced on the day Ms. Roberts was killed, Cedric Evans picked Tyrone up at a friend's house during the early morning hours.  They then went to Ms. Robert[s]'s home.

7.  From what I heard, I believe Tyrone saw Cedric kill Ms. Roberts after Tyrone raped her.  I believe this because Tyrone told me he left Montgomery for Florence because something bad had happened in Montgomery.

(*Id.*).

[8]      Barbour alleges that his confessions conflict with the evidence because his confessions were false and coerced.  He made three confession statements. (Doc. 101 at 43, n.23).  Two were taken on May 1, 1992, one audiotaped and one videotaped. (*Id.*).  The recorded confessions were transcribed and were introduced at trial. (*Id.*).  The third, was taken on May 29, 1992 and was suppressed, but it was offered into evidence by the defense. (*Id.*).  Barbour asserts that all of his confession statements should have been suppressed because they were the products of police coercion, intimidation, and tactics designed to break his will and elicit an unlawful confession.  Pre-trial, Barbour twice moved to suppress his confession on the grounds it was unlawfully obtained. (Doc. 59 at 25).  The trial court held suppression hearings on August 21, 1992 and December 29, 1992.  On January 13, 1993, the court denied Barbour's motion to suppress. (*Id.* at 26).

Barbour presents evidence that other witnesses faced coercive tactics during the investigation of the murder.  These affidavits present testimony from Melvin Roberts, (doc. 1-5), Lola Roberts, (doc. 1-6), and William Roberts, (doc. 1-7), all relatives of the victim, and Cedric Evans, son of the victim's neighbor, (doc. 1-8), all of whom assert that they were subjected to varying degrees of intimidation, threats, and verbal and/or physical abuse by police in the course of their investigation of the Roberts murder.

with a knife. (Doc. 101 at 46–47).  However, investigators determined that the killer had left a plastic bag over the victim's head and had attempted to strangle her.  The plastic bag is consistent with William Roberts's statement: "I found my mother in her room with a plastic bag over head." (Doc. 155-2 at 2, para. 5).

- **Barbour and Hester were convicted based on different accounts of the crime.**  Barbour was the sole defendant in his case, (CC-92-1544).  Following Barbour's indictment, Hester was indicted in a separate capital murder case, (CC-92-1680), for the rape, beating, and murder of Thelma Roberts, but he did not proceed to trial.  Instead, three months after Barbour's sentencing, Hester pled guilty to felony murder; he received a sentence of ten years to life. (Doc. 59 at 30–31, paras. 62–63).  Moreover, at the plea hearing on his felony murder conviction, Hester provided an account of the crime that differed from the description in Barbour's confession.[9]  Thus, two fundamentally different versions of the crime were presented.

## B. Barbour's specific allegations establish good cause for supplemental discovery in the form of DNA testing.

As the final step in reviewing Barbour's discovery request, the Court now determines whether Barbour's specific allegations support the essential elements of his actual innocence claim enough to establish good cause for discovery.

Barbour's specific allegations compel the conclusion that he is entitled to discovery under Habeas Corpus Rule 6(a).  In *Bracy*, the petitioner's specific allegations were "that his trial attorney, a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged . . . cases might attract."

---

[9] In Hester's version of events, (1) Mitchell was not present in the victim's home; instead, the trio was Barbour, Hester, and a woman, Angela Stykes; (2) the trio did not gain voluntary entrance to the victim's home, but instead they broke into the residence; (3) only Barbour went to the area of the house near the victim's bedroom; (4) Hester denied seeing or touching the victim; and (5) Hester did not learn that she might have been harmed until days later. (Doc. 59 at 30–31, para. 63).

520 U.S. at 909.  By comparison, Barbour specifically alleges that his confession was false and coerced, that DNA evidence will demonstrate its falsity, that numerous family members of the victim believe the real perpetrator was never brought to justice, and a host of other inconsistencies exist.  Further, Barbour submitted new evidence in the form of numerous credible affidavits from key witnesses that another perpetrator may have committed the crime, extending Barbour's allegations well beyond "mere speculation" or "pure hypothesis." *See Arthur*, 459 F.3d at 1311.

If Barbour's specific allegations are fully developed and proved—that DNA will prove he was not a participant in the rape or murder of Roberts and that a different perpetrator actually committed the rape and murder—then no reasonable juror would have found him guilty beyond a reasonable doubt in light of the record as a whole. *See House*, 547 U.S. at 538; *see also Floyd v. Vannoy*, 894 F.3d 143, 157–58 (5th Cir. 2018) (holding a petitioner had alleged an actual innocence claim because newly discovered evidence undermined the petitioner's confessions).  But, importantly, Barbour need not establish at this time that he *can* pass through the *Schlup* gateway, just that, "if the facts are fully developed," he *may* be able to do so. *See Bracy*, 520 U.S. at 909.  The Court simply finds that Barbour likely will be able to pass through the *Schlup* gateway if his specific and concrete allegations are proved true, in light of the record as a whole.  Therefore, the Court concludes Barbour has established good cause for supplemental discovery. *See Bracy*, 520 U.S. at 909.  Like in *Bracy*, "given the facts of this particular case, it would be an abuse of discretion not to permit any discovery . . . ." *See id.*

The Court therefore considers Barbour's discovery requests in support of his actual innocence claim.  Barbour has requested the following supplemental discovery:

> (1)  DNA testing of all items containing biological material from the crime scene, including but not limited to, slides, test tubes, clothing, weapons, hairs, blood, semen, carpet, and bedding;
>
> (2)  Inspection of all physical or other evidence related to the murder of Thelma Roberts or the investigation of Christopher Barbour, Christopher Hester, Michael Mitchell, Melvin Roberts, William Roberts, or Lola Roberts in custody of any law enforcement agency;
>
> (3)  Prosecutors' and law enforcement investigation files pertaining to the investigation of all above-named individuals;
>
> (4)  Prosecutors' and law enforcement trial files related to the prosecutions of Christopher Barbour, Christopher Hester, Michael Mitchell, Melvin Roberts, or William Roberts;
>
> (5)  All video and audio tapes of Christopher Barbour's confession;
>
> (6)  Personnel files for Det. Danny Carmichael and Lt. James Davis;
>
> (7)  Any and all criminal case files related to investigations or prosecutions of the previously identified suspect and his brother, including sealed juvenile files.[10]

(Doc. 163 at 29).

The Court finds that Barbour's specific allegations support his request for DNA testing.  The blood samples and rape kit evidence in Barbour's case were DNA tested in

---

[10] The Court assumes that Barbour refers to Cedric Evans and Tyrone Jackson as "the previously identified suspect and his brother." (Doc. 163 at 29).

the 1990's.[11] (Doc. 132 at 4).[12]  Since that time, there have been significant technological advances in DNA testing.[13]  DNA testing has become much more refined and precise; if the same blood, semen, and rape kit evidence in this case were re-tested with current state-of-the-art DNA testing procedures, the results should be significantly more reliable. Moreover, Barbour asserts that the true perpetrator's DNA may already be in Alabama's database. (Doc. 165 at 13).  The State asserts that new DNA testing would only show that Barbour's confession is correct—that he did not commit the rape, but he did commit the murder. (Doc. 164 at 8).  But the Court disagrees.  For example, new testing of the semen left by the rape could reveal: (1) Barbour committed the rape; (2) Mitchell committed the rape;[14] or (3) neither Barbour, Mitchell, nor Hester committed the rape, and someone else did, calling into question whether or not Barbour was at the crime scene on the night of the murder.  Other biological evidence from the crime scene could support or refute Barbour's claim in similar ways.  Thus, new DNA testing of the evidence found at the crime scene would be the strongest evidence to support or refute Barbour's actual innocence claim.

---

[11] Larry Huys, the State's forensic serologist, performed DNA testing on the blood samples and the rape kit evidence in May 1992. (Doc. 1-9 at 3).

[12] The Court has considered the Amicus Curiae Brief. (Doc. 132).  It provides additional evidence that serves a two-fold purpose: it strengthens both Barbour's actual-innocence claim and his discovery request.

[13]  The HLA DQ alpha testing in Barbour's case is described as "the first generation of PCR based DNA typing . . . ." (Doc. 1-9 at 3).

[14] DNA testing already revealed that Hester did not commit the rape, proving at least part of Barbour's confession to be false. (Doc. 59 at 20, para. 41).

In sum, Barbour has made the necessary showing to establish good cause, and his discovery request for DNA testing will be granted.  All other discovery requests will be denied without prejudice.

## IV.    MOTION TO DISMISS

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides a one-year statute of limitations for federal habeas petitions. 28 U.S.C. § 2244(d); *see also Sibley v. Culliver*, 377 F.3d 1196, 1199 (11th Cir. 2004).  The AEDPA seeks to promote the societal interests in finality and comity, *Williams v. Taylor*, 529 U.S. 420, 436–37 (2000), and emphasizes the strong interest the State and victim's families[15] have in "the timely enforcement of a sentence." *See Arthur v. King*, 500 F.3d 1335, 1340 (11th Cir. 2007) (quoting *Hill v. McDonough*, 541 U.S. 573, 584 (2006)).

However, the Supreme Court has long recognized that a prisoner may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. *See Herrera v. Collins*, 506 U.S. 390 (1993); *see also Wyzykowski v. Dep't of Corrs.*, 226 F.3d 1213, 1218 (11th Cir. 2000) ("[T]he factual issue of whether the petitioner can make a showing of actual innocence should be first addressed, before addressing the constitutional issue of whether the Suspension Clause requires such an exception for actual innocence.").  Thus, a petitioner who can pass through the actual innocence gateway is exempt from the procedural bar of the statute of limitations under the miscarriage of justice exception.

---

[15] In this case, the victim's family does not seek timely enforcement of Barbour's sentence, and they instead support Barbour's request for DNA testing. (Doc. 155-2 at 3, 5–6).

This miscarriage of justice exception to AEDPA's statute of limitations is different from equitable tolling of the limitations period, but both doctrines stem from the court's equitable authority.  The exception "is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U.S. at 404 (quoting *McKleskey*, 499 U.S. at 502).  The Supreme Court explained, "'equitable principles have traditionally governed the substantive law of habeas corpus,' . . . [and] 'we will not construe a statute to displace courts' traditional equitable authority absent the clearest command.'" *McQuiggin*, 569 U.S. at 397 (quoting *Holland v. Florida*, 560 U.S. 631, 646 (2010)).  AEDPA has no such "clear command" displacing federal habeas courts' equitable authority. *Id.*  Thus, the miscarriage of justice exception is necessary "to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup*, 513 U.S. at 324.

A petitioner who seeks to prove entitlement to the miscarriage of justice exception must proffer evidence to support his actual innocence claim.  And an actual innocence claim requires "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 316.

In this case, the respondent argues that the petitioner filed his habeas petition well past the one-year statute of limitations period, and the petition thus should be dismissed as untimely. (Doc. 51).  The Court declines to determine whether Barbour meets the miscarriage of justice exception at this juncture.  Instead, the Court will deny the

respondent's motion to dismiss without prejudice.   Barbour's case may well be the "extraordinary case" worthy of the miscarriage of justice exception, and further discovery will allow the Court to make that determination.[16] *See Schlup*, 513 U.S. at 324.

## V.   CONCLUSION

In sum, Barbour has presented good cause for further discovery, and he is entitled to DNA testing.   Accordingly, it is

ORDERED that:

1. Petitioner's   discovery   request   embodied   in   petitioner's   post-status conference briefs, (docs. 163 and 165), is GRANTED in part and DENIED in part as follows:

---

[16] To hold otherwise would place Barbour in a catch-22: he would be unable to proffer new DNA testing as evidence of innocence, yet he may need the DNA evidence to stake his claim in the first place.  In 2004, the Eleventh Circuit declined to allow a petitioner to conduct an evidentiary hearing on his actual innocence allegations because the hearing was unlikely to produce the kind of reliable evidence required to allow the petitioner to pass through the *Schlup* gateway. *Sibley v. Culliver*, 377 F.3d 1196, 1206–07 (11th Cir. 2004). However, *Sibley* is distinguishable for several reasons.  First, the *Bracy* good cause standard is the criteria for opening discovery under Rule 6, and *Bracy* requires specific allegations that demonstrate an entitlement to relief.  Second, *Sibley* is specific to evidentiary hearings, not discovery itself.  In fact, in *House v. Bell*, 547 U.S. 518, 540 (2006), the district court granted DNA testing prior to conducting any evidentiary hearings. *See House v. Bell*, 2000 WL 35504792, at *1 (E.D. Tenn. Feb. 16, 2000) (describing an evidentiary hearing held from February 1 to February 3, 1999); *House v. Bell*, No. 3:96-cv-883 (E.D. Tenn.) (The district court granted motions for DNA testing three times prior to the 1999 evidentiary hearing: document 163 contains an order granting a motion for DNA testing, issued on June 25, 1998; document 174 contains an order granting a motion for DNA testing, issued on August 3, 1998; and document 181 contains an order granting a motion for DNA testing, issued on August 25, 1998).  Third, Barbour has put forth new evidence—including evidence that a different perpetrator may have committed the crime—which may well be sufficient for the purposes of the miscarriage of justice exception.  The Eleventh Circuit explained in *Sibley*, "[o]ur confidence in Sibley's guilt remains substantially solid," as his proffered evidence, even accepted as true, did not undermine confidence in the ultimate conviction. 377 F.3d at 1207. This Court cannot, at this point, say the same in Barbour's case.

    a.  Petitioner is GRANTED limited discovery in respect to the testing of all DNA evidence in possession of the Montgomery Police Department with current, state-of-the-art technology.

    b.  The remainder of petitioner's discovery request is DENIED without prejudice.

2.  Respondents' Motion to Dismiss Habeas Petition as Untimely, (doc. 51), is DENIED without prejudice.

3.  The petitioner's motion for status conference, (doc. 166), is DENIED as moot.

4.  The Parties are required to file a status report regarding the petitioner's discovery request on the first business day of every month beginning on June 1, 2021.

DONE this 30th day of March, 2021.

                          /s/ Emily C. Marks

                      EMILY C. MARKS
                      CHIEF UNITED STATES DISTRICT JUDGE