IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER BARBOUR, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | CASE NO. 2:01-cv-612-ECM |
| ) | (WO) |
| JOHN HAMM, Commissioner, ) | |
| Alabama Department of Corrections, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION AND ORDER**

Now pending before the Court are the Petitioner's Motion for Supplemental Discovery (doc. 223) and the Respondent's Motion for Leave for Further Discovery (doc. 224). For the reasons set out below, both motions are due to be granted in part.

**I.   Introduction**

Petitioner Christopher Barbour ("Barbour") was convicted in March 1992 for the murder of Thelma Roberts ("Roberts"). The circumstances of the crime and Barbour's subsequent procedural history have been extensively detailed in previous filings of this litigation. (*See, e.g.*, Doc. 168).

Last year, the Court denied Respondent John Hamm's ("the State") motion to dismiss Barbour's habeas petition and granted Barbour's request for DNA testing of evidence collected at the crime scene. (*Id.*). The Court concluded that if DNA testing proved that neither Barbour nor his alleged co-perpetrators participated in the rape and

murder of Roberts, and if it instead identified a different perpetrator, Barbour could potentially establish a claim of actual innocence sufficient to excuse the alleged untimely filing of his habeas petition. (*Id.* at 14–18).  The Court's (and Barbour's) suspicion has been borne out:  testing of semen swabs collected from Roberts revealed Jerry Tyrone Jackson ("Jackson")—Roberts' former neighbor, currently serving a life sentence for the murder of a different woman—as the source of the semen.  Barbour was conclusively excluded as the samples' source (as were all individuals alleged at various times to have been present with him at the crime scene).  No other DNA or forensic evidence yet known to this Court connects Barbour to the crime scene.

Barbour now argues that these DNA results (and the absence of any other forensic evidence connecting him to the crime or clear corroboration of his confession) make it "more likely than not . . . no reasonable juror would find [him] guilty beyond a reasonable doubt," such that his petition should not be dismissed as untimely, and his claims of constitutional deficiencies in his conviction should be reviewed on the merits. (Doc. 223 at 2 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)).  The State disagrees, arguing that the DNA evidence only demonstrates that Jackson had intercourse (consensual or otherwise) with Roberts within the twenty-four to seventy-two hours prior to her murder, but that it does not conclusively exonerate Barbour nor throw sufficient doubt on his conviction to excuse Barbour's untimely filing.

2

In attempts to bolster their respective positions, both parties move the Court to allow supplemental discovery. Barbour seeks access to various investigatory and prosecutorial files, crime scene evidence, interrogation evidence, investigator personnel files, police department files, and files on Jackson. The State seeks to depose three individuals who support Barbour's case—Niquita Smith, Lakeisha Hall, and Alan Keel.[1] Because Barbour does not oppose the State's request to depose the three individuals (*see* doc. 226 at 7), the State's motion will be granted.[2]

As for Barbour's motion, however, there is a wrinkle. The State asserts that Barbour's discovery requests cannot properly be granted until the Court rules on whether he has satisfied the actual-innocence standard set out in *Schlup v. Delo*, 513 U.S. 298 (1995), such that his untimely filing is excused, and his petition may be properly considered on the merits. Barbour disagrees, arguing that though he believes he has already met the *Schlup*

---

[1] The State's motion for discovery was filed with redactions. No unredacted version was filed. As such, the Court labors to discern who exactly (aside from Alan Keel, who is openly named) the State seeks to depose. Barbour believes the State is requesting to depose Niquita Smith and Lakeisha Hall. (Doc. 226 at 7). The Court agrees—in its request, the State quotes Smith's and Hall's declarations. (Doc. 224 at 5–8 (quoting Doc. 155-2)). The Court construes the State's motion as such and grants the request. However, the Court notes that there is no standing seal or redaction order active in this case. The State is cautioned to review Local Rule 5.2 (dictating the proper way to file redacted documents with this Court, which involves simultaneously filing an *unredacted* copy under seal for the Court's use).

[2] Barbour requests the Court hold the State's motion in abeyance until after the disclosure and review of the documents he seeks. Because the Court grants the motion to turn over the requested documents on an expedited timeline, the Court declines to delay ruling on the State's motion. The Court is confident that the parties can work out a timeline amenable to all that is consistent with its guidelines. *See* Guidelines to Civil Discovery Practice in the Middle District of Alabama § III(C)(1) ("[L]awyers are expected to cooperate to produce [requested] documents within a reasonable time before [noticed] deposition[s], to encourage cheaper, shorter, and more meaningful depositions.").

3

standard, no such conclusion is required by this Court before it grants supplemental discovery unrelated to that issue. The Court turns now to Barbour's motion.

## II.   Analysis

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Instead, to unlock the tools of civil discovery, a habeas petitioner must demonstrate "good cause" for what he seeks, the measure of which lies within the "discretion of the District Court." *Id.* at 909 (discussing Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts). To demonstrate good cause, the petitioner must present "specific allegations [to] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Id.* at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The specific allegations that underlie a showing of good cause "cannot arise from mere speculation" or "pure hypothesis." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006) (per curiam). That said, a petitioner "need not show that the additional discovery would definitely lead to relief. Rather, he need only show good cause that the evidence sought would lead to relevant evidence regarding his petition." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000). If he does so, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 909 (quotations and citation omitted).

4

Since Rule 6 requires a showing of good cause to win access to civil discovery, the rule's corollary is clear: if the petitioner *cannot* show good cause, he is not entitled to civil discovery. Put another way, if no facts exist, developed or not, that will entitle the petitioner to relief, he cannot show good cause, and so cannot be granted civil discovery.

The State argues that Barbour's petition *may* present such a scenario. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year time limit on the filing of a habeas petition in federal court challenging a state court conviction. *See* 28 U.S.C. § 2244(d). Barbour admits that he failed to file his petition within the required statutory period. In ordinary circumstances, such failure would preclude this Court's review of the petition's claims. The State has for decades maintained that Barbour's petition should be handled in that routine way—dismissed as untimely without review of the merits, and without review of any *facts* that may underlie those merits, since no relief is possible.

But, Barbour argues, this is no ordinary circumstance. Instead, he asserts that he can make (and *has* made) a convincing showing of actual innocence of Roberts' murder, such that AEDPA's time bar does not apply and the merits of his petition may be considered. To do so, Barbour must produce new evidence to show, on the expanded record, that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329; *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (holding that a showing of actual innocence under *Schlup* can overcome the

5

expiration of AEDPA's statute of limitations and allow consideration of a petition's merits). "[A] petition supported by a convincing *Schlup* gateway showing raises sufficient doubt about the petitioner's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error." *House*, 547 U.S. at 537 (alterations adopted) (quotations and citations omitted).  Though the Court has not yet determined that he has, Barbour believes the evidence he has produced thus far has satisfied his *Schlup* burden.  The State disagrees.

And there's the rub—in the State's framing, before granting any discovery motion that could touch on substantive issues in Barbour's petition, the Court must first decide which of two worlds his petition inhabits:  one in which he has not made a convincing showing of actual innocence such that his petition remains time-barred and *no* facts exist upon which he could be entitled to relief; or, alternatively, one in which he has made such a showing, so that review of the merits by this Court is permitted, and ultimate relief, however likely, remains a possibility.  To that end, the State further argues that if the Court cannot yet conclusively determine whether Barbour has satisfied his burden under *Schlup*, the Court can only order discovery limited to resolution *of that issue*.  Barbour argues that if the Court is not yet prepared to rule on the *Schlup* gateway, it is not otherwise bound by any such limitation.

In support, the State relies primarily upon *Wyzykowski v. Department of Corrections*, 226 F.3d 1213 (11th Cir. 2000).  In *Wyzykowski*, the district court dismissed

the petitioner's habeas petition as time-barred for failing to satisfy AEDPA's one-year limitation. *Id.* at 1215. On appeal, the petitioner argued that AEDPA's one-year limitation was a *per se* violation of the Constitution's Suspension Clause, or, separately, that to avoid such a violation, AEDPA's statute of limitations had to contain an implicit exception for petitioners who could demonstrate actual innocence. *Id.* The Eleventh Circuit held that AEDPA's one-year limitation was not a *per se* unconstitutional suspension of the writ of habeas, *id.* at 1217, but it *declined* to determine whether an actual innocence exception had to be read into the limitation to avoid a constitutional violation, *id.* at 1218. The court explained that though the petitioner's argument "raise[d] a troubling and difficult constitutional question, . . . neither the magistrate judge nor the district court addressed [his] claims of actual innocence." *Id.* Because "constitutional issues affecting legislation will not be determined . . . at the instance of one who fails to show that he is injured by the statute's operation," *id.* at 1219 (quoting *New York City Transit Authority v. Beazer*, 440 U.S. 568, 583 n.22 (1979)), the court held that the petitioner's constitutional argument was not properly before it, *id.* Without any indication of whether the petitioner would be *affected* by an actual innocence exception to AEDPA's statute of limitations, opining on the existence of such an exception was inappropriate.

*Wyzykowski* does not apply here in the way the State contends.[3] The court's decision stood upon "the one doctrine more deeply rooted than any other in the process of

---

[3] *But see infra* at 11.

7

constitutional adjudication," *id.* at 1218–19 (quoting *Beazer*, 440 U.S. at 582), that of *constitutional avoidance*.  The court was not explicating a grand principle that courts must determine whether a petitioner has made out a showing of actual innocence before taking any other step in the litigation.  Nor did the court say anything about limitations on a reviewing court's ability to order discovery—the issue here.  Instead, the court merely declined to answer a constitutional question that had not yet been shown to affect the status of the petitioner before it.  Nothing in *Wyzykowski* relates to the permissibility or propriety of allowing factual discovery on substantive claims simultaneously with discovery on precedent procedural issues.

The State also argues that petitions brought pursuant to 28 U.S.C. § 2254(d) are limited to the "record that was before the state court that adjudicated the claim on the merits." (Doc. 224 at 3 (quoting *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1262 (11th Cir. 2014)).  As such, the State contends, any motion for discovery is premature because the Court must first determine that the state court's adjudication of Barbour's claims violated the standards of § 2254(d).

Section 2254(d) limits a federal court's review of claims that were adjudicated on the merits in state court. *See* 28 U.S.C. § 2254(d).  If a claim was adjudicated on the merits in state court, a federal court may only grant a petition on that claim if the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)–(2). As the State correctly contends, a federal court reviewing such a claim is limited to the record that was before that state court. *Cullen v. Pinholster*, 563 U.S. 170, 181–85 (2011).

But the State's argument conflates the standard of ultimate review of the petition's merits with the standard for *discovery* on those merits or on other procedural issues. *Pinholster* explicitly declined to decide "whether § 2254(e)(2) prohibited the [district court] from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing *before it determines* that § 2254(d) has been satisfied." *Id.* at 203 n.20 (emphasis added). Thus, the door remains open for the Court to allow factual development before deciding whether § 2254(d) applies—an issue the parties have not briefed and the Court has not decided. Neither AEDPA, nor the Supreme Court in *Pinholster*, addressed the question of whether discovery may precede such a determination. *See High v. Nevens*, 2013 WL 1292694, at *9 (D. Nev. Mar. 29, 2013) ("The rule in *Pinholster* of course has no bearing whatsoever on such non-merits factual development, under *Schlup* or otherwise.").

Indeed, "[t]he Court is not deciding the merits today, whether under deferential review under § 2254(d)(1) or instead on *de novo* review if applicable." *Id.* at *4. Likewise, it "will not necessarily decide every potential procedural and merits issue in the case before it permits discovery of facts that may more fully inform its consideration of at least some

9

of those issues later in the case." *Id.* at \*6 (footnote omitted). While the Court agrees with the State that it cannot *address* Barbour's underlying constitutional claims without first deciding whether he has met his burden under *Schlup*—that is, of course, the entire point of the *Schlup* analysis—that question is not determinative of the evidentiary question here.

More fundamentally though, the State misrepresents what exactly Barbour is requesting and why. Barbour does not argue that the Court should grant him the documents he seeks because the evidence would fill out a record for his other constitutional claims. Instead, he seeks evidence to further his claims of *innocence* under *Schlup* and *Herrera*.[4] That the same evidence may also support his substantive constitutional claims does not diminish its probative value in Barbour's show of actual innocence.

While it remains an open question whether a *Herrera*-type claim is a viable claim for habeas relief, *see House*, 547 U.S. at 555, and *McQuiggin*, 569 U.S. at 392, the Court need not decide that question here. The typical justification for *Herrera* relief is that the execution of someone who is truly innocent is *itself* a constitutional error, in violation (most commonly) of the Eighth or Fourteenth Amendments. *See, e.g.*, *In re Davis*, 2010 WL 3385081 (S.D. Ga. Aug. 24, 2010) (finding that the Eighth Amendment provides the

---

[4] The Supreme Court in *Herrera v. Collins* assumed for the sake of argument that a capital petitioner could make out a claim for habeas relief, absent any other constitutional error in the underlying conviction, on an *extraordinarily* rigorous showing of actual innocence. 506 U.S. 390, 417–19 (1993). Such a showing is often described as a freestanding claim of actual innocence. Barbour argues that he can satisfy such a demanding standard.

innocent with a cognizable constitutional claim to be free from execution); Brandon L. Garrett, *Claiming Innocence*, 92 MINN. L. REV. 1629, 1704–10 (2008) (arguing that such a claim could be supported by the Sixth, Eighth, and Fourteenth Amendments).  But until the Court is convinced on the underlying facts that Barbour would be affected by the existence, or lack thereof, of a *Herrera* claim, it declines to address the constitutional question of whether the Eighth Amendment (or some other constitutional provision) demands its existence. *See Wyzykowski*, 226 F.3d at 1217–19 (declining to decide, on the same rationale, whether the Suspension Clause requires an actual innocence exception to AEDPA's statute of limitations).  As the Supreme Court has itself acknowledged, the claim, if it does exist, would be subject to the same discovery procedures as other claims. *See Dist. Att'y's Off. for the Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68 (2009) ("If such a habeas claim [of freestanding actual innocence] is viable, federal procedural rules permit discovery 'for good cause.'"); *see also In re Davis*, 557 U.S. 952 (2009) (transferring a habeas petition to the district court for factual development of the petitioner's actual innocence claim).  By that same token, that Barbour wishes to fill out the record on a *Herrera*-claim does not, by that reason alone, doom any showing of good cause.

Besides, even if Barbour *was* asking for simultaneous discovery on his innocence claims (*Schlup* or *Herrera*) and the other claims of his petition, the State's argument that the Court must cabin discovery to the former before allowing the latter is unconvincing.  On the contrary, courts have often allowed simultaneous discovery on claims of actual

11

innocence *and* a petition's substantive claims, even if the evidence to support the two was not the same. *See, e.g*, *High*, 2013 WL 1292694, at *2–9 (granting simultaneous discovery on records relevant to an actual innocence claim and records relevant to a claim of ineffective assistance of counsel); *Hasan v. Ishee*, 2011 WL 5596891 (S.D. Ohio Nov. 17, 2011) (same). So too do courts grant discovery on evidence that supports *both* claims. *See, e.g.*, *Blank v. Vannoy*, 2021 WL 4163566 (M.D. La. Sept. 13, 2021) (granting discovery because the requested evidence was relevant to several of the petitioner's substantive claims *and* his actual-innocence claim). To sanction the sort of piecemeal discovery the State seeks in the face of good cause would be to needlessly complicate and extend habeas litigation, a choice that does not serve the State's interest in the finality of its judgments nor the petitioner's interest in relief.[5] No matter how Barbour frames his request, the relevant inquiry is whether he has demonstrated good cause.

And Barbour has largely done so here. The Court "retains discretion to order discovery . . . when it would help the [Court] make a reliable determination with respect to the prisoner's claim." *Herrera*, 506 U.S. at 444 (Blackmun, J., dissenting on other grounds) (citations omitted). Barbour makes clear how most of the evidence he requests would help

---

[5] And the latter consideration is made all the more important—and delay made all the more unpalatable—when the petitioner makes a meritorious claim that he is actually innocent of the underlying crime. *See Kuhlmann v. Wilson*, 477 U.S. 436, 452 (1986) (plurality opinion), *superseded by statute on other grounds*, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, *as recognized in Banister v. Davis*, 140 S. Ct. 1698 (2020) (A "prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated").

the Court decide whether he had met his burden under *Schlup* or if he has succeeded on a freestanding innocence claim under *Herrera*.

But before it turns to the individual requests, the Court first notes that several of Barbour's requests do not appear to be limited to information connected to *this* case and crime. For example, request (2) asks for "*all* crime scene videos and photographs," (doc. 223 at 14 (emphasis added)), which it then specifies includes photos of Roberts. Similarly, request (5) asks for "*all* contemporaneous bench notes . . . and photographs of Mr. Huy's observations of microscope slides." (*Id.* at 15 (emphasis added)). The requests could thus be interpreted to reach *all* crime scene photos *in the entire department*, or *all* photographs Mr. Huy *has ever taken*. To the extent that Barbour requests materials that broadly, he has not demonstrated good cause for their discovery. However, the Court believes good cause *has* been shown for such information (save for two exceptions, explained below) to the extent that it relates to the crime, and subsequent investigations and prosecutions, at issue here. As such, the Court construes any such request (further explained in detail below) to reach only information connected to, or deriving from, the rape and murder of Roberts.

Turning to the requests themselves, requests (1) through (7), as well as request (21), relate directly to the crime scene and the police's investigation of it, including any material that links Barbour—or some other individual—to the crime. Barbour has long argued that *no* forensic evidence connects him to the crime scene, and that his conviction was predicated almost entirely upon his confession. Review of crime scene evidence may

13

confirm or undercut that contention by either surfacing forensic (or investigatory) connections to Barbour, or by further reinforcing that no such connections exist. Barbour's basis for discovery is supported by far more than mere speculation or hypothesis: affidavits from the victim's children and others familiar with the situation explicitly connect Jackson to the crime (or name him as its perpetrator), accusations supported by credible DNA results collected from Roberts. Together, Barbour builds a strong case that he is innocent of his convicted offense, a case that could be strengthened with the evidence he requests.

Requests (8)[6] through (15)[7] may support Barbour's decades-long contention that his confession was coerced. That contention both lays the foundation for many of his constitutional claims and supports a showing of actual innocence: if Barbour uncovers convincing evidence that his confession was coerced (as he believes he will, a reasonable belief considering the DNA results), a jury would be even *less* likely to convict him than it would be had it relied solely upon the new DNA records and the record presented at trial. *See Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir. 2018) (explaining that evidence that undermines the petitioner's confession "is relevant to his actual-innocence claim because it supports [his] assertions [that] his confessions were false"). With little else connecting Barbour to the crime, that he could further cast doubt on his own confession and the

---

[6] Request 8 asks for information related to Cedric Jackson. The Court assumes Barbour meant to request information related to Cedric *Evans*, Jackson's brother, construes it as such, and grants it on that basis.

[7] Except for request (14), discussed below.

14

methods by which it was obtained would make it more apparent that he is, as he contends, innocent.  The records on Barbour's own interrogation, as well as the interrogation records of other witnesses who have also claimed that they were subject to coercive and abusive investigation tactics, may reveal those claims to be accurate.  The evidence may also demonstrate whether the police encouraged and taught proper investigatory techniques, how they came to settle on Barbour as the perpetrator, and how they divined the explanation of the crime that prosecutors later presented at trial—an explanation Barbour believes incorrect.

Requests (17) and (18) may both support Barbour's *alternative* explanation for the crime:  that Jackson raped and murdered Roberts.  Jackson is currently serving a life sentence for a crime substantially like that at issue here.  His previous prosecution or investigation files may surface additional connections to Roberts' murder, beyond the startling connection of his DNA in the victim.  Request (18) would also serve to make the State's explanation of the DNA evidence and the Roberts children's affidavits—that Jackson was acting strangely because he was nervous Roberts' children would learn he had had intercourse with their mother—all the less likely.

Requests (19) and (20) may provide evidence that the Montgomery Police Department employed hypnosis as an interrogation technique during the relevant period.  Because the State now relies upon the affidavit of Angela Stikes, who herself represented in 2001 that she was subject to hypnosis during her original interrogation by police in 1992,

15

(*see* doc. 214-3),[8] records of the Department's use of hypnosis could serve both to validate Stikes' 2001 declaration and undercut the new 2022 affidavit that links Barbour to the crime (doc. 211-2).

That said, Barbour fails to demonstrate good cause for two of his requests. Request (14) requests "[a]ny and all files related to the misconduct investigation of members of the Montgomery Police Department and the Montgomery Fire Department between the years of 1990 and 1995[.]" (Doc. 223 at 16). Barbour does not make clear which investigation he references, or why that date range is appropriate. As currently drafted, the State could provide documents on wholly unrelated investigations (like an investigation into timesheet fraud or workplace harassment) that would not further Barbour's case. Without a clearer connection between "the" investigation he references and his specific case or allegations, the Court will not grant his request.

For similar reasons, the Court declines to grant request (16)—seeking the "[n]ames of all persons interviewed by [Detective] Danny Carmichael during the two years prior to [Barbour's] arrest . . . who were subsequently charged with a felony[.]" (*Id.*). Barbour does not make clear the connection between those Carmichael merely *interviewed* (instead of, say, *interrogated*) and those interviewees' later charges. For example, if Carmichael

---

[8] The State requests the Court order Barbour to produce any record or documentation he may have regarding Stikes' hypnosis during her 1992 interview. Barbour responds that his representation of Stikes' hypnosis derived from her own 2001 declaration, already in the record. In any event, the Court will grant the request.

arrived on a crime scene and interviewed a concerned neighbor, and later that neighbor was charged with a wholly unrelated felony, such a file would be responsive to Barbour's request but have no probative value to the merits of his petition. Nor is his request limited only to those who *confessed*, the cornerstone of Barbour's allegations (*i.e.*, that Carmichael coerced his *confession*). Barbour does not demonstrate good cause for such a broad request, and so the Court will not grant it.

But for the remainder, the documents Barbour seeks have a large chance to help the Court resolve the numerous outstanding issues with his petition, both procedural and substantive. Mindful that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (citation omitted), the Court is persuaded that "more liberal discovery is appropriate in capital cases where the stakes . . . are so high," *Payne*, 89 F. Supp. 2d at 971. Against this backdrop, the Court finds that Barbour has demonstrated good cause for the discovery he seeks.

### III. Conclusion

Accordingly, and for good cause, it is

ORDERED that the motion for supplemental discovery (doc. 223) is GRANTED to the following extent:

    1) Request (1) is GRANTED;

17

2) Request (2) is GRANTED to the extent that the crime scene videos and photographs relate to the murder of Thelma Roberts;

3) Request (3) is GRANTED;

4) Request (4) is GRANTED;

5) Request (5) is GRANTED to the extent that the bench notes, worksheets, and photographs of Mr. Huy relate to the murder of Thelma Roberts;

6) Request (6) is GRANTED to the extent that the bench notes, photographs, documents, and DQ alpha testing relate to the murder of Thelma Roberts;

7) Request (7) is GRANTED to the extent that the investigation files, notes, and reports relate to the murder of Thelma Roberts,

8) Request (8) is GRANTED to the extent that the files and notes relate to those individuals as they were investigated for the murder of Thelma Roberts;

9) Request (9) is GRANTED;

10) Request (10) is GRANTED;

11) Request (11) is GRANTED;

12) Request (12) is GRANTED;

13) Request (13) is GRANTED;

14) Request (14) is DENIED;

15) Request (15) is GRANTED to the extent that it relates to the time period of 1990–1993;

18

16) Request (16) is DENIED;

17) Request (17) is GRANTED;

18) Request (18) is GRANTED;

19) Request (19) is GRANTED;

20) Request (20) is GRANTED;

21) Request (21) is GRANTED to the extent that it requests exculpatory and inculpatory evidence of Barbour related to the murder of Thelma Roberts.

It is further

ORDERED that the motion for leave for further discovery (doc. 224) is GRANTED. It is further

ORDERED that the parties shall have **thirty days** to supply the opposing side with the documents requested, should they exist. If, after diligent review, a party is unable to adhere to this timeline, or if it finds that the documents requested do not exist, that party shall file a NOTICE with the Court, explaining the efforts undertaken to locate the documents, reasons why they cannot be found, and proposed next steps to procure similar information. The parties are CAUTIONED that motions for extensions of time will be heavily disfavored in this matter. It is further

ORDERED that the parties shall have **ninety days** in which to notice and depose the five individuals named in motions the Court has granted. It is further

ORDERED that any other motion to depose witnesses shall be filed no later than **thirty days** after the receipt of the documents and materials herein granted.

Done this 7th day of March, 2022.

                              /s/ Emily C. Marks  
                              EMILY C. MARKS  
                              CHIEF UNITED STATES DISTRICT JUDGE