IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CHRISTOPHER BARBOUR,                      )
                                          )
      Petitioner,                       )
                                          )
v.                                        )        CASE NO. 2:01-cv-612-ECM
                                          )                  [WO]
JOHN Q. HAMM, Commissioner,               )
Alabama Department of Corrections,        )
                                          )
      Respondent.                       )

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

In March 1992, Thelma Roberts was raped and stabbed to death in her home in Montgomery, Alabama.  Ultimately, Christopher Barbour ("Barbour") and Christopher Hester ("Hester") were charged in separate capital cases for these crimes.  Barbour confessed, telling police that he stabbed Mrs. Roberts to death after he and Michael Mitchell ("Mitchell")[1] aided and abetted Hester in raping her.  Prior to his trial, Barbour recanted his confessions, alleging that they were false, coerced, and involuntary.  No physical evidence or eyewitness testimony linking him to the crimes was presented at his trial.  Barbour was convicted and sentenced to death.

Barbour has maintained his innocence since his conviction.  He later argued that Jerry Tyrone Jackson, Mrs. Roberts' neighbor at the time of her murder, may have committed the crime.  In state and federal court, Barbour sought DNA testing of semen

---

[1] At that time, Mitchell was a juvenile.  He was charged with capital murder in May 1992, but the charge was dismissed in June 1992. (Doc. 295-11).

recovered from Mrs. Roberts' body, which he claimed would identify the true perpetrator.

In 2021, this Court ordered that DNA testing be conducted.  Those DNA test results revealed that the source of the semen recovered from Mrs. Roberts' body was Jerry Tyrone Jackson ("Tyrone Jackson" or "Jackson").  Since 2003, Jackson has been serving a life sentence for murder after he was convicted of stabbing a woman to death in her home after she refused his sexual advances.

The following summarizes the procedural history leading up to this revelation.  On May 21, 2001, Barbour filed a petition for a writ of habeas corpus in this Court, pursuant to 28 U.S.C. § 2254, challenging his 1993 convictions for the capital murder of Thelma Roberts in the Montgomery County Circuit Court and resulting death sentence. (Doc. 1).  On February 23, 2005, Barbour filed a Second Amended Petition (doc. 59), and on April 17, 2023, he filed a Third Amended Petition (doc. 349).  Barbour claims that his conviction and death sentence were obtained in violation of his rights under the United States Constitution.[2]

Barbour's direct appeal concluded on June 24, 1996, when the United States Supreme Court denied certiorari review. *See Barbour v. Alabama*, 518 U.S. 1020 (1996).  Respondent John Q. Hamm ("the State"),[3] Commissioner of the Alabama Department of Corrections ("ADOC"), moved to dismiss Barbour's petition as untimely, arguing that

---

[2]  This case originally was assigned to District Judge Myron H. Thompson.  On July 19, 2016, this case was reassigned to then-Chief District Judge W. Keith Watkins (*see* doc. 144), and on August 7, 2018, this case was reassigned to the undersigned district judge (*see* doc. 151).

[3]  In their written filings, the parties routinely refer to plural "Respondents."  However, the only Respondent at this stage is John Q. Hamm.

Barbour filed the petition beyond the prescribed one-year limitations period, *see* 28 U.S.C. § 2244(d)(1). (Doc. 51).  Barbour acknowledges that based on his petition's May 2001 filing date, it appears untimely; however, Barbour contends that he is exempt from § 2244(d)'s time-bar because he is actually innocent of the underlying charges on which he was convicted.  As summarized in the Court's March 30, 2021 Memorandum Opinion and Order (doc. 168 at 9–14) and the evidence Barbour presented to the Court in support thereof, the Court found that his specific allegations established good cause for supplemental discovery in the form of DNA testing. (*Id.* at 14–18).  For these reasons, on March 30, 2021, the Court denied the State's Motion to Dismiss without prejudice and granted Barbour limited discovery with respect to testing of all DNA evidence in possession of the Montgomery Police Department with current, state-of-the-art technology. (*Id.* at 20–21).

Subsequent to the results obtained when the DNA evidence was tested in 2021, Barbour filed his Third Amended Petition, the operative one.[4] (Doc. 349).  On June 20 and June 28–30, 2023, the Court conducted an evidentiary hearing on Barbour's *Schlup*[5] gateway innocence claim (hereinafter referred to as the "*Schlup* hearing"). (*See* docs. 436, 438, 439, 440).  Following that hearing, Barbour's *Schlup* claim has been fully briefed and is ripe for review.  This matter is before the Court to determine whether

---

[4]  The State did not file a response to said petition, but in its Post-Hearing Brief on Barbour's Actual Innocence Claim (doc. 450), the State contends that Barbour has not overcome the untimely filing of his federal habeas petition and has not met his burden under *Schlup* to establish a gateway actual-innocence claim.  The State concludes:  "As such, his third amended federal habeas petition should be dismissed, with prejudice[], as time barred." (*Id.* at 159).  The Court construes this response (doc. 450) as a renewed motion to dismiss as untimely.

[5]  *Schlup v. Delo*, 513 U.S. 298 (1995).

Barbour has presented sufficient evidence of his innocence at this stage to pass through the *Schlup* gateway and excuse the untimeliness of his petition.

For the reasons explained below, the Court concludes that Barbour has met the *Schlup* standard for an actual innocence claim, and that the State's renewed Motion to Dismiss as Untimely (doc. 450) is due to be denied.

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND ................................................................................................. 7

   A.     Procedural Background ................................................................................ 7

   B.     Factual Background and General Timeline of Events Before Barbour's Trial ....................................................................................................................... 7

       1.  Events preceding Thelma Roberts' Murder ........................................... 7

       2.  Thelma Roberts' murder ........................................................................ 9

       3.  Investigation following Thelma Roberts' murder .................................11

       4.  The MFD's polygraph examination of Barbour .................................... 14

       5.  Barbour's first confession statement .................................................... 15

       6.  Barbour's second confession statement ............................................... 16

       7.  Barbour's arrest and indictment ........................................................... 17

   C.     Barbour's Trial ......................................................................................... 18

       1.  Suppression hearing .............................................................................. 18

       2.  The prosecution's theory of guilt at Barbour's trial ............................ 21

       3.  The evidence on which Barbour was convicted .................................... 22

   D.     Factual Background and General Timeline of Events After Barbour's Trial. ..................................................................................................................... 24

       1.  Hester pleads guilty to felony murder .................................................. 24

       2.  Tyrone Jackson murders Monique Vaughn ......................................... 25

       3.  DNA testing of Tyrone Jackson's saliva .............................................. 26

       4.  Affidavit and declaration evidence Barbour submitted in 2001 and 2018.... 26

       5.  This Court orders new DNA testing ..................................................... 29

       6.  2021 and 2022 results of the rape kit evidence tested with STR DNA testing ................................................................................................................. 29

       7.  February 10, 2022 status conference regarding the DNA test results ........... 30

   E.     Evidence Presented at *Schlup* Hearing ................................................... 34

       1.  DNA testing of rape kit evidence and DNA extracts ........................... 35

       2.  DNA testing of Tyrone Jackson's saliva .............................................. 45

       3.  Expert evidence concerning polygraph testing and scoring .......................... 46

**4. Expert evidence concerning police investigative practices and interrogations, false confessions, and the associated risk factors** .................. 47

**5. Lay witness testimony** .................................................................................. 54

**6. Depositions of lay witnesses admitted at the *Schlup* hearing** ...................... 61

**III. APPLICABLE LAW** .............................................................................................. 63

**A.    The "Miscarriage of Justice" Exception to AEDPA's Time-Bar** ................. 63

**B.    Standard for a Gateway Actual Innocence Claim** ...................................... 65

**IV.  DISCUSSION** ........................................................................................................ 67

**A.    Summary of Record Evidence—Old and New—Relevant to *Schlup* Inquiry**..
...................................................................................................................................... 67

**1. Barbour's Evidence** ........................................................................................ 67

**2. The State's Evidence** ...................................................................................... 69

**B.    New DNA Evidence** ........................................................................................ 70

**1. The reliability of the new DNA evidence** ...................................................... 71

**2. Effect of new DNA evidence on reasonable jurors** ........................................ 76

**C.    Barbour's Confessions and Other Evidence of Guilt** ................................. 89

**1. Deference to state court factual findings** ....................................................... 94

**2. Dr. Leo's testimony** ........................................................................................ 95

**D.    Barbour Has Satisfied the *Schlup* Standard** ................................................. 97

**E.  The State's Argument that the Court Improperly Limited the *Schlup* Hearing Testimony Fails** ....................................................................................................... 101

**V.  CONCLUSION** ................................................................................................... 104

## II.  BACKGROUND

### A.      Procedural Background

The Court incorporates by reference the procedural background of Barbour's case as recounted by the state appellate courts on direct appeal. *See Barbour v. State*, 673 So. 2d 461 (Ala. Crim. App. 1994); *Ex parte Barbour*, 673 So. 2d 473 (Ala. 1995).  Barbour sought post-conviction relief in the Alabama state courts pursuant to ALA. R. CRIM. P. 32. In an unpublished Order dated April 21, 1998, the Montgomery County Circuit Court denied this petition. *See Barbour v. State*, Case No. CC-92-1544.60-WRG, Order Dated April 21, 1998.  Barbour did not appeal.

### B.      Factual Background and General Timeline of Events Before Barbour's Trial

#### 1.  Events preceding Thelma Roberts' Murder

Thelma Bishop Roberts was married to Melvin Roberts ("Melvin"), and they had two children:  a daughter, Lola Roberts ("Lola"), and a son, William Roberts ("William").  Mrs. Roberts and her husband were estranged.  Sometime before the murder, Mrs. Roberts and her children had moved from the marital residence to 3575 Manley Drive in Montgomery, Alabama.  Mrs. Roberts' children described her as a "very religious" and "strict" woman who did not drink or smoke. (Doc. 462-132 at 54:22–55:7) (William's testimony); (doc. 440 at 148:15–16) (Lola's testimony).[6]

Then-sixteen-year-old Tyrone Jackson, his mother, his siblings, and his stepfather lived across the street from Mrs. Roberts on Manley Drive.  William and Jackson were friends, and they would hang out inside the Robertses' home.  Despite their friendship,

---

[6]  References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

Jackson "used to tell [William] that [Jackson] was going to get [William's] mama all the time." (Doc. 462-132 at 58:7–8) (William's deposition testimony); (doc. 440 at 99:3–4) (William's testimony at the *Schlup* hearing that "[Jackson] said he was going to get my mama"). William at first thought Jackson was joking, but Jackson "kept on" and "said it about two or three times." (Doc. 462-132 at 58:15–20). Also, Mrs. Roberts did favors for the Jacksons, including allowing them to store food in her refrigerator and use her phone because their own home did not have power. (Doc. 462-132 at 55:20–56:9). According to William, Mrs. Roberts would open the door for Jackson if he knocked on her door, but she would not open the door to a stranger.

Around March 6, 1992, Mrs. Roberts cashed a tax refund check from the IRS. She gave $250.00 to Lola and $250.00 to William, deposited $500.00 in the bank, and kept the rest in cash. (Doc. 1-3 at 50). After receiving his $250.00, William flashed the money in front of some friends in the neighborhood, including Jackson. (*Id.*).

On March 20, 1992, several friends, including Jackson, Lola, and William, were at a party at the home of Lakeisha Hall ("Hall"). (Doc. 462-123 at 22:16–17, 22–23; 23:1–9) (Hall's deposition testimony); (*see also* doc. 440 at 77:18–25, 78:1–4) (William's *Schlup* hearing testimony); (*id.* at 123:23-25, 124:1-9) (Lola's *Schlup* hearing testimony). Hall lived in the same neighborhood as the Robertses and the Jacksons. (Doc. 440 at 156:18–19, 157:13–17) (Hall's *Schlup* hearing testimony). According to Hall, she did something she wasn't "supposed to have been doing" by having Jackson at her house, explaining that her mother had forbidden her from having Jackson over because he had

previously raped Hall's neighbor. (Doc. 284-4 at 44:23, 45:1–12).[7]  Later in the evening

of March 20, Jackson left Hall's home by himself without explanation. (Doc. 462-123 at

29:20–30:23).  Jackson returned while it was still dark and woke up William to ask him

for a cigarette. (Doc. 462-123 at 42:1–43:22); (doc. 284-7 63:2–23).  According to

William, Jackson appeared "jittery." (Doc. 440 at 82:11).  According to Hall, Jackson

was "shaking" and repeatedly said "I'm sorry, I'm sorry" to William. (Doc. 462-123 at

42:4–23).

### 2. Thelma Roberts' murder

During the late evening of March 20, 1992, or the early morning of March 21,

1992,[8]  Thelma Roberts was raped and murdered in her home at 3575 Manley Drive.  She

was forty years old. (Doc. 265-2 at 2).  William, who was seventeen years old at the time,

returned home at around 11:15 a.m. on the morning of March 21, 1992, found the door

locked, and let himself in with a key. (Doc. 70-8 at 124).  He then discovered his

deceased mother's body in her bedroom. (*Id.*).

The Montgomery Police Department ("MPD") and the Montgomery Fire

Department ("MFD") investigated the crime.  Law enforcement officers filed numerous

reports, one of which described the circumstances of the crime as follows:

> The victim was found by her son and daughter after they
> returned home from spending the night with friends.  The
> victim was found lying on the floor of the master bedroom

---

[7]   Jackson admitted that he was arrested for rape sometime before 1992. (Doc. 434 at 35:15–22) (Jackson's deposition testimony); (*see also* doc. 468-1).

[8]   In his opening statement at trial, the prosecutor told the jury that this crime occurred on March 20, 1992. (Doc. 70-4 at 70:16–20).

> with a plastic bag covering her head and a knife protruding
> from her chest.  The victim's son removed the bag and knife
> before Police arrived.  An attempt to burn the victim inside
> the house was made and soot, ashes and partially burned
> materials were found in the bedroom and throughout the
> house.

(Doc. 1-3 at 12).  The police reports do not indicate any evidence of forced entry or a

break-in.  Investigators found three separate areas of fire at the crime scene:  one was "at

the closet door in front and behind the closet door on the floor," the second was "on the

victim's chest and on the left arm," and the third was evidenced by "a blister on the

victim's right leg approximately in the middle of the floor." (Doc. 70-4 at 177).

Mrs. Roberts' body was transported to the ADFS facility in Montgomery on

March 21, 1992, for an autopsy. (Doc. 70-5 at 26:7–10).  Beginning at 9:00 a.m. on

March 23, 1992, Dr. Allan Stilwell, a medical examiner for the Alabama Department of

Forensic Sciences ("ADFS"), performed the autopsy on Mrs. Roberts. (Doc. 265-2 at 2).

Dr. Stilwell opined that Mrs. Roberts died as a result of nine stab wounds to her left

chest, one of which penetrated her left lung. (*Id.* at 3, 6).  Dr. Stilwell further found that

Mrs. Roberts suffered multiple blunt trauma to the face and head; manual strangulation;

and fire damage to the left chest, flank, and arm. (*Id.*).  Serological evidence was

collected from Mrs. Roberts' vaginal and anal cavities during the autopsy.

### 3. Investigation following Thelma Roberts' murder

Initially, numerous MPD officers interviewed Mrs. Roberts' family, neighbors, and several others who the officers thought might have knowledge about this crime.[9] MPD Detective D.H. "Danny" Carmichael ("Detective Carmichael") was the lead investigator and prepared the majority of the police reports of record. (*See* doc. 1-3 at 1– 99). Given the crime scene evidence that fires had been set in Mrs. Roberts' home, the MFD also became involved in the investigation. Lieutenant William Davis ("Lt. Davis") was the lead investigator for the MFD. Based on the serological evidence obtained from Mrs. Roberts during her autopsy (the "rape kit evidence"), it appeared that she had been sexually assaulted just prior to her death. Additionally, a ring and a necklace that had belonged to Mrs. Roberts were missing from her home. (Doc. 70-8 at 124). For these reasons, the case was investigated (and later prosecuted) as a rape/murder/arson/robbery scenario. Detective Carmichael and Lt. Davis investigated this case for about six weeks before anyone was charged.

Initially, Melvin was the prime suspect, and William also was a person of interest for a time. The police also interviewed Cedric Evans ("Evans"), a/k/a "Coon" or "Koon,"[10] as a potential suspect. Evans is Jackson's brother and lived with Jackson across the street from Mrs. Roberts when she was killed. Melvin, William, Evans, and Jackson are African-American.

---

[9] Officers J.H. Russell, M.G. Jones, M.L. Gantt, K.C. Baldwin, R.H. Green, S.S. Smith, D.M. Hoffman, S.W. Saint, D.H. Carmichael, J.T. Hunt, and D.T. Marshall prepared supplementary offense reports. (Doc. 1-3).

[10] Evans explained that he was given this nickname because he wore a coonskin cap "all the time." (Doc. 302-4 at 11:9–14).

The police questioned Melvin, William, Lola, and Evans numerous times during the investigation. According to Melvin, at around 3:30 p.m. the day Mrs. Roberts' body was discovered, police took him to the police station in handcuffs and handcuffed him to a chair for approximately twelve hours. (Doc. 284-3 at 68:14–69:2) (Melvin's deposition testimony). During this time, the officers refused Melvin's requests to go to the bathroom. (*Id.* at 69:2–3). Melvin also claims that while he was handcuffed to a chair, Detective Carmichael kicked him in the chest so hard that the chair slid across the floor. (*Id.* at 69:3–20). Melvin also says that Detective Carmichael and other officers kept "slapping" and "beating on" Melvin, calling him the "N" word, and saying "you know you did it." (*Id.* at 70:12–23).[11]

The police remained focused on Melvin until a Caucasian pubic hair was discovered on the trace sheet[12] in which Mrs. Roberts' body was wrapped. In Detective Carmichael's supplemental offense report dated April 5, 1992, he explains the impact of this development:

> We learned upon examination of the body a white or Caucasian pubic hair was found on the sheet that she was wrapped in. This Caucasian hair was found in the proximity of the area where her genitalia would have been located on the sheet. With this new evidence we were confounded.

---

[11] Melvin could not recall the other officers' names.

[12] Mary Holt, the prosecution's forensic hair analyst, testified at trial about what a "trace sheet" is and about the results of the analysis of the Caucasian hair: "A trace sheet is a sheet that's usually wrapped around a body and the sheet has never been used before. It will be a new sheet taken out of a plastic package that's never been laundered because you do have some transfer of hair in laundered items. It will be used to wrap a body." (Doc. 70-5 at 15–16). As to the hair, she testified that the one "blonde yellowish-looking" Caucasian pubic hair found on the trace sheet was dissimilar to Barbour's hair. (*Id.* at 17).

The record does not reveal how the pubic hair got onto the trace sheet.

> Extensive talks were held with the Department of Forensic Sciences regarding this information.  It is in fact a Caucasian pubic hair.

(Doc. 1-3 at 43).  The discovery of this Caucasian hair materially shifted the investigation's focus away from Melvin and other African-American suspects, and the police began to consider possible Caucasian suspects.

For the next couple of weeks, law enforcement officers interviewed numerous individuals, including juveniles and adults who hung out on Manley Drive or socialized with people who lived there.  Around April 21, 1992, MPD officers questioned several individuals who said that Barbour probably knew something about Mrs. Roberts' murder.  (Doc. 70-13 at 120, 122).  At that time, Barbour, who is Caucasian, was homeless and sleeping somewhere behind the Eastdale Mall in Montgomery. (*Id.* at 122, 131).

On April 22, 1992, Detective Carmichael and Lt. Davis located Barbour and another white male, Michael Braswell, in the food court at the Eastdale Mall. (*Id.* at 131).  Detective Carmichael and Lt. Davis brought Barbour to police headquarters and questioned him about his associations with various individuals, including suspected gang members. (*Id.* at 131–32).  According to Barbour, the officers were verbally and physically abusive at times, and Detective Carmichael repeatedly slapped Barbour in the face when he did not know the answers to Detective Carmichael's questions.  In his report, Detective Carmichael described Barbour as a "whimpie little thing" who "scares real easy." (*Id.* at 131).

Prior to Mrs. Roberts' murder, the MFD was investigating a series of fires that had been set in area Winn-Dixie grocery stores.  In late April 1992, Barbour became a suspect

in the Winn-Dixie arson investigation.[13]  On April 28, 1992, Lt. Davis asked Barbour if he would take a polygraph test at the fire station on May 1, 1992, about the Winn-Dixie fires, and Barbour agreed.  According to Barbour, Lt. Davis threatened to "beat [Barbour] with[in] an inch of [his] life" if he did not cooperate with the officers, which caused Barbour to be "very" afraid of Lt. Davis. (Doc. 70-7 at 168).  Then, sometime before May 1, 1992, Barbour became a suspect in Thelma Roberts' murder after individuals reported to police that Barbour probably knew something about it.  For this reason, MFD's polygraph examiner, Lieutenant John McKee ("Lt. McKee"), decided to administer the polygraph to Barbour regarding the fires at Mrs. Roberts' home.  Barbour claims he was not informed until he arrived at the fire station on May 1, 1992, that he would be examined about the fires at Mrs. Roberts' home instead of the Winn-Dixie fires. (*Id.* at 169–70, 174).  According to Barbour, once he arrived at the fire station, he believed he had no choice but to take the polygraph, explaining:  "After being threatened with violence, you know, I wasn't going to say no." (*Id.* at 174).

### 4.  The MFD's polygraph examination of Barbour

Lt. McKee of the MFD administered the polygraph to Barbour.  He asked Barbour three relevant questions about the fires set at Mrs. Roberts' home:  Question 5:  "Did you set any of the fires at 3575 Manley Drive?"; Question 7:  "Did you set any of the fires at

---

[13]  According to Lt. Davis' testimony at Barbour's trial, the MPD was investigating a gang called the ESPs, short for "East Side Piroos," who frequented the Eastdale Mall. (Doc. 70-7 at 24:25–25:4).  Lt. Davis stated that the investigators initially brought Barbour in to talk about members of the ESPs. (*Id.* at 25:5–7).  The investigators then asked Barbour if he knew about the Winn-Dixie fires. (*Id.* at 25:7–9).  According to Lt. Davis, Barbour said that James Mann had told him that he had set one of those fires. (*Id.* at 25:9–11).  The investigators then questioned James Mann, who told them that Barbour had set one of those fires. (*Id.* at 25:13–24).

3575 Manley Drive on March 21, 1992?"; and Question 10: "Were you physically present when the fires were set at 3575 Manley Drive?" (Doc. 70-8 at 83, 85). Lt. McKee concluded that Barbour showed "deception reactions" to the three relevant questions and that Barbour "was deceptive regarding the issue of the fire at 3575 Manley Drive." (*Id.* at 85). Lt. McKee told Barbour about the polygraph results, and Lt. McKee also advised Lt. Davis that Barbour had failed the polygraph. Barbour then consented to talk to Lt. Davis at his office at the fire station on Selma Highway to further discuss this matter, and Lt. McKee transported Barbour to that fire station.

After the polygraph, Barbour made three, uncounseled confession statements: two on May 1, 1992, one audiotaped and one videotaped; and the third on May 29, 1992. The state trial court suppressed the third statement because it occurred after Barbour obtained counsel. Barbour's two confession statements from May 1, 1992, are summarized below.

### 5. Barbour's first confession statement

On May 1, 1992, after arriving at the Selma Highway fire station, Lt. Davis and Barbour talked for about three hours before Barbour made a recorded statement confessing to his involvement in Mrs. Roberts' murder. (Doc. 70-8 at 40–46).[14] According to Barbour, he was shown crime scene photos and told details about the crime scene before he confessed. (*See* doc. 438 at 113:16–23). Barbour also claims that he "rehearsed" his confession four to five times before Lt. Davis recorded it. (*Id.*).

Barbour recounted the following narrative in his first statement: on the evening of March 20, 1992, he, Hester, and Mitchell were driving around drinking. They went to

---

[14] The three-hour conversation which preceded Barbour's tape-recorded statement was not recorded.

Hester's friend Evans' house and knocked on the door, but Evans was not there. (Doc. 70-8 at 41).  Hester next walked across the street and knocked on the door of what turned out to be Mrs. Roberts' house. (*Id.*).  Hester then told Barbour and Mitchell that they were going to stay there and drink. (*Id.*).  The trio went inside the house and started drinking with Mrs. Roberts. (*Id.*).  Barbour did not know Mrs. Roberts and had never been in her home before. (*Id.* at 42).  After they drank for a while, Mrs. Roberts went to her bedroom in the back of the house, and Hester followed a few minutes later. (*Id.* at 41).  Barbour and Mitchell heard arguing and went to the back where they discovered Hester and Mrs. Roberts arguing. (*Id.*).  Hester hit Mrs. Roberts, and they all started fighting. (*Id.*).  Eventually Mrs. Roberts fell to the ground, at which point Hester pulled down his pants, got on top of her, and raped her while Barbour and Mitchell held her down. (*Id.* at 41, 43).  Barbour then went to the kitchen, got a knife, returned to the bedroom and stabbed Mrs. Roberts multiple times. (*Id.* at 41, 45).  Barbour then removed some items from the closet and lit them on fire "to try to cover it up." (*Id.* at 41).  Before the trio left the house, Barbour ripped the smoke detector off the wall and threw it towards the living room. (*Id.* at 45).  Barbour did not mention placing a plastic bag over Mrs. Roberts' head.

### 6. Barbour's second confession statement

At some point, Lt. Davis advised Detective Carmichael that Barbour had confessed and that he would be taking a recorded statement from Barbour.  Detective Carmichael then went to the Selma Highway fire station and transported Barbour to police headquarters downtown for further questioning.  Once downtown, Detective

Carmichael and Barbour talked for about three hours in an unrecorded conversation. Then, Barbour made a videotaped confession statement to both Detective Carmichael and Lt. Davis late in the evening on May 1, 1992. (Doc. 70-8 at 47–78).

Barbour recounted the following narrative in his second statement:  on the evening of March 20, 1992, he, Hester, and Mitchell were looking for a place to drink a twelve-pack of beer they had just purchased. (*Id.* at 49–50).  First, they went to Evans' residence on Manley Drive, but he was not there. (*Id.* at 49).  Hester knew Thelma Roberts, who lived across the street from Evans, and Hester then went to her house and asked her if the three of them could drink beer at her house. (*Id.* at 49, 51).  She agreed and let them into her home.  After they all watched television and drank beer for a while, Hester and Mrs. Roberts went to a bedroom at the back of the residence. (*Id.* at 51).  Ultimately, Hester raped her while Barbour and Mitchell held her down. (*Id.* at 53).  Afterwards, Barbour decided to kill her because he thought she could identify them. (*Id.* at 55).  He went to the kitchen, found a knife, returned to her bedroom, and stabbed Mrs. Roberts in the chest multiple times. (*Id.* at 55–56).  Barbour did not mention placing a plastic bag over Mrs. Roberts' head.

### 7.  Barbour's arrest and indictment

Subsequently, Barbour was arrested for the capital murder of Thelma Roberts. (Doc. 70-2 at 15–18).  On July 10, 1992, a Montgomery County grand jury indicted Barbour on four capital offenses:  murder committed during the course of a rape, murder committed during the course of a burglary, murder committed during the course of an arson, and murder committed during the course of a robbery. (*Id.* at 10–14).

C.    **Barbour's Trial**

On July 20, 1992, Barbour pleaded not guilty to the capital charges. (*Id.* at 19). Barbour recanted his confession, and in August 1992, he moved to suppress his statements to law enforcement on the grounds that they were not voluntary. (*Id.* at 25–26). The trial court, Montgomery County Circuit Judge William Gordon, heard Barbour's suppression motion on December 29, 1992. (Doc. 70-7 at 101–205). Lt. Davis and Lt. McKee testified at that hearing.

1. **Suppression hearing**

To support his suppression motion, Barbour offered the testimony of three witnesses: himself; his grandfather, John Brown; and Dr. Patrick Daniel Slattery. (*Id.* at 165–205). Barbour testified about the circumstances of the repeated interrogations by Detective Carmichael and Lt. Davis during the last week of April 1992. He testified that during these interrogations, usually one of the officers would leave the other one alone with him. He stated that they would be "verbally abusive" at times, and that sometimes the abuse would become physical. (*Id.* at 167:4–5, 7–10). Barbour detailed that Detective Carmichael slapped his face several times with the front and back of his hand when Barbour could not answer Detective Carmichael's questions. (*Id.* at 167:9–15, 173:5–6). Barbour also testified that Lt. Davis had threatened to "beat [him] with[in] an inch of [his] life" if he did not cooperate with the officers, which caused Barbour to be "very" afraid of Lt. Davis. (*Id.* at 168:18–19, 22–23).

Concerning the polygraph, Barbour testified that he was fearful of violence from Lt. Davis and Detective Carmichael when he agreed to take the polygraph. (*Id.* at 169).

Barbour also described the alleged deception leading up to the administration of the polygraph test and its coercive effect on him. (*Id.* at 169–71, 174).  He stated he did not learn that he would be questioned on the fires at Mrs. Roberts' house until he had arrived at the fire station for the polygraph. (*Id.* at 170, 174).  Barbour further testified that given the violence he had previously experienced from Detective Carmichael and the threats Lt. Davis had made to him, he "pretty much thought that [he] had no choice in the matter." (*Id.* at 174:17).

Barbour also offered lay testimony from his grandfather, John Brown ("Brown"). Brown testified that sometime in April, after Detective Carmichael and Lt. Davis initially questioned Barbour but prior to his arrest, Barbour told Brown about how they had treated him. (*Id.* at 197–201).  Brown recalled Barbour saying that Detective Carmichael "beat up on him." (*Id.* at 198:3–4); (*see also id.* at 199:1–3) (Brown describing how he relayed his conversation with Barbour to another individual, saying: "[W]e was talking about Chris saying that Carmichael beat up on him and made him confess.").

Additionally, Barbour presented expert testimony from Patrick Daniel Slattery, Ph.D., a licensed psychologist and associate professor of psychology at Auburn University of Montgomery.  Given Dr. Slattery's expertise in psychology and his knowledge of polygraphs and the effects of stress, the trial court permitted him to testify to the limited issue of whether "being required to take a polygraph examination is a form of psychological coercion" which contributed to Barbour's confession. (*Id.* at 187:8–13). Dr. Slattery also testified "about the psychological effect of the chipping away at a suspect to overcome his resistance." (*Id.* at 187:14–17).

19

Dr. Slattery testified that while "physical coercion" occurs when "an individual behaves or agrees because of his desire to not be hurt," there are also forms of psychological coercion. (*Id.* at 193–194).   Dr. Slattery identified a few potentially psychologically coercive aspects of a polygraph examination.  Dr. Slattery confirmed that telling a person "a number of times throughout the test [that they] are not telling the truth or [that they] are telling the truth" is a part of psychological coercion. (*Id.* at 193:6–10). He further explained that "[a]n individual who wants to satisfy those in charge will then attempt to either tell a story that satisfies [those in charge] or do something which shows them how sincere they are with the story they have already told." (*Id.* at 10–14).   Dr. Slattery also testified that, if you tell someone that you will know if they lie, that person may think they "might as well tell you what you tell [them] you want" to hear, and that is a form of psychological coercion. (*Id.* at 195:3–7).  Further, Dr. Slattery stated that if the post-polygraph "interview doesn't end until you get the person you are talking to to come clean or to tell you what you want to hear, then in a sense you are keeping him on the spot.  That's coercive." (*Id.* at 195:14–17).  While Dr. Slattery gave a general opinion on psychological coercion and polygraph testing, he did not examine Barbour and thus could not express an opinion on whether Barbour was coerced in his polygraph examination. (*Id.* at 196).

On January 13, 1993, Judge Gordon denied Barbour's suppression motion. (Doc. 70-2 at 68–69).

### 2.  The prosecution's theory of guilt at Barbour's trial

Thelma Roberts' murder was prosecuted on the theory that her rape and murder occurred contemporaneously, as reflected by the capital charge of murder committed during the course of a rape and in the prosecutor's opening statement:

> Ladies and gentlemen, this is our case in a nutshell. Sometime on March 20th of 1992[,] this defendant Christopher Barbour with two friends of his, Chris Hester and Mike Mitchell, went into the home of Thelma Roberts at 3575 Manley Drive here in Montgomery County.  And during that time while Mr. Barbour was in there, Mr. Barbour, Mr. Hester, and Mr. Mitchell savagely beat Ms. Roberts.  Ms. Roberts was raped.  And as she lay helpless on the floor, this defendant went to the kitchen and got a butcher knife and stabbed her nine times.

(Doc. 70-4 at 70:16–25).  In his opening statement, the prosecutor also mentioned that, as part of the rape kit, "semen was detected" in the "swabs" taken "from Ms. Roberts of her back, of her vagina and of her anus," and the jury was "going to hear all that testimony." (*See id.* at 75:4–6).

During closing argument, the prosecutor told the jurors that they "heard [Barbour] describe through his video confession how he kneeled down after beating her, after holding her legs up and arms up and she was raped," (doc. 70-5 at 142:10–14), and how Barbour "held up the arm and leg of a woman who is almost unconscious and aid[ed] in her rape," (*id.* at 146:16–18).

In short, the prosecution's theory at trial, consistent with Barbour's confession statements, was that Mrs. Roberts was murdered during the course of a rape; three people were involved in the crime—Barbour, Hester, and Mitchell; Hester raped Mrs. Roberts

with Barbour's and Mitchell's assistance; and after the rape, Barbour stabbed her to death with a knife he found in the kitchen.

### 3.  The evidence on which Barbour was convicted

Barbour's case was tried in June 1993. (Doc. 70-3 at 120–207; doc. 70-4; doc. 70-5; doc. 70-6 at 1–179).  During the guilt phase, the prosecution's proof of Barbour's guilt consisted of (1) his two confession statements made while he was in custody on May 1, 1992:  one being the audiotaped statement he made to Lt. Davis at the Selma Highway fire station, and the second being the videotaped statement he made later that evening to Detective Carmichael and Lt. Davis at police headquarters in downtown Montgomery; and (2) testimony from Lt. Davis and Detective Carmichael describing Barbour's confession statements.  There was no eyewitness testimony and no physical evidence—such as fingerprints, blood, hair, or DNA test results—linking Barbour to these offenses.

At trial, the prosecution presented some evidence concerning DNA testing of the serological material collected from Mrs. Roberts during her autopsy.  Larry Huys, a forensic serologist at ADFS and the Section Director of its laboratory in Birmingham (doc. 70-5 at 58–59), was the State's DNA expert at trial.[15]  In the jury's presence, Mr. Huys explained DNA testing in general terms, that a DQalpha test was performed on the material collected from Mrs. Roberts, how the DQalpha testing was performed, the safeguards incorporated into the testing process, and what the test results would show.

---

[15]  Mr. Huys did not perform the DNA testing himself.  Deborah K. Dodd—another forensic analyst at the ADFS lab in Birmingham—tested this DNA evidence. (Doc. 450-4 at 2–5).  Ms. Dodd's DNA testing was "quality control" reviewed by Sue Rogers and by Mr. Huys before he prepared his report on her test results. (*Id.* at 4, para. 8).

(Doc. 70-5 at 63:4–25; at 64:1–25; at 65:1–23).  Mr. Huys clarified that the DQalpha test is *not* what is known as a DNA fingerprint test, which is a type of DNA testing that is "more commonly referred to as RFLP and is a much more specific identifier but requires either a larger quantity of DNA or a much more purified or refined type of DNA than this particular type of testing." (*Id.* at 68:18–25).  After this testimony, Barbour's counsel objected, stating:  "Your Honor, if this is not a specific identifier, we object to it coming into evidence." (*Id.* at 69:2–3).

At this point, Judge Gordon recessed the trial and conducted an *in camera* hearing with counsel and Mr. Huys concerning the DNA testing, where the court and counsel questioned Mr. Huys about the test results. (*Id.* at 69–80).  Mr. Huys stated that testing of the vaginal swabs showed four characteristics, known as "alleles" in genetic terminology: 1.1, 3, 4, and that a 1.2 was inferred, but "we could not determine if the [1.2] was present or not just because of the nature of the test.  Ms. Roberts contains the traits [1.1] and [3]." (*Id.* at 73:25; at 74:1–2).  Testing of Hester's standard blood sample showed that he had a "2" characteristic, but that characteristic was not present in the vaginal swabs tested.  Mr. Huys testified that, although Barbour's genetic markers placed him in approximately one-third of the white male population that could have been the source of the semen present in the rape kit evidence, the DNA test results did not definitively connect him to this homicide.  Mr. Huys further opined that the test results spoke "very strongly against Mr. Hester being the source of the semen" and that they "exclude[d] Mr. Roberts." (*Id.* at 77:9–15).

23

At the conclusion of the *in camera* hearing, Judge Gordon ruled that the DNA test results were admissible. (*Id.* at 80:2–3).  When the trial resumed, Mr. Huys was not questioned about what the DNA test results indicated.  Although Judge Gordon and the attorneys knew from the *in camera* hearing what the DNA test results established, the jury was unaware of this testimony.  In essence, the jury was not presented with evidence excluding Hester as the source of DNA; they knew only that the rape kit evidence was DNA tested.

At the guilt phase, Barbour presented no evidence in his defense.  Ultimately, the jury found Barbour guilty of three counts of capital murder. (Doc. 70-2 at 156).[16]  After the trial's penalty phase, the jury recommended that Barbour be sentenced to death by a 10–2 vote. (Doc. 70-2 at 174).  On January 31, 1994, Judge Gordon followed the jury's recommendation and sentenced Barbour to death. (Doc. 70-3 at 5–21).

**D.     Factual Background and General Timeline of Events After Barbour's Trial**

**1.  Hester pleads guilty to felony murder**

On April 14, 1994, three months after Barbour was sentenced, Hester entered into a plea agreement and pleaded guilty to felony murder in connection with Thelma Roberts' death. *See State of Alabama v. Christopher Hester*, CC-92-1680 (Fifteenth Judicial Circuit, Montgomery County, Plea Hearing Transcript, April 14, 1994, at 4); (doc. 211-3).  Hester received a sentence of ten years to life.

At the plea hearing, Hester provided an account of the crime which differs from Barbour's account in his confession statements.  According to Hester:  (1) Mitchell was

---

[16]  The jury found Barbour not guilty of capital murder committed during a robbery. (Doc. 70-2 at 156).

not a member of the trio present in Mrs. Roberts' home; instead, the trio consisted of Hester, Barbour, and a female, Angela Stikes ("Stikes"); (2) they went to Mrs. Roberts' home to "steal whatever [they] could find inside"; (3) Mrs. Roberts did not let them inside; instead, they had to open a door to get in; (4) once inside the house, Hester "went one way" and Barbour went "the other way"; (5) Hester did not know Mrs. Roberts had died until days later when Barbour told him he "had some trouble in the house"; and (6) Hester later found out that Barbour had killed Mrs. Roberts.[17] (Doc. 211-3 at 5:17–6:22). Hester's account did not mention a rape.

### 2. Tyrone Jackson murders Monique Vaughn

In July 2003, a Lauderdale County jury convicted Tyrone Jackson of the capital murder of Monique Vaughn, and he was sentenced to life imprisonment without the possibility of parole. "Jackson beat and stabbed Monique Vaughn in her home on the evening of October 21, 2001, when apparently, Vaughn rebuffed his sexual advances." *Jerry Tyrone Jackson v. State*, CR-02-2280, slip op. at 1 (Ala. Crim. App. Nov. 19, 2004); (doc. 213-3 at 2). Jackson lived approximately two blocks away from Ms. Vaughn's home. (Doc. 295-2 at 4) (Florence Police Department's Affidavit for Search Warrant for Jackson's two vehicles and his DNA). According to ADFS's autopsy report, Ms. Vaughn suffered multiple stab wounds, including penetrating wounds to her left breast and chest and wounds to her head, abdomen, and hands. (Doc. 263-3 at 2). Ms. Vaughn also suffered blunt force trauma to the head. (*Id.*).

---

[17] Neither Hester nor Mitchell testified in this case, and the parties did not seek to bring them in to testify.

### 3.  DNA testing of Tyrone Jackson's saliva

In July 2010, Barbour, *sua sponte*, by counsel, asked the Serological Research Institute ("SERI") in Richmond, California, to conduct HLA DQalpha testing on a saliva sample from Tyrone Jackson.  Barbour's counsel, Miriam Gohara, allegedly obtained this sample from Jackson in September 2003, while he was confined at Kilby Correctional Center in Montgomery, Alabama. (*See* doc. 313-1).  Mr. Gary Harmor, then SERI's Senior Forensic Analyst, tested the sample.  On August 19, 2010, Mr. Harmor reported the test results to Barbour's counsel, George Kendall. (Doc. 313-1).  Mr. Harmor, now SERI's Executive Director and Chief Forensics Analyst, testified at the *Schlup* hearing about this test and his report. (Doc. 436 at 134–89).

The purpose of SERI's DQalpha test was to identify the genetic alleles in the saliva reference sample from Jackson.  Mr. Harmor determined that Jackson's alleles are 1.2, 4, and that the test results established that Jackson is among the approximate one-third of the population that could have been the source of the semen in Mrs. Roberts' rape kit.  To conclusively establish whether Jackson was the source of the semen, Mr. Harmor recommended that the rape kit evidence be tested using the more refined Short Tandem Repeat ("STR") DNA testing method.  However, in 2010, Barbour did not have access to the rape kit evidence.

### 4.  Affidavit and declaration evidence Barbour submitted in 2001 and 2018

In May 2001, before Barbour filed the present action, and to support his claim that his confession was involuntary and coerced, Barbour filed affidavits in the Montgomery County Circuit Court from Lola, William, Melvin, and Evans, all detailing how Detective

Carmichael and Lt. Davis allegedly treated them while these officers were investigating Mrs. Roberts' murder. (*See* doc. 70-15 at 13–21, 71–73). These affidavits are part of the state court record Barbour filed in the present action on April 5, 2005. (*See generally* doc. 70).

Subsequently, in October 2018, to further support his actual innocence claim and to support his motion for DNA testing in this case, Barbour filed declarations from William and Lola, dated September 2018. (*See* doc. 155-2 at 2–3, 4–6). Barbour also submitted declarations from Hall, dated September 20, 2018 (*id.* at 7–8), and from Niquita Smith ("Smith"), dated May 18, 2017 (*id.* at 9). These affidavits and declarations supported Barbour's request for DNA testing. But as explained further below, the Court declines to consider them for the current *Schlup* inquiry because of subsequent testimony revealing the circumstances under which the affidavits and declarations were obtained. For context, the Court briefly summarizes the declarations filed in this action.

In his 2018 declaration, William recounted being interviewed and interrogated by the police nearly every day in the two weeks after his mother's murder, and that he "was subjected to physical abuse and threats." (Doc. 155-2 at 2). He wrote that "[o]n one occasion, Detective Carmichael slapped me hard while I was sitting on a stool in a room at the police station" because he was mad that "I would not confess to the crime," and on another occasion, Lt. Davis slammed him against a wall. (*Id.*). William also suggested that Tyrone Jackson had the opportunity to take William's house keys out of his pocket at a party at Hall's house on March 20, 1992. (*Id.* at 3). According to William, Jackson woke William up the next morning asking for a cigarette and was "nervous, visibly upset,

27

crying and he kept apologizing." (*Id.*).  William "asked [Jackson] what was wrong, but [Jackson] would not tell [William]." (*Id.*).  William stated that "[o]n several occasions prior to my mother's murder, Tyrone would say to me and Lola that 'he was going to get our mama.' I never understood what he meant." (*Id.*).  William also stated that he told Detective Carmichael and Lt. Davis multiple times that he thought Jackson and Evans were involved in the murder, but they never gave him the opportunity to share details and instead said that they would charge William or his father with the murder. (*Id.* at 2).

Lola stated in her declaration that she would be picked up by the police "without warning" in the weeks following her mother's murder. (*Id.* at 4).  She said that the police questioned her and "threatened to send [her] to jail if [she] did not tell them who was responsible for [her] mother's death." (*Id.* at 5).  Lola also corroborated William's story in her declaration, describing how Jackson left the party at Hall's house "sometime in the early morning and returned a few hours later," "shaking, upset," "talking crazy," and "apologizing." (*Id.*).  Lola stated:  "I was so grief stricken at the time and the police scared me so much that I could not share the following details that I now realize would have been helpful to apprehending the actual person(s) who killed my mother." (*Id.*).  Hall recounted the same events from the party in her declaration, adding that Jackson was "out of control" that evening, "acting in a sexually inappropriate manner," and at one point "pulled his penis out and waved it at" a ten- to twelve-year-old girl at the party. (*Id.* at 7).

Smith, who dated Jackson during some of 1996 and 1997 after he moved to Florence, Alabama, stated in her declaration that "Tyrone is presently serving a life

sentence for murder." (*Id.* at 9).  The victim was another female who was killed in her home. (*Id.*).  She said, "[f]rom what I heard, I believe Tyrone and his brother Cedric Evans are responsible for Ms. Roberts' death . . . .  Tyrone told me he left Montgomery for Florence because something bad happened in Montgomery." (*Id.*).

### 5.  This Court orders new DNA testing

On March 30, 2021, based on the affidavits Barbour filed in May 2001 in Montgomery County Circuit Court and on the declarations filed in October 2018 in this case, this Court found that Barbour had established good cause for supplemental discovery in the form of DNA testing of all DNA evidence in MPD's possession, including the rape kit evidence, using current, state-of-the-art technology. (*See* doc. 168).

### 6.  2021 and 2022 results of the rape kit evidence tested with STR DNA testing

In 2021, Mr. Alan Keel at the Forensic Analytical Crime Laboratory ("FACL") tested the rape kit evidence with STR DNA testing, currently the most discerning DNA testing method available.[18]  Mr. Keel reported that from the testing, Barbour, Hester, and Melvin were all eliminated as the source of the semen on the vaginal and anal swabs taken from Mrs. Roberts during her autopsy. (*See* docs. 185, 213-1 at 2).  Mr. Keel then forwarded FACL's report to Acadiana Crime Laboratory ("Acadiana") in Louisiana for

---

[18]  Mr. Keel DNA tested other items recovered from the crime scene, including a large kitchen knife. (Doc. 213-1 at 2).  Mr. Keel concluded that the testing of the kitchen knife "was not informative due to the poor quality of the recovered DNA." (*Id.*).

comparison with the CODIS[19] national database.  On October 7, 2021, Acadiana reported that FACL's test result produced a positive CODIS match with Alabama database sample FS2003-073085, which was identified as "Jerry Tyrone Jackson." (Doc. 190-1 at 2).

Subsequently, in 2022, the ADFS tested the rape kit evidence with the same STR DNA testing employed by FACL.  As explained further below, these two labs used the same procedure to test the DNA evidence in the rape kit, and the labs' respective testing produced the same results:  Jackson was the sole source of male DNA in the rape kit.

### 7. February 10, 2022 status conference regarding the DNA test results

At an in-person status conference on February 10, 2022, the Court and the parties discussed how FACL's DNA test results identifying Jackson impacted this case.  (*See generally* doc. 220) (hearing transcript).  Barbour averred that this new evidence was definitive proof of his innocence.  The State, on the other hand, asserted that this new evidence did not assist Barbour to establish a gateway innocence claim under *Schlup* and that his federal habeas petition should be dismissed as time-barred.  The State argued that this new evidence only showed that Jackson had sexual contact with Mrs. Roberts "within a 24-to-72-hour timeframe" before her death. (*Id.* at 17:9).  Summarizing its position, the State said:  "We're just saying that the semen here, that that window is 24 to 72 hours that she had sexual contact with Jackson.  There's nothing else that puts Jackson in that house that night." (*Id.* at 18:14–17).

---

[19]  CODIS, an acronym for "Combined DNA Index System," is a national DNA information repository maintained by the Federal Bureau of Investigation which allows state and local crime laboratories to store and compare DNA profiles from crime-scene evidence and convicted offenders. (*See* doc. 436 at 45:4–10).

To support this "24-to-72 hour timeframe" argument, the State offered the affidavit of his DNA expert, Jason Kokoszka, Ph.D., dated October 27, 2021. (Doc. 211-1).  Dr. Kokoszka is the Forensic Biology Discipline Chief and the Statewide DNA Technical Leader for the ADFS.  Dr. Kokoszka opined that sperm cells last in the vagina for approximately three days and in the anus for approximately one day, that an individual's activity level can affect these time frames, and that sperm "may persist in the vaginal cavity beyond 3 days." (Doc. 211-1 at 4).  His affidavit states in relevant part:

> 1.  *Persistence of Spermatozoa within Body Cavities*
>
> .  .  .  The average ejaculate contains approximately 2 to 5 ml of semen and 200 to 300 million sperm cells.
>
> Sperm cells will persist within the vagina for approximately 3 days, within the anal cavity for approximately 1 day, and within the oral cavity for approximately 6 hours.  However, it should be noted that activity levels of the individual can affect these time frames.  For example, activities such as urination, defecation, tooth brushing, and/or bathing may shorten these time frames, and it has also been reported that sperm may persist in the vaginal cavity beyond 3 days (see references 1-5).

(*Id.*).  At the *Schlup* hearing, Dr. Kokoszka testified consistently with the foregoing statements in his affidavit. (Doc. 436 at 203:7–17).  The State's other DNA expert, Mr. Della Manna, concurred with Dr. Kokoszka's opinion concerning the persistence of sperm within body cavities. (Doc. 440 at 205:5–18).

In response to Dr. Kokoszka's expert opinion, Barbour presented the declaration of Mr. Keel, dated March 2, 2022.  Mr. Keel concurred with Dr. Kokoszka's ultimate opinion but provided a more in-depth opinion than Dr. Kokoszka.  Mr. Keel explained

that after sex, multiple factors cause semen and sperm to be cleared from the vagina and
anus, including gravity, movement, bodily functions, and personal hygiene practices.  Mr.
Keel opined that, if Mrs. Roberts and Jackson had sex, it must have occurred on the day
of her death, and a theory that they had sexual contact earlier in time would require that
Mrs. Roberts "had not had a bowel movement or practiced any significant personal
hygiene after the sex." (Doc. 462-80 at 5).  Mr. Keel's Declaration states in relevant part:

> 9.    Dr. Kokoszka's description of semen and the stated
> average numbers of sperm per unit volume are accurate.  It
> was generally recognized in 1992 and is **generally
> recognized today that sperm persist longer in terms of
> sheer number in a deceased person's vagina than in a
> living person's vagina.**  This is because living women are
> active and upright after intercourse, and gravity and
> movement expel most of the excess liquid from the vagina
> almost immediately.  In addition, seminal fluid in the vagina
> is diluted over time by vaginal fluid that constantly bathes the
> vaginal vault.  Foreign cellular material such as sperm cells
> are also cleared by phagocytosis and bacterial catabolism.  As
> a result, most semen is lost from the vagina within a few
> hours.    Personal hygiene, wiping, and bathing further
> contribute to the loss of semen from the vagina.

> 10. The amount of seminal fluid and the numbers of sperm in
> the vagina continue to decline over time. As Dr. Kokoszka
> states in his affidavit, some measure of identifiable sperm
> cells persists in the living active vagina and rectum for about
> 3 days and 1 day, respectively.    Most of the scientific
> literature studies describing the persistence of seminal
> fluid/sperm are from the late 1970s and early 1980s, when
> methods to use semen as physical evidence were first being
> developed.  And it is these studies that are still relied upon
> and cited by each of the more current review documents Dr.
> Kokoszka lists in his declaration. However, it is critical to
> recognize the distinction between the persistence of a few
> sperm cells and the persistence and recovery of a sufficient
> number of sperm to obtain a meaningful result.  The scientific
> literature documents that sperm begin to degenerate in the

vagina within hours of ejaculation and finding <u>any</u> sperm (from among the millions initially deposited) in a living vagina after 72 hours is a 50/50 proposition (Soules, et. al., 1978). As a result of this rapid and continual loss of semen, most state law enforcement sexual assault evidence collection policies and procedures used 72 hours post-assault as a guide/limit for the expectation of recovering <u>any usable amount of semen</u>. In the deceased person, all the above influences that clear semen from the body cavities, except for catabolic activity, essentially cease at the time of death.

11.   Also as stated by Dr. Kokoszka in his affidavit, the clearance of semen/sperm from the living anorectal cavity is much faster and is affected by many of the same factors that eliminate semen from the vagina; however, defecation, anal wiping, and/or bathing will essentially <u>clear</u> semen from the anorectal area. The distinction in time between clearance of semen from the anorectal region typically within a day and dissipation of semen from the vagina over about three days is relevant in this case because semen was recovered from both the victim's vagina and anus. **This means that if the victim and Mr. Jackson had sex, it must have happened on the day of her death**. Any theory that the sex took place as long as three days prior would require that the victim had not had a bowel movement or practiced any significant personal hygiene after the sex. Since the victim was found nude, supine, and with her legs spread it is plausible the semen on the anal swabs results from vaginal drainage, <u>which would further restrict</u> the time interval for any consensual sex act between the victim and Mr. Jackson that day nearer to the time of her death.

12. **The state's claim that the DNA test results show only that "Jackson had sex with Roberts within a 24- to 72-hour time frame" is not supported by the physical evidence, the DNA test results, the scientific literature, or Dr. Kokoszka's affidavit. Rather, the physical evidence and DNA test results are more compatible with ejaculation by Mr. Jackson into the victim at or near the time of the victim's death.**

(Doc. 462-80 at 4–5) (underlining in original) (first and second bold emphasis in original) (third bold emphasis added) (footnotes omitted).

As indicated above, the Court conducted a multiday evidentiary hearing on Barbour's actual innocence claim in June 2023.

## E.    Evidence Presented at *Schlup* Hearing

The Court heard live testimony from numerous expert and lay witnesses, and the Court also admitted the deposition testimony of numerous witnesses.  As relevant here, the Court heard live testimony from the following expert witnesses:  Alan Keel, Angelo Della Manna, Laura Wendell, and Dr. Jason Kokoszka, all of whom testified about DNA testing;  Larry Honts and Alan Slupski, both of whom testified about polygraph examinations;  and Dr. Richard Leo and Dr. Glen King, both of whom testified about police interrogations and false or coerced confessions.  Additionally, the Court heard live testimony from multiple lay witnesses, including:  Kenneth Baldwin, William Davis, and Michael Thomas, all of whom were MFD or MPD officers involved in investigating Mrs. Roberts' murder;  Adam Bollaert and James Newman, both of whom relayed inculpatory statements allegedly made by Barbour;  William and Lola;  and Hall, whose home was the venue for the gathering attended by the Roberts children and Tyrone Jackson the night before Mrs. Roberts' deceased body was discovered.  The Court also admitted the deposition testimony of, among others, Hall, William, Evans, Jackson, and Smith.  The Court summarizes the testimony and evidence to the extent that it is relevant to the *Schlup* analysis.

### 1.  DNA testing of rape kit evidence and DNA extracts

As explained in more detail below, Barbour's expert, Mr. Alan Keel, tested the rape kit evidence with STR DNA testing.  In sum, based on his testing of both the vaginal and anal swabs, Mr. Keel concluded: (1) "the semen originates from Mr. Jackson and the nonsperm DNA originates from Ms. Roberts" (doc. 436 at 52:17-18); (2) "Mr. Barbour, Mr. Hester, and Mr. Roberts are eliminated as the semen source on the vaginal and the anal swabs" (*id.* at 62:10–11); and (3) there is no "indication of any other DNA source besides Mr. Jackson or Mrs. Roberts on either sample" (*id.* at 42:23–25, 52:20–22).  In Mr. Keel's expert opinion, "[Jackson] is the one and only source of semen on the Roberts vaginal and anal swabs." (*Id.* at 110:25–111:1).

Ms. Wendell of ADFS was unable to test the DNA from the rape kit because there was not enough genetic material to test.  Thus, she tested DNA "extracts" made from the vaginal and anal swabs.  Ms. Wendell explained that the extracts provide a "pristine sample" of DNA to test "with today's technology." (Doc. 439 at 19:13–16, 20:16–22, 21:8–10; *see also* doc. 436 at 57:9–11).  In sum, Ms. Wendell concluded that Barbour and Hester were excluded as DNA contributors to the anal and vaginal swab sperm fractions and that Jackson's DNA was the only male DNA present on the anal and vaginal swab sperm fractions. (*Id.* at 23:14–23, 27:22–28:2; *see also* doc. 462-28 at 2, paras. 1–5).

The State's DNA expert, Dr. Kokoszka, concurred with Ms. Wendell's findings. (*See, e.g.*, doc. 436 at 250:16–22, 251:17–19, 254:11–13, 254:14–17, 254:23–255:3).

### a. DNA testing by FACL

FACL is an independent, privately-owned laboratory in Hayward, California. According to Mr. Keel, then FACL's supervisor of the Forensic Biology and DNA Analysis Unit, FACL performs work for "prosecution, defense, and civil clients." (Doc. 436 at 9:6, 10:5–6).

Mr. Keel tested the rape kit evidence with STR DNA testing. Mr. Keel spent the first half of his career working at law enforcement crime labs and has more than twenty-five years of experience conducting STR DNA testing. (*Id.* at 10:24–11:3, 12:14–16; *see also id.* at 13:1–3 (stating he has conducted this DNA testing with this technology in "[s]everal hundred [cases] since 1998"); *id.* at 33:2–4 (explaining that STR testing looks at "as many as 21 and up to 24 different short tandem repeat genes")). More particularly, Mr. Keel has experience testing "aged and degraded evidence," including in more than 150 post-conviction investigations. (*Id.* at 124:13–18). He stated that throughout his career, he has testified about his DNA testing "in excess of 75 times," mostly for the prosecution. (*Id.* at 13:20–24).

Explaining his testing methodology, Mr. Keel stated that he first "recover[ed] the DNA from those cells" on Mrs. Roberts' vaginal and anal swabs, "typ[ed] it and develop[ed] a profile of these various STR genes." (*Id.* at 17:16–18). Because cellular material "includes the sperm cells, commingled with any other nonsperm cells such as epithelial cells from the lining of the vagina," he used a digestion process to create two "fractions": one with "isolated sperm cells" and one with "the nonsperm cells," "refer[red] to as the epithelial cell fraction or the nonsperm fraction." (*Id.* at 34:18–25).

He then "calculate[d] a statistic which demonstrates how common or . . . uncommon that particular profile is in the general population" and "type[d] reference[d] samples from persons of interest and compare[d] those two results, and one will either be included or excluded as a potential source of the evidentiary material." (*Id.* at 17:18–18:1).

### i. Vaginal swab sperm fraction

Per the parties' agreement, Mr. Keel first tested the vaginal swab collected from Mrs. Roberts. (*Id.* at 43:8–10). He identified that "[t]he vaginal swab sperm fraction contained a mixture of DNA from two contributors," with "most of the DNA" from a male and some "carryover DNA from the female into the sperm fraction." (*Id.* at 44:5–10).[20] Mr. Keel "confirmed that Ms. Roberts was one of the two contributors," (*id.* at 44:13–16), and then, by comparing the male profile to Barbour's and Hester's reference samples, he was able to "eliminate[] [them] as potential contributors." (Doc. 436 at 44:16-18, 48:23–49:5); (*see* doc. 462-21 at 1, para. 7) ("Mr. Barbour is absolutely eliminated as a potential contributor."); (*id.* at 49:6–8) (stating the same regarding Hester).

As stated earlier, Mr. Keel then sent the unknown male profile on the vaginal swab sperm fraction to Acadiana in New Iberia, Louisiana, and requested that Acadiana submit

---

[20] Mr. Keel testified that there is an "automatic assumption" of two contributors when conducting DNA testing of semen in a sexual assault case to account for the potential presence of the victim's DNA. (Doc. 436 at 112:23–113:2, 17–22). Mr. Keel elaborated that "it occurs quite frequently . . . for some female DNA to carry over into the sperm fraction," and that one looks for "a mixture of male and female DNA because there's a mixture of male and female biology." (*Id.* at 113:3–5, 17–22). Ms. Wendell also assumed two contributors when she tested the DNA extracts. (*See* doc. 462-28 at 2, para. 1).

the profile to CODIS.[21] (*See id.* at 45:4–20).   The result was a "CODIS match between the major contributor DNA profile from the sperm fraction of the vaginal swab and Alabama database sample FS2003-073085," which was "identified as Jerry Tyrone Jackson." (Doc. 462-24 at 1).   Subsequently, pursuant to Court Order (*see* doc. 194), Mr. Keel then received and tested a reference sample from Tyrone Jackson, which verified the CODIS hit, "a process [that] essentially creates a foolproof mechanism for confirming the candidate match." (Doc. 436 at 46:6–8).

Mr. Keel compared Jackson's reference sample to the unidentified male profile on the vaginal swab sperm fraction and determined that it was "approximately 300 octillion times more likely if the DNA originated from Tyrone Jackson and Thelma Roberts than if the DNA originated from two unknown persons." (Doc. 462-20 at 14, para. 3; *see also* doc. 436 at 47:23–48:7).   Mr. Keel further concluded that the mixture was fully explained by Jackson's and Mrs. Roberts' DNA. (Doc. 436 at 48:19–22; *see also* doc. 462-25).

### ii. Anal swab sperm fraction

Next, Mr. Keel tested the anal swab sperm fraction.   He "determined [it] to be essentially single source." (Doc. 462-20 at 14; doc. 462-21 at 1, para. 6; *see also* doc. 436 at 49:22–23).   As a single-source profile, Mr. Keel stated that the likelihood that Tyrone Jackson was the source of this DNA was "about 200 billion compared to a person chosen at random." (Doc. 436 at 50:4–6; *see also* doc. 462-21 at 1 (chart, line 3)).   Mr. Keel also

---

[21]   Per Mr. Keel, since FACL is a privately-owned laboratory, it has no direct access to CODIS, a government-maintained database.   Mr. Keel explained that Acadiana served as FACL's "CODIS connection." (Doc. 436 at 45:17–20; 84:8–10).   Essentially, Acadiana was the conduit between FACL and CODIS in getting this unknown DNA male profile to CODIS for comparison with the national database.

determined that Barbour and Hester were eliminated as potential DNA contributors to the anal swab sample. (*See* doc. 436 at 50:2–4; *see also id.* at 51:13–19, 52:7–14).

Nevertheless, Mr. Keel testified that "in an abundance of caution," he also analyzed this sperm fraction "as a mixture from two contributors: a major male and a trace level/minor DNA contributor." (Doc. 462-20 at 14; doc. 462-21 at 1, para. 6).[22] Even in this scenario, Mr. Keel excluded Barbour and Hester as potential DNA contributors to this sample and found that it was "approximately 10 billion times more likely if the DNA originated from Tyrone Jackson and an unknown contributor than if the DNA originated from two unknown persons." (*Id.*).

In summary, based on his testing of both the vaginal and anal swabs, Mr. Keel concluded: (1) "the semen originates from Mr. Jackson and the nonsperm DNA originates from Ms. Roberts" (doc. 436 at 52:17–18); (2) "Mr. Barbour, Mr. Hester, and Mr. Roberts are eliminated as the semen source on the vaginal and anal swabs" (*id.* at 62:10–11); and (3) there is no "indication of any other DNA source besides Mr. Jackson or Mrs. Roberts on either sample" (*id.* at 42:23–25, 52:20–22). In Mr. Keel's expert opinion, "[Jackson] is the one and only source of semen on the Roberts vaginal and anal swabs." (*Id.* at 110:25–111:1).

---

[22] Further, due to Mr. Keel's impression that there were two artifacts on the electropherogram, he also analyzed the anal swab sperm fraction as a mixture of two contributors. (*See* doc. 436 at 49:23-50:1, 95:2-7). However, as his hearing testimony and his previously filed declaration make clear, he concluded the anal swab sperm fraction was a single source sample of Tyrone Jackson's DNA with *no* indication of any other male DNA source. (*See id.* at 120:4–121:15) (testifying that the two peaks on the anal swab sperm fraction were artifacts, not indications of a second male DNA contributor); (*id.* at 131:14–132:2) (reading his previously filed declaration stating his opinion that the anal swab sperm fraction is a single-source sample); (doc. 462-81 at 6–8, paras. 19–24) (Mr. Keel's July 11, 2022 declaration stating that, "[w]hile I did allow for the *possibility* of more than one semen source in the probabilistic genotyping of the anal swab result, it is my opinion the DNA profile from the #36-7 anal swab sperm fraction represents a single semen source and two PCR artifacts" (emphasis in original)).

### b.  Testing performed by Alabama Department of Forensic Sciences

The ADFS is an independent, forensic laboratory.  Its Director, Angelo Della Manna, explained that the ADFS is not a part of any other law enforcement agency within the State of Alabama.  Mr. Della Manna further explained that the ADFS "is unique within the forensic science community in that we're one of the oldest forensic lab systems in this country, having been formed in 1935.  We're an independent state-level agency.  We're not affiliated with a prosecutor's office or defense counsel." (Doc. 440 at 191:17–21).

Mr. Della Manna testified that the ADFS tests evidence it receives from over 450 law enforcement agencies throughout Alabama. (*Id.* at 193:22–24).  The ADFS performs the tests that are warranted and then returns the evidence items to the investigating law enforcement agency from which the ADFS received the evidence. (*Id.* at 194:1–4).  While the ADFS does not retain the evidence it tests, the ADFS makes DNA "extracts" of that evidence and retains the extracts indefinitely. (*Id.* at 194:5–22).  Mr. Della Manna explained the difference between the DNA evidence itself and the DNA extract, which is created from the DNA that is present in the evidence item:

> A.  So a DNA extract refers to a small tube of liquid that is a collection of chemicals and the actual DNA that is recovered from a particular stain.  So if there's a bloodstain on a garment, for example, the first step in the DNA testing process is to cut that stain, place it in the tube, add a collection of chemicals to remove the DNA from the substrate, and then begin this extraction process.  At the end of that process, at the end of the DNA testing process, what is left, that liquid, is referred to as the DNA extract in a small tube.
> Q.  And how is the DNA extract classified?

> A. DNA extracts are classified as work product in compliance with the FBI's quality assurance standards and are stored in a freezer indefinitely, ever since we've begun DNA testing in our laboratories.

(*Id.* at 194:9–22).

In early 2022, after FACL tested the DNA evidence and returned it to the MPD, the Alabama Attorney General's Office asked the ADFS to reprocess the evidence in the Thelma Roberts "Capital Murder Case." (Doc. 462-35).  This request identifies "Jerry Jackson" as the suspect. (*Id.*).

### i.  ADFS testing of the evidence in MPD's possession

Laura Wendell, an expert in forensic DNA analysis, is the Forensic Biology Section Chief in the ADFS Montgomery Lab.  In 2022, she performed the same type of STR DNA testing on this evidence that Mr. Keel at FACL had done.  As she explained below, she tested evidence from the vaginal and anal swabs:

> Q.  So what evidence did you first test? And you can refer to this report.
> A.  So in this case we had a few items that we conducted testing on.    There was a swab that was identified to be a vaginal swab from the deceased; a swab that was identified to be an anal swab from the deceased.
>     Then we did testing on several reference standards that were submitted:  One identified to be from Thelma Roberts, a reference standard identified to be from Melvin Roberts, a reference standard identified to be from Christopher Barbour, and a reference standard identified to be from Christopher Hester.  We also conducted screening on a pair of pajama pants.
>     And I believe that was it in this case, aside from the reference standard that was identified to be from Jerry Tyrone Jackson.

(Doc. 439 at 16:5–19).

As to the swabs tested, Ms. Wendell testified that she tested the vaginal swab sperm fraction, the vaginal swab nonsperm fraction, the anal swab sperm fraction, and the anal swab nonsperm fraction and that generally speaking, the results were uninformative. (*Id.* at 17). She explained the potential reasons for the uninformative results as follows:

> Q. And what are potential reasons for this?
> A. So in this particular situation, we were testing evidence that had already been examined by another laboratory. So at this point -- and these were items I think that had previously been at the Department of Forensic Sciences years and years prior as well. So we were looking at items of evidence that had been tested multiple times previously, so you would expect that the best or most probative parts of that evidence would have been removed or tested already.
> And in addition to time -- time will degrade DNA and so will storage conditions. I'm not entirely sure how these were stored over the time that they were retained.
> Q. And when you say -- just breaking it down a little for us nonexperts. When you say that they have been sampled before, would that mean that there's less biological material remaining to physically test?
> A. Yes.

(*Id.* at 17:22–18:13).

To recap, the ADFS first tested this evidence in 1992, FACL tested it again in 2021, and then the ADFS tested it again in February 2022. As Ms. Wendell explained, time and storage conditions, depending on how the evidence is stored, can degrade DNA. Another factor contributing to the uninformative results was that there was simply "less biological material remaining to physically test." (*Id.* at 18:11–13). In sum, the DNA evidence had mostly been consumed or degraded over the course of being tested three times. On March 31, 2022, given the uninformative results from the February 2022

testing of the DNA evidence itself, Ms. Wendell began testing the DNA extracts which the ADFS had created in 1992.

### ii.  ADFS testing of the DNA extracts

Ms. Wendell tested DNA extracts made from the vaginal and anal swabs, which had been stored at minus twenty degrees[23] in a freezer in the ADFS lab in Birmingham, Alabama, for the previous thirty years. (Doc. 439 at 20:2–7).  These extracts consist of DNA that was removed from the rape kit evidence and put in solution in 1992. (*Id.* at 19:9–13).  As such, the extracts provide a "pristine sample" of DNA to test "with today's technology." (*Id.* at 19:13–16, 20:16–22, 21:8–10; *see also* doc. 436 at 57:9–11).  Ms. Wendell documented her peer-reviewed findings in a report dated April 26, 2022. (Doc. 462-28; *see also* doc. 439 at 34:10–23 (explaining the peer reviewer had no disagreements with her findings)).

### a.  Anal swab sperm fraction extracts

Ms. Wendell determined that "[t]he genetic traits detected from the sperm fraction of the anal swab(s) (AS2 extract) and the DNA profile of Jerry Jackson match." (Doc. 462-28 at 2, para. 4).  She explained that the term "match" indicates that the sample was a single source profile, "[t]here was nobody else detected in there, and it matches a particular reference standard." (Doc. 439 at 22:12–16).  According to Ms. Wendell, the term "match" offers the highest degree of certainty within ADFS. (*Id.* at 22:17–19).  Ms. Wendell also reported that, "[w]ith a high degree of confidence, Jerry Jackson, or his identical twin, is the source of the[] genetic traits" from the anal swab sperm fraction.

---

[23]  Ms. Wendell did not specify whether it was twenty degrees Fahrenheit or Celsius.

(Doc. 462-28 at 2, para. 4).  ADFS only uses the phrase "high degree of confidence" when the statistical likelihood of a match is "approximately 1,000 times greater than the world population." (Doc. 439 at 22:24–23:5).  In this case, the odds of an individual, like Jackson, having this combination of genetic traits "occurs in approximately 1 of 36.3 decillion (3.63E+34) random, unrelated Caucasian individuals, and 1 of 145 nonillion (1.45E+32) random, unrelated African-American individuals." (Doc. 462-28 at 2, para. 4).  Because the DNA on the anal swab sperm fraction "match[ed]" Jackson, Ms. Wendell concluded that he was the *sole* male DNA contributor on this sample. (Doc. 439 at 22:11–15).  She also excluded Barbour and Hester as potential contributors. (*Id.* at 23:17–21).

### b. Vaginal swab sperm fraction extracts

Ms. Wendell also tested the vaginal swab sperm fraction extracts and found a DNA mixture, likely from two contributors:  Jackson and Mrs. Roberts. (Doc. 462-28 at 2, para. 1).[24]  Ms. Wendell opined that "the probability of including a random, unrelated individual"—meaning a person who was neither Jackson nor Mrs. Roberts, nor related to either of them—"as a potential contributor [to the mixture on the vaginal swab sperm fractions]," was "approximately 1 of 2.35 trillion (2.35E+12) Caucasian individuals and 1 of 167 billion (1.67E+11) African American individuals." (*Id.*).  Ms. Wendell further testified that Barbour and Hester were excluded as potential contributors to the vaginal

---

[24]  As explained earlier, there is an "automatic assumption" of two contributors when conducting DNA testing of semen in a sexual assault case to account for the potential presence of the victim's DNA. (Doc. 436 at 112:23–113:2, 17–22) (Mr. Keel's testimony).  Ms. Wendell also assumed two contributors when she tested the DNA extracts. (*See* doc. 462-28 at 2, para. 1).

sperm fractions. (Doc. 439 at 27:22–28:2).  Ms. Wendell found there was *no* indication of any contributor besides Jackson and Mrs. Roberts in the DNA mixture. (*Id.* at 26:8–9, 17–20).

In summary, Ms. Wendell reached two conclusions: (1) Barbour and Hester were excluded as DNA contributors to the anal and vaginal swab sperm fractions, and (2) Jackson's DNA was the only male DNA present on the anal and vaginal swab sperm fractions. (*Id.* at 23:14–23, 27:22–28:2; *see also* doc. 462-28 at 2, paras. 1–5).

At the evidentiary hearing, the State's DNA expert, Dr. Kokoszka, concurred with Ms. Wendell findings.[25] (*See, e.g.*, doc. 436 at 250:16–22, 251:17–19) (testifying that he had "no reason to quarrel" with Ms. Wendell's finding that Tyrone Jackson was a match to the DNA on the anal swab sperm fraction extract and agreeing that "he's the one donor, the male donor" in that sample); (*id.* at 254:11–13) ("I agree that Mr. Jackson does line up with being a contributor to the sperm fraction of [the] vaginal swab and the sperm fraction of [the] anal swab."); (*id.* at 254:14–17) (agreeing "there's very strong support that Mr. Jackson is the male DNA contributor on the vaginal swab sperm fraction"); (*id.* at 254:23–255:3) (agreeing that Barbour and Hester "are excluded as being a contributor to the sperm fraction of the vaginal swab").

### 2.  DNA testing of Tyrone Jackson's saliva

Gary Harmor, now SERI's Executive Director and Chief Forensics Analyst, testified at the *Schlup* hearing about the 2010 DNA testing of Tyrone Jackson's saliva

---

[25] Dr. Kokoszka is ADFS's DNA Technical Leader.  He described Ms. Wendell as a "very competent and very bright forensic analyst." (Doc. 436 at 241:4–5.)  Ms. Wendell has conducted STR DNA testing for about fifteen years and in "[h]undreds" of cases.  (Doc. 439 at 9:23–10:5).

sample and his report on that testing. (Doc. 436 at 134–89). On cross-examination, Mr. Harmor admitted that he used expired test kits and reagents when he tested Tyrone Jackson's saliva. Specifically, the dot blot test strips Mr. Harmor used expired on November 20, 2003. (*Id.* at 177:13–15). By 2010, the reagents used in this testing had also expired. Mr. Harmor failed to note in his bench notes the expiration date of the reagents. (*Id.* at 177–78).[26] Additionally, Mr. Harmor acknowledged that he changed his opinion on the accuracy of the findings in the ADFS's 1992 DNA testing report.[27] (Doc. 436 at 185:1–9).

### 3. Expert evidence concerning polygraph testing and scoring

As summarized above, Barbour underwent a polygraph examination before he confessed and was ultimately charged with Thelma Roberts' murder. Barbour contends that the circumstances surrounding his polygraph examination, including what he was led to believe afterwards when talking to Lt. McKee, were factors contributing to his false confession. At the *Schlup* hearing, the Court heard expert testimony concerning polygraph examinations and their scoring from Barbour's polygraph expert, Dr. Larry R. Honts, and from the State's rebuttal expert, Charles Edward Slupski. In essence, the Court heard dueling expert testimony about whether Barbour's polygraph examination

---

[26] Mr. Harmor acknowledged that the manufacturer of the dot blot test kits used for DQalpha testing stopped making those test kits around 2001 or 2002. (Doc. 436 at 173:16–18). SERI stockpiled the test kits at that time, and Mr. Harmor continued to conduct DQalpha testing with the stockpiled tests kits even after they had expired. (*Id.* at 173:19–23).

[27] Mr. Harmor criticized the ADFS for not presuming two contributors, although he acknowledged that it is not always possible to know the number of contributors when the 1.2 allele is inferred—as it was in the 1992 testing in this case—and that it is difficult to assess the number of contributors when the victim is deceased. (Doc. 436 at 181).

was scored correctly and whether he failed.  But it is undisputed that Barbour was told that he failed the polygraph, which he claims contributed to the pressure he felt to confess.

### 4. Expert evidence concerning police investigative practices and interrogations, false confessions, and the associated risk factors

Barbour contends that the numerous discrepancies between his confession statements and the crime-scene evidence also support his actual innocence claim as they are additional signs that his confession is false.  Barbour's "false confession" expert is Dr. Richard A. Leo.  Currently, Dr. Leo is a professor of law and psychology at the University of San Francisco in California, a position he has held since 2006.  Since 1997, Dr. Leo has testified as an expert, sometimes for the prosecution, in over 400 cases (doc. 438 at 65:3–6), and he has published six books.[28]  In the present action, the Court accepted Dr. Leo as an expert "in false confessions and the risk factors attendant to false confessions." (*Id.* at 79:5–7; 12–13).

By training, Dr. Leo is a social psychologist and criminologist. (*Id.* at 53:9–11). He testified that there is a subfield within the discipline of criminology that studies police investigative practices and that he is an expert in this subfield (*id.* at 54:8–12), which is the foundation for his expertise in the phenomenon of false confessions.[29]  As additional background for his knowledge of police interrogations and false confessions, Dr. Leo

---

[28] One book is co-authored. *See* Steven A. Drizin & Richard Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L. REV. 891, 894–900 (March 2004).

[29] Dr. Leo has analyzed thousands of cases involving interrogations and confessions; written many published, peer-reviewed articles, plus several books, on these subjects, including some for which he has received a number of awards; and provided expert testimony in more than 300 state, federal, and military cases. (*See* doc. 462-47 at 1–2; doc. 462-43).

stated that he has studied police interrogations "[s]ince the fall of 1990, so 33 years." (Doc. 438 at 79:19).

Dr. Leo testified in detail about the numerous factors and circumstances that can result in a false confession. (*Id.* at 50–182). He described various police investigative techniques and explained the difference between an interview—which is characterized by open-ended, non-accusatory questions designed to obtain information—and an interrogation—which "involves accusation of a presumed guilty suspect and techniques" designed to obtain an incriminating statement from the suspect. (*Id.* at 67:13–20). Further, Dr. Leo explained that there are three types of police errors—misclassification, coercion, and contamination—which can lead to detailed albeit false confessions. (*Id.* at 95–96). Dr. Leo testified that these three errors "explain not only why you get a false confession, but how and why those false confessions lead to wrongful convictions." (*Id.* at 97:10–13).

First, Dr. Leo testified that misclassification errors occur when police misclassify an innocent person as guilty and consequently subject him to interrogation techniques meant for presumptively guilty people. (*Id.* at 95). The goal of interrogators who use guilt-presumptive techniques is to "get the confession, not to evaluate whether the suspect is lying or telling the truth . . . . And this can be problematic if the interrogators' presumption is incorrect." (*Id.* at 98:5–10). According to Dr. Leo, these interrogation mindsets can lead to "tunnel vision," when interrogators "rule out anything that's inconsistent with the interrogator's vision of the suspect's guilt and getting a confession." (*Id.* at 98:13–18). Dr. Leo testified that confirmation bias also presents a problem with

these interrogation techniques.   Confirmation bias is "where people consciously or unconsciously seek to confirm their preexisting beliefs," and thus "tend to selectively focus on information that confirms those beliefs and either ignore or be more critical of information that's inconsistent with those beliefs." (*Id.* at 98:22–99:13).   Additionally, Dr. Leo said that investigations can be "theory driven" or "suspect driven," as opposed to evidence driven. (*Id.* at 99:17–100:10).   Theory or suspect-driven investigations can result in "investigations that are biased in the favor of a particular conclusion regardless of the evidence." (*Id.*).

Second, Dr. Leo testified that coercion errors refer to why an individual makes or agrees to a false confession, and it "usually involves the risk factors," "the techniques of interrogation," and "the individual vulnerabilities." (*Id.* at 96:1–6).   Dr. Leo testified about two types of risk factors:  "situational" risk factors and "individual" risk factors. According to Dr. Leo, situational risk factors "increase the risk of eliciting false confessions that are borne of the environment.   And the environment in this case would be the police interrogation environment and the police interrogation techniques." (*Id.* at 101:14–19; 105:11–20).   Dr. Leo offered examples of situational risk factors:  the false evidence ploy,[30] lengthy interrogation, sleep deprivation, a physically coercive interrogation, promises of leniency, or conversely, threats of harm or adverse consequences. (Doc. 438 at 102:2–15).

---

[30]  Dr. Leo noted that Lt. McKee, the polygraph examiner, led Barbour to believe that he had failed the polygraph (doc. 438 at 112–13), which Barbour indicated "made him feel hopeless, and that contributed to his decision to confess." (*Id.* at 113:9–10).

Dr. Leo also testified about individual risk factors, *i.e.*, individuals with particular characteristics which make them more likely to confess falsely. (*Id.* at 105:11–20). Based on his review of this case and his interview with Barbour, Dr. Leo opined that Barbour had several individual risk factors for a false confession: "Mr. Barbour was very distressed at that time. His mother had recently died. He was depressed. He had substance abuse or alcoholic issues." (*Id.* at 110:13–15). "I think he was living in his car." (*Id.* at 110:23). Dr. Leo observed that Dr. Slattery, one of Barbour's consulting psychologists, noted that Barbour "was highly suggestible and would be unusually influenced by others in an interrogation." (*Id.* at 110:17–20).

Finally, Dr. Leo testified that contamination errors occur when non-public details are leaked or disclosed to the suspect, typically by police, during the interrogation. (*Id.* at 96:7–14). Consequently, when these non-public details are repeated by the suspect in a confession, the confession appears more persuasive and compelling. (*Id.* at 96:23–97:9). Dr. Leo further testified that false confessions sometimes contain details consistent with crime scene evidence, often due to contamination errors. (*See id.* at 102:18–103:1). Dr. Leo explained that while non-public information is often leaked during an interrogation, there have also "been many cases where suspects have learned crime scene facts from third parties, from community gossip, from witnesses, from people they know who were involved in the crime, or even facts [] reported in the media[.]" (*Id.* at 102:18–103:1). Dr. Leo then explained why an innocent person would go to such length and put details about the crime into a false confession. (*See id.* at 103:5–20). He testified that when innocent suspects are "broken" and falsely confess, their "motivation is to end the

interrogation" and "satisfy their interrogators." (*Id.* at 103:5–9).  In order to do that, they must give a plausible or persuasive story, and they can do so through reiterating certain details which were disclosed to them. (*Id.* at 103:9–15).  Further, Dr. Leo said that the suspect is "often edited or corrected or coached by police," who can "suggest advertently or inadvertently more details to fill in the confession more plausibly." (*Id.* at 103:12–16).

Dr. Leo further testified that empirical studies show contamination is common in false confession cases. (*See id.* at 103:24–104:8).  Dr. Leo opined that Barbour's interrogation[31] included police contamination:

> . . . Mr. Barbour described to me that he was seen -- he was shown crime scene photos.  He described to me that he was told crime scene details.  That he knew nothing about this crime prior to the interrogation, and he was educated by the detectives, and that's what he incorporated into his confession.  He also described to me that they had rehearsed this four to five times before going on tape and having his confession on May 1st recorded.

(Doc. 438 at 113:16–23).

Dr. Leo also testified that there are cases when an innocent person has confessed falsely and repeated that false confession multiple times in the same case. (*Id.* at 100:17–20).  He opined that there are several reasons why this happens:  the suspect may be trying to "avoid a threatened harm" or "adverse consequences," they may be responding to "promises of benefit[s] or leniency," or they may "think they can prove their innocence after they escape police custody." (*Id.* at 101:2–12).  He further explained that individuals may repeat the same false confession to non-law enforcement, even their own attorneys,

---

[31] Barbour's interrogation was not recorded. (*Id.* at 115:19–21).  Only the two confession statements made on May 1, 1992, were recorded. (*Id.* at 115–16).

long after the initial false confession. (*Id.* at 178–79).  Dr. Leo further opined that it is "not surprising to see a calm and collected demeanor" during an innocent person's confession statement. (*Id.* at 126:17–20).

Based on his interview with Barbour and his review of Barbour's case, Dr. Leo opined that during Barbour's May 1, 1992 interrogation, Lt. Davis and Detective Carmichael educated Barbour about the crime scene and had Barbour "rehearse" his confession multiple times, and that such police contamination and scripting played a role in producing Barbour's videotaped statement. (*See id.* at 113:16–23; 132:10–133:3).  In sum, Dr. Leo opined that while Barbour's videotaped confession may appear to be persuasive to a third party who has no knowledge of the case and views it out of context, Barbour's confession is false. (*See id.* at 138:24–139:24).

The State countered Dr. Leo's opinion with its own expert, Dr. Glen D. King, a clinical psychologist in Montgomery, Alabama.  Dr. King was licensed to practice psychology in Alabama in 1973 and was board-certified by the American Board of Professional Psychology in 1979.  He has been in the private practice of clinical psychology since 1983. (Doc. 439 at 43–44).  As part of his practice, Dr. King has performed court-ordered forensic examinations concerning competency to waive *Miranda* rights, competency to stand trial, and mental state at the time of the offense. (*Id.* at 45:14–25).  From 1992 to 2017, he did approximately 8,000 contract evaluations for the Alabama State Department of Mental Health. (*Id.*).  The Court accepted Dr. King as an expert in clinical and forensic psychology. (*Id.* at 51:5–8).  Unlike Dr. Leo, Dr. King

was not offered or accepted as an expert in false confessions and the risk factors attendant to false confessions.

Dr. King also "work[s] on contract for the state Attorney General's office in Alabama with a contract that's renewed every two years." (*Id.* at 51:13–14).   In this action, the Attorney General's Office retained Dr. King to work on Barbour's case specific to Barbour's innocence claim.   He was not retained to conduct a forensic evaluation of Barbour but instead "to review information regarding [Barbour's] assertion that his videotaped confession in a Capital Murder case was a false confession or a coerced confession given under duress," and "to come to a conclusion and render an opinion regarding these issues." (Doc. 462-93 at 1).

In performing this task, Dr. King reviewed a plethora of materials, itemized at pages 1 and 2 of his report.[32] (Doc. 462-93 at 1–2).   On May 21, 2023, he prepared a six-page report of his work and the conclusions he reached as to Barbour's innocence claim, entitled "Forensic Psychology Consultation." (*Id.* at 1–6).   Dr. King opined that "there is no evidence for the presence of coercion, duress, or promises of any outcome for Mr. Barbour during, before, or after his videotaped confession." (*Id.* at 5).   Dr. King concluded:   "There is no evidence that Mr. Barbour engaged in a false confession regarding the circumstances of the offense for which he was convicted." (*Id.*).

At the *Schlup* hearing, Dr. King was questioned extensively about the materials he reviewed and asked to explain the conclusions he reached.   Dr. King stated that based on

---

[32]   The materials Dr. King reviewed included the Report of Dr. Richard A. Leo dated July 9, 2017; Dr. Leo's Deposition dated July 26, 2022; the Affidavit of Peter Neufeld; Peter Neufeld's Deposition dated July 29, 2022; the Report of Dr. Charles Honts; and Dr. Charles Honts' Deposition dated March 29, 2023.

his review, he saw no evidence that Barbour had any intellectual disability or mental illness. (Doc. 439 at 56).   Additionally, he testified that in Barbour's videotaped confession, Barbour "appeared to me to give answers that were spontaneous" and a "narrative that was linear." (*Id.* at 56:23–24).   Further, Dr. King saw no indication of contamination, "meaning that [he] didn't see any efforts on the part of the interviewers to provide information to Mr. Barbour while the interview was occurring to supplement his memory." (*Id.* at 57:3–6).   Also, Dr. King pointed out that Barbour's videotaped confession contained information that was generally not known to the public, such as (1) "he had stabbed the victim multiple times and left the knife sticking in her" (*id.* at 57:21–22); (2) the victim was nude (*id.* at 57:23); (3) he set fire to her body with articles—including papers and clothing material—he retrieved from a closet (*id.* at 57:24–58:2); (4) he took the smoke detector off the wall (*id.* at 58:3–4); (5) he re-enacted with his fist how Hester hit the victim with his right hand on the left side of the victim's face (*id.* at 58:9–16); (6) he knelt on one side of the victim during the rape (*id.* at 58:16–18); and (7) he and Mitchell held up the victim's legs to allow Hester to rape her. (*Id.* at 59:6–8).   Additionally, Dr. King testified that he saw no indicia that Barbour had been subjected to a "guilt presumptive interrogation or interview." (*Id.* at 59:12–24).

### 5. Lay witness testimony

#### a. Officials who investigated this crime

The Court heard testimony from former MFD officer William Davis and former MPD officers Michael Thomas, John Gallups, Kenneth C. Baldwin, and Michael Gantt. Officers Baldwin and Gantt were only involved in the investigation initially and

peripherally, and the Court need not summarize their testimony because it is not relevant to the *Schlup* analysis.  The relevant testimony of Officers Baldwin, Davis, and Thomas, respectively, is summarized below.

### i. Kenneth Baldwin

Kenneth "K.C." Baldwin is retired from the MPD.  In 1992, Baldwin was a robbery/homicide investigator, and he testified that he was initially involved in investigating Mrs. Roberts' murder. (Doc. 440 at 9:20, 10:18–24).  He was one of the law enforcement officials dispatched to the crime scene on Manley Drive, and he instructed other investigators and patrol officers on what to do while at the crime scene. (*Id.* at 10:12–13, 10:18–24).  He recalled that he and another investigator questioned William and Lola at the scene, and he also spoke with some of Mrs. Roberts' neighbors. (*Id.* at 11:10–16, 13:13–21).   Additionally, he interviewed Melvin twice. (*Id.* at 18:12–14).  According to Baldwin, this was the entirety of his work on this case. (*Id.* at 18:23–24).

On cross-examination, Baldwin testified that he never spoke to Tyrone Jackson.  Baldwin acknowledged that he would have wanted to learn more about Jackson if he had known Jackson had been arrested for sexually assaulting a woman in her home before Mrs. Roberts was murdered. (*Id.* at 28:14–19).   Baldwin also acknowledged that he would have wanted to interview Jackson if he had known that Jackson had made comments about wanting to harm Mrs. Roberts. (*Id.* at 29:17–20).  Baldwin also stated that if DNA had been tested in the case, he would have wanted to know whether that DNA testing included or excluded an offender. (*Id.* at 31:11–12, 18).

### ii. William Davis

William Davis, formerly Lt. Davis, is retired from the MFD.  In 1992, he was the MFD's lead investigator in this case.  He traced the circumstances and the series of events which resulted in Barbour becoming a suspect in this case.  He testified that at the time of Mrs. Roberts' death, the MFD was already investigating the Winn-Dixie arson fires that had occurred earlier that year.

At the *Schlup* hearing, Mr. Davis testified that he did not show Barbour any pictures of the crime scene or provide him any details of the crime and that he did not threaten Barbour. (*Id.* at 271:4–9, 275:11–14).  Mr. Davis denied that on April 22, 1992, he told Barbour that he "would beat him within an inch of his life without leaving a mark." (*Id.* at 272:4–7).  Mr. Davis also stated that he did not verbally abuse Barbour. (*Id.* at 272:8–9).  Additionally, he testified that he did not hit Barbour and that he did not witness anyone else hit Barbour. (*Id.* at 272:10–13).

### iii. Michael Thomas

Michael Thomas is a former police officer.   In February 1992, he became employed as an investigator in the Montgomery County District Attorney's Office ("DA's office"). (Doc. 439 at 187:24).  He has been employed there for thirty-one years and is currently the Chief Investigator. (*Id.* at 184:20–25).

He explained that an investigator in the DA's office assists the prosecution with whatever is needed, normally receiving instructions from the assigned prosecutor.  The Barbour case was one of the first cases assigned to him at the DA's office.  Initially, the MPD investigated the Thelma Roberts' murder and presented the case against Barbour to

the DA's office.[33]   Mr. Thomas stated that prior to Barbour's trial, the DA's office received an affidavit, "something to do with Christopher Barbour or Christopher Hester, some information." (*Id.* at 191 at 24–25).   That affidavit is a two-page, handwritten, narrative statement dated October 19, 1992, and signed by James Newman ("Newman"), then an inmate at the Montgomery County jail. (Doc. 462-119).   On March 4, 1993, Mr. Thomas and MPD Officer Merritt interviewed Newman about the circumstances giving rise to that affidavit.[34]

Mr. Thomas also testified that he was a part of an interview that Detective Carmichael had with Angela Stikes ("Stikes") on May 13, 1992. (Doc. 439 at 195:8–18). This interview was transcribed on a MPD form and consists of thirteen pages. (Doc. 462-117).   From the transcription, it appears that Mr. Thomas only observed that interview, as he asked Stikes no questions.

### b.  Individuals who knew Barbour in 1992

The Court also heard testimony from some of Barbour's friends, acquaintances, and associates who knew him in 1992, both before and after this crime occurred.   The testimony from the individuals who provided relevant information is summarized below.[35]

---

[33]  Since Mr. Thomas became employed as an investigator in the DA's office in February 1992, prior to this homicide in March 1992, Mr. Thomas did no investigative work on this case on behalf of the MPD.

[34]   This interview and Newman's affidavit are discussed in greater detail, *infra*, in the summary of Newman's testimony at the *Schlup* hearing.

[35]  James Mann and Michael Braswell also testified at the *Schlup* hearing.   Because their testimony was not relevant to the *Schlup* inquiry, the Court need not summarize it.

### i. Adam A. Bollaert

Adam Bollaert first met Barbour at a party on the evening of March 21, 1992, when groups of friends gathered at a place in the woods, commonly known as "Casino's," near the Eastdale Mall to drink and visit. Bollaert remembered that Barbour and Hester were at the party. Bollaert understood that Barbour and Hester were both homeless and living in a car. Bollaert remembered Barbour and Hester talking about "death and how cool it was." (Doc. 439 at 167:7–8). Barbour and Hester also talked "about some woman the previous night." (*Id.* at 167:8–9). They did not mention hurting her, but they "did talk about her screaming." (*Id.* at 167:9–10).

In July 1992, Bollaert was questioned about Mrs. Roberts' murder, and he made a voluntary statement to Lt. Davis at the Montgomery Fire Department. Bollaert stated in relevant part:

> Q. What was the conversation at the party?
> A. Chris Hester, and Chris Barbour were drunk and began talking. They said stuff like "remember the chick we did last night" and "she screamed" and other things that made everyone there uneasy. What they were saying didn't sound right. It scared us and so we started getting ready to leave.
> Q. Did they mention any names, locations or anything else that would let you know who they were talking about?
> A. No they did not.
> . . .
> Q. Did they mention killing anyone?
> A. They did not say anything about actually killing someone but they were talking most of the night about death and how interesting it was.

(Doc. 462-121 at 1–2). Bollaert did not testify at Barbour's trial.

### ii. James A. Newman

In 1992–93, Newman was an inmate in the Montgomery County jail.  While there, he met Barbour when they were assigned to the same cell block for a period. (Doc. 440 at 52:1–5).  At the *Schlup* hearing, Newman remembered that Barbour told him that he was in jail on a murder charge, but Newman had no independent memory regarding the contents of Barbour's statements to him about the offense. (*Id.* at 54:10–15, 57:19–25).  Newman explained that in 2001, he sustained a head injury in a motor vehicle collision that has affected his memory. (*Id.* at 53:1–7).[36]

Previously, on October 19, 1992, Newman signed a handwritten affidavit relaying statements Barbour purportedly made to him while they were in the same cell block. (Doc. 462-119).  According to Newman's affidavit, Barbour told Newman that he (Barbour) told the police that Hester killed Mrs. Roberts because Barbour wanted to "get back" at Hester for standing Barbour up. (*Id.* at 1).  At the *Schlup* hearing, Newman testified that, while he did not remember making the statement, he knew his signature was on the affidavit. (Doc. 440 at 58:12–22, 59:5–10).

On March 4, 1993, MPD Officer Denny Merritt and Michael Thomas, investigator for the Montgomery DA's Office, interviewed Newman at the jail and questioned him extensively about (1) his becoming friends with Barbour and what Barbour had told him about the Thelma Roberts' case; (2) Newman's subsequent conversations with Hester, who he later met while they were both incarcerated at the jail, about the Thelma Roberts'

---

[36] Newman testified that the injury has caused "holes" in his memory. (Doc. 440 at 53:12–19).  He further testified that he remembers having had two surgeries to remove metal from his brain. (*Id.* at 67:12–18).  He explained that he has "like a hard plastic filler" in his skull. (*Id.* at 67:13–14).

case; and (3) the handwritten affidavit Newman signed on October 19, 1992. (Doc. 462-118) (transcript of interview).  In the interview, Newman recounted that he and Barbour became friends while in the Montgomery County jail and that Barbour discussed his case with Newman.  Newman stated that when Barbour tried to tell him details about Barbour's case, Newman told Barbour to "skip all the sick stuff" because Newman had "a weak stomach." (*Id.* at 10).  Additionally, Newman recalled that Barbour told him that "the lady was stabbed," but that Barbour did not say who stabbed her. (*Id.* at 10–11).  According to Newman, Barbour also told him "the last part of what happened where [Barbour] burned her." (*Id.* at 10).  Newman also recalled that Barbour "always said . . . it was just something to do, she was in a lot of pain, he was making him feel good." (*Id.* at 11).[37]  Newman did not testify at Barbour's trial.

### c.  Mrs. Roberts' family and the party her children attended on March 20, 1992

The Court heard live testimony from Thelma Roberts' husband, Melvin; her two children, William and Lola; and William and Lola's friend, Lakeisha Hall.

The Court has recounted relevant portions of each witness's respective testimony earlier in this Opinion and need not repeat them here.  Additionally, Lola and William both testified that Mrs. Roberts did not have a relationship with Tyrone Jackson. (Doc. 440 at 113:15–20) (William's testimony); (*id.* at 148:20–25) (Lola's testimony that Mrs. Roberts did not have a sexual relationship with Tyrone Jackson).

---

[37]  The Court has quoted Newman's interview statements as they appear in the transcript.

As discussed further below, these witnesses' testimonies are also relevant to the trustworthiness of the affidavits and/or declarations signed by Melvin, William, Lola, and Hall in 2001 and 2018. However, the Court need not summarize the testimony further because it is not relevant to the Court's *Schlup* analysis.

### 6. Depositions of lay witnesses admitted at the *Schlup* hearing

In addition to the live testimony summarized above, the Court admitted the deposition testimony of multiple lay witnesses, including William and Tyrone Jackson.

#### a. *William Roberts*

The State deposed William on May 10, 2022. (Doc. 462-132). William testified that when his mother was murdered in March 1992, Tyrone Jackson lived across the street from the Robertses on Manley Drive. (*Id.* at 11:17–23). William described Jackson as one of his closest friends and testified that he had known Jackson his entire life. (*Id.* at 10:6–18). Despite their friendship, Jackson "used to tell [William] that [Jackson] was going to get [William's] mama all the time." (*Id.* at 58:7–8).

William also testified that Mrs. Roberts did favors for the Jackson family, including allowing them to store food in her refrigerator and use her phone because the Jacksons' home did not have power. (*Id.* at 55:20–56:9). According to William, Mrs. Roberts would open the door for Jackson if he knocked on her door, but she would not open the door to a stranger.

### b.  Jerry Tyrone Jackson

On June 27, 2023, the State deposed Jackson at Kilby Correctional Facility in Montgomery, Alabama. (Doc. 434).[38]   Jackson is forty-seven years old. (Doc. 434 at 19:7–8).  He grew up in Montgomery, Alabama.  At one time, he and his family lived on Manley Drive, but he did not remember the exact address, when, or how long they lived there.   Jackson testified that in March 1992, he also had family members living in Florence, Alabama, and that he "would live back and forth from Florence to Montgomery" (*id.* at 22:2–3), going to Florence every year for the summer and living with different family members in Florence. (*Id.* at 22).

Jackson stated that he did not know why he was being deposed and that he did not know Barbour, that he had never met Barbour, and that he knew nothing about Barbour's case. (*Id.* at 10:17–11:2).  When Jackson was asked *any* questions about Thelma Roberts, such as (1) whether he knew her or her children, (2) whether he had ever had any sexual contact with her, and (3) most other questions concerning the investigation of her murder and the neighbors near his home on Manley Drive, he invoked the Fifth Amendment right against self-incrimination and did not answer the question. (*Id.* at 19–34).   In total, Jackson asserted his Fifth Amendment rights over forty times throughout his deposition in response to questions regarding Thelma Roberts or the circumstances surrounding her death. (*Id.*).

---

[38]  On April 21, 2023, the Court appointed CJA Panel Attorney Jon Carlton Taylor to represent Jackson in this matter. (Doc. 353).  Attorney Taylor has ably discharged his responsibilities.

Jackson did acknowledge, however, that he was charged with rape when he was a juvenile:

> Q.  Were you ever charged with rape in 1988?
> A.  Yeah, I was arrested and -- Well, I don't know if it was '88.  But -- I don't remember the exact year, but I was.
> Q.  So, you were charged with -- You don't know the exact year, but you were charged with rape at some point before 1992?
> A.  Yes.

(*Id.* at 35:15–22).

## III.  APPLICABLE LAW

Because Barbour filed this petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244 *et seq.*, AEDPA governs its disposition.  AEDPA imposes a one-year statute of limitations for the filing of § 2254 habeas petitions. *See* 28 U.S.C. § 2244(d); *see also McQuiggin v. Perkins*, 569 U.S. 383, 388 (2013); *Webster v. Moore*, 199 F.3d 1256, 1257 & n.3 (11th Cir. 2000) (per curiam).  Pursuant to § 2244(d), a state prisoner must file a § 2254 petition within one of the latest among four determining dates. *See* 28 U.S.C. § 2244(d)(1).  For purposes of this action, the applicable date is "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review." 28 U.S.C. § 2244(d)(1)(A); *see also Webster*, 199 F.3d at 1257 n.3.

### A.    The "Miscarriage of Justice" Exception to AEDPA's Time-Bar

To "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," *Schlup v. Delo*, 513 U.S. 298, 324 (1995), the Supreme Court established a

miscarriage-of-justice exception, arising from a prisoner's factual innocence, to excuse a federal habeas petitioner's procedural default of a claim in federal court.[39]   The *Schlup* Court reiterated that "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" 513 U.S. at 320–21 (quoting *Murray v. Carrier*, 477 U.S. 478, 495 (1986)).

*Schlup* formulated a specific rule to implement this general principle.  It held that a prisoner asserting innocence as a gateway to reach the merits of defaulted claims must establish that, in light of new, reliable evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327.   This rule "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).  Typically, "the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims." *House v. Bell*, 547 U.S. 518, 537 (2006).

In *McQuiggin*, the Supreme Court observed that it had applied the "miscarriage of justice exception to overcome various procedural defaults," including "filing deadlines." 569 U.S. at 392–93 (first citing *Coleman*, 501 U.S. at 750; then citing *Murray*, 477 U.S.

---

[39]  A habeas petitioner who fails to properly present a claim in state court, and therefore loses the right to raise the claim within state procedures, is said to have "procedurally defaulted" the claim and is no longer able to raise it in either state or federal court. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012).  However, procedural default is not an absolute bar to federal habeas relief.  To overcome the bar, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

at 495–96).  The *McQuiggin* Court held that "actual innocence, if proved, serves as a gateway through which a [habeas] petitioner may pass" to overcome AEDPA's statute of limitations. *Id.* at 386.

Thus, recognizing the "paramount importance of avoiding the injustice of executing one who is actually innocent," *Schlup* and its progeny allow a federal habeas petitioner to "raise[] a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims." *E.g.*, *Schlup*, 513 U.S. at 326–27.  This premise applies equally regardless of whether a constitutional claim is untimely or is procedurally defaulted. *See McQuiggin*, 569 U.S. at 386, 392–93.

## B.      Standard for a Gateway Actual Innocence Claim

A petitioner asserting actual innocence to overcome a procedural bar such as the statute of limitations need not make an *absolute* showing of innocence. *See House*, 547 U.S. at 538 ("[T]he *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence.").  *House* articulated the actual innocence standard for gateway procedural relief as follows:  "A petitioner's burden . . . is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Id.* at 538.  The Supreme Court elaborated that "a petition supported by a convincing *Schlup* gateway showing 'raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error'; hence, 'a review of the merits of the constitutional claims' is justified." *Id.* at 537

(alterations in original) (quoting *Schlup*, 513 U.S. at 317).  A gateway innocence claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

Where a petitioner meets the initial burden of producing new, reliable evidence of his innocence, the federal habeas court must consider "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determine whether the petitioner has met the standard for a gateway claim of innocence. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327–28).  This assessment requires the court to make "a holistic judgment about 'all the evidence' and its likely effect on reasonable jurors applying the reasonable-doubt standard." *Id.* at 539 (quoting *Schlup*, 513 U.S. at 328).  "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329.  In making this determination, the habeas court appropriately assesses the new evidence in light of the prosecution's theory of guilt presented *at trial*. *See House*, 547 U.S. at 539–40; *see also, e.g.*, *id.* at 540–48 (discussing the habeas petitioner's new evidence in light of the prosecution's theory of guilt presented at trial).

# IV.  DISCUSSION

## A.   Summary of Record Evidence—Old and New—Relevant to *Schlup* Inquiry

### 1.  Barbour's Evidence

Barbour marshals a variety of evidence to support his innocence claim, but the centerpiece is the DNA test results establishing that the only male DNA removed from Mrs. Roberts' body belonged to Tyrone Jackson.  Barbour relies on, among other things, the following evidence:  (1) FACL's 2021 DNA testing and ADFS's 2022 DNA testing identifying Tyrone Jackson as the only source of male DNA in Mrs. Roberts' rape kit; (2) Mr. Keel's and Dr. Kokoszka's respective expert testimony about how long sperm can be detected in the vaginal and anal cavities, as well as the factors which tend to shorten these timeframes; (3) expert testimony from Dr. Leo that Barbour's confession had the hallmarks of being a false and/or coerced confession; (4) Jackson's deposition testimony in this case in which he asserted his Fifth Amendment rights and declined to answer any questions related to Thelma Roberts and her murder; (5) Jackson's other criminal history, namely his 2003 murder conviction for stabbing a woman to death in her own home; (6) witness testimony regarding Jackson's demeanor around the time of Mrs. Roberts' death and his potential motive; and (7) discrepancies between Barbour's and Hester's respective accounts of the crime. (*See generally* docs. 449, 460).

To the extent Barbour relies on it, the Court does not consider the following evidence in assessing whether he has met the *Schlup* standard:  Mr. Harmor's 2010 testing of Jackson's saliva; and the 2001 affidavits and 2018 declarations of certain witnesses, including Mrs. Roberts' family members.  As set out above, the State

impeached Mr. Harmor's testing methodology and his credibility at the *Schlup* hearing and seriously undermined Mr. Harmor's representation that he is an expert who conducts trustworthy DNA testing and obtains reliable results.  Thus, the Court finds that the 2010 test results are not reliable for *Schlup* purposes.  In any event, because he did not test the rape kit evidence in this case, Mr. Harmor's 2010 testing of Tyrone Jackson's saliva is of no moment for purposes of the *Schlup* analysis.  Consequently, at this stage this Court need not, and does not, consider Mr. Harmor's 2010 test results of Tyrone Jackson's saliva.[40]

Additionally, as part of its *Schlup* analysis, the Court does not consider the affidavits Barbour submitted to the Montgomery County Circuit Court in May 2001 from Mrs. Roberts' family (doc. 70-15 at 14–15) (Melvin); (*id.* at 17–18) (Lola); (*id.* at 20–21) (William), or Evans (*id.* at 71–73).  Testimony from Lola and William at the *Schlup* hearing, and from Evans' deposition, describing how these affidavits were obtained colors their reliability at this stage.[41]

---

[40]  Nevertheless, the Court is troubled by the manner in which Barbour's counsel, Miriam Gohara, allegedly approached Tyrone Jackson and the representations she allegedly made to obtain a saliva sample from him.  While Ms. Gohara's interaction with Tyrone Jackson is collateral to the issue of whether Barbour has satisfied the *Schlup* standard, the Court cannot, and will not, turn a blind eye to Ms. Gohara's alleged conduct, which, if true, may violate the Alabama Rules of Professional Conduct, at a minimum.  The Court will address this matter in a subsequent order.

[41]  These witnesses generally testified that they did not read their respective declarations or affidavits before signing them; the declarations and affidavits were not entirely accurate; members of Barbour's legal team had not been forthcoming about their representation of Barbour; and an investigator on Barbour's legal team, Richard Reyna, had given them money on multiple occasions. (*See, e.g.*, doc. 440 at 84:18–85:23, 88:5–6, 105:7–24) (William's testimony); (*id.* at 130:21–131:20) (Lola's testimony); (doc. 302-4 at 35:16–38:15) (Evans' testimony).  While Melvin was not questioned at the *Schlup* hearing about the circumstances giving rise to his 2001 affidavit, the Court surmises that its reliability is equally suspect.

Similarly, as part of its *Schlup* analysis, the Court does not consider the following evidence Barbour submitted in the present action: (1) Declaration of William Roberts dated September 20, 2018 (doc. 155-2 at 2–3); (2) Declaration of Lola Roberts dated September 20, 2018 (*id.* at 4–6); (3) Declaration of Lakeshia Hall dated September 20, 2018 (*id.* at 7–8); and (4) Declaration of Niquita Smith dated May 18, 2017 (*id.* at 9). Testimony from Lola, William, and Hall at the *Schlup* hearing, and from Smith at her deposition, describing how these declarations were obtained taints their reliability.[42] While these declarations had value to Barbour at one time in this matter, the circumstances under which they were obtained undermines the Court's ability to rely on them at this stage with a sufficient degree of confidence that they reflect the truthful, accurate testimony of each affiant or declarant.[43] Moreover, these witnesses gave sworn testimony at depositions, the *Schlup* hearing, or both, which the Court does consider. For these reasons, the contents of the aforementioned affidavits and declarations play no part in the Court's holistic evaluation of all of the evidence the *Schlup* analysis requires.

## 2. The State's Evidence

In opposition to Barbour's assertion of actual innocence, the State relies on multiple pieces of evidence which it contends establishes Barbour's guilt, including: (1) Barbour's audiotaped and videotaped confession statements made on May 1, 1992;

---

[42] See, for example, Lola's testimony (doc. 440 at 130:21–131:20); William's testimony (*id.* at 88:5–24); Hall's testimony (*id.* at 167:18–168:21); and Smith's testimony (doc. 284-5 at 24:10–26:5, 36:8–37:17).

[43] Additionally, in reaching its conclusion that Barbour has met the *Schlup* standard, the Court did not consider the letter attached to Barbour's post-hearing brief (doc. 449-1), or the related argument within Barbour's brief (doc. 449), nor would these materials, if considered, change the Court's conclusion. Consequently, the State's Amended Motion to Strike that letter and the related argument in Barbour's brief (doc. 455) is due to be denied as moot.

(2) the jury's verdict convicting Barbour of three capital offenses for the murder of Thelma Roberts; (3) Dr. King's expert opinion that Barbour's confession was not false or coerced; (4) William Davis' (formerly Lt. Davis) testimony denying all allegations of police scripting or contamination and denying all allegations that he and Detective Carmichael physically abused and psychologically coerced Barbour into falsely confessing; (5) Newman's statements describing what Barbour told him about Mrs. Roberts, which inculpates Barbour;[44] (6) Hester's statement at his guilty plea hearing inculpating Barbour; and (7) Stikes' statements from her June 2, 1993 interview with Detective Carmichael (doc. 217-2),[45] and her January 27, 2022 affidavit (doc. 211-2) in which she places Barbour, Hester, and Mitchell on Manley Drive at the time of Mrs. Roberts' murder.

## B.    New DNA Evidence

The lynchpin of Barbour's new evidence is the recent DNA testing.  Both Mr. Keel of FACL and Ms. Wendell of ADFS tested the DNA evidence from Mrs. Roberts' rape kit using STR DNA testing, which is currently the most discerning DNA testing method available, and the labs' respective testing produced the same results:  Tyrone Jackson is the sole source of male DNA in Mrs. Roberts' rape kit.  The State's DNA expert, Dr. Kokoszka, concurred with these findings.  Barbour contends that the new

---

[44]  To reiterate, Newman did not testify at Barbour's trial.

[45]  The gist of Stikes' interview statements is that she, Barbour, Hester, and Mitchell were at or near Mrs. Roberts' home the night she was murdered.  Stikes never says that Tyrone Jackson was present. Additionally, the Court questions the reliability of Stikes' interview with Detective Carmichael (doc. 217-2), upon which the State relies, because it appears that Stikes was in a hypnotic state. (*See, e.g.*, *id.* at 2) (in Detective Carmichael's first question to Stikes, he asks, "all this is a dream that you're having right?").

DNA test results qualify as reliable, new "exculpatory scientific evidence" which was not presented at trial. *See Schlup*, 513 U.S. at 324, 327.  Additionally, Barbour argues that the new DNA evidence would cause reasonable jurors to harbor doubt about whether he murdered Thelma Roberts and that the DNA evidence fundamentally undermines the material factual bases of Barbour's confessions:  (1) he, Hester, and Mitchell were the persons present at the crime scene; and (2) Hester raped Mrs. Roberts, which Barbour and Mitchell aided and abetted, before Barbour ultimately stabbed Mrs. Roberts to death.

The State does not dispute that the 2021 DNA test results are "new evidence," but it argues that they are unreliable for two reasons:  Barbour's alleged lack of diligence and interpretational bias.  The State additionally argues that, even accepting that Barbour's new DNA evidence is "reliable," it does not help Barbour satisfy the *Schlup* actual innocence standard.  The State downplays the significance of the new DNA evidence, claiming it merely establishes that Jackson and Mrs. Roberts had sex sometime in the twenty-four hours before her murder.

The Court first assesses whether the new DNA evidence is "reliable" for purposes of the *Schlup* inquiry.  The Court then assesses the DNA evidence's probabilistic impact on reasonable jurors.

### 1.  The reliability of the new DNA evidence

The State insists that the new DNA evidence is not reliable for two reasons: (1) Barbour was not sufficiently diligent; and (2) Mr. Harmor and Mr. Keel exhibited interpretational or confirmation bias, which prevented accurate results.  The Court addresses each argument below.

### a. Barbour's alleged lack of diligence

The State urges that Barbour cannot meet the *Schlup* standard because he was not diligent in asserting his innocence until 2001 or in presenting the evidence he obtained in 2010 from the testing of Tyrone Jackson's saliva.  To support this diligence argument, the State relies on *McQuiggin*, in which the Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations." 569 U.S. at 386.  The *McQuiggin* Court further stated that "a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." *Id.* at 387.

The State's reliance on *McQuiggin* to support its diligence argument is misplaced because *McQuiggin* rejects the proposition that a habeas petitioner must make a threshold showing of diligence to satisfy *Schlup*. *See id.* at 389–99.  Instead of treating timeliness as a threshold inquiry, *id.* at 400, the *McQuiggin* Court explained that timing may be a "factor relevant in evaluating the *reliability* of the petitioner's proof of innocence," *id.* at 399 (emphasis added).  The Court reasoned that "[i]t would be bizarre to hold that a habeas petitioner who asserts a convincing claim of actual innocence may overcome the statutory time bar § 2244(d)(1)(D) erects, yet simultaneously encounter a court-fashioned diligence barrier to pursuit of her petition." *Id.*  "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has" convincingly shown actual innocence, *i.e.*, "that it is more likely than not that no reasonable juror would have

convicted him in the light of the new evidence." *Id.* (quoting *Schlup*, 513 U.S. at 327).  In sum, timing is merely one factor in the overall evaluation of a petitioner's actual innocence claim, which is intended to respond "to the State's concern that it will be prejudiced by a prisoner's untoward delay in proffering new evidence," while remaining "tuned to the rationale underlying the miscarriage of justice exception—*i.e.*, ensuring 'that federal constitutional errors do not result in the incarceration of innocent persons.'" *Id.* at 399–400 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

Lower courts have recognized the *McQuiggin* Court's distinction between a threshold diligence requirement and timeliness as a factor in evaluating the reliability of new evidence of innocence.  As the Fifth Circuit explained, under *McQuiggin* "no threshold diligence requirement applies to actual-innocence claims; the delay is simply a factor in the court's reliability evaluation." *Floyd v. Vannoy*, 894 F.3d 143, 156 (5th Cir. 2018) (per curiam) (affirming the district court's finding that the petitioner established actual innocence under *Schlup*); *see also Davis v. Bradshaw*, 900 F.3d 315, 325 n.6 (6th Cir. 2018) (explaining that "equitable tolling requires a showing of diligence, while the actual-innocence exception does not" and that "[i]n actual-innocence-exception cases, courts consider diligence only when determining the credibility of evidence proffered to show actual innocence" (citing *McQuiggin*, 569 U.S. at 399–401)).[46]

Thus, *McQuiggin*, properly understood, would require the State to show that Barbour's alleged lack of diligence undermines the reliability of FACL's 2021 DNA test

---

[46] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.  While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

results.  The State fails to do so.  As the Fifth Circuit aptly explained, "[s]cientific-based evidence . . . is less susceptible to manipulation and, therefore, is appropriately considered reliable evidence despite the time lapse." *Floyd*, 894 F.3d at 156 (making this observation regarding new fingerprint comparison evidence).   And in *Floyd*, the petitioner sought federal habeas relief "over 23 years after his conviction became final," *id.* at 154, which is much longer than the eight-year time lapse in this case.  Here, FACL's 2021 DNA test results are recent and not stale, and the results were confirmed by Ms. Wendell at ADFS and Dr. Kokoszka, the State's DNA expert.  Moreover, this case does not present a situation where the timing of the revelation of the new DNA evidence means that a trial witness who has died cannot now appear to rebut the new evidence. *Cf. McQuiggin*, 569 U.S. at 399–400 (recounting the State of Michigan's concern).  Consequently, the State fails to show that any lack of diligence by Barbour undermines the reliability of FACL's 2021 DNA test results.

### b.  Confirmation bias or interpretational bias

The State further contends that "interpretational bias prevented accurate [DNA] test results" from Mr. Keel and Mr. Harmor (doc. 450 at 125), which the State claims undermines the viability of Barbour's actual innocence claim.  At the *Schlup* hearing, Mr. Della Manna explained "confirmation bias" or "interpretational bias" as that term relates to DNA testing. (*See* doc. 440 at 224:18–225:3).  In sum, Mr. Della Manna opined that, to avoid confirmation or interpretational bias, an analyst should first interpret the evidentiary samples before looking at the reference samples.

Beginning with Mr. Harmor, the Court need not consider the State's arguments because, as explained above in Section IV.A.1., the Court need not, and does not, consider the results from Mr. Harmor's HLA DQalpha testing for purposes of the *Schlup* analysis.

The State argues that Mr. Keel's approach to his analysis resulted in biased results because he limited the number of contributors during testing. (Doc. 450 at 132–33). The State asserts that Mr. Keel's results are biased even though Ms. Wendell's 2022 testing for ADFS reached the same result as Mr. Keel's testing—that Tyrone Jackson was the sole source of male DNA on the vaginal and anal swabs collected during Mrs. Roberts' autopsy. But the State does not question Ms. Wendell's methodology or the accuracy of her results. Indeed, the State touts the "quality control measures" that ADFS generally takes to ensure the accuracy of its work. (*See id.* at 66) ("ADFS has both analytical laboratory steps as well as quality control measures in place, as well as has an independent qualified analyst review the work."). The State cannot reasonably contend that Mr. Keel's test results are biased when Ms. Wendell's testing reached the same results and the State's own DNA expert confirmed the results. Moreover, the State's own DNA expert, Dr. Kokoszka, testified that Mr. Keel did not exhibit any bias in his testing. (*See* doc. 436 at 229:3–12). And although the State criticizes Mr. Keel's analytical approach in certain respects,[47] these criticisms are insufficient to undermine Mr. Keel's

---

[47] For instance, while Mr. Keel opined that the three peaks on the electropherogram were either stutter or an artifact, Dr. Kokoszka opined that it could not be determined whether they were either stutters or alleles. (Doc. 436 at 256–57). In any event, the State fails to establish that any purported deficiencies in Mr. Keel's analytical approach undermine the ultimate conclusion reached by both Mr. Keel and Ms. Wendell that Tyrone Jackson was the sole male DNA contributor.

conclusion, which was also reached by Ms. Wendell, that Tyrone Jackson was the sole male DNA contributor.  For these reasons, the State's argument that Mr. Keel's test results are biased or otherwise flawed is without merit.

### c.  Barbour's new DNA evidence is reliable

The 2021 and 2022 DNA test results are new, reliable evidence.  This DNA evidence is the type of "exculpatory scientific evidence" which the Supreme Court identified as reliable in *Schlup*. *See* 513 U.S. at 324.  And other federal courts have found "exculpatory scientific evidence" to be reliable. *See, e.g.*, *Floyd*, 894 F.3d at 156–57 (finding new fingerprint comparison evidence reliable).  As explained above, FACL's 2021 DNA test results are recent and not stale, and the results were confirmed in 2022 by Ms. Wendell at ADFS and Dr. Kokoszka, the State's DNA expert.  Any delay by Barbour in asserting his innocence is insufficient to undermine the reliability of the recent DNA test results under the circumstances of this case.  Additionally, for the reasons explained above, the State's argument that Mr. Keel was biased is without merit, and the argument about Mr. Harmor is irrelevant because the Court does not consider Mr. Harmor's findings or opinions at this stage.  Consequently, the Court concludes that Barbour's new DNA evidence is reliable and credible as contemplated by *Schlup* and its progeny.

### 2.  Effect of new DNA evidence on reasonable jurors

At this stage, the Court must make a probabilistic determination about how all the evidence, old and new, would affect "reasonable jurors applying the reasonable-doubt standard." *See House*, 547 U.S. at 539 (quoting *Schlup*, 513 U.S. at 328); *Schlup*, 513 U.S. at 329 (explaining that the "district court [must] make a probabilistic determination

about what reasonable, properly instructed jurors would do"). And, consistent with *House*, the Court considers the new evidence in light of the prosecution's theory of guilt presented at trial. *See House*, 547 U.S. at 539–40.

The prosecution's theory at Barbour's trial was that Thelma Roberts had been raped just before she was murdered; and that Barbour, Hester, and Mitchell were at the crime scene and involved in the rape, murder, and arson. Specifically, the prosecution claimed that Barbour murdered Mrs. Roberts soon after Hester raped her with Barbour's and Mitchell's assistance. And the prosecution emphasized to the jury that the most powerful piece of evidence against Barbour was his own confession in which he described himself, Hester, and Mitchell—no one else—as active participants in the crime. The new DNA evidence identifying Jackson's DNA as the sole male DNA in Mrs. Roberts' rape kit is powerful evidence that Barbour's confession is false, and that Mrs. Roberts' murder did not occur as the prosecution presented it at trial. No physical evidence links Barbour to the crime scene. Thus, this DNA evidence "further excludes [Barbour] from the [crime] scene, invalidates his confession, and links a [new] third party"—Tyrone Jackson—"to that scene." *See Floyd*, 894 F.3d at 157.

Viewed through the prosecution's theory that Mrs. Roberts was raped just before she was murdered and that her rapist was part of the overall rape, murder, and arson, the new DNA evidence would likely cause reasonable jurors to believe that Jackson was present at the crime scene and involved in the rape, murder, and arson. As mentioned above, Jackson's involvement is inconsistent with Barbour's confession because Barbour identified only himself, Hester, and Mitchell as present at the crime scene. Consequently,

viewed through the lens of the prosecution's trial theory, the new DNA evidence would more likely than not cause reasonable jurors to have reasonable doubt about the reliability of Barbour's confessions, and thus his guilt, and to link a new third party to the crime. *See id.*  And although this comparative exercise is neither dispositive nor required, the DNA results would more likely than not cause reasonable jurors to perceive the case against Jackson as stronger than the case against Barbour, especially since no physical evidence links Barbour to the crime scene.

To be sure, the trial court, the prosecutor, and Barbour's lawyers (but not the jury) knew at Barbour's trial that his confession was inaccurate to the extent he claimed that Hester raped Mrs. Roberts, based on Mr. Huys' testimony excluding Hester as the source of male DNA.  However, a reasonable jury likely would not find evidence that Hester was not the rapist, by itself, sufficient to create reasonable doubt about Barbour's guilt because it does not foreclose the possibility that Barbour or Mitchell was the rapist.  Nor would a reasonable jury likely have reasonable doubt about Barbour's guilt if the new DNA results had matched Barbour or Mitchell.  By contrast, the revelation of Jackson as the sole source of male DNA fundamentally undermines Barbour's confession in a way that the earlier DNA testing excluding Hester did not, and in a way that theoretical DNA results matching Barbour or Mitchell would not.  Reasonable jurors likely would find that the new DNA evidence invalidates Barbour's confession and links a new third party, Jackson, to the crime scene, thereby creating reasonable doubt about Barbour's guilt. *See id.*; *cf. Godschalk v. Montgomery Cnty. Dist. Attorney's Off.*, 177 F. Supp. 2d 366, 370 (E.D. Pa. 2001) (evaluating, in the context of a 42 U.S.C. § 1983 due process claim, how

reasonable jurors would weigh a person's confession to rape against DNA evidence excluding that person as the source of genetic material from the victims, and reasoning that "[g]iven the well-known powerful exculpatory effect of DNA testing, confidence in the jury's finding of . . . guilt at his past trial, where such [DNA] evidence was not considered, would be undermined").

Lower federal courts have considered DNA evidence sufficient to meet the *Schlup* standard. *See, e.g.*, *Floyd*, 894 F.3d 143; *Williams v. Brown*, 208 F. Supp. 3d 713, 738 (E. D. Va. 2016).  And the new DNA evidence here is stronger than the new evidence of innocence presented in *Schlup*, which was solely affidavits. *See Schlup*, 513 U.S. at 331 (explaining that if eyewitnesses' sworn statements were true, then a reasonable juror would not vote to convict); *see also Schlup v. Delo*, 912 F. Supp. 448, 450–51, 455 (E.D. Mo. 1995) (on remand from the Supreme Court, finding that the new eyewitness statements were credible and that the petitioner had sufficiently shown actual innocence). The DNA evidence is also stronger than the new evidence of innocence presented in *Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021), in which the Tenth Circuit affirmed the district court's finding of actual innocence under *Schlup* based largely on new witness statements and a recantation from the prosecution's eyewitness at trial. *See id.* at 1051– 52.

DNA evidence tested with current technology is a powerful tool available to the State in criminal prosecutions to offer convincing proof of guilt.  In multiple capital murder cases in Alabama, DNA evidence was part of the evidence the prosecution presented which led to a conviction. *See, e.g.*, *Petric v. Alabama*, 157 So. 3d 176 (Ala.

Crim. App. 2013), *cert. denied*, Ala. Sup. Ct. Order No. 1121404, *cert. denied*, *Petric v. Alabama*, 574 U.S. 1030 (2014); *Morris v. State*, 60 So. 3d 326 (Ala. Crim. App. 2010), *cert. denied*, Ala. Sup. Ct. Order No. 1091052 (2010), *cert. denied*, *Morris v. Alabama*, 562 U.S. 1287 (2011); *Harris v. State*, 2 So. 3d 880 (Ala. Crim. App. 2007), *cert. denied*, Ala. Sup. Ct. Order No. 1070871, *cert. denied*, *Harris v. Alabama*, 555 U.S. 1155 (2009). Further, DNA evidence has caused or contributed to the release of defendants whose convictions were based on false confessions. *See, e.g.*, *Gray v. Maryland*, 228 F. Supp. 2d 628, 632–34 (D. Md. 2002); *Godschalk*, 177 F. Supp. 2d at 369–370.

Additionally, DNA evidence has been used nationwide to solve cold murder cases, including one in Alabama.  Recently, DNA evidence led to a break in a 1999 cold case in Dale County, Alabama, involving the deaths of two teenagers, Tracie Hawlett and J.B. Beasley.  Following the 2018 arrest of a California man, DNA testing sparked a chain of events which culminated in the March 2019 arrest of Coley McCraney for the murders in this cold case.  Alabama Attorney General Steve Marshall observed that "new DNA testing of forensic evidence . . . led law enforcement to McCraney as a suspect." Press Release, Alabama Attorney General Steve Marshall, *Attorney General Steve Marshall Statement on Arrest of Suspect in Murders of Tracie Hawlett and J.B. Beasley in 20-Year-Old Wiregrass Cold Case* (Mar. 18, 2019), https://www.alabamaag.gov/wp-content/uploads/2023/05/AG-Marshall-Statement-on-Hawlett-Beasley-Murder-Case.pdf. According to news reports, Ozark Chief of Police Marlos Walker said he was "surprised" that McCraney was implicated but observed that "DNA doesn't lie." Carol Robinson, *Arrest of Golden State Killer suspect sparked break in 1999 murders of Alabama teens*,

AL.COM (Mar. 18, 2019, 2:07 p.m.), https://www.al.com/news/2019/03/arrest-of-golden-state-killer-suspect-sparked-break-in-1999-murders-of-alabama-teens.html.    In April 2023, the jury found McCraney guilty of four counts of capital murder,[48] and in June 2023, McCraney was sentenced to life without parole. Press Release, Alabama Attorney General Steve Marshall, *Convicted Capital Murderer Coley McCraney Sentenced in 1999 Murders of J.B. Beasley and Tracie Hawlett* (June 15, 2023), https://www.alabamaag.gov/wp-content/uploads/2023/06/6.15.23-Press-Release.pdf.

Further, the State of Alabama has recognized the advancements in DNA testing and the potential benefit DNA testing may have for defendants convicted of capital offenses.  In 2009, the Alabama Legislature passed H.B. No. 146, Act 2009-768, codified at ALA. CODE § 15-18-200, which is entitled "Motion by persons convicted of capital offense for forensic DNA testing and analysis."  In relevant part, this statute provides:

> (a) An individual convicted of a capital offense who is serving a term of imprisonment or awaiting execution of a sentence of death, through written motion to the circuit court that entered the judgment of sentence, may apply for the performance of forensic deoxyribonucleic acid (DNA) testing on specific evidence, if that evidence was secured in relation to the investigation or prosecution that resulted in the conviction of the applicant, is still available for testing as of the date of the motion, forensic DNA testing was not performed on the case at the time of the initial trial, and the results of the forensic DNA testing, on its face, would demonstrate the convicted individual's factual innocence of the offense convicted. The filing of a motion as provided in this subsection shall not automatically stay an execution.

---

[48] One count was murder during the commission of a rape. (Doc. 536 in *State of Alabama v. Coley Lewis McCraney*, Case No. CC-2019-000187.00 (Dale Cnty. Cir. Ct. Apr. 26, 2023)).

ALA. CODE § 15-18-200(a).  It appears that the foregoing statute would have been of no value to Barbour vis-à-vis his gateway claim of innocence, because (1) in 1992, prior to Barbour's trial, the ADFS conducted forensic DNA testing on the serological evidence obtained from Thelma Roberts; and (2) in 2001, Barbour filed a motion in state court for access to this same serological evidence for DNA testing with the more advanced DNA testing that had become available after he was convicted.  In any event, this statute evidences Alabama's recognition of the value of DNA testing to those convicted of capital offenses.

The State insists that the new DNA evidence does not undermine Barbour's conviction because it simply establishes that sometime in the twenty-four hours before her death, Mrs. Roberts had consensual sex with Tyrone Jackson.  In its post-hearing brief, the State maintains that while "the DNA evidence places Mr. Jackson with Mrs. Roberts at some time twenty-four hours before her murder, it does not place Mr. Jackson inside her home at the time she was killed." (Doc. 450 at 147).  Intertwined with the theory that Mrs. Roberts and Jackson had consensual sex before she was murdered, the State suggests that after Mrs. Roberts had consensual sex with Jackson, Hester raped her before Barbour killed her, as Barbour described in his confession.  Under this theory, Hester raped Mrs. Roberts but left no DNA behind.

To support the theory that Mrs. Roberts could have had consensual sex with Jackson within twenty-four before her death, the State points out that the amount of sperm Mr. Keel documented—1,200—is minimal compared to the norm. (*Id.*).  From this point, the State suggests that the consensual sex could have occurred up to twenty-four

hours before her death.  Barbour counters that this theory is not credible based on the expert testimony about how long sperm may be detected in body cavities after deposit; the multiple factors which shorten those timeframes, especially in living persons; and the persistence of sperm in the vagina for longer periods when the person is deceased.  To assess the State's argument, the Court considers the length of time between semen deposit and the autopsy; and the amount of sperm in the normal male ejaculate at deposit in conjunction with how long sperm may be detected after deposit.

The parties' experts agree that at the time of deposit, the average male ejaculate contains millions of sperm. (Doc. 211-1 at 4) (Dr. Kokoszka's affidavit stating that "[t]he average ejaculate contains approximately 2 to 5 ml of semen and 200 to 300 million sperm cells"); (doc. 440 at 206:23–25) (Mr. Della Manna's testimony that "in general, 50 to 100 million is the generally accepted term for how many sperm are in the male ejaculate"); (doc. 436 at 272:24–25) (Mr. Keel's testimony that "there are hundreds of millions of sperm in the typical ejaculate").  The rape kit evidence was not taken from Mrs. Roberts until approximately forty-eight hours after her death. (Doc. 265-2 at 2) (Dr. Stilwell's autopsy report indicating that Mrs. Roberts' autopsy began on 9:00 a.m. on March 23, 1992).  If Mrs. Roberts' death occurred late in the evening on March 20, as the prosecutor stated, then her autopsy was conducted approximately two and one-half days after her death.  If she was murdered in the early morning hours of March 21, the autopsy was performed approximately two days after her death.  Consequently, semen was not obtained from Mrs. Roberts until at least forty-eight hours after being deposited.

As detailed earlier, Mr. Keel and Dr. Kokoszka agree that semen can be detected in a living person's vaginal cavity for up to three days after deposit and in a living person's anal cavity for no longer than one day after deposit. Both experts also agree that certain activities shorten these timeframes, such as urination, defecation, and personal hygiene. (*E.g.*, doc. 211-1 at 4). Moreover, as Mr. Keel explained, the number of semen and sperm begins to decline soon after deposit: in a living person, "most semen is lost from the vagina within a few hours," and "[t]he amount of seminal fluid and the numbers of sperm in the vagina continue to decline over time." (Doc. 462-80 at 4, paras. 9–10). However, as Mr. Keel also explained, semen persists in the vagina for longer when the person is deceased because "[i]n the deceased person, all the above influences that clear semen from the body cavities, except for catabolic activity, essentially cease at the time of death." (*Id.* at 4, para. 10).

The State's arguments and alternative theories about how Jackson's DNA ended up inside Mrs. Roberts are insufficient to rebut the new DNA evidence's likely exculpatory impact on reasonable jurors assessing Barbour's guilt. As a threshold matter, any reasonable jury would doubt the veracity of the claim that Mrs. Roberts, a forty-year-old churchgoing woman, had consensual sex with Jackson, her sixteen-year-old neighbor who was a year younger than her own son. And besides the amount of sperm collected at the autopsy, the State proffers no evidence to support the theory that Mrs. Roberts had consensual sex with Jackson up to three days before she died. By contrast, William and Lola, who were living with Mrs. Roberts when she died, both testified at the *Schlup*

hearing that Mrs. Roberts did not have a relationship with Jackson. (Doc. 440 at 113:15–20) (William's testimony); (*id.* at 148:20–25) (Lola's testimony).

Reasonable jurors also likely would not accept the State's consensual sex theory given the physical evidence, DNA test results, and expert testimony. (*See, e.g.*, doc. 462-80 at 5, para. 12) (Mr. Keel's opinion that this theory is not supported by the evidence or the scientific literature). Jackson's semen was found on both the vaginal and anal swabs collected from Mrs. Roberts during her autopsy, which occurred two to two-and-a-half days after her body was discovered. (Doc. 462-13 at 2; doc. 436 at 268:15–8). Given the lifespan of semen and sperm after deposit in the vaginal and anal cavities as discussed above, the fact that *any* sperm were detected from Mrs. Roberts' autopsy suggests that sexual contact between Mrs. Roberts and Jackson occurred in close proximity to her death. Indeed, Mr. Keel opined that sexual contact between Mrs. Roberts and Jackson must have occurred on the day of her death, the DNA test results are "more compatible with ejaculation by Mr. Jackson into the victim at or near the time of the victim's death," and the theory that they had sex earlier would require that Mrs. Roberts "had not had a bowel movement or practiced any significant personal hygiene after the sex." (Doc. 462-80 at 4–5, paras. 11–12). Moreover, if Mrs. Roberts' rape and murder occurred contemporaneously, as this case was presented at trial, there was no opportunity for the normal life activities to occur (such as bathing, wiping, urination, defecation, or drainage by standing upright after sex) which would facilitate loss of semen from the vagina. The fact that all metabolic functions and bodily movements stop at death explains why, after a minimum of forty-eight hours from the time of deposit, semen and sperm remained in the

rape kit evidence recovered at the autopsy on March 23. (*See id.* at 4, para. 10).[49] Reasonable jurors considering all the evidence would likely conclude that Jackson had sexual contact with Mrs. Roberts and ejaculated inside of her near the time of her death.

Additionally, for the State's consensual sex theory to be true and consistent with the prosecution's theory at trial, it must also be true that detectable amounts of Jackson's semen remained inside Mrs. Roberts even after Hester raped her, and that Hester left no DNA behind.  A reasonable jury likely would extrapolate from the expert testimony discussed above that subsequent vaginal and/or anal penetration would disrupt or eliminate semen which previously had been deposited.  Thus, to accept the State's theory, reasonable jurors would have to accept that neither penetration, nor Mrs. Roberts' engaging in normal life activities after sexual contact with Jackson, nor Mrs. Roberts' metabolic and catabolic functions, separately or together, were sufficient to eliminate Jackson's semen from Mrs. Roberts' body, and that Hester left no DNA behind.  That is a bridge too far.  Applying Occam's Razor,[50] the physical evidence, DNA test results, expert testimony, and common sense would cause reasonable jurors to doubt the veracity of the State's theory that Hester raped Mrs. Roberts after she had consensual sex with Jackson when only Jackson's DNA was present.

---

[49]  And as a factual matter, the State's reliance on the "low" amount of sperm collected at the autopsy also ignores that Mr. Keel's finding of a "fairly high density of sperm" is consistent with the ADFS's initial March 27, 1992 examination, which found "moderate sperm" on the anal slide. (*See* doc. 440 at 250:2–15) (Mr. Della Manna acknowledging that the ADFS found a "moderate amount of sperm" on the anal smear).

[50]  Occam's Razor is a philosophical principle that "the explanation of an event with the fewest assumptions—the simplest explanation—should trump complex explanations that rely on the unlikely confluence of a number of assumed factors." *Williams*, 208 F. Supp. 3d at 717 n.5.

To further illustrate the implausibility of the State's theory, consider a hypothetical scenario in which the State were prosecuting Jackson for Mrs. Roberts' rape and murder using this new DNA evidence, and Jackson's defense theory was that he had consensual sex with Mrs. Roberts and someone else raped and murdered her later.   In this hypothetical scenario, the Court seriously doubts whether the consensual sex theory, without more, would suffice to create reasonable doubt about Jackson's guilt.  In sum, a reasonable jury considering all the evidence would be unlikely to accept the State's theory that Hester raped Mrs. Roberts after she and Jackson had sex because the theory defies logic, common sense, and science.  Consequently, reasonable jurors likely would not accept the State's claim that Jackson had consensual sex with Mrs. Roberts up to three days prior to her death.

Additionally, the State's theory resemble theories which other district courts have rejected when considering new DNA evidence in the *Schlup* context.  For example, in *Williams*, the district court concluded that petitioners satisfied *Schlup* based primarily on new DNA evidence showing that another man's "DNA was found in [the victim's] vagina and under [her] fingernail." 208 F. Supp. 3d at 738.  In reaching this conclusion, the court rejected the government's "proposed scenarios where both [petitioners] could have participated in the rape and murder without leaving any DNA" because "those scenarios are at best doubtful." *Id.* (noting that "[a] reasonable juror would find the evidence of the crime scene . . . nearly impossible to reconcile with an attack by multiple assailants"); *see also Watkins v. Miller*, 92 F. Supp. 2d 824, 828 (S.D. Ind. 2000) (rejecting the "improbable assumption that semen from two different men just happened

87

to be collected on the same vaginal swabs in exactly equal amounts," explaining that "such a possibility is 'farfetched' from a scientific standpoint").

DNA evidence is sufficient for many juries to convict beyond a reasonable doubt. By the same token, it is also sufficient to create reasonable doubt.  If reasonable jurors were informed that the male DNA recovered from Mrs. Roberts did not belong to Barbour, Hester, or Mitchell, but instead to Jackson—who was not mentioned at Barbour's trial and who does not know Barbour[51]—those reasonable jurors would more likely than not harbor reasonable doubt about Barbour's guilt.  It is puzzling that in this case, the State downplays the significance of the new DNA evidence when the State otherwise relies on similar DNA evidence to secure convictions and clear cold cases.  It is also ironic given that the discovery of a single Caucasian hair caused law enforcement to change the course of their investigation into Mrs. Roberts' murder, turning away from African-American suspects and focusing on Caucasian suspects.  As it concerns this case, the new DNA evidence is more than sufficient to establish that "more likely than not, in light of the new evidence, no reasonable juror would find [Barbour] guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *See House*, 547 U.S. at 538.

---

[51]  To the extent the State argues that the new DNA evidence merely places Jackson at the crime scene along with Barbour, Hester, and Mitchell, this theory is not supported by competent evidence, and it is also inconsistent with the prosecution's theory at trial and Barbour's confessions—the best evidence of Barbour's guilt—that Barbour, Hester, and Mitchell alone were involved in the crime. *Cf. House*, 547 U.S. at 540–48 (discussing the habeas petitioner's new evidence in light of the prosecution's theory of guilt presented at trial).  Additionally, Jackson's testimony that he had never even met Barbour further undermines this alternative theory.

**C.      Barbour's Confessions and Other Evidence of Guilt**

Notwithstanding the new evidence of Barbour's innocence, there is also evidence of Barbour's guilt, chief among them Barbour's own confessions.  As other evidence of Barbour's guilt, the State cites Hester's statements at his change of plea hearing inculpating Barbour; Stikes' statements in an interview and an affidavit placing Barbour at or near Mrs. Roberts' home at the time of the murder; and Newman's statements relaying inculpatory statements Barbour made to him when they were cellmates.

Barbour argues that neither his confessions nor these other witness statements are credible evidence of his guilt in light of the new DNA evidence.  He also proffers evidence, some old and some new, which he contends establishes that his confessions were false, coerced, or both (hereinafter the "false confession evidence").  Among this false confession evidence, Barbour identifies discrepancies between his confession statements and the crime scene evidence, and inconsistencies between his and Hester's respective narratives of how the crime was committed.

Barbour's old false confession evidence consists of his testimony during the suppression hearing in which he detailed Lt. Davis's and Detective Carmichael's physical abuse, threats, and coercion during Barbour's interrogations.  Barbour claimed that during an April 1992 interrogation, Detective Carmichael repeatedly slapped him in the face when he did not know the answers to Detective Carmichael's questions.  Barbour also testified that Lt. Davis "threatened to "beat [Barbour] with[in] an inch of [his] life" if he did not cooperate with officers' requests to take a polygraph test, which caused Barbour to be "very" afraid of Lt. Davis. (Doc. 70-7 at 168).  Barbour's claim that law

enforcement subjected him to physical and verbal abuse is at least partially corroborated by Melvin's sworn testimony, in which he similarly claims that Detective Carmichael was physically and verbally abusive during his interrogation. Lt. Davis denies that he was ever physically or verbally abusive towards Barbour or that he ever threatened Barbour.

Barbour presents additional, new evidence that his confessions were false: Dr. Leo's expert testimony. Dr. Leo opined that Barbour's confessions are false based on his assessment that police contamination had occurred, and that Barbour possessed certain individual risk factors which made him more susceptible to being coerced into falsely confessing. Based on his evaluation of Barbour and what Barbour told him, Dr. Leo opined that during Barbour's May 1, 1992 interrogation, Lt. Davis and Detective Carmichael educated Barbour about the crime scene and had Barbour "rehearse" his confession multiple times,[52] and that such police contamination and scripting played a role in producing Barbour's videotaped statement, which may appear to be a "true" confession. (*See* doc. 438 at 102:16–103:21, 132:8–133:3). Dr. Leo further testified that Barbour's individual risk factors contributed to his false confessions, including homelessness, distress related to the recent loss of his mother, and substance abuse issues. (*Id.* at 110:7–15). Dr. Leo explained that individuals may repeat the same false confession to non-law enforcement, even their own attorneys, long after the initial false

---

[52] To reiterate, Lt. Davis denies showing Barbour any pictures of the crime scene or telling him any details of the crime.

confession. (*Id.* at 178:1–179:22).  Dr. Leo also opined that it is "not surprising to see a calm and collected demeanor" when an innocent person confesses. (*Id.* at 126:17–20).

As additional evidence that his confessions are false and not credible, Barbour identifies discrepancies between his confession statements and both the crime scene evidence and Hester's account from his guilty plea hearing.  For example, even though Mrs. Roberts was found with a plastic bag over her head and the autopsy report indicated manual strangulation, and despite Detective Carmichael's several questions about whether Barbour had tried to kill Mrs. Roberts in any way other than stabbing her or whether Barbour or his companions tried to "cover her up," Barbour never mentioned placing a plastic bag over Mrs. Roberts' head or attempting to strangle her. (Doc. 70-8 at 63–64, 76).  Additionally, although Barbour stated that Mrs. Roberts drank beer with them (*id.* at 71) ("Q:  Did the woman drink with y'all?  A:  Yeah.  I believe she had a beer or two, yeah."), no alcohol was found in Mrs. Roberts' blood (doc. 70-5 at 43:7–13). Further, Mrs. Roberts' children testified that their mother did not drink alcohol. (Doc. 440 at 148:15–16) (Lola's testimony); (doc. 462-132 at 54:22–55:7) (William's testimony).  Barbour also told police that they took a twelve-pack of beer into Mrs. Roberts' home and that they all drank beer (doc. 70-8 at 50), yet there was no report of any beer cans being found anywhere at the crime scene.  And although Barbour told police he only set one fire in Mrs. Roberts' bedroom, investigators found evidence of at least three fires throughout the home.  These inconsistencies would likely cause reasonable jurors to view Barbour's confession even more skeptically.

Additionally, Barbour points out that two fundamentally different versions of the crime were presented to two separate factfinders in his and Hester's respective prosecutions. On one hand, Barbour's jury heard that Barbour, Hester, and Mitchell gained voluntary entrance to Mrs. Roberts' home to drink beer; Hester raped her; Barbour and Mitchell aided and abetted the rape; and after the rape, Barbour stabbed her to death with a knife he found in the kitchen. On the other hand, the trial judge in Hester's case heard that the trio consisted of Barbour, Hester, and Angela Stikes; they went to Mrs. Roberts' home to steal, and Mrs. Roberts did not let them inside;[53] once the trio was inside the house, Hester "went one way" and Barbour went "the other way"; Hester did not know Mrs. Roberts had died until days later when Barbour told him he "had some trouble in the house"; and Hester later found out that Barbour had killed Mrs. Roberts. (Doc. 211-3 at 5:17–6:22). These discrepancies would likely raise additional questions about the reliability of Barbour's confession in the minds of reasonable jurors.

"Confessions are generally considered strong evidence of guilt, and a sound confession alone may significantly influence a juror's decision." *Floyd*, 894 F.3d at 157 (citation omitted). Nonetheless, the credibility of Barbour's confessions and other evidence of Barbour's guilt must be evaluated in light of all the evidence, including the new DNA evidence identifying Jackson as the sole male source of DNA, the other evidence inculpating Jackson, and Barbour's false confession evidence. *See id.* A

---

[53] To the extent Hester implied that they broke into Mrs. Roberts' home, this theory contradicts William's testimony that he used his key to open the locked front door when he returned home the morning of March 21, 1992, following the murder. (Doc. 70-4 at 96:9–14). Moreover, the police reports do not indicate any evidence of forced entry.

reasonable, informed jury who considered all the evidence through the lens of the prosecution's theory at trial—that Mrs. Roberts was raped shortly before she was murdered, and that Barbour, Hester, and Mitchell alone were involved—would likely harbor reasonable doubt about the credibility of Barbour's confessions and the witness statements inculpating Barbour, including the statements of Hester, Stikes, and Newman, because they cannot be squared with the new DNA evidence showing that the semen in Mrs. Roberts' body belonged to Jackson alone and that the semen was deposited in close proximity to her death. *See id.* The evidence of Barbour's guilt is further undermined by the other evidence inculpating Jackson, the discrepancies between Barbour's statements and the crime scene evidence, and Barbour's false confession evidence.

The State argues that, as a threshold matter, Barbour's evidence of Detective Carmichael's and Lt. Davis' alleged coercion and police misconduct is not clear and convincing evidence sufficient to rebut the state court's finding that Barbour's confessions were voluntary, and thus this Court should not consider it. Additionally, the State contends that Dr. Leo's testimony is insignificant because the State's expert, Dr. King, opined that Barbour's confession was not coerced. But as explained further below, the Court need not, and does not, disturb the state trial court's factual findings to determine whether Barbour has presented sufficient evidence to meet the *Schlup* standard. Additionally, even if reasonable jurors did not credit Barbour's false confession evidence or gave it little weight, the Court's conclusion remains the same.

### 1. Deference to state court factual findings

The Court begins with the State's argument regarding the state court's factual findings. The State submits that the state court's findings of fact in denying Barbour's motions to suppress his confession are entitled to deference under 28 U.S.C. § 2254(e)(1). The State contends that the state courts rejected Barbour's claim that his confession was coerced and that, in the absence of "clear and convincing evidence to rebut those facts," the federal habeas court must presume the correctness of the state court's factual findings and afford deference to those findings. (Doc. 450 at 148–51). The State submits that Barbour's evidence of alleged coercion and police misconduct does not qualify as "clear and convincing evidence."

To support this argument, the State relies on *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258–59 (11th Cir. 2013), where the court concluded that the petitioner failed to meet the cause and prejudice exception to overcome his procedural default because the "state court's factual finding found fair support in the record" and the petitioner presented "no clear and convincing evidence to rebut" those facts. *Bishop*, however, did not involve a *Schlup* inquiry. The Eleventh Circuit appears not to have squarely addressed whether § 2254(e)(1) applies in the *Schlup* context. However, several federal appellate courts have held that "in the context of a gateway claim of actual innocence under *Schlup*, a federal habeas court must presume that a state court's factual findings are correct, rebuttable only upon a showing of clear and convincing evidence of error." *Cosey v. Lilley*, 62 F.4th 74, 82–83 (2nd Cir. 2023) (citing other circuits which held similarly, including the Third, Fourth, Fifth, Eighth, and Tenth Circuits); *see also*

*Kirkpatrick v. Chappell*, 950 F.3d 1118, 1131 (9th Cir. 2020) ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits. Rather, it appears to apply to all factual determinations made by state courts.").

Assuming without deciding that § 2254(e)(1) applies to *Schlup* proceedings, the Court's conclusion remains the same. At this stage, the Court's task is to assess whether, in light of all the evidence—including Barbour's new DNA evidence which was never heard or considered by the trial court, the state post-conviction court, or the state appellate courts in Alabama—it is more likely than not that no reasonable juror would vote to convict. In making this assessment, the Court need not, and does not, disturb the state trial court's factual findings to determine whether Barbour has presented sufficient evidence to meet the *Schlup* standard.[54] Moreover, even if it is unrebutted that Barbour's confessions were not coerced by law enforcement, they nonetheless could still be false. Indeed, the 1992 DNA evidence established the confession's falsity to the extent Barbour claimed Hester raped Mrs. Roberts. The new DNA evidence further undermines the confessions by linking a new third party to the crime scene who Barbour had not claimed was involved. Therefore, even accepting the State's argument that § 2254(e)(1) applies here, the Court's conclusion remains the same.

### 2. Dr. Leo's testimony

The State also downplays Dr. Leo's substantive opinion that Barbour's confession was false, citing Dr. King's opinion to the contrary. As noted earlier, the Court accepted

---

[54] At this stage, the Court expresses no view about whether Barbour's false confession evidence is clear and convincing evidence sufficient to rebut the state court's finding that his confession was not coerced.

Dr. Leo as an expert "in false confessions and the risk factors attendant to false confessions." (Doc. 438 at 79:5–7; 12–13). By contrast, the Court accepted Dr. King as an expert in clinical and forensic psychology. (Doc. 439 at 51:5–8). Dr. Leo's credentials more closely align with the specific phenomenon of false confessions and the attendant risk factors, whereas Dr. King's credentials in clinical and forensic psychology are more general. For these reasons, the Court finds that reasonable jurors would more likely credit Dr. Leo's testimony over Dr. King's testimony on the issue of whether Barbour's confession was false. But even if reasonable jurors did not so credit Dr. Leo's testimony or gave it little weight, the Court's conclusion remains the same because of the new DNA evidence.

At this stage, the Court need not, and does not, decide whether Barbour's confessions were coerced, entirely false, or both. Instead, the Court must make a probabilistic determination of how Barbour's false confession evidence would impact reasonable, fully informed jurors' assessment of Barbour's guilt. Even if reasonable jurors did not view Barbour's false confession evidence as dispositive or even strong evidence that Barbour is not guilty beyond a reasonable doubt, the evidence would likely affect their assessment of Barbour's guilt because it provides context to possibly explain how and why Barbour would have made and repeated a detailed statement incriminating himself in a terrible crime. In this way, the false confession evidence, considered together with the new DNA results and other evidence, would more likely than not cause reasonable jurors to harbor doubt about whether Barbour murdered Mrs. Roberts.

**D.      Barbour Has Satisfied the *Schlup* Standard**

The Court must make "a holistic judgment about 'all the evidence,'" "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and "its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 538–39 (quoting *Schlup*, 513 U.S. at 327–28).

A fully informed jury would hear the prosecution argue that Mrs. Roberts was murdered soon after she was raped, and that Barbour, Hester, and Mitchell—no one else—were involved in this crime.  The jury would hear Barbour's confessions to law enforcement, in which he described how he, Hester, and Mitchell went into Mrs. Roberts' home and drank beer with her, and how Barbour then stabbed Mrs. Roberts to death after Hester raped her with Barbour's and Mitchell's assistance.  This jury would also hear testimony about Barbour's inculpatory statements to his former cellmate, James Newman; as well as statements from Hester and Stikes implicating Barbour in this crime. This jury would also hear William Davis' (formerly Lt. Davis') testimony denying that Barbour was threatened or physically assaulted, and Dr. King's expert testimony that Barbour's confession was not coerced.  The jury would also hear Davis' testimony denying that Barbour had been shown crime scene photographs or told any details about Mrs. Roberts' murder before he confessed.

But a fully informed jury would also hear about the recent DNA evidence revealing that Tyrone Jackson—who Barbour does not mention in his confession—is the sole source of male DNA recovered from Mrs. Roberts' body, and expert testimony that

Jackson must have ejaculated inside of Mrs. Roberts soon before she died.  The jury would also hear about Jackson's prior threats towards Mrs. Roberts; his disappearance from a party the night of Mrs. Roberts' murder; and his "jittery," "shaking," and apologetic demeanor upon his return.  The jury would also be told that Mrs. Roberts knew Jackson and his family, and that she would have opened the door for Jackson but not a stranger—which Barbour was.  The jury would hear that sometime prior to Mrs. Roberts' murder, Jackson was arrested for rape—a fact which would have caused Baldwin to want to learn more about Jackson if Baldwin had known about it during his investigation. (Doc. 440 at 28:14–19).  They would also hear that since 2003, Jackson has been serving a life sentence for stabbing another woman to death in her home after she rebuffed his sexual advances.  The jury would also hear how the crime scene evidence is inconsistent with Barbour's confession in multiple ways, including how Barbour never mentioned putting a plastic bag over Mrs. Roberts' head, and how no beer cans were found at the crime scene and Mrs. Roberts had no alcohol in her blood.  They would hear that when Hester pleaded guilty to Mrs. Roberts' murder, he told the judge a different story about how the crime was committed and who was involved.  They would hear Dr. Leo's testimony that individuals do falsely confess and repeat false confessions, as well as Dr. Leo's opinion that Barbour was vulnerable and susceptible to coercion and making a false confession.

Barbour's confessions are the State's best evidence of Barbour's guilt and are the foundation upon which his conviction rests.  No physical evidence links Barbour to the crime scene.  But his confessions must be evaluated in light of all the evidence, old and

new, including the new DNA evidence.  And Barbour's new DNA evidence unravels his confessions; further excludes him from the crime scene; and links a new third party—Jackson—to the scene.  Additionally, the Court finds that reasonable, fully informed jurors would likely find the objective, unrefuted DNA evidence more probative than the other evidence of Barbour's guilt, including the statements of Hester, Newman, and Stikes.  These statements suffer the same flaw as Barbour's own confession:  they are inconsistent with the new DNA evidence.  The evidence of Barbour's guilt, especially his confessions, are further undermined by the discrepancies between Barbour's statements and the crime scene evidence described above.   And the other evidence inculpating Jackson, including his actions and statements around the time of Mrs. Roberts' murder and before, his other criminal history, and his Fifth Amendment invocations in this case, further bolsters the significance of Jackson's DNA alone being found inside Mrs. Roberts because it is additional evidence that someone else—Jackson—may have committed the crimes of which Barbour was convicted.

To be sure, some of Barbour's new evidence is subject to dispute, including the false confession evidence,[55] in that the State has offered some evidence to rebut it.  Additionally, the jury may well have unresolved questions about what happened, including how a Caucasian pubic hair wound up in the trace sheet in which Mrs. Roberts' body was wrapped, and why Barbour (and Hester, for that matter) would have admitted to participating in this terrible crime if that was not true.   But the new DNA evidence—

---

[55]   The Court concludes that, even if the jury did not hear or wholly disregarded Barbour's false confession evidence, it is still more likely than not that no reasonable jury would convict Barbour based on the new DNA evidence.

that the only male DNA found on Mrs. Roberts belonged to Tyrone Jackson—is objective, reliable, and undisputed.  And unlike people, "DNA doesn't lie."  The DNA evidence linking Jackson to the crime scene, in light of the prosecution's theory at trial, would likely create reasonable doubt about Barbour's guilt and prevent reasonable jurors from finding him guilty.

Multiple federal courts have concluded that a habeas petitioner established actual innocence even though the petitioner previously confessed, and in some cases when exculpatory DNA evidence was not presented. *See, e.g.*, *Fontenot*, 4 F.4th 982 (petitioner satisfied *Schlup* despite earlier confession and no exculpatory DNA evidence presented); *Floyd*, 894 F.3d 143 (petitioner satisfied *Schlup* based in part on exculpatory DNA evidence and despite earlier confession); *Williams*, 208 F. Supp. 3d 713 (petitioners satisfied *Schlup*, based in part on exculpatory DNA evidence and despite earlier confessions).  And as explained above, Barbour's new DNA evidence is stronger than the new evidence of innocence presented in *Schlup*, which was solely affidavits. *See Schlup*, 513 U.S. at 331 (explaining that if sworn statements of eyewitnesses were true, then a reasonable juror would not vote to convict); *see also Schlup*, 912 F. Supp. at 450–51, 455 (on remand from the Supreme Court, finding that the new eyewitness statements were credible and that the petitioner had sufficiently shown actual innocence).

Considering *all* the evidence, including the new DNA evidence and the other evidence inculpating Jackson, it is more likely than not that no reasonable juror would find Barbour's confessions or the other witness statements inculpating him, separately or together, sufficient to find him guilty beyond a reasonable doubt. *See Floyd*, 894 F.3d at

160. Consequently, Barbour's failure to file this habeas action within the applicable one-year limitations period is excused, the State's motion to dismiss Barbour's petition as untimely is due to be denied, and Barbour is entitled to have his habeas petition reviewed on the merits.

## E.  The State's Argument that the Court Improperly Limited the *Schlup* Hearing Testimony Fails

Finally, the Court addresses, and rejects, the State's argument that the Court erred in not leaving the proceedings open for it to present testimony from additional witnesses, and in not disqualifying Barbour's counsel, Miriam Gohara, so that she could be questioned about the circumstances surrounding her collection of Tyrone Jackson's saliva sample.  The State contends that the Court impermissibly prohibited it from presenting testimony from several witnesses, including Barbour's trial counsel, Clifford Heard; the State wished to question Heard about whether Barbour had told Heard he was innocent. According to the State, the Court's "limited time frame prevented [it] from not only presenting witness testimony relevant to the issues presented," but also "forced" it to choose "between completing a thorough direct examination from fact witnesses" or "presenting highlights from several fact witnesses." (Doc. 450 at 152).  The State's position is wrong for two independent reasons:  (1) this Court acted within its broad discretion in limiting live testimony; and (2) in any event, the exclusion of such testimony was harmless on this record.

The State fails to show that the Court abused its discretion in limiting the evidentiary hearing to four days or in limiting the State's rebuttal case.  The Federal

Rules of Evidence provide that district courts should "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment." FED. R. EVID. 611(a). The "discharge of this responsibility necessarily entails the exercise of discretion." *United States v. Hill*, 643 F.3d 807, 845 (11th Cir. 2011) (quoting *Haney v. Mizell Mem'l Hosp.*, 744 F.2d 1467, 1477 (11th Cir. 1984)). "That discretion is broad." *Id.* One such exercise of discretion involves "maintain[ing] the pace of the [hearing] by interrupting or cutting off counsel." *Id.* (quoting *Moore v. United States*, 598 F.2d 439, 442 (5th Cir. 1979)).[56] Another permissible use of discretion is imposing flexible and reasonable time limits on testimony. *See Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1346 (11th Cir. 2005). The State does not cite, let alone analyze, the Rules of Evidence or the Eleventh Circuit's caselaw regarding district courts' considerable discretion in this area.

First, the State's argument fails because the Court's time limits on the *Schlup* evidentiary hearing and the State's presentation of witness testimony advanced the ascertainment of truth and avoided the needless consumption of time. Heard's potential testimony—which rests on the State's speculation that Heard *may* have undermined Barbour's claim that he immediately recanted his confession—would not undermine the objective, unrefuted DNA evidence identifying Jackson and excluding Barbour, Hester,

---

[56] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

and Mitchell.  And while Ms. Gohara's alleged conduct, if true, raises serious ethical concerns, it also does not undermine the new DNA evidence.  Similarly, the other testimony the State wanted to present concerns matters unrelated to the new DNA evidence and thus would not undermine or otherwise bear on the new DNA evidence. Thus, permitting this additional testimony would have needlessly consumed time beyond the four days allotted for the *Schlup* evidentiary hearing without advancing the ascertainment of truth.  Consequently, the State has not shown that this Court abused its broad discretion when it declined the State's request to permit additional testimony.

Second, the Court finds that even if the testimony of the State's proffered witnesses should have been presented, its exclusion was harmless.  "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984) (citing FED. R. EVID. 103 and FED. R. CIV. P. 61).  Errors affect a party's substantial rights "if they have a 'substantial influence' on the outcome of a case or leave 'grave doubt' as to whether they affected the outcome of a case." *United States v. Frazier*, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946)).  "The burden of demonstrating that substantial rights were affected rests with the party asserting error." *Perry*, 734 F.2d at 1446 (citing *Liner v. J.B. Talley & Co., Inc.*, 618 F.2d 327, 329 (5th Cir. 1980)).

The State has not met its burden of showing that excluding the testimony of his other witnesses substantially influenced the outcome of this case or left grave doubt as to whether the outcome was affected.  As explained above, the "missing" testimony would

not undermine or otherwise bear on the new DNA evidence.  If the Court did consider the testimony, it would not change the Court's conclusion that a reasonable, fully informed jury more likely than not would decline to find Barbour guilty.  Absent "identifiable prejudice," the State has failed to show that any error the Court may have committed affected his substantial rights, and thus the Court concludes that any error was harmless. *See Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 811 (11th Cir. 2017).

## V.  CONCLUSION

Upon the holistic evaluation of all the evidence in this case, the Court concludes that "it is more likely than not that no reasonable juror would have found [Barbour] guilty beyond a reasonable doubt." *See Schlup*, 513 U.S. at 327.

For all the foregoing reasons, and for good cause, it is

ORDERED as follows:

1. Petitioner Christopher Barbour has met the *Schlup* standard for an actual innocence gateway claim, and he is entitled to have his federal habeas petition reviewed on the merits;

2.  The State's renewed Motion to Dismiss as Untimely (doc. 450) is DENIED;

3.  The State's Amended Motion to Strike Exhibit A to Barbour's post-hearing brief (doc. 455) is DENIED as moot;

4.  A status conference is SET for **October 9, 2024, at 10:00 a.m.** in **Courtroom 2A**, Frank M. Johnson, Jr. United States Courthouse, One Church Street, Montgomery, Alabama;

5. The Court defers further consideration of this matter pending the status conference.

DONE this 16th day of August, 2024.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE