IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER BARBOUR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:01-cv-612-ECM |
| | ) | [WO] |
| | ) | |
| JOHN Q. HAMM, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

In March 1992, Thelma Bishop Roberts was raped and stabbed to death in her Montgomery home.  Christopher Barbour confessed, claiming that he killed Mrs. Roberts after he and Michael Mitchell aided and abetted Christopher Hester in raping her.  In 1993, Barbour was convicted of capital murder for Mrs. Roberts' killing and later sentenced to death.  On May 21, 2001, Barbour filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254, arguing that his convictions and death sentence must be vacated because of constitutional errors in his trial and because he is actually innocent. (Doc. 1).  Barbour did not file his petition within the one-year limitations period required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *see* 28 U.S.C. § 2244(d), a failure that usually results in the dismissal of a federal habeas action.  However, on August 16, 2024, this Court concluded that Barbour met the United States Supreme Court's standard for an actual innocence gateway claim pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995), based on

(among other evidence) new DNA testing of serological crime scene evidence which revealed that the source of the semen recovered from Mrs. Roberts' body was Jerry Tyrone Jackson, Mrs. Roberts' neighbor. (Doc. 473). The result of this Court's *Schlup* decision is that Barbour's failure to file this habeas action within the applicable one-year limitations period was excused, and this Court must now consider the merits of Barbour's constitutional claims that he raises in his Third Amended Petition, the operative one (doc. 349).

Barbour raises five claims in his Third Amended Petition: (1) the State failed to disclose DNA bench notes to Barbour's defense counsel in violation of Barbour's due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the State made false representations to the jury in violation of Barbour's due process rights pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972); (3) Barbour's trial counsel were constitutionally ineffective during the guilt phase under *Strickland v. Washington*, 466 U.S. 668 (1984); (4) the trial court erred in admitting Barbour's confession at trial because it was not voluntary; and (5) Barbour is actually innocent of capital murder pursuant to *Herrera v. Collins*, 506 U.S. 390 (1993). (Doc. 349). Barbour and John Q. Hamm, Commissioner of the Alabama Department of Corrections ("Respondent"), have briefed the Third Amended Petition, and it is ripe for review. (Docs. 485, 500, 514, 515). After consideration of the entire record, and for the reasons that follow, Barbour's federal habeas petition is due to be granted in part, denied in part, and denied as moot in part.

2

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................... 1

II. JURISDICTION AND VENUE ........................................................................ 5

III. BACKGROUND AND PROCEDURAL HISTORY ...................................... 5

   A.   Facts ............................................................................................................ 5

     1.   The state court's description of the crime ............................... 5

     2.   Police reports and witness interviews concerning Mrs. Roberts' murder .... 7

     3.   Barbour's polygraph examination and confessions ..................... 19

     4.   Police investigation after Barbour's confessions ...................... 23

     5.   The ADFS's DNA Report ......................................................... 29

   B.   Mitchell's Case and Hester's Pretrial Proceedings ........................ 31

   C.   Barbour's Pretrial Proceedings ...................................................... 33

   D.   Barbour's Trial .................................................................................. 46

   E.   Barbour's Sentencing ....................................................................... 61

   F.   The Resolution of Hester's Case ...................................................... 61

   G.   Barbour's Direct Appeal .................................................................. 62

   H.   Barbour's Rule 32 Proceedings ....................................................... 64

   I.   Barbour's Federal Habeas Proceedings ......................................... 70

IV. STANDARDS OF REVIEW .......................................................................... 88

   A.   Exhaustion and Procedural Default ................................................ 88

   B.   AEDPA Review of State Court Decisions ..................................... 90

   C.   *De Novo* Review .............................................................................. 93

   D.   Consideration of New Evidence ...................................................... 94

V. DISCUSSION .................................................................................................. 95

   A.   Barbour's Due Process Claims Regarding the State's Nondisclosure of Evidence and Failure to Correct False Evidence (Claim B in the Third Amended Petition) ......................................................................... 96

     1.   Barbour's *Brady* Subclaim ................................................... 102

     2.   Barbour's *Napue/Giglio* Subclaim ...................................... 119

   B.   Barbour's Ineffective Assistance of Counsel Claim (Claim I in the Third Amended Petition) ......................................................................... 129

    **C.**    **Barbour's Involuntary Confession Claim (Claim C in the Third Amended Petition)** ............................................................................................ 141

    **D.**    **Barbour's Freestanding Actual Innocence Claim (Claim A in the Third Amended Petition)** ........................................................................... 152

**VI.  CERTIFICATE OF APPEALABILITY** ............................................................ 153

**VII.  CONCLUSION** ................................................................................ 155

## II.  JURISDICTION AND VENUE

Jurisdiction and venue over Barbour's petition for writ of habeas corpus are proper under 28 U.S.C. § 2241(d) because he was convicted and sentenced in state court in Montgomery County, Alabama, which is within the United States District Court for the Middle District of Alabama.

### III.  BACKGROUND AND PROCEDURAL HISTORY[1]

**A.    Facts[2]**

**1.    The state court's description of the crime**

In its opinion on Barbour's direct appeal from his convictions and sentence, the Alabama Court of Criminal Appeals ("ACCA") described the crime as follows:

> The state's evidence tended to show that on March 21, 1992, 16–year–old William Roberts found the naked and partially burned body of his mother, Thelma Bishop Roberts, lying on the floor of her bedroom. There was a white plastic trash bag over her head and a knife protruding from her chest. William Roberts testified that when he saw his mother's body he removed the knife out from her chest and threw it across the room. He also removed the trash bag from her head and called the emergency police telephone number. William Roberts also testified that the jewelry that his mother always wore was missing.

> Dr. Alan Stilwell, medical examiner for the Alabama Department of Forensic Sciences, performed an autopsy on the victim. It was his opinion that Thelma Roberts died as a result of nine stab wounds to her chest, one of which penetrated her left lung and one of which penetrated her heart, causing extensive internal bleeding. Two of the wounds had been inflicted with such

---

[1]  This case bears a lengthy and convoluted procedural history.  Barbour's federal habeas proceedings alone have been pending for nearly twenty-five years, with over five hundred filings.  Nonetheless, given Barbour's claims, a detailed review of both the state and federal court records is necessary.

[2]  For the reasons explained herein, the Court is not limited to considering only the facts as found by the state courts but may also consider facts about the case that were developed during this proceeding.  In the interest of completeness, the Court will recount both in this Opinion.

force that they pierced her back. Dr. Stilwell further testified that the victim's eyes were swollen from repeated blows to her head.

Barbour confessed and gave a detailed account of the facts surrounding Roberts's murder. Barbour told police that on March 20, 1992, he, Chris Hester, and Mike Mitchell went to see, "Koon,"[3] who was a friend of Hester's and who lived on Manley Drive in Montgomery. Hester talked with someone at the door and discovered that Koon was not home. The three then went across the street to the victim's house. Barbour stated that they entered the house, sat down in the living room, and started drinking beer. Hester and the victim started talking. Later, the victim left the living room and went to the back of the house. A few minutes later, Hester also went to the back of the house. Hester and the victim remained there for several minutes while Mitchell and Barbour stayed in the living room. A short while later, Barbour and Mitchell heard loud noises coming from the back and went to investigate. They entered the bedroom and saw that the victim was naked and that Hester was wearing only his pants. Hester then hit the victim, and Barbour and Mitchell started hitting her about the head. The victim fell to the floor. Barbour and Mitchell got on either side of her and held her down while Hester had sex with her. After Hester got up and pulled on his pants, Barbour told the others that they could not leave because she could identify them. Barbour confessed that he then went to the kitchen, grabbed a knife, and returned to the bedroom. He got on his knees and forcibly stabbed the victim several times. He left the knife in her body, stood up, walked to the closet, threw some things from the closet around her body, and set them on fire. As they fled from the house Barbour grabbed the smoke detector off the wall in the hallway and threw it in the living room.

*Barbour v. State*, 673 So. 2d 461, 463 (Ala. Crim. App. 1994).

---

[3] "Koon," alternatively "Coon," is Cedric Evans, who explained that he was given this nickname because he wore a coonskin cap "all the time." (Doc. 302-4 at 11:9–14). Unless the Court is quoting record evidence, the Court will refer to him as Cedric Evans or Evans.

## 2.    Police reports and witness interviews concerning Mrs. Roberts' murder[4]

On March 21, 1992, the Montgomery Police Department ("MPD") and the Montgomery Fire Department ("MFD") began investigating the crime scene at Thelma Roberts' ("Mrs. Roberts") home, 3575 Manley Drive, Montgomery, Alabama. MPD Detective D. H. "Danny" Carmichael ("Det. Carmichael") was the lead investigator and prepared many of the police reports of record. (*See* doc. 1-3 (police reports); doc. 70-13 at 62–159 (same)).[5] Lieutenant William Davis ("Lt. Davis") was the lead investigator for the MFD, which became involved given the evidence that fires had been set inside Mrs. Roberts' home. Mrs. Roberts was described as a 40-year-old Black female, who was discovered lying naked on her back on her bedroom floor with her legs spread apart and a knife protruding from her chest. There was evidence that several small fires had been set in the bedroom where she was found. Officers noted that the fires had just smothered themselves out. Officers created an inventory of property taken from the crime scene for evidentiary purposes, which included a phone book, a notebook folder, a brown plastic folder, assorted clothing, a torn plastic bag, assorted papers, an Indian Spirit-brand air freshener spray can, receipts, bank booklets, a phone handset, a smoke detector, a large kitchen knife, and a pair of blue pajama pants with feces stains. (Doc. 33 at 4–5 (property inventory)).

---

[4] The record contains police reports and transcripts of witness interviews. The Court has attempted to relay the information contained in the reports in chronological order to present a clear timeline of the investigation. The Court's recitation of these events is not meant to be an all-encompassing depiction of the entire investigation.

[5] References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

The State Medical Examiner, Dr. Alan Stilwell ("Dr. Stilwell"), transported Mrs. Roberts' body to the Alabama Department of Forensic Sciences ("ADFS") facility, and he conducted an autopsy on March 23. (Doc. 265-2 (autopsy report)).  Dr. Stilwell found that Mrs. Roberts died due to nine stab wounds to her left chest, one of which penetrated her left lung.  Dr. Stilwell further found that Mrs. Roberts suffered multiple blunt traumas to her face and head; manual strangulation; and fire damage to her left chest, flank, and arm. During the autopsy, Dr. Stilwell collected serological evidence from Mrs. Roberts' oral, vaginal, and anal cavities.  Based on the serological evidence, it appeared that she had been sexually assaulted just prior to her death.  Additionally, a ring and a necklace that had belonged to Mrs. Roberts were missing from her home. (Doc. 70-4 at 111:6–112:19 (William Roberts' trial testimony)).  For these reasons, the case was investigated (and later prosecuted) as a rape/murder/arson/robbery scenario.  Officers investigated the case for about six weeks before anyone was charged.

Police interviewed Mrs. Roberts' children, 17-year-old William and 16-year-old Lola, on numerous occasions following the murder.[6]  On the day Mrs. Roberts' body was discovered, William told police that the previous night, he and Lola had been at a party at the home of their teenaged friends Darrius and Lakeisha Hall, who lived in the same neighborhood. (Doc. 1-3 at 17, 42).  Lola confirmed that she and William had left home for the party the previous night around 8:15 p.m. (*Id.* at 17).  William said that they went

---

[6]  The Court at times refers to these individuals as "William" and "Lola" and at times uses their full names. The Court will engage in the same practice regarding all other individuals discussed in the Background section of this Opinion.

to the party to get drunk and ended up spending the night there.[7] (Doc. 1-3 at 17). He said that he, Lola, and some friends walked to his mother's home at around 10:30 a.m. the morning after the party. (*Id.*). William recounted the events following his discovery of his mother's body as follows: He unlocked the door to his house with a key, went inside, did not immediately notice his mother but felt like something was wrong, and started checking the rooms. (*Id.*). He then found his mother lying face up on the floor with a butcher knife in her chest. (*Id.*). He shook her several times, took the knife out and threw it across the room, went outside and told his sister that their mother was dead, and went back inside and started knocking furniture over and kicking the walls. (*Id.*). He then went to a neighbor's house and called the police. (*Id.*).

Police also spoke with Lakeisha and Darrius Hall that day, and they confirmed that William and Lola spent the night at their house. (*Id.* at 37). The Hall children also told police that they, Lola, William, and Jackson "went back to [Mrs. Roberts'] house at the time of the discovery" of Mrs. Roberts' body. (*Id.* at 37–38). Officers went to Jackson's house to speak with him, but they were informed that he had already left for work. (*Id.* at 38).

In subsequent interviews, William told police that some days before her murder, his mother had received an income tax refund check valued at approximately $1,300 and that

---

[7] Although this information is not in the police reports, Tyrone Jackson—who was then 16-years-old and friends with William—also attended this party. Jackson left the party sometime that evening without explanation and returned while it was still dark. (Doc. 462-123 at 29–30, 42–43). William described Jackson upon his return as "jittery," (doc. 440 at 82:11), and Lakeisha Hall recalled that Jackson was "shaking" and repeatedly said "I'm sorry, I'm sorry" to William, (doc. 462-123 at 42).

she gave each of her children $250 in cash. (*Id.* at 42, 50). William told police that he flashed his cash in front of his neighborhood friends, including Jackson. (*Id.* at 50).

In the days following Mrs. Roberts' murder, several factors led police to consider her estranged husband, Melvin Roberts, the principal suspect: (1) Melvin was thought to be the last person to have seen Mrs. Roberts alive, (2) officers learned that he had a history of physically abusing his wife, (3) he had been begging her for weeks to allow him to move back in with her and their children, and (4) he was a persistent visitor to Mrs. Roberts' home. (*Id.* at 19–53). After being with his wife at around 8:00 p.m. on the night of her death, he did not return to the house where he was living at all that night. (*Id.* at 24–27). Melvin came back to his wife's house in the early morning hours of March 21 before her body was discovered, but he said that he could not get in and that no one opened the door. (*Id.* at 25). One police report stated: "The main reason we are looking at the victim's husband, Melvin Roberts, as the prime suspect, is due to the fact that he had access to the house, and if he did not leave the house until the morning he could have killed Ms. Roberts, could have possibly staged the scene, and when he later returned to the residence acted like it was the first time hearing about the offense." (*Id.* at 35). Nonetheless, because Melvin's alibi eventually matched up with other witnesses' statements, by early April, officers noted that Melvin was "relatively a mild suspect." (*Id.* at 43).

William Roberts was also a suspect for a time. Det. Carmichael discovered that both William and Lola hung around with a gang called the Disciples and that it was rumored that William had to kill a parent to get out of the gang. (*Id.* at 42). Det. Carmichael reported that when William was asked who he thought could have killed his mother: "All

10

we could get out of William was . . . I don't know, I don't know." (*Id.*).  At that point, Det.

Carmichael considered William a "suspect, but not a prime suspect." (*Id.*).

Melvin, William, and Lola Roberts, as well as Darrius and Lakeisha Hall and

Tyrone Jackson, are Black.  On April 4, the ADFS discovered a Caucasian pubic hair on

the trace sheet[8] in which Mrs. Roberts' body was wrapped when it was taken for the

autopsy.  Det. Carmichael described the impact of this development in a report dated April

5:

> We learned upon examination of the body a white or Caucasian pubic hair
> was found on the sheet that she was wrapped in.  This Caucasian hair was
> found in the proximity of the area where her genitalia would have been
> located on the sheet.  With this new evidence we were confounded.
> Extensive talks were held with the [ADFS] regarding this information.  It is
> in fact a Caucasian pubic hair.

(*Id.* at 43).

The discovery of this forensic evidence shifted the focus of the investigation.  For

the next couple of weeks, police interviewed numerous individuals, including juveniles and

adults who hung out on Manley Drive or socialized with people who lived there.  Officers

heard from various people that members of the Disciples and Bloods gangs lived near

---

[8]  Mary Rhodes Holt, a forensic analyst with the ADFS and the prosecution's forensic hair analyst at
Barbour's trial, testified at trial about what a "trace sheet" is and about the results of the analysis of the
Caucasian hair, stating:

> A trace sheet is a sheet that's usually wrapped around a body and the sheet has never been
> used before. It will be a new sheet taken out of a plastic package that's never been laundered
> because you do have some transfer of hair in laundered items. It will be used to wrap a
> body. And then after the body is removed from the sheet at the medical examiner's office,
> the sheet is then sent to the laboratory for examination for any kind of debris or hairs that
> might be present.

(Doc. 70-5 at 15:24–16:7).  The record does not reveal how the pubic hair got onto the trace sheet or whose
hair it was.

Manley Drive, that there was trouble between the two gangs, and that William Roberts was in the Disciples gang. (*Id.* at 51–52). Eventually, a female confidential informant told officers that a "white male identified as Chris, who resides in the Stonehenge Apartments on the Lower Wetumpka Road, who drives a black small vehicle, was one of the subjects who killed Thelma Roberts." (*Id.* at 43). On April 20, officers started looking for a 16-year-old white female named Nicki Langley, whom they had heard may have information about the murder. (*Id.* at 76). She was living in Mobile at that time, and as explained in more detail below, officers did not speak with her until later. (*Id.*).

At the same time as Mrs. Roberts' murder investigation, police were also investigating several unrelated offenses involving 22-year-old white male Christopher Hester ("Hester") and 16-year-old white male Michael Mitchell ("Mitchell"). Mitchell's father, Rayburn Mitchell, had reported that he was the manager of a local establishment called the Nashville Show Case, and that his son, along with Hester, had burglarized the business, stealing cash. (*Id.* at 62). Hester was also wanted for writing bad checks and raping a 13-year-old girl. (*Id.* at 60–61). On April 21, officers picked up a 13-year-old white male, Wayne Freeman, at the Villager Inn in Montgomery, and brought him to headquarters for questioning. (*Id.* at 60, 63). Officers believed that Freeman was involved in the recent Nashville Show Case burglary, that he had knowledge of the Manley Drive murder, and that he was associated with Hester. (*Id.* at 63). Officers noted that Hester was known to hang around with some people who had been named in the Manley Drive murder investigation and who were involved in gang activity, including Evans, Jackson's brother who lived across the street from Mrs. Roberts. (*Id.* at 60). Freeman gave officers a list of

people that he knew were gang-affiliated, both white and Black, who hung around the Manley Drive area, including white male Kevin "Kevo" Turrentine, Evans, and Jackson. (*Id.* at 60, 64). Freeman further told officers that Evans mainly associated with white males and provided police the names of Evans' friends. (*Id.* at 60). Among those friends were Hester, Mitchell, and white male Chris Barbour ("Barbour"). (*Id.* at 64). Freeman said that Barbour was approximately 21 or 22 years old with black hair and a black beard, was not believed to be gang-affiliated, and was the boyfriend of a white juvenile female named Ranzey Young.[9] (Doc. 1-3 at 64).

After talking with Freeman, officers stated that it was "imperative" that they talk to Hester about the Manley Drive murder. (*Id.* at 60). From several people, officers learned that Hester might be with Turrentine, Eric Gray, Mitchell, Ranzey Young, and two females named Nicole Phrakonkhan and Shannon Jordan. (*Id.* at 61–62). Officers went to Turrentine's home and spoke with his mother. (*Id.* at 65). Officers subsequently located Turrentine and others and brought the group to MPD headquarters for questioning. (*Id.*).

During the questioning, Turrentine said that he had introduced a sub-group of the Bloods gang into Montgomery called the "ESP," standing for "East Side Piru" or "East Side Piroos." (*Id.*). Turrentine gave officers a list of subjects who were in the ESP group, both white and Black, including Evans. (*Id.*). Det. Carmichael noted that although none of the group could tell them anything about the Manley Drive murder, "they stated that probably

---

[9] Young's and Barbour's names are spelled in various ways in the police reports, and later, in hearing and trial transcripts. For example, Young's name is sometimes spelled "Ramsay Young" or "Ranzy Young," and Barbour's name is sometimes spelled "Christopher Barber."

Christopher Barber knew something about it." (*Id.* at 62). The group told officers that Hester and Mitchell could be located at a condominium on North Pass Road. (*Id.* at 66). Officers then located Hester and Mitchell at the condominium and brought them to MPD headquarters for questioning. (*Id.*).

Once at MPD headquarters, Hester confessed to writing bad checks and having a sexual encounter with a 13-year-old girl. (*Id.* at 62). He was charged with those offenses, placed in custody, and photographed, and he waived his constitutional rights and consented to having a blood sample taken. (*Id.* at 62, 74).

Mitchell was questioned about the Nashville Show Case burglary, but he did not admit that he was involved, and he was not arrested at that time. (*Id.* at 66). As part of his interviews with officers, Mitchell told them that that on April 17 and 18, he had been at a party with Ranzey Young and Barbour. (*Id.* at 62, 66). Mitchell helped officers locate Young, and she was brought in for questioning. (*Id.* at 66). She confessed to writing numerous bad checks and to her involvement in criminal activity with Hester, and she was placed in custody. (*Id.*). Young also told officers that at one time Hester had told her about a woman who had been killed and whose house had been burned, but officers noted that "later she recanted that story and admitted that she was lying in order to tell us what she thought we wanted to hear." (*Id.*). Det. Carmichael wrote in his report on April 22:

> After great screaming, crying, and gnashing of teeth we still were no further along in this investigation than we were to start with. Ranzy Young consistently lied to us with regard to everything she told us. . . . We did find out, however, that Christopher Barber is sleeping someplace behind Eastdale Mall, and hangs out at Eastdale Mall all the time. An effort will be made to locate Christopher Barber today.

(*Id.* at 62).

On April 22, a confidential informant told officers that if they wanted to know who had killed someone, they should speak with Jeremy Jones and Barbour. (*Id.* at 66). The informant told officers that this group of juveniles got the money to throw parties in local motels from writing bad checks. (*Id.* at 68). The informant believed that Hester may be a member of the ESP gang as he had seen the letters "ESP" shaved into the side of his head. (*Id.* at 69).

That day, Det. Carmichael and Lt. Davis spoke with John Brown, Barbour's grandfather, who said he had thrown Barbour out of the house and did not know where he was. (*Id.* at 71). Mr. Brown still had Barbour's small gray car at his house, and he was going to tow it to Eastdale Mall. (*Id.*).

Lt. Davis and Det. Carmichael then went to Eastdale Mall and found Barbour in the food court. (*Id.*). Det. Carmichael and Lt. Davis brought Barbour to MPD headquarters and questioned him about his associations with various individuals. (*Id.* at 71–72). They also questioned Barbour about another investigation into a series of small fires that had been set in local Winn-Dixie grocery stores to cover up shoplifting of small items, which had occurred from May through December 1991. (*See generally* doc. 462-111 (transcript of Barbour's interview with Lt. Davis); *see also* doc. 70-7 at 25 (Lt. Davis' testimony at a pretrial suppression hearing)). Det. Carmichael summarized Barbour's April 22 interview in the following report:

> When we got Barbour back to headquarters, we questioned him intently with regard to his association with a white female, identified as Ramsay Young. He went into detail about his association with Ramsay Young, and how they

were busting checks for the City of Montgomery. He further went on to talk about parties they had thrown at different motels, and who was present. This is what we were particularly interested in, as the people that he was having attend these parties were these gang members. He is associated with them and claims he does not know them well. It is difficult for me to understand why he is throwing expensive parties in motels, and inviting strictly these people. It is my belief that he is in this group, and I have been told by other gang members that he is in the [ESP]. He is a whimpie little thing, and scares real easy. He does not appear to be the type to be violent; however, according to Ramsay Young, when he gets to drinking and using crack, he gets extremely violent, and has been known to use tire irons on her and other people. In other words, he goes nuts when he gets drunk. He further went on to state that he had only a passing acquaintance with the person identified as Koon. He stated that he knew him, but not well. This was the same with other gang members that we have talked to. The only one he claims close association with is a boy by the name of Christopher Hester. Christopher Hester is previously stated in other supps, and has been arrested, and is now in the County Jail. He does claim close association with him, and does know several others. Let it be noted that Christopher Hester and this Christopher Barbour are 22 and 23 years old. The base age of the group that they run with is 17 and 18 years of age. They are all mostly juveniles. We did not get anything concrete from this individual. He was evasive in all his answers, and would not get concrete. We talked to him about a certain conversation that Ramsy Youngblood had with her ex-boss, Allen Fox. This statement concerned Ramsay Youngblood telling her ex-boss that she had to get away from these people; that they had killed somebody and burned their house up. This is consistent with our murder on Manley Drive. He denies emphatically[] ever having heard this conversation.

(Doc. 1-3 at 71–72).

On April 24, MPD Investigator M. G. Jones ("Inv. Jones") arrested a white male named Jeffery Defee for theft and questioned him about the murder investigation because Inv. Jones believed that Defee would have some information. (*Id.* at 80). Defee offered to tell Inv. Jones what he knew if he could get out of the theft charge. (*Id.*). Inv. Jones told Defee that he could not offer him a deal but that he could advise the Montgomery County District Attorney's ("DA") office that he provided information. (*Id.*). Defee said that in

March, Barbour had come to his house asking for a place to stay and that Barbour "acted scared and stated that he had to lay low for some time." (*Id.*). Defee said that Barbour "confessed to him that he and Chris Hester killed a female after they raped her." (*Id.*). Later, Defee said that he had lied "regarding Chris Barber telling him that he had murdered someone, and stated that Chris Barber had never come to his residence and, in fact, had never told him anything about a murder," that Defee "knew nothing regarding a murder," and that he had "made up everything he told [Inv. Jones]." (*Id.*). Still later, Defee changed course again and said that Barbour did tell him something about the murder. (*Id.* at 80–81). Inv. Jones reported that he refused to make any deals with Defee since Defee had lied to him. (*Id.* at 81). Det. Carmichael summarized in a separate report that although Defee "knew all of the parties that they had been dealing with," he "is a little crook trying to get any help he can get." (*Id.* at 84). Det. Carmichael did note that "the overalls that we have continually seen Christopher Barbour in . . . were stolen from Jeffery Defee." (*Id.*).

On April 25, Nicki Langley contacted the MPD and agreed to talk to officers at MPD headquarters. (*Id.* at 76). When Inv. Jones asked her if she had heard anything about the March 21 murder of a Black female named Thelma Roberts on Manley Drive, she replied that she had heard that Barbour and Hester had killed the woman. (*Id.*). When asked why she believed that Barbour and Hester were the culprits, Langley stated that she saw Barbour and Hester on March 20 at around 11:30 p.m. at a party. (*Id.* at 76–77). Barbour and Hester had about $500 in cash with them, a large amount of liquor, and at least two cases of beer. (*Id.* at 77). When she asked them how they had bought the liquor, they said that they had money from writing bad checks and cashing them. (*Id.*). They also showed her a checkbook

they said they stole in a burglary, and the checks bore the name of Hester's aunt. (*Id.*). They stayed at the party for about thirty minutes and abruptly left. (*Id.*). She fell asleep at the party, and when she woke up the next morning, she observed that they had returned to the house and were both asleep, apparently drunk. (*Id.*).

Langley saw Barbour and Hester two weeks later, when they called her and asked her to attend a party at the Holiday Inn. (*Id.*). They said that they were partying at different motels every night using the bad checks for cash. (*Id.*). She went to the party at the Holiday Inn, and the following night, to another party at the Coliseum Motel. (*Id.* at 77–78). At the Coliseum Motel party, she saw Barbour, Hester, Mitchell, Young, Turrentine, Evans, and others. (*Id.* at 78). Hester had more checks, and some of them had a different female's name on them and a street address that Langley believed was Manley Drive. (*Id.*). Later, after some of the partiers left, Hester and Barbour started bragging about "killing a lady and cutting off her head and putting it in a box." (*Id.*). Hester advised Langley that they had "broken into a house, cut a lady's head off, put it into a box, taken several of her things, including a checkbook, broke several pictures, and left." (*Id.*).

On April 28, Det. Carmichael and Lt. Davis located Barbour in the wooded area behind Eastdale Mall. (*Id.* at 84). Det. Carmichael reported: "[W]e talked with [Barbour] with regard to this offense again. L[t.] Davis set up a time for [Barbour] to be polygraphed on 5/1/92 by the Arson Investigators." (*Id.*).

In a report dated May 4, Det. Carmichael wrote:

On 5/1/92, Lieutenant Davis of the Arson Investigators along with myself and other detectives continued to work on this case. We have been trying for the past week to show connections between the victim and certain defendants

in this case.  These defendants are:  Christopher Hester, Christopher Barbour, and other people that run with the ESP's (East Side Piroos).  Finally on May 1, 1992, Lieutenant Davis made arrangements for Christopher Hester to be polygraphed.  He was polygraphed by members of the [MFD] Investigative Division, and failed his polygraph miserably.  Lieutenant Davis notified myself and Sergeant Marshall as to the results.  At 1600 Hours, I left work and went home.  At approximately 1830 Hours, I was re-contacted by Lieutenant Davis stating that Christopher Barbour had in fact confessed to the murder and all participation in the murder of Thelma Roberts.

(*Id.* at 87).

### 3.    Barbour's polygraph examination and confessions

Along with Hester,[10] Barbour was administered a polygraph examination on May 1.[11] MFD Lieutenant John McKee ("Lt. McKee") administered the test to Barbour at MFD headquarters, beginning around 1:00 p.m. (*See* doc. 70-8 at 81–102).[12]  Among other questions, Lt. McKee asked Barbour the following:

Question 5:  Did you set any of the fires at 3575 Manley Drive?

Question 7:  Did you set any of the fires at 3575 Manley Drive on March 21, 1992?

Question 10:  Were you physically present when the fires were set at 3575 Manley Drive?

---

[10]  The results of Hester's polygraph examination are not in the record.

[11]  Police reports do not document any communication between police and Barbour from April 28, when Det. Carmichael and Lt. Davis spoke with Barbour in the wooded area behind Eastdale Mall, until May 1, when Barbour was polygraphed at MFD headquarters.  However, Barbour testified at his suppression hearing that he was in contact with police during that time, as discussed further in this Opinion.

[12]  The cited portion of the record contains Barbour's waiver of constitutional rights forms, documents showing the questions that Barbour was asked during the polygraph test, Lt. McKee's reported conclusions about Barbour's performance on the polygraph test, a numerical analysis data sheet showing Barbour's scores on the tests, and graphs showing the test results.

(Doc. 70-8 at 83, 85). Lt. McKee concluded that Barbour "was deceptive regarding the issue of the fire at 3575 Manley Drive." (*Id.* at 85).

After Lt. McKee concluded the test, Lt. Davis arrived at MFD headquarters and transported Barbour to the Selma Highway fire station to discuss the matter further. (Doc. 70-4 at 189:2–3, 198:12–22 (Lt. Davis' trial testimony)). Barbour and Lt. Davis arrived at the fire station around 5:00 p.m. on May 1. (*Id.* at 198:20–199:1). Lt. Davis advised Barbour of his constitutional rights at 5:01 p.m. (*Id.* at 198:24). According to Lt. Davis, he and Barbour then talked for some time, and Lt. Davis said that Barbour confessed. (*Id.* at 199:20–22). At that point, Lt. Davis asked Lieutenant J. A. Deaton ("Lt. Deaton"), who was also there, to buy a new cassette tape with which to record Barbour's statement. (*Id.* at 199:22–200:1). While Lt. Deaton was gone, Barbour went over his statement with Lt. Davis again. (*Id.* at 200:1–2). When Lt. Deaton returned, Lt. Davis asked Barbour if he was hungry, and he said he was, so Lt. Davis offered to let Barbour eat dinner with the firemen. (*Id.* at 200:2–16). While they were waiting on dinner to be ready, Barbour asked if he could have a tour of the fire station, and they agreed. (*Id.* at 200:18–20). During the tour, they let Barbour crank up the fire truck and see how it operated. (*Id.* at 200:23–201:1).

### a. Barbour's first confession

After dinner, Barbour gave a recorded statement to Lt. Davis. (Doc. 70-5 at 4:25, 5:1). Lt. Davis began recording at 7:51 p.m. (Doc. 70-4 at 199:6–8). After acknowledging that he was being recorded and denying that he had been coerced or threatened to make a statement, Barbour described the events surrounding the murder in narrative form and then answered some questions by Lt. Davis. (Doc. 70-8 at 40–46 (transcript of Barbour's first

confession)).  Barbour stated the following:  He, Hester, and Mitchell were driving around drinking beer. (*Id.* at 41).  They went to Hester's friend Evans' house, and Hester knocked on the door, but Evans was not there. (*Id.*).  Hester walked across the street and knocked on the door of what turned out to be Mrs. Roberts' house, while Mitchell and Barbour stayed in the car. (*Id.*).  Hester told Barbour and Mitchell that they were going to stay there and drink their beer. (*Id.*).  The trio went inside the house and started drinking with Mrs. Roberts. (*Id.*).[13]  Barbour said that he did not know Mrs. Roberts and had never been in her home before. (Doc. 70-8 at 42).  After they drank for a while, Mrs. Roberts went to her bedroom in the back of the house, and Hester followed a few minutes later. (*Id.* at 41).  Barbour and Mitchell heard cussing, like "f--- you and son of a bitch," which caused them to walk to the back of the house where they discovered Hester and Mrs. Roberts arguing. (*Id.* at 41–42).  Hester was wearing only his pants, and Mrs. Roberts was nude. (*Id.* at 43).  Hester punched Mrs. Roberts on the left side of her face, and they all started fighting. (*Id.* at 43–44).  Eventually Mrs. Roberts fell to the ground, at which point Hester said "I'm gonna f--- you bitch," pulled down his pants, got on top of her, and raped her while Barbour and Mitchell held her down. (*Id.* at 41, 43).  Barbour then went to the kitchen, got a knife out of a drawer, returned to the bedroom, and stabbed Mrs. Roberts "a bunch of times." (*Id.* at 41, 45).  Barbour described the knife as a type of butcher knife, about eight inches long, with a hardwood handle. (*Id.* at 44).  Barbour said that he stabbed Mrs. Roberts between her abdomen and chest area, and he left the knife inside her. (*Id.* at 45).  Barbour

---

[13]  As explained later in this Opinion, no alcohol was detected in Mrs. Roberts' blood, and no beer cans were found at the crime scene.

then removed some items from the closet and lit them on fire "to try to cover it up." (*Id.* at 41). Before the trio left the house, Barbour ripped the smoke detector off the wall and threw it towards the living room. (*Id.* at 45). When they left, Barbour told the others to drop him off in the woods behind Eastdale Mall because he had been sleeping there. (*Id.* at 41). Barbour said that he had not seen Hester since that night, and although he'd seen Mitchell several times, they had not talked about the murder. (*Id.*). Lt. Davis stopped the recording at 8:02 p.m. (*Id.* at 46).

Before he had started the interview, Lt. Davis had advised Det. Carmichael that Barbour had confessed and that he would be taking a recorded statement from Barbour. (Doc. 70-13 at 147 (Det. Carmichael's supplemental police report)). Det. Carmichael drove to the Selma Highway fire station and arrived during Lt. Davis' recorded interview with Barbour. (*Id.*). After the interview concluded, Lt. Davis told Det. Carmichael what had occurred, and Det. Carmichael listened to the interview. (*Id.*). Det. Carmichael then transported Barbour to MPD headquarters for further questioning. (*Id.*).

### b. Barbour's second confession

Once at MPD headquarters, Lt. Davis and Det. Carmichael conducted a longer, videotaped interview with Barbour. (Doc. 70-8 at 47–78 (transcript of Barbour's second confession); *see also* doc. 70-13 at 147–48 (Det. Carmichael's supplemental police report describing the interview)). Det. Carmichael began taping at 9:30 p.m. (Doc. 70-8 at 47). After Barbour waived his rights and acknowledged that he was being taped, Barbour told Det. Carmichael and Lt. Davis essentially the same information again. (*Id.* at 48–78). During this interview, Det. Carmichael asked Barbour to draw diagrams of the layout of

Mrs. Roberts' entire house, the layout of her bedroom with her body in it and the fires that he set, and the layout of the living room, and he complied. (*Id.* at 52, 58, 60, 66; *see also* doc. 462-115 (drawings)). Despite Det. Carmichael asking Barbour several times if he tried to kill Mrs. Roberts in any other way or if he covered up her body at all, Barbour did not mention placing a plastic bag over Mrs. Roberts' head or strangling her. (*See, e.g.*, doc. 70-8 at 63, 64, 76; *see also* doc. 70-13 at 149 (Det. Carmichael's supplemental police report noting that Barbour did not mention the plastic bag)). Det. Carmichael stopped recording at 10:30 p.m. (Doc. 70-8 at 78).

By that point in the evening of May 1, Hester was already in custody, and officers arrested Mitchell shortly after Barbour confessed. (Doc. 1-3 at 87). All three were charged with capital murder.

The next day, on May 2, Lt. Davis took an audio-recorded statement from Barbour specifically about the Winn-Dixie arsons. (Doc. 462-111 (transcript of interview)). Barbour waived his rights and described how he set fifteen fires in Winn-Dixie stores to divert attention and steal small items. (*Id*. at 2). Lt. Davis asked Barbour about specific fires at specific stores, and he admitted that he started each one. (*See, e.g.*, *id.* at 4).

### 4.    Police investigation after Barbour's confessions

After Barbour confessed, MPD continued its investigation. For example, on May 7, Det. Carmichael spoke with two white female juveniles whom he had been told had information: Kat Morgan and Heather Rowan, known as "Duck." (Doc. 70-13 at 156). Morgan stated that she knew Barbour, Mitchell, and the others who hung out in their friend group. (*Id*.). Morgan and Rowan also stated that sometime shortly after March 21, Hester

and Mitchell went to Florida with 16-year-old Angela Stikes, Nicki Langley, and 16-year-old Kathy Sasser. (*Id.*).

On May 8, Det. Carmichael started looking for Angela Stikes. (*Id.* at 157). According to information Det. Carmichael had, Langley introduced Stikes to Barbour and Hester. (*Id.*). On May 13, Det. Carmichael interviewed Stikes in the presence of her mother. (*Id.*). Her interview was recorded and transcribed. (Doc. 214-2 at 5–16 (transcript)). Stikes confirmed that she knew Barbour and Hester. (*Id.* at 5). She said that she, Langley, Mitchell, Sasser, and Hester all went to Florida in Hester's car, leaving Montgomery on March 24 sometime after dark. (*Id.* at 5–6, 8). She recalled that Hester first asked her to go to Florida on March 22. (*Id.* at 6). She said that Hester was in a rush to get out of town and commented that he was wanted for murder, but she did not know if he was joking or not. (*Id.* at 6, 8). She described Barbour as someone who "loves to fight," "drinks like a fish," and is "very violent." (*Id.* at 14). She said that she had heard that Hester forced girls into having sex, but she had never actually seen it. (*Id.*). She said that James Mann would be the person who would know a lot about Hester and Barbour. (*Id.*).

On May 14, Carmichael spoke with Langley again, as well as Sasser. (Doc. 70-13 at 158). Langley confirmed that the group went to Florida, but she stated that there was never any talk about the murder while they were in Florida. (*Id.*). She also remembered Hester being in an extreme rush to get out of town. (*Id.* at 159). She recalled that they returned to Montgomery on April 6, and that Hester started throwing parties in motels. (*Id.*). She remembered a party at the Holiday Inn on April 11 and a subsequent party at the Coliseum Motel. (*Id.*). At that latter party, she stated that Hester was drunk and talked to

24

Kevin Turrentine and Eric Gray about killing a lady, burning her, and stealing her necklace, money, and checks. (*Id.*).

On May 29, 1992, Barbour gave another statement about the murder to Det. Carmichael. This statement was taken at the Montgomery County Jail and was also recorded and transcribed. (Doc. 70-8 at 23–39 (transcript of Barbour's May 29 statement)).[14] Barbour's statement was consistent with his previous statements on May 1.

On July 1, police questioned 18-year-old Adam Bollaert about Mrs. Roberts' murder at the MFD. (Doc. 462-121 (transcript of interview)). Bollaert first met Barbour at a party on the evening of March 21, 1992, when groups of friends gathered at a place in the woods, commonly known as "Casino's," near Eastdale Mall to drink and hang out. (*Id.* at 1). Bollaert remembered that Barbour and Hester were at the party. (*Id.*). Bollaert told the officers in relevant part:

Q. What was the conversation at the party?

A. Chris Hester, and Chris Barbour were drunk and began talking. They said stuff like "remember the chick we did last night" and "she screamed" and other things that made everyone there uneasy. What they were saying didn't sound right. It scared us and so we started getting ready to leave.

Q. Did they mention any names, locations or anything else that would let you know who they were talking about?

A. No they did not.

. . .

Q. Did they mention killing anyone?

---

[14]  As discussed in further detail later in this Opinion, this statement was suppressed at Barbour's trial because law enforcement obtained the statement after Barbour had counsel.

A.  They did not say anything about actually killing someone but they were talking most of the night about death and how interesting it was.

(*Id.* at 1–2).

On March 4, 1993, about two months before Barbour's trial, MPD Officer Denny Merritt and Michael Thomas, investigator for the Montgomery DA's Office ("Inv. Thomas"), interviewed an inmate at the Montgomery County Jail named James Newman. (Doc. 462-118 (transcript of interview)).  About six months earlier, on October 19, 1992, Jimmy Pool ("Mr. Pool"), Hester's attorney, had asked Newman to write and sign a two-page affidavit. (*Id.* at 2–3, 17).  In the affidavit, Newman stated that Barbour had been in a cell adjacent to his, and that they talked almost every day. (Doc. 462-119 at 1 (Newman's affidavit)).  Newman also said that Barbour told him on several occasions that Hester wasn't with him on the night of the murder; that Barbour told police that Hester killed the woman because Barbour wanted to get back at Hester for standing him up and not meeting him where and when he said he was going to meet him; and that Barbour felt sorry for implicating Hester in the murder. (*Id.*).  On March 4, Inv. Thomas interviewed Newman at the jail and questioned him extensively about his friendship with Barbour and what Barbour had told him about Mrs. Roberts' case; Newman's subsequent conversations with Hester, whom he later met while they were both incarcerated at the jail, about Mrs. Roberts' case; and the handwritten affidavit Newman signed in October 1992. (Doc. 462-118 (transcript of interview)).  In the interview, Newman recounted that he and Barbour became friends while in the Montgomery County jail and that Barbour discussed his case with Newman. (*Id.* at 6–7).  Newman stated that when Barbour tried to tell him details about Barbour's

case, Newman told Barbour to "skip all the sick stuff" because Newman had "a weak stomach." (*Id.* at 10).  Additionally, Newman recalled that Barbour told him that "the lady was stabbed," but Barbour did not say who stabbed her. (*Id.* at 10–11).  According to Newman, Barbour also told him "the last part of what happened where [Barbour] burned her." (*Id.* at 10).  Newman said Barbour sometimes claimed Hester was involved and other times said Hester was not involved. (*Id.* at 7).

In September, Newman was moved to a different cell block, and although he never saw Barbour again, he was in the same cell block as Hester. (*Id.* at 24–25, 28).  Newman and Hester eventually discussed Mrs. Roberts' murder several times. (*See id.* at 28).  Newman recalled one instance where Hester told him that "he came in while whatever was happening to the lady was happening," but Newman told Hester to stop telling him because Newman did not want to hear the "gross details." (*Id.* at 29).  Hester continued to tell Newman that Hester was inside the house, and when he left, "the girl Angela" tried to get him to stop Barbour "so the lady will be all right." (*Id.* at 30).  However, by the time Hester tried to stop Barbour, "it was too late, she was already dead, and he was starting her on fire." (*Id.*).  Hester said that he tried to talk Barbour out of it, but Barbour said "he had to take care of the evidence or something." (*Id.* at 32).

Regarding his October 1992 affidavit, Newman told Inv. Thomas that Hester encouraged Newman to talk to Hester's lawyer about what Barbour had told Newman to see if it would help Hester, but Hester told Newman to only tell Hester's lawyer about the part where Barbour said Hester was *not* involved, not the part where Barbour said Hester *was* involved. (*Id*. at 35–36).  Newman said that Hester's lawyer came to see him at the

jail. (*Id.* at 41). The lawyer wrote the affidavit while Newman talked. (*Id.* at 19). Newman said he indeed left some parts out, including the times that Barbour said that Hester was involved. (*Id.* at 18).

On June 2, 1993, Det. Carmichael and Inv. Thomas interviewed Angela Stikes again. The interview was recorded and transcribed. (Doc. 217-2 (transcript)). Although Stikes said several times that she was under the influence of alcohol and marijuana that evening, she said she recalled several things about the night Mrs. Roberts was murdered. (*Id.* at 3).[15] Although her recitation of events is disjointed, the following is a summary of her statements.

Stikes was with Barbour, Hester, and a third person she believed was Mitchell. (Doc. 217-2 at 16–17). She recalled being in an unfamiliar neighborhood and walking down the street looking for Barbour or Hester. (*Id.* at 6, 14). She saw Mitchell's car outside of a house and went up to the partially opened door of the house, pushed it open further, and heard yelling inside the house. (*Id.* at 14–15). She thought she smelled smoke and saw Hester inside the kitchen looking for something and yelling at Barbour. (*Id.* at 3–4, 25, 28). Barbour then pulled on her and yelled at her to get away from the front door. (*Id.* at 23). She then recalled seeing a nude lady, although she could mainly just see one leg, lying on her back on the floor in the back bedroom of the house, with Hester standing at her feet screaming. (*Id.* at 11, 23). She saw someone else in the room, who she suspected was

---

[15] As explained later in this Opinion, Stikes subsequently claimed that one of the officers tried to hypnotize her before this interview. Indeed, Det. Carmichael's first question to Stikes was "all this is a dream that you're having right?" (Doc. 217-2 at 2).

Mitchell because his car was outside the house, but she never saw his face because it was dark. (*Id.* at 16–17). She remembered being frightened that they were going to kill the lady, and she said it was because they didn't like her. (*Id.* at 9). Hester was screaming something about the lady seeing their faces. (*Id.* at 13). Barbour at that point grabbed her by the arm and dragged her out of the house, at which point she started screaming, crying, gagging, and eventually threw up in the yard. (*Id.* at 6, 11, 23). She thought she was only in the house about five minutes (*id.* at 16), and she didn't know who killed the lady (*id.* at 13). At the end of the interview, Det. Carmichael asked her why she did not tell them any of this information a year ago when they first talked, and she replied that she did not remember all of it at the time. (*Id.* at 29).

### 5. The ADFS's DNA Report

In May 1992, the ADFS conducted DNA testing on the vaginal and anal swabs containing semen taken from Mrs. Roberts' body, as well as the blood samples taken from Mrs. Roberts, Melvin Roberts, Barbour, and Hester. Specifically, the ADFS performed Human Leukocyte Antigen ("HLA") DQalpha testing. Deborah K. Dodd, a forensic analyst at the ADFS lab in Birmingham, performed the testing (doc. 450-4 at 2–5), but it was quality control reviewed by Sue Rogers and Larry Huys, the director of the ADFS's Birmingham laboratory (*id.* at 4).

On June 3, 1992, the ADFS issued a three-page report, signed by Mr. Huys. (Doc. 295-7). The report stated that the ADFS had tested blood samples from Mrs. Roberts, Melvin Roberts, Hester, and Barbour, as well as vaginal and anal swabs containing semen from Mrs. Roberts' body. (*Id.* at 4). Mr. Huys did not have a blood sample from Mitchell

to test. (*See* doc. 70-5 at 77:16–23). The report listed the genetic traits found to be present in each sample. The report stated that the vaginal swabs containing semen collected from Mrs. Roberts' body had the following genetic traits: "1.1, 3, 4 (1.2)." (Doc. 295-7 at 5). The report further stated that Mrs. Roberts' genetic traits were "1.1, 3"; that Melvin Roberts' genetic traits were "1.2, 2"; that Hester's were "2, 4"; and that Barbour's were "1.1, 4." (*Id.*). Based on that information, Mr. Huys concluded that "the man/men who are the source of the semen on the vaginal swabs is either HLA-DQ-alpha type (4), (3, 4), (1.2, 4) or (1.1, 4)." (*Id.*). He determined that Barbour could not be excluded as the source of the semen, stating: "Christopher Barbour is HLA-DQ-alpha type (1.1, 4). These traits would occur in approximately one (1) of three (3) white individuals." (*Id.*). Regarding Hester, Mr. Huys stated:

> Based upon the quantity of spermatozoa found and Christopher Hester's DQ-alpha type, could not be positively eliminated; however, there is strong reason to believe that he is not the man who is the source of the semen on the vaginal swab.

(*Id.* at 6).[16] Mr. Huys determined that Melvin Roberts was excluded as the source of the semen due to his genetic traits. (Doc. 295-7 at 6). On June 9, 1992, the ADFS sent a copy of the report to the Montgomery County DA[17] and to Det. Carmichael and Inv. Deaton at the MFD. (Doc. 295-7 at 2).

---

[16] As discussed later in this Opinion, there were bench notes underlying Mr. Huys report to which Barbour did not have access until April 2022, when he obtained them pursuant to court-ordered discovery in this case. According to Barbour's experts, these bench notes reveal that Mr. Huys' report was flawed and that the DNA testing *conclusively* excluded both Barbour *and* Hester as sources of the semen.

[17] As discussed later in this Opinion, the prosecutors in Hester's and Barbour's cases concluded, based on Mr. Huys' report, that Hester was excluded as the source of the semen.

**B.    Mitchell's Case and Hester's Pretrial Proceedings**

Mitchell was charged as a juvenile with capital murder, and he had a hearing on May 26, 1992, in juvenile court. (Doc. 295-11 at 2–3 (case action summary and probation officer's report)).  He was released the same day, and the charges against him were dismissed. (*Id.*).

On June 5, 1992, a preliminary hearing was held in Hester's capital murder case with Judge Miller presiding. (Doc. 337-4 (transcript)).  The prosecutor, Montgomery County Assistant DA William Gunter ("Mr. Gunter"), called Det. Carmichael to testify to establish probable cause for the record, and he was then cross-examined by Hester's attorney, Mr. Pool. (*Id.* at 4–36).  Det. Carmichael described the crime scene, the investigation, and MPD and MFD's development of three suspects:  Barbour, Hester, and Mitchell. (*Id.* at 5–7).  He also described Barbour's May 1 confession. (*Id.* at 8–9:18).  Det. Carmichael testified that Barbour's confession, as well as statements from Stikes and Langley, linked Hester to the murder. (*Id.* at 10:11–11:25, 12:1–15).

Det. Carmichael admitted that he didn't have any other witness statements linking Hester to the crime. (*Id.* at 12:21–13:2).  He testified that he had not yet determined if checks were stolen from Manley Drive. (*Id.* at 14:4–7).  He did say that Mrs. Roberts' family told him that there was jewelry missing, but police had not been able to find it. (*Id.* at 14:11–14).  Mr. Pool asked him whether the Caucasian pubic hair recovered from the trace sheet matched Hester (*id.* at 14:19–23), and Det. Carmichael testified that the ADFS's forensic report showed it did not (*id.* at 15:1–7).  He confirmed that the pubic hair was

golden brown; Barbour had dark hair; Hester had light hair; and Mitchell had brown hair. (*Id.* at 30:2–13).

At that point, Mr. Gunter told the court that he had a copy of the ADFS's DNA report and that it showed that the DNA evidence did not implicate Hester. (*Id.* at 19:2–13). The following exchange occurred:

> [Mr. Pool]:  Do you have the Department of Forensic Science report with you Detective Carmichael?
>
> [Det. Carmichael]:  No Sir.
>
> [Mr. Pool]:  Is it in the case file?
>
> Mr. Gunter:  We've got a fax on it, and we'll get it to you. We will give it to you after.
>
> Mr. Pool:  Well, I've got it in the deal. But I want – if this is the only witness you're going to put on, I want Judge Miller to know that Chris Hester is not implicated in that forensic report at all.
>
> Mr. Gunter:  Well, I can state that to the Court that he's not.
>
> The Court:    Okay.

(*Id.* at 18:21–19:14).  Mr. Pool asked Det. Carmichael:  "Is it your belief at this point in time that Barber may have withheld something from you in his statement?" (*Id.* at 27:2–4).  Det. Carmichael responded:  "I don't believe that.  I just believe that that aspect of it may need a little more looking into, which we are doing." (*Id.* at 27:5–7).

Langley also testified at Hester's preliminary hearing, stating the same information that she had previously told police. (*Id.* at 38–62).  She also repeated the story about Hester bragging about killing a lady, cutting her head off, burning her, and raping her. (*Id.* at

55:12–19).  Finally, she said that Hester smoked crack cocaine the night he made those statements. (*Id.* at 60:2–6).

## C.    Barbour's Pretrial Proceedings

In early May 1992, the court appointed attorneys Frank W. Riggs ("Mr. Riggs") and J. Clifford Heard ("Mr. Heard") to represent Barbour. (*See* doc. 484-1 at 15, 19).  In late June 1992, Mr. Riggs filed a "Motion to Require the State of Alabama to Pay Reasonable Attorneys Fee or, In the Alternative, to Excuse Counsel," writing:  "The compensation allowed by the law of the State of Alabama [which at the time was a maximum of $1,000 for all pre-trial work, and another maximum of $1,000 for trial work] is not sufficient to pay the overhead expenses of maintaining [his] private law practice [and] encourages conflicts of interest because attorneys so appointed and underpaid are placed in a position of being rendered less able to furnish competent representation to the clients they are appointed to represent." (Doc. 70-2 at 20–21).  Mr. Riggs asked for additional attorney's fees, or, in the alternative, to be excused from the case. (*Id.* at 21).  While the trial court agreed that the fees were unreasonable, the court noted that it was without power to grant relief and denied the motion. (*Id.* at 65).

In July 1992, Barbour was indicted on four capital offenses:  murder committed during the course of a rape, in violation of ALA. CODE § 13A-5-40(a)(3) (Count I); murder committed during the course of an arson, in violation of ALA. CODE § 13A-5-40(a)(9) (Count II); murder committed during the course of a burglary, in violation of ALA. CODE § 13A-5-40(a)(4) (Count III); and murder committed during the course of a robbery, in violation of ALA. CODE § 13A-5-40(a)(2) (Count IV). (Doc. 484-1 at 11–14).  Barbour

pleaded not guilty to the capital murder charges and not guilty by "reason of insanity." (*Id.* at 19).

Around the same time, Barbour was separately indicted on arson charges arising out of the Winn-Dixie fires. Barbour's capital murder case was originally assigned to Judge Price, and his Winn-Dixie arson case was assigned to Judge Gordon. Mr. Riggs and Mr. Heard ultimately represented Barbour in both cases, and in November 1992, both cases were consolidated before Judge Gordon for purposes of determining pretrial motions (*see* doc. 70-2 at 58 (November 10, 1992 order)). Because some of the proceedings in the Winn-Dixie arson case are relevant to Barbour's capital murder case, they are discussed below.

On August 3, 1992, Mr. Riggs and Mr. Heard filed a motion in Barbour's capital murder and Winn-Dixie arson cases to suppress any statements Barbour made, written or oral, contending that they were not voluntarily made. (*See id.* at 25 (motion to suppress in Barbour's capital murder case)). Defense counsel also filed numerous other pretrial motions in Barbour's capital murder case, including motions for discovery, a motion to have Barbour evaluated for competency to stand trial and to determine his mental condition at the time of the offense, and a motion to allow Barbour to view the scene of the alleged crime with his attorneys. (*Id.* at 5–7, 33–34, 45–46). As explained further below, hearings on Barbour's motion to suppress were held over several days between August 1992 and December 1992.

### 1.    Suppression Hearing Day 1:  Winn-Dixie Arson Case

On August 21, 1992, Judge Gordon held a hearing in Barbour's Winn-Dixie arson case on his motion to suppress his statements. (Doc. 70-7 at 15–53 (transcript)). At that

time, Barbour's capital murder case was still assigned to Judge Price. (*See id.* at 17–18). At the hearing, Lt. Davis testified as follows: Lt. Davis identified Barbour as a suspect during his investigation into fires that were set in various grocery stores around the Montgomery area. (*Id.* at 21:7–12). After Barbour implicated James Mann as the arsonist, Mann was later interviewed and stated that he had overheard Barbour confess that he had started the fires. (*Id.* at 25:5–24). Lt. Davis asked Barbour if he would agree to take a polygraph test on the Winn-Dixie fires, and Barbour stated that he would. (*Id.* at 25:24–26:2). In the meantime, Barbour became a suspect in the capital murder on Manley Drive, so the MFD contacted Barbour and asked him if he would "take a polygraph on the capital murder instead of the Winn-Dixie fires," and Barbour agreed. (*Id.* at 26:4–10). On May 1, Lt. Deaton picked Barbour up from his father's house and drove Barbour to headquarters for the polygraph exam. (*Id.* at 37:4–6). Lt. Davis wanted to give Barbour timely notice that the polygraph questions would focus on the Manley Drive murder rather than the Winn-Dixie fires because Barbour had been "very cooperative." (*Id.* at 32:15–20). Barbour failed the polygraph and subsequently confessed to the capital murder on the evening of May 1. (*Id.* at 26:12–18). On May 2, Lt. Davis visited Barbour at the jail and took Barbour's statement about the Winn-Dixie fires. (*Id.*).

Mr. Riggs argued at the conclusion of Lt. Davis' testimony that Barbour's May 2 statement about the fires should be suppressed because Barbour was interrogated about different crimes over a period of several days. (*Id.* at 46). Judge Gordon orally denied the motion to suppress. (*Id.* at 47).

At the same hearing, Judge Gordon heard testimony from Barbour's grandfather, John Brown, regarding a mental evaluation for the Winn-Dixie arson case. (*Id.* at 47–53). Mr. Brown explained that after Barbour's mother committed suicide in the fall of 1991, Barbour began acting like "something wasn't just right." (*Id.* at 49:13–15, 51:5–9). He testified that Barbour "would get mad real easy about things and just destroy anything within sight for apparently no reason." (*Id.* at 48:23–25). Mr. Brown further testified that he could hear Barbour crying at night. (*Id.* at 50:3–4). Mr. Riggs commented to Judge Gordon that although Barbour was cooperative, he was withdrawn and never called his lawyers to ask any questions. (*Id.* at 51:17–21, 52:4–5). Mr. Riggs further stated: "And Cliff [Heard] and I have been very careful to make sure he knew how to get in touch with us and encouraged him to call us because we wanted to support him as much as we could in whatever way. And he has yet to call on either one of us. And I feel like that's unusual. But in the kind of situation he is in, I felt that he would be more interested in talking to his lawyers." (*Id.* at 51:25–52:6). Thereafter, Judge Gordon ordered Barbour to be evaluated by Dr. Karl Kirkland, Ph.D. ("Dr. Kirkland"), the State's contract forensic psychologist. (*See* doc. 70-2 at 53).

### 2.    Suppression Hearing Day 2:  Winn-Dixie Arson Case

On October 5, 1992, Barbour filed a motion in the Winn-Dixie arson case to reopen the hearing on the motion to suppress, which Judge Gordon granted. (*See* doc. 1 in *State v. Barbour*, Case No. CC-1992-1074 (Montgomery Cnty. Cir. Ct.)). On November 4, 1992, Judge Gordon reopened the hearing on the motion to suppress. (Doc. 70-7 at 76–85 (transcript)). By that point, Dr. Kirkland had issued a report from his evaluation of Barbour

regarding the Winn-Dixie fires.  Mr. Riggs argued that, based on Dr. Kirkland's finding that Barbour was of "relatively low intelligence," the manner in which Barbour was subjected to the polygraph test had a coercive effect. (*Id.* at 77:16–23).  Mr. Riggs said:

> [W]e feel that this involves a process of what Cliff [Heard] has referred to as a nickel and dime the defendant into a confession.  You get him to agree to something and he agrees to that.  And then you get him to agree to a little something more, and pretty soon he has committed himself to the point where he just can't say no anymore.  And we think we can show from the evidence . . . that this man was led step by step into the process of the polygraph. . . .
>
> And as far as I can tell, there is no statement in there where anybody explained to him what the polygraph was and what its effect was, and nobody gave him a fair opportunity to make an intelligent informed decision to whether he would agree to take the polygraph test.  And we think that we will be able to show that particularly with a young man like this . . . extracting a confession out of him by means of a polygraph examination is just as coercive as a rubber hose except that it is psychological and not physical.  Because you reel a person in to a point where they have already made a sufficient commitment that it is impossible for them to not make a little bit more of a commitment.

(*Id.* at 78:25–79:24).  Mr. Riggs requested a continuance of the suppression hearing to allow Lt. McKee, who conducted the polygraph examination, to testify, and so the defense could procure an expert to evaluate his testimony. (*Id.* at 80).  Separately, Judge Gordon expressed a desire to have both Barbour's capital murder case and his Winn-Dixie arson case heard by the same judge. (*See id.* at 83–85).  Judge Gordon observed that, because of overlap in Barbour's motion to suppress in the two separate cases, "continuity of judge might be appropriate in this particular situation." (*Id.* at 84:6–13).  Judge Gordon ultimately postponed the suppression hearing in the Winn-Dixie arson case. (*Id.* at 84:15).

On November 10, 1992, Judge Gordon consolidated Barbour's capital murder and Winn-Dixie arson cases for purposes of determining pretrial motions. (Doc. 70-2 at 58).

### 3.    Suppression Hearing Day 3:  Capital Murder and Winn-Dixie Arson Cases

On December 14, 1992, the suppression hearing resumed in Barbour's now-consolidated cases. (Doc. 70-7 at 87–99 (transcript)).  At that time, Barbour's counsel had recently filed a "Motion to Require State to Produce Material Information," in which they alleged for the first time that Det. Carmichael physically assaulted Barbour to coerce him to confess to capital murder. (Doc. 70-2 at 59–62).  The motion alleged that "[Det.] Carmichael follows a consistent course of committing physical assaults upon persons accused or suspected of crimes in order to induce said persons to involuntarily confess" and asked the court to order the State to furnish the names and locating information of every person who had been interrogated by Det. Carmichael and later charged with a felony for the past two years. (*Id.* at 59–60).

When discussing the recently-filed motion at the hearing, Mr. Riggs indicated that Barbour had not told them about Det. Carmichael's physical assault until the week before. (Doc. 70-7 at 89:20–21).  Mr. Riggs stated that he anticipated that Barbour would testify that "L[t.] Davis was present when [Det.] Carmichael roughed him up." (*Id.* at 92:7–9).  The prosecution then informed the court that there were "similar allegations in other capital murder cases," including from an individual who alleged that the MPD beat him to obtain a confession; that the FBI was investigating the MPD; and that the police wanted "independent representation." (*Id.* at 93:12–16, 18–25; 94:1–5).  At the hearing, Mr. Riggs

and Mr. Heard also asked that Judge Gordon order a second evaluation of Barbour's competency before the court conducted a hearing on Barbour's competency in the capital murder case because Dr. Kirkland's first report only related to the arson charges. (*Id.* at 96–97). Counsel said: "We suspect the evidence will be in this case that alcohol, for example, was a major factor in the facts of the case. And we think that Dr. Kirkland ought to have the opportunity to reevaluate Chris to have this information in hand." (*Id.* at 98:10–14). Judge Gordon agreed to postpone the suppression hearing to ensure that Lt. Davis had counsel if he was called to testify, given the allegations that Barbour made against the MPD and the MFD, and he granted counsel's request for Dr. Kirkland to evaluate Barbour again with respect to the capital murder charges. (*Id.* at 94, 98).

### 4.    Suppression Hearing Day 4:  Capital Murder and Winn-Dixie Arson Cases

On December 29, 1992, Judge Gordon resumed the suppression hearing. (*Id.* at 101–205 (transcript)). Lt. Davis testified again, this time about Barbour's May 1 confession to Mrs. Roberts' murder. (*See id.* at 105–46). Lt. Davis testified as follows:

> We asked Christopher if he would take a polygraph on the Winn-Dixie fires. He agreed to do so. Before we could get the polygraph examination given, he was developed as a suspect in the Manley Drive arson and homicide. When my people went to pick up Christopher for the polygraph, we asked Christopher if he would also take a polygraph for the fires on Manley Drive. He stated he would. When he went to the polygraph office, I believe McKee asked him again.

(*Id.* at 108:3–11). Around 1:00 p.m. on May 1, Barbour began the polygraph examination. (*Id.* at 108:15–16). Lt. McKee later told Lt. Davis that Barbour had failed the polygraph. (*Id.* at 108:19–20). Lt. Davis then told Barbour he had failed the polygraph and asked

Barbour if he would come to Lt. Davis' office, located at MFD Station 14 on Selma Highway, to discuss it further. (*Id.* at 108:22–24). They had to move to the fire station because it was getting close to 5:00 p.m. and the people who worked at the MFD headquarters were leaving for the day. (*Id.* at 122:7–11).

Lt. Davis then testified about what happened in the almost three hours between 5:00 p.m. when he and Barbour arrived at the fire station and 7:51 p.m. when he started recording Barbour's statement. (*Id.* at 110, 123–24). He and Barbour talked, and Barbour confessed to him. (*Id.* at 110). Lt. Davis went over Barbour's statement with him again. (*Id.* at 110:15–16). Lt. Davis asked Barbour if he was hungry, and he said he was, so Lt. Davis offered to let Barbour eat dinner with the firemen. (*Id.* at 110:16–20). While they were waiting on dinner to be ready, Barbour "went out and walked around the fire truck with one of our sergeants." (*Id.* at 110:21–22). While Barbour ate dinner, Lt. Davis called the MPD and reported that Barbour had confessed. (*Id.* at 112:16–19). After dinner, Lt. Davis took the recorded statement from Barbour in which he confessed. (*Id.* at 110:23–24). Barbour was then transported to the MPD where he provided a videotaped statement to Lt. Davis and Det. Carmichael describing how he murdered Mrs. Roberts. (*Id.* at 112–13). Barbour was transported to the MPD headquarters for a second statement because the fire station did not have the facilities to videotape the statement or the equipment to book Barbour and place him in custody. (*Id.* at 139:23–140:1). When asked whether Det. Carmichael threatened Barbour, promised him anything, beat him, or exerted any physical force on him, Lt. Davis responded: "none whatsoever." (*Id.* at 113:10–18). The tapes were admitted into evidence and portions of them were played for Judge Gordon. On cross-

examination, Lt. Davis admitted that he did not know if Det. Carmichael had talked to Barbour before May 1. (*Id.* at 118). He also said that he did not have to repeatedly ask Barbour to tell the truth because he was "very cooperative." (*Id.* at 124:4–6).

Lt. McKee then testified about Barbour's May 1 polygraph examination, and how polygraph examinations work. (*See id.* at 147:4–165:11). After Barbour was initially asked to take a polygraph test on the Winn-Dixie fires, he was told that there was information uncovered that he might have been involved in the incident on Manley Drive. (*Id.* at 159:16–160:12). Barbour was never asked any polygraph questions about the murder, only the fires, at Manley Drive. (*Id.* at 149:1–5). A score of minus three or lower on a polygraph test indicated deception, and on the question of whether he was physically present when the fires were set on Manley Drive, Barbour received a minus four. (*Id.* at 152:13–154:11, 154:23–157:5). Lt. McKee did not try to intimidate, threaten, or promise Barbour anything. (*Id.* at 156:22–157:3). Additionally, Barbour was never told that he had failed the test but was merely told that the result indicated he had been deceptive regarding whether he was physically present when the fires were set on Manley Drive. (*Id.* at 154:21–155:3). The results of the polygraph test were admitted into evidence. (*Id.* at 155:23–25).

Barbour himself then testified solely about the circumstances of being questioned by Det. Carmichael and Lt. Davis on and off from April 22 to May 1, 1992. (*Id.* at 166:6–178:17). The following exchange occurred:

Q.    [Will] [y]ou—tell the judge if you will how Detective Carmichael dealt with you in terms of talking to you?

A.    Most of the time either Detective Carmichael or Lieutenant Davis would leave the room, leaving one or the other to question me alone.

41

And they were usually—sometimes they would be nice. Sometimes, you know, they would get a little verbally abusive. You know, not physically just, you know, kind of getting harsh with the questions and such as that.

Q.    Was there anytime when Detective Carmichael actually put his hand or his fist on you or hit you in any way?

A.    Yes, sir, the first time I was brought down for questioning at the police department in his office he slapped me.

Q.    Was anybody else present when he did that?

A.    Yes, sir, Lieutenant Davis was present.

Q.    Did—how hard did he slap you?

A.    I don't think he hit me as hard as he could. But he did slap me pretty hard.

Q.    Did you have to get any kind of medical treatment?

A.    No, sir, I was just bruised up a little. Nothing major.

Q.    And you—what was the occasion for him to slap you?

A.    He kept asking me questions that I didn't know the answer to. And I kept saying I don't know. You know, I can't you tell what I don't know. And he got mad and hit me.

Q.    Okay. And did he hit you just the one time?

A.    No, sir, he slapped me five times.

Q.    Did he ever slap you on any occasion after then?

A.    No, sir, never after that.

Q.    I will ask you whether or not after that when you were interrogated by either one of these officers or by any law enforcement personnel you had a fear that they would commit an act of violence on you?

A.    Oh, yes, after that day, I had a bad fear that if I didn't tell them what they wanted or, you know, didn't tell them something, that he was going to hit me more.

(*Id.* at 166:24–168:7). Barbour later clarified that on April 22, "Det[.] Carmichael started the questioning by showing me a bunch of pictures of some people, you know, wanting to know if I knew them or not" (*id.* at 172:16–19), and "maybe halfway through the time [Barbour] was there," Det. Carmichael slapped him "[a]pproximately four or five times" "with the front of his hand and the back of his hand" (*id.* at 172:24–25, 173:3, 5–6).

Barbour also testified as follows about the circumstances surrounding the polygraph examination: Lt. Davis "told me I was going to take the polygraph test" and "gave me his card and wrote down several phone numbers on it and told me that I was to call him every morning at eight o'clock until the day of the polygraph test." (*Id.* at 168:12–15). Lt. Davis told Barbour that if he failed to comply, "[Lt. Davis] would beat me with[in] an inch of my life." (*Id.* at 168:18–19). This statement caused Barbour to be very afraid of Lt. Davis, although Lt. Davis did not threaten him before or after that. (*Id.* at 168:22–169:1). On cross-examination, Barbour admitted that Lt. Davis "always explained my rights to me," (*id.* at 176:4), and that "I understood that I didn't have to talk. But if I didn't, you know, I would be slapped again or something of that nature." (*Id.* at 176:7–9). Barbour did not learn he would be questioned about the Manley Drive fires until he had arrived at the fire station for the polygraph on May 1. (*Id.* at 173:20–174:7). He was told that he could have a lawyer and did not have to answer any of the questions, but after what Lt. Davis had said to him, "I pretty much thought that I had no choice in the matter." (*Id.* at 174:12–17). They told him that he did not have to take the polygraph, but "[a]fter being threatened with

violence, you know, I wasn't going to say no." (*Id.* at 174:18–23). They did not threaten him with violence on the day of the polygraph. (*Id.* at 174:24–175:2).

Barbour's counsel then presented testimony from Patrick Daniel Slattery, Ph.D. ("Dr. Slattery"), a psychologist and associate professor of psychology at Auburn University of Montgomery. (*Id.* at 179–95). Although Dr. Slattery was not a polygraph examiner and did not examine Barbour, based upon his knowledge of polygraphs and the effects of stress, Judge Gordon permitted him to testify to the limited issues of whether "being required to take a polygraph examination is a form of psychological coercion" which contributed to Barbour's subsequent confession and "about the psychological effect of the chipping away at a suspect to overcome his resistance." (*Id.* at 187:8–10, 14–16). While Dr. Slattery gave a general opinion on psychological coercion and polygraph testing, he did not examine Barbour and could not express an opinion on whether *Barbour* was coerced in his polygraph examination. (*Id.* at 190:11–195:17, 196:10–18).

Barbour's final witness was his grandfather, John Brown. (*Id.* at 197). Mr. Brown testified that after Det. Carmichael and Lt. Davis initially questioned Barbour but before his arrest, Barbour told Mr. Brown about how they had treated him. (*Id.* at 197:18–198:6). Mr. Brown recalled Barbour saying that Det. Carmichael "beat up on him." (*Id.* at 198:3–4). Mr. Brown also testified that he knew of another person, whose name he could not remember, who said "he heard Mr. Carmichael make the statement several times that he could beat a person half to death and not even as much as leave a bruise place on him." (*Id.* at 198:12–16, 199:5–8). Mr. Brown admitted that he did not know Det. Carmichael or Lt. Davis personally. (*Id.* at 199:11–14).

At the conclusion of the hearing, Mr. Riggs told Judge Gordon that several years prior, a man named Eugene Washington had consulted him about a potential civil rights case and he made similar allegations of physical abuse against Det. Carmichael. (*Id.* at 202:11–19). Mr. Gunter objected to Barbour's request that the State turn over MPD personnel files on Det. Carmichael, noting that having to bring in every person that Det. Carmichael had questioned would be impossible, unduly burdensome, and irrelevant to the case. (*Id.* at 203:15–204:3).

On January 13, 1993, Judge Gordon issued an order in both Barbour's capital murder and Winn-Dixie arson cases denying Barbour's motion to suppress his statements, writing:

> Christopher D. Barbour has renewed his motion to suppress his confession. He contends that his confession was involuntary because it was psychologically and/or physically coerced.
> Barbour has also filed a motion for the state to disclose the names, addresses, telephone numbers and places of employment of all persons who have been interrogated by Detective Danny H. Carmichael within the last two years who were subsequently charged with a felony. Barbour alleges that Carmichael engages in a "consistent course of committing physical assaults upon persons accused or suspected of crime in order to induce said persons to involuntarily confess commission of such crimes." In support of the motion for disclosure Barbour offered the testimony of his grandfather and Barbour's attorney's representation concerning a client who claimed to have been assaulted by Detective Carmichael.
> Mr. Brown's testimony is vague and uncertain. The Court accepts counsel's representation as truth; however, the Court finds that <u>reports</u> of two incidents of abuse apparently separated by many months are insufficient to order the requested disclosure.
> The Court further finds that Dr. Slattery's testimony, in view of his qualifications, is entitled to little weight, and the Court holds that upon consideration of the evidence Barbour's confession was not the result of psychological abuse or physical abuse.

(Doc. 70-2 at 68–69) (underlining in original).

On February 9, 1993, Dr. Kirkland evaluated Barbour for the second time as ordered by Judge Gordon, this time related to the capital murder charges. Dr. Kirkland issued a forensic evaluation report on February 13, 1993. (Doc. 70-8 at 3–8 (report)). Dr. Kirkland ultimately found that Barbour was competent to stand trial, including that he understood the process of a trial, was comfortable with his attorney, and "[h]e is also able to disclose pertinent facts about his mental state and timing of his actions to his attorney." (*Id.* at 6–7). Regarding Barbour's mental state at the time of the offense, Dr. Kirkland stated the following:

> The defendant has a complete memory of his behavior at the time of the offense. He is at least of average intelligence and is able to disclose in detail information about his mental state, feelings, and actions at the time of the offense. He is suffering from a long term pattern of alcohol abuse. Alcohol dependence may have also been a possible diagnosis. However he does not suffer from any other symptoms of any other type of mental disorder that would detract from his ability to appreciate the criminality or wrongfulness of his behavior at the specific time of the particular offense. It is apparent, particularly from his own self-report as well [as] from third party collateral sources of information that he clearly understood that his behavior was criminal, wrong, and illegal at the time of the offense. For example, his alleged behavior was very deliberate and purposeful with regard to trying to prevent discovery of the body and further to prevent interruption of the fire. His behaviors were deliberate and goal directed according to his own self-report. It is particularly noteworthy to report that he states that he started the alleged fire to destroy alleged evidence.

(*Id.* at 7–8).

## D.    Barbour's Trial

At some point before Barbour's capital murder trial, Mr. Gunter left the Montgomery DA's Office and Assistant DA Randy McNeill ("Mr. McNeill") became the

new lead prosecutor in Barbour's case. Barbour's trial began on June 22, 1993, and lasted three days. (*See* docs. 70-3 at 120–207; 70-4; 70-5; 70-6 at 1–179 (trial transcripts)).

On the first morning of trial, Barbour's counsel moved in open court to suppress his May 1 confession, this time arguing that police obtained his confession with a purpose to disguise or hide Barbour's remorse over the events that he described in the confession. (Doc. 70-2 at 136–38). The motion alleged that the officers purposefully sought to disguise Barbour's remorse over his actions by first taking Barbour to a fire station, feeding him a large meal, inviting him to crank the engine of a fire truck, and then transporting him to MPD headquarters where they rehearsed the questions that they were going to ask him on tape and his answers to those questions. (*Id.* at 136–37). Judge Gordon denied the motion to suppress. (*Id.* at 136; doc. 70-4 at 5:21–23).

During the lunch break after jury selection, but before the trial began, Mr. McNeill presented Mr. Riggs and Mr. Heard with a transcript of Barbour's May 29, 1992 jail interview with Lt. Davis, telling Mr. Riggs that he had just received the transcript that morning and he did not intend to use it at trial. (Doc. 70-4 at 60:17–25). Mr. Riggs immediately moved to suppress the interview on grounds of its late disclosure and because, although Barbour was advised of and waived his rights and agreed to speak with Lt. Davis that day, Barbour had appointed counsel at the time. (*Id.* at 61:1–14). Judge Gordon suppressed the statement. (*Id.* at 63:4–5).

The prosecution's theory was that Mrs. Roberts' rape and murder occurred contemporaneously, and the prosecution emphasized Barbour's confession in which he implicated three people in the crime: himself, Hester, and Mitchell. In his opening

statement, Mr. McNeill described the charges against Barbour, the crime scene, and the events Barbour described in his May 1 confession. (*Id.* at 67:2–70:7, 70:16–75:13, 75:19–81:2). Mr. McNeill told the jurors that they were going "to see this confession on videotape" and "see this as [Barbour] is telling the story." (*Id.* at 77:23–25). Mr. Riggs then gave the defense's opening statement, in which he urged the jury to consider the fact that even though Barbour would likely appear as though he showed no remorse when confessing to the crime, officers had already talked with him for several hours about the crime before taping his statement and had even rehearsed his statement. (*Id.* at 84:11–85:12).

The State's first witness was William Roberts, who described the events of the day before his mother's murder. He testified that he and Lola spent the night at Darrius and Lakeisha Hall's house, and he described finding his mother and the crime scene. (*Id.* at 89:1–113:4). The State next called three officers who investigated the crime scene: Curtis Drew, an MFD fire medic; G. D. Salum, an MPD officer; and William R. Huett ("Mr. Huett"), an MPD evidence technician. Through these witnesses, crime scene photographs were admitted. (*Id.* at 117:21–174:7).

Mr. Huett testified that MPD officers processed the crime scene for fingerprints and other trace evidence by examining several items, including the front doorknob, kitchen cabinet handles, the knife used to stab Mrs. Roberts, and the smoke detector that was found on the kitchen floor; however, these items showed either fingerprints from Mrs. Roberts or no fingerprints at all. (*Id.* at 140:1–157:11). He explained that it was not necessarily unusual that he was not able to obtain fingerprints from the items, either because their

texture was rough or possibly because they were partially burned. (*Id.* at 140:3–5, 145:4–5).  Mr. Huett also stated that he obtained pubic hair samples from Barbour and gave them to the ADFS. (*Id.* at 171:20–172:6).

On the second day of trial, the State called Lt. Deaton, Lt. Davis, Craig Bailey, Mary Rhodes Holt, Dr. Stilwell, Laura Shevlin, William Landrum, Mr. Huys, and Det. Carmichael. (*See generally* docs. 70-4, 70-5).  Lt. Deaton testified that there appeared to be three separate fires set in the bedroom where Mrs. Roberts' body was found. (Doc. 70-4 at 177:4–9).  Lt. Davis described the circumstances surrounding Barbour's May 1 interview at the Selma Highway fire station, and the jury heard the audio recording of Barbour's statement to Lt. Davis. (*Id.* at 188:5–200:25; doc. 70-5 at 2:1–7:18).  Lt. Davis' trial testimony was consistent with his testimony at Barbour's suppression hearing. (*Compare* doc. 70-4 at 188:16–192:3, 196:18–198:2 (Lt. Davis' trial testimony regarding events surrounding Barbour's May 1 interview), *with* doc. 70-7 at 108:3–116:12 (Lt. Davis' suppression hearing testimony regarding the same)).

Craig Bailey ("Mr. Bailey"), an ADFS forensic scientist, then testified, explaining that he specialized in trace evidence from crime scenes, including hairs and fibers. (Doc. 70-5 at 7:15–8:7).  He described, among other things, that he received the trace sheet in which Mrs. Roberts' body was wrapped from Dr. Stilwell and turned it over to Ms. Holt at the ADFS. (*Id.* at 10:15–11:12).  Ms. Holt, an ADFS forensic scientist, then testified, explaining that she tests hair found at crime scenes. (*Id.* at 12:9–22, 14:16–15:14).  She testified that she received the trace sheet from her supervisor, Mr. Bailey, opened up the sheet and examined it for the presence of hair or fibers, and found one Caucasian pubic

hair that was "blond[] yellowish-looking." (*Id.* at 15:19–17:8). She said that the pubic hair was dissimilar to Barbour's pubic hair sample. (*Id.* at 17:9–18).

Dr. Stilwell then testified as an expert in forensic pathology. (*See generally id.* at 23:7–39:17). He explained that he performed Mrs. Roberts' autopsy and that the autopsy included a rape kit, which entailed taking vaginal smears, anal smears, and oral smears, fingernail clippings, and the combing of hair looking for trace evidence. (*Id.* at 27:2–25). He said that he turned over the rape kit evidence to Bill Landrum ("Mr. Landrum"), who was the director of the serology section of the ADFS, and the blood evidence to toxicologist Laura Shevlin ("Ms. Shevlin") at the ADFS. (*Id.* at 28:1–8). Dr. Stilwell opined that the cause of death was multiple stab wounds to the left chest with injury to the heart and left lung. (*Id.* at 34:13–20).

Ms. Shevlin, the ADFS's forensic toxicologist, testified as an expert in the field of toxicology, stating that she tested Mrs. Roberts' blood and other vitreous humours for the presence of alcohol and drugs and found neither. (*Id.* at 40:3–43:13). Mr. Landrum, the ADFS's forensic serologist, then testified as an expert in the field of forensic serology. (*See generally id.* at 46:13–53:17). He said that he received the rape kit and blood sample of Mrs. Roberts, that he tested the blood to see what type it was, and that he tested the vaginal, anal, and oral swabs and the slides with the smears, as well as the knife and fingernail clippings, for blood. (*Id.* at 47:23–52:1). He stated that he then turned all of this evidence over to Mr. Huys in the Birmingham ADFS lab. (*Id.* at 52:2–11).

The State's second-to-last witness was Mr. Huys, the director of the ADFS's Birmingham laboratory and author of the June 1992 DNA report. The court qualified Mr.

50

Huys as an expert in forensic serology and DNA analysis. (*Id.* at 58:19–61:21). Mr. Huys first explained that a serologist's duties are to "identify bodily fluids and stains" like blood, saliva, or semen and attempt to characterize them as having originated from an individual using that individual's DNA. (*Id.* at 59:1–9). He stated that he had testified as an expert in forensic serology and DNA analysis "well over a hundred" times and conducted thousands of DNA tests. (*Id.* at 60:8–19).

After the court qualified him as an expert, Mr. Huys explained the process of DNA testing. He stated that he received blood samples from Mrs. Roberts, Melvin Roberts, Hester, and Barbour, as well as vaginal and anal swabs from Mrs. Roberts' body that contained semen. (*Id.* at 62:2–10). He explained that his lab then ran an HLA DQalpha analysis DNA test, which he described as a widely-accepted test that the ADFS has run many thousands of times. (*Id.* at 63:2–3, 65:4–9). He described how the DQalpha testing was performed, including how the HLA part of DNA is first extracted from blood or semen stains and purified, then amplified, or copied, and then incorporated into a chemical that causes a color reaction to occur. (*Id.* at 63:6–64:9). He explained that the chemical is then attached to a test strip of nylon, and the DNA analyst uses the color reaction on the test strip to define what type of HLA fraction is present. (*Id.* at 64:10–65:3). He also explained the safeguards incorporated into the testing process, including performing quality control samples with each test that must show the same result as the non-sample test in order to be reported. (*Id.* at 65:10–23, 66:13–22). When questioned by Mr. Riggs about these safeguards, Mr. Huys testified that less than ten percent of the time, discrepancies between

the sample and non-sample test results preclude him from reporting that test. (*Id.* at 66:23–67:25).

Mr. Huys then explained that the HLA DQalpha test is not a DNA fingerprint test, a type of DNA test that is "more commonly referred to as RFLP and is a much more specific identifier but requires either a larger quantity of DNA or a much more purified or refined type of DNA than this particular type of testing." (*Id.* at 68:21–25). Mr. McNeill then asked Mr. Huys why the DNA fingerprint test was not run in this case, but before he could answer, Mr. Riggs objected, stating: "Your Honor, if this is not a specific identifier, we object to it coming into evidence." (*Id.* at 69:2–3).

At that point, Judge Gordon recessed the trial and conducted an *in camera* hearing with counsel and Mr. Huys, and the following exchange occurred:[18]

The Court:     How is this going to help the jury, Randy?

Mr. McNeill: They don't do what they used to do, the PGM typing and all this. They have gone into this DNA testing. And basically what it does, Judge, is that it is that it is going to—we expect the results are going to show that the semen that was found could have been the defendant's and it could have been Hester's.

The Court:     What does that tell the jury?

Mr. McNeill:  Tells the jury that the defendant could have had sex with her and also Hester could have had sex with her.

Mr. Riggs:      Didn't you say yesterday that something like a 30 percent—

Mr. McNeill:  That's correct.

---

[18] Because this exchange is critical to understanding the factual basis for three of Barbour's claims, the Court has reproduced the exchange nearly in full.

Mr. Riggs:      Out of a hundred people—as I understand it, it is narrowed down to thirty out of a hundred. It could be any one of twenty-nine people other than the defendant.

Mr. McNeill:  I will tell you exactly what the results are. It is—basically you are right. One out of every three people would have the results that your client had of white people. That's what it was white people. This is not a sex—

The Court:     The law has never required that it be specifically identified—for instance, evidence of secretors has been admitted in courts of this state for fifteen or twenty years where the evidence is a defendant falls within a range of persons or a population segment that could have done it. But—

Mr. McNeill:  Judge, if you express your concerns, maybe I can work something—I can change strategy or whatever. What are your concerns?

The Court:     I reckon my concerns are sometimes that when all the jury hears is it is something [that] could have happened, it begins to border on speculation.

Mr. McNeill:  Judge, half of my position is that in a capital case the jury—I am obligated to present every piece of evidence that I can present. I mean, I just don't want it to look like I'm trying to hide something in this case.

The Court:     Let me put this question to you.  Two days ago y'all were so concerned about this being a capital case that we didn't let the jury sequester.  Now you are not so concerned that you are willing to put some evidence in that may cause you a problem down the road.  That's where I'm basically coming from.

Mr. McNeill:  You are concerned with the entire DNA analysis testing procedure?

The Court:     No. I mean the law of this state right now is that it is accepted. And I am sitting here looking at *Perry versus State*.  And there is no problem with it.

Mr. McNeill:  As it stands now.

The Court:    As it stands now. But Mr. Riggs is right. There is becoming a very—and just for cross-examination, but there is, as I understand it, beginning to arise in the scientific community some serious questions about the reliability of DNA testing. That's just Judge Gordon. I don't know what this witness is going to say. I assume the witness will answer otherwise. I don't have any idea. But about the accuracy of it at least.

Mr. McNeill:  Judge, if I can figure out a way without a witness—you know, to save face, I can pull him back off.

The Court:    I am not trying to run your case. That's why I asked the question to start with early on. I am looking at [the] *Perry* [decision] right now. It doesn't have to specifically identify anybody.

Mr. McNeill:  See that's—the point is that we don't have that in this case. This testing is just like what they use[d] to do when they had the PGM typing.  Remember what they use[d] to do is they got the blood and go down—

The Court:    No, I don't remember what they use[d] to do.  I have never confronted DNA testing in a case before.

Mr. McNeill:  . . . One thing I can add on this test is his test would indicate that it could have come from both, but in his opinion the semen would have been more likely to have come from Barbour.

Mr. Riggs:    We would object to that.

The Court:    Well, I understand you would. What does he base his opinion on? . . . I would like to get a preview of what he is going to say.

Mr. McNeill:  Sure. Larry, in simple terms for us lawyers in here, explain what your results were and your opinions and findings from the results. It is easier with the chart. Do you have your report here?

[Mr. Huys]:   Yeah. All right. Has everybody got a copy of this?

Mr. Riggs:    No.

Mr. McNeill:  Yes you do.

The Court:     Not in here.

Mr. Riggs:     And I wouldn't have known what it was if I looked at it.

Mr. McNeill:   Frank, look over his shoulder or something. I have got a copy somewhere. Judge, you can have my copy.

The Court:     All right. We are looking at page 2.

Mr. Riggs:     Can I look over your shoulder?

[Mr. Huys]:    If you will look at item four in the chart.

Mr. Riggs:     This is the chart that we are looking at.

The Court:     I got it.

[Mr. Huys]:    Page 2. Present in the vaginal swabs item four are four characteristics:  One point one, a three, a four and then we could not determine if the one point two was present or not just because of the nature of the test. Ms. Roberts contains the traits one point one and three. Those could be explained in the vaginal swabs from Ms. Roberts. However, absolutely without doubt there must be semen present from someone who contains that four characteristics. That absolutely must exist in the man who produced that semen stain. There is two individuals here who contain the four characteristics, Mr. Barbour and Mr. Hester. They both see that in there. . . .

               In their standard samples. . . .

               Mr. Barbour also contains the one point one trait which is present in the vaginal swabs. However Mr. Hester contains a two characteristic which is absolutely lacking in the vaginal swabs. Therefore, while he contains the trait that must be present, he does not have the characteristic which should have been there. That two characteristic is missing. Therefore, it is highly unlikely he could have been a contributor to that semen.

Mr. McNeill:   Could you eliminate—

[Mr. Huys]:   Not absolutely.  I don't know if you are familiar with paternity testing and indirect and direct exclusions. This is what would be the equivalent of an indirect exclusion, a characteristic lacking which should be there. While that's not an absolute exclusion, it speaks strongly to him not being the source of the semen while Mr. Barbour's—both of the characteristics are of—of Mr. Barbour are in fact in that vaginal swab.

Mr. Riggs:   Judge, all I can say to that, and I don't understand all the scientific end of it, but if you are talking about one in three probabilities, there were that many males on Manley Drive that night. There were three white males in Ms. Roberts' house. When you get to something else we were talking about a minute ago out of that case, when you are talking about a probability of one out of two hundred and fifty thousand, that's a lot more men than there are in the City of Montgomery.  And I just don't think the probabilities in this case arise to the point where they can be admissible in evidence to prove that Chris Barbour raped this woman.

The Court:   I don't know that it definitely proves anything.  But the question is whether it is relevant, not what it proves.

Mr. McNeill:  That's your determination, Judge.  My feelings are not going to get hurt on this.

Mr. Riggs:   The point I'm trying to make is if it is like one in two hundred and fifty thousand, it may not prove conclusively that it was that person. But it points so strongly in that direction that it would be a mistake to ignore it. If it points to one in three, which is the basic premise I understand we are operating on here, that's a whole lot less probability. And I don't think that arises to the point of being evidence.

The Court:   You have heard what Mr. Riggs says. Do you have a response to that?

[Mr. Huys]:   It does if you exclude the husband in this case. I understand Mr. Roberts is the husband.

Mr. McNeill:  No dispute in this trial on that.

[Mr. Huys]:    This has been the essence of serology and the admissibility of serology for a number of years. Whether you are talking about HLA or ABO characteristic, it is fairly commonly admitted if somebody is ABO type O that they are half the population of the world. But that's not routinely excluded from evidence. And this is no more or less a descriptive genetic characteristic than being an ABO type O.

Mr. Riggs:    You are not a lawyer. You are saying it is accepted in courts and that's not really evidence?

[Mr. Huys]:    I can use this same type of technology to do ABO typing.

The Court:    I did understand you correctly to say that you have given this same identical type [of] evidence in court before?

[Mr. Huys]:    Yes, I think approximately twenty times it has been used in courts before both to exclude people and to include them. I have been called by the defense probably 25 percent of the time. And we routinely exclude defendants in 25 to 30 percent of the cases where we actually do testing. It is a very powerful exclusion tool in fact.

The Court:    Just not as powerful an inclusion tool.

[Mr. Huys]:    You don't generate as big numbers as what commercially is known as the fingerprinting technique.

The Court:    What does all this tell us in a nutshell?

[Mr. Huys]:    Tells us that Mr. Barbour could be the source of the semen. Approximately one in three Caucasian individuals could be the source of that semen. It speaks very strongly against Mr. Hester being the source of the semen. And it excludes Mr. Roberts. That's what it tells us.

Mr. Riggs:    Doesn't exclude the third person at the scene.

[Mr. Huys]:    I never received blood from him.   So I couldn't reach an opinion.

The Court:    Who was the other person?

Mr. Riggs:    Michael Mitchell.

The Court:    How come we didn't do him?

Mr. McNeill:  Never got a court order.

Mr. Riggs:    Judge, we have been trying to settle this case so they would have something more against him. . . .

The Court:    So there is a one in three probability that Chris Barbour had intercourse with this lady?

[Mr. Huys]:   No, that's not what's being said.  One in three probability if you close your eyes and pick a white person in the population that he'll fall into this category of people who could be the source of this semen.

Mr. Heard:    One third of all the white people have the same characteristics?

[Mr. Huys]:   That's correct. . . .

Mr. Heard:    Any relevancy that it has got—would be outweighed by the prejudicial effect in a capital murder case like this, wouldn't it?

Mr. McNeill:  Judge, again, this is your call.

The Court:    I don't think I can change the rules of the relevance because it is a capital case.  Relevance is relevance any way you cut it.

Mr. McNeill:  State—we will submit to your discretion.

Mr. Riggs:    I want the Court to rule on it.  I am uncomfortable—lawyers are more and more wanting to ask the judge what he is thinking.  I would like to feel free to do that.  But I just never have. . . .

Mr. McNeill:  My point is this. I can see your point. I feel that we have a very strong case without this evidence against Mr. Barbour.  And I guess the only thing I am saying is I'm not going to whine and complain if you exclude this evidence.

The Court:    You know, judges are use[d] to people whining and complaining either way. We are either judges or referees. And

58

> I kind of like to be the former as opposed to the latter. I didn't mean that ugly. I just meant, you know, I have got a job to do and you have got your job to do.

Mr. McNeill:   That's what I'm doing. I'm putting forth my evidence.

The Court:   I appreciate it.

Mr. Riggs:   And let me bring up this point. The pubic hair.

Mr. McNeill:   That excludes your client.

Mr. Riggs:   I know. You know good and well the only blond[] pubic hair out there was Chris Hester. There is something wrong with this testing. And I don't know enough about it to know what it is.

The Court:   Well, my ruling is that it is admissible.  That's my ruling.

(Doc. 70-5 at 69:11–72:9, 72:14–20, 72:25–77:25, 78:4–12, 78:15–79:2, 79:6–80:3) (errors in original).

When the jury was called back in, Mr. McNeill did not question Mr. Huys any further about what the DNA test results indicated and did not attempt to offer the DNA evidence into evidence. (*Id.* at 80:20–81:8).  He merely asked one question about the chain of custody of the relevant evidence. (*Id.* at 80:21–25).  Mr. Riggs did not cross-examine Mr. Huys.

The State's final witness was Det. Carmichael. (*See generally id.* at 81:13–99:11). He spoke about the crime scene and his May 1 interview with Barbour at MPD headquarters. (*Id.* at 82:2–83:17, 85:12–95:8).  He identified Barbour in the courtroom and also described Hester's physical characteristics, including that he had "blondish" hair. (*Id.* at 84:9–14).  Like Lt. Davis, Det. Carmichael denied ever threatening, coercing, hitting, slapping, or inflicting any physical abuse on Barbour, nor offering him any hopes of a

reward for his testimony. (*Id.* at 85:15–86:3).  Det. Carmichael explained that it was MPD policy to videotape any confession in a homicide investigation. (*Id.* at 89:2–5).  The prosecution played the videotape of Barbour's confession for the jury. (*Id.* at 91:3).

On cross-examination, Det. Carmichael acknowledged that a blond pubic hair was found on the trace sheet and admitted that Hester is the only one of the three men mentioned in Barbour's statement who had blond hair.[19] (Doc. 70-5 at 97:9–21).  He stated that he did not drive Barbour from the Selma Highway fire station to MPD headquarters and he denied speaking with Barbour at all before he began the videotaped statement at around 9:30 p.m. that evening. (*Id.* at 97:21–98:9).  Other than "the tape [Det. Carmichael] heard of [Lt.] Davis," he denied being aware of any time that Barbour had "gone over" his statement. (*Id.* at 98:14–17).

Barbour did not present a defense.  In closing statements, the prosecution relied on Barbour's confession, stating that the video testimony represented the accurate account of Mrs. Roberts' murder. (*Id.* at 141:20–147:2).  On June 24, 1993, the jury convicted Barbour of capital murder during the commission of a rape, a burglary, and an arson, in violation of ALA. CODE § 13A-5-40(a)(3), (a)(4), and (a)(9) (Counts I, II, and III),[20] but the jury

---

[19]  As discussed earlier in this Opinion, *supra* at page 31, Det. Carmichael testified at Hester's June 1992 preliminary hearing that the pubic hair did not match Hester. (*See* doc. 337-4 at 19:8–13).

[20]  Pursuant to ALA. CODE § 13A-5-40(a)(3), murder is a capital offense if committed during a rape, regardless of who performs the rape; similarly, pursuant to ALA. CODE § 13A-5-40(a)(4), murder is a capital offense if committed during a burglary, regardless of who commits the burglary.  Pursuant to ALA. CODE § 13A-5-40(a)(9), murder is made capital if the murder is committed by the defendant during arson also committed by the defendant.

acquitted him on the count of capital murder committed during the course of a robbery (Count IV). (Doc. 484-1 at 156).

## E.    Barbour's Sentencing

The trial's penalty phase began on June 24, 1993, the same day as the jury's verdict, and continued into the next day. (*See generally* doc. 70-6 at 30–179).  The State did not call any witnesses, but the defense called Barbour's father, Paul Barbour; Barbour's grandfather, John Brown; and Dr. Slattery, the psychologist who testified during Barbour's suppression hearing about the effects of polygraph examinations on individuals. (*Id.* at 47:18–80:18 (Paul Barbour), 81:9–97:10 (John Brown), 97:24–130:16 (Dr. Slattery)).

On June 25, 1993, at the conclusion of the penalty phase, the jury recommended by a ten to two vote that Barbour be sentenced to death. (Doc. 484-1 at 174 (penalty phase verdict form)).

On January 31, 1994, following a judicial sentencing hearing, Judge Gordon issued a sentencing order. (Doc. 70-3 at 5–21).  Judge Gordon stated that he had weighed the aggravating and mitigating circumstances and determined that Barbour would be put to death. (*Id.* at 20–21).  On February 2, 1994, Judge Gordon reconvened the sentencing hearing to formally pronounce Barbour's sentence of death. (Doc. 70-6 at 212–13).

## F.    The Resolution of Hester's Case

On April 14, 1994, Judge Gordon conducted a change of plea hearing in Hester's capital murder case. (Doc. 7-6).  During that hearing, Judge Gordon granted the State's motion to amend Hester's indictment from charging capital murder to charging felony murder, and Hester pled guilty to felony murder in connection with Mrs. Roberts' death.

(*Id.* at 3).  At his hearing, Hester's version of events differed from Barbour's.  Hester testified that he, Barbour, and Angela Stikes entered Mrs. Roberts' home to steal whatever they could find. (*Id.* at 5:17–23).  According to Hester, he walked straight ahead and eventually got to the kitchen, while Barbour went "the other way" in the house. (*Id.* at 5:24–6:6).  Hester stated that he "ended up getting some liquor" from the kitchen. (*Id.* at 6:8–9).  About fifteen or twenty minutes later, Barbour walked into the kitchen with a stolen ring. (*Id.* at 6:10–14).  Hester testified that, about two days later, he found out that someone had died inside the house. (*Id.* at 6:15–17).  Hester said Barbour told him that "he had some trouble in the house" but that Barbour never specifically said that he killed Mrs. Roberts. (*Id.* at 6:18–20).  Hester ultimately was sentenced to ten years to life on the felony murder conviction.

## G.    Barbour's Direct Appeal

Barbour appealed his conviction and sentence to the ACCA, still represented by Mr. Heard and Mr. Riggs.  Barbour raised the following claims on direct appeal:  (1) Alabama's system for compensating attorneys appointed to represent indigent defendants set out in ALA. CODE § 15–12–21 (specifically, the $1,000 cap on the amount that those attorneys can receive) is unconstitutional; (2) the trial court's denial of several discovery motions violated *Brady*; (3) the trial court erred in denying Barbour's motion to suppress his May 1 statement because the method in which his statement was obtained violated his right against self-incrimination and made his confession coerced and involuntary; (4) the trial court erred in failing to instruct the jury on manslaughter as a lesser offense to capital murder; (5) the trial court erred in considering the presentence report in sentencing him

because the report reflected that the person preparing the report did not adequately investigate his background; (6) the trial court erred in not considering at sentencing the letter from Mrs. Roberts' brother which stated that his family did not wish for Barbour to be put to death; (7) the trial court erred in denying Barbour's request during the penalty phase to poll the jury as to whether at any time during its deliberations a majority of the jurors favored life without parole; (8) plain error occurred because an elected judge sentenced Barbour to death; and (9) the trial court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses. (Doc. 70-8 at 105–211).

On December 29, 1994, the ACCA affirmed Barbour's capital convictions and death sentence. *Barbour*, 673 So. 2d at 461, 472.  The ACCA held, among other things, that the trial court "did not err" in allowing the May 1 videotaped confession to "be received into evidence" despite Barbour's complaints that Det. Carmichael had assaulted him and otherwise manipulated the statement. *Id.* at 465–67.  Barbour sought a petition for certiorari, but the Alabama Supreme Court affirmed the ACCA. *Ex parte Barbour*, 673 So. 2d 473, 475 (Ala. 1995).

After the Alabama Supreme Court's decision, Barbour sought and received new counsel from the Equal Justice Initiative ("EJI").  The EJI found an attorney and law professor to write Barbour's petition for a writ of certiorari to the United States Supreme Court. (Doc. 484-15 at 157, para. 3).  Barbour's petition raised two arguments:  (1) that the trial court violated Barbour's rights by refusing to consider the aforementioned letter from Mrs. Roberts' brother as mitigation evidence at sentencing; and (2) the deception

surrounding the use of the polygraph test rendered Barbour's confession involuntary. (Doc. 70-10 at 130–52). The United States Supreme Court denied Barbour's petition for certiorari on June 24, 1996. *Barbour v. Alabama*, 518 U.S. 1020 (1996).

## H.    Barbour's Rule 32 Proceedings

On March 4, 1997, Barbour sought postconviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure by filing a Petition for Relief from Judgment (the "Rule 32 petition") in the Montgomery County Circuit Court (hereinafter, the "Rule 32 Court"). (Doc. 484-12 at 2–56). Barbour proceeded *pro se*, but the EJI had secured a different attorney and law professor from Michigan to ghost-write the petition. (Doc. 484-15 at 157, para. 5; doc. 4 at 3). The fifty-five-page petition alleged that Barbour was denied effective assistance of counsel on numerous grounds, including that Mr. Riggs and Mr. Heard failed to make various objections at trial and cross-examine various witnesses, including Mr. Huys, the State's DNA expert; and that at the penalty phase, they failed to obtain experts who could have testified to Barbour's emotional disabilities, "failed to present evidence that at the time of the crimes at issue in this case, [Barbour] was in fact acting under the domination of his co-defendants," and "failed to call an available witness, Angela Stikes, who would have testified that the plan to kill the deceased victim was originally conceived by co-defendant Hester rather than [Barbour]." (Doc. 70-11 at 12, 16, 30, 34, 50, 52). The petition also alleged, among other claims, that Barbour was not competent to stand trial, that the trial court failed to exclude biased jurors, that being convicted of arson violated his due process rights, that his confession was coerced, and that newly discovered evidence showed that his "mental faculties were deeply impaired" and

he "acted under the dominion of his co-defendants at the time of the crime." (*Id.* at 5–61). Barbour also requested that the court appoint counsel because the EJI attorney could not continue with his case. (*Id.* at 58).

Judge Gordon, the same judge who presided over Barbour's trial and sentencing, presided over his Rule 32 proceedings. Judge Gordon appointed Montgomery attorney Joe Espy ("Mr. Espy") to represent Barbour. (*Id.* at 3–4). On September 10, 1997, Mr. Espy filed an amended Rule 32 petition on Barbour's behalf with only minor alterations. (*Id.* at 61–118). Mr. Espy also secured funding for a mental health evaluation. (*Id.* at 3–4). The State answered the petition, agreeing that an evidentiary hearing was warranted on Barbour's ineffective assistance of counsel claims. (*Id.* at 119–50).

On March 13, 1998, the State deposed Barbour. (Doc. 7-7 at 2–14). At his deposition, Barbour acknowledged that he met with Mr. Riggs and Mr. Heard about five times before trial and that he discussed the guilt and penalty phases of his trial with them. (*Id.* at 7). He also acknowledged that Mr. Riggs and Mr. Heard advised him that he could present a defense, including witness testimony, during the guilt phase. (*Id.*). Barbour testified, "We went over that, and there really wasn't anybody I could think of to—to call. I—you know, there just wasn't anybody." (*Id.* at 7:17–20). However, Barbour stated that he did wish that Mr. Riggs and Mr. Heard had called additional witnesses at the penalty phase, including former employers who could have testified to his good work record. (*Id.* at 8–10).

On March 18, 1998, Judge Gordon held an evidentiary hearing on Barbour's ineffective assistance of counsel claims, and Mr. Espy called both Mr. Riggs and Mr. Heard

to testify. (Doc. 70-11 at 151–204). Mr. Riggs stated the following: He had served as an assistant DA earlier in his career, during which time he handled over one hundred felony jury trials; however, by the time he represented Barbour, he had not handled a criminal capital murder case in about eight to ten years, instead focusing on civil work. (*Id.* at 153–54). He acknowledged that he initially told the court administrator when he was appointed that he did not feel "totally comfortable being thrown into a case like this." (*Id.* at 154:18–20). Mr. Riggs testified that he first met with Barbour within a day or two after being appointed and that he probably met with him twenty times before trial. (*Id.* at 160–61). The following exchange then occurred between Mr. Espy and Mr. Riggs:

> Q.  Do you know what would have been the average length of these meetings, if you have any idea?
>
> A.  Oh, well, I mean I think before we actually got serious about preparing for trial, you know, they would be—I would say they would average pretty close to half an hour. And then as the trial approached, they might have gotten somewhat longer. Let me say this, though, in terms of our visits with Chris. The facts of this case were fairly confined. You know, I mean, as far as what actually happened, we pretty much knew what he was accused of from the beginning. So it wasn't a matter of having to meet with him and go over facts dealing with guilt or innocence all that much. But it was more trying to find people who would vouch for his good character and who would shed some light on his psychological condition and things like that.
>
> Q.  So actually you were asking Chris for information that you could use to present at trial?
>
> A.  Right.
>
> Q.  Do you believe that you developed a good relationship with Chris?
>
> A.  I certainly felt like I did.
>
> Q.  And when Chris gave you information, would you investigate it?

> A.  I certainly—yes.  I mean, I am sure if we thought the information did not justify investigation, we would have told him that and given him the reasons why.  If we didn't explain to him why we weren't going to look at it, we would have tried to investigate everything he told us.

(*Id.* at 161:11–162:13).  Mr. Riggs also testified that during his representation of Barbour, he advised Barbour about the kinds of evidence he could present at both phases of his trial; filed various pretrial motions; talked with Barbour's family members and friends, including his grandparents, his father, and his brother; consulted with Dr. Slattery, Dr. Kirkland, and a neurologist in an attempt to plead not guilty by reason of insanity or otherwise demonstrate to the jury that Barbour suffered from psychological problems; obtained hospital records pertaining to a head injury that Barbour suffered as a child; and consulted with Cecil Johnston, a career polygraph operator. (*Id.* at 162–68).

Mr. Heard testified that he had handled criminal cases prior to 1986, but since then, the only criminal case that he had ever handled was Barbour's. (*Id.* at 170–71).  He confirmed that he and Mr. Riggs met with Barbour around twenty times before trial, that they tried to investigate any information Barbour provided, and that they consulted with several experts. (*Id.* at 175–84).  Mr. Heard recalled numerous details about Barbour's upbringing and listed by name several individuals with whom they talked in hopes of establishing mitigation, including Barbour's past employers. (*Id.* at 184–85).

On April 21, 1998, Judge Gordon denied Barbour's Rule 32 petition, finding that the claims raised were precluded, insufficiently pleaded, or without merit. (Doc. 484-12 at 185–243).  Among other things, Judge Gordon noted that he had granted Mr. Espy's request that Barbour be taken to the Kirklin Clinic at the University of Alabama at

Birmingham where he was evaluated by Dr. Thomas Boll ("Dr. Boll"), a neuropsychologist, but Dr. Boll was not called as a witness at the evidentiary hearing. Judge Gordon inferred that Dr. Boll must not have discovered evidence of any psychological or neurological disabilities.

Barbour did not appeal. Two years later, on September 8, 2000, the State moved to set an execution date for Barbour. (*See* doc. 1 at 4, para. 9e). The EJI opposed the State's motion, stating that Mr. Espy had abandoned Barbour after his Rule 32 evidentiary hearing, leading Barbour to miss the appeal deadline, and urging the Alabama Supreme Court to deny the State's motion to set the execution date. (*See* doc. 4 at 3). In January 2001, the EJI secured new counsel for Barbour: George Kendall and Miriam Gohara ("Mr. Kendall" and "Ms. Gohara"), who still represent Barbour today.

On April 4, 2001, Mr. Kendall and Ms. Gohara filed a "Motion to Reopen Rule 32 Proceedings" and a "Motion for Preservation of DNA Evidence" in the Rule 32 Court. (Docs. 484-13 at 9–200; 484-14 at 3–106). Judge McCooey was assigned the case. In those pleadings, Barbour argued that his prior Rule 32 proceeding should be reopened because, through no fault of his own, he never had an opportunity to appeal the denial of his original petition. (Doc. 484-13 at 11, 147–49). Barbour attached to the pleadings police reports made by MPD and MFD officers during the investigation into Mrs. Roberts' death. (Doc. 484-14 at 9–106). Barbour argued that, not only should he be permitted to develop new facts that would show that his confession was coerced and unreliable, but that "he should be permitted to perform DNA testing, using procedures far superior to those which existed in 1992, of biological material collected at the crime scene[] . . . [that] will show

beyond doubt that neither he nor his co-defendant, Christopher Hester, sexually assaulted the victim and that a third person unknown to them—the real killer—did so." (Doc. 484-13 at 149, para. 4). In support of that claim, he described other cases around the country in which improved DNA testing had exonerated wrongly convicted individuals. (*Id.* at 177–82). He also argued that that the "rudimentary" DNA testing "performed on the evidence at the time of Barbour's trial" could not "definitively include or exclude accused individuals," and that the type of DNA testing required to pinpoint the identity of the semen source was not available in Alabama until 1999. (*Id.* at 13–14; doc. 70-15 at 44–45). Barbour also alleged, among other claims, that the State failed to disclose evidence it possessed of an investigation into Lt. Davis and Det. Carmichael's abuse of other suspects. (Doc. 484-13 at 182–84).

On April 20, 2001, the Alabama Supreme Court granted the State's motion to set an execution date and ordered Barbour's execution for May 25, 2001. (Docs. 484-15 at 170–71).

On April 24, 2001, the State moved the Rule 32 Court to summarily dismiss Barbour's motion to reopen, arguing that the motion was a successive Rule 32 petition and time barred. (Doc. 484-14 at 113–51). Regarding Barbour's request for DNA testing, the State argued that ordering new, more sophisticated DNA testing would be futile because a finding that Barbour was not the source of the semen collected from Mrs. Roberts' body would not alter the case because the State had never accused Barbour of raping Mrs. Roberts. (*Id.* at 119).

On May 4, 2001, Barbour moved the Rule 32 Court to defer ruling on the State's motion to dismiss. (Doc. 484-15 at 149–55). Barbour asserted that modern DNA testing could potentially impeach his confession. (*Id.* at 152, para. 8). Barbour attached his own affidavit in which he asserted that he "did not rob, rape, or murder Mrs. Roberts, and to the best of [his] knowledge, neither did Christopher Hester or Michael Mitchell." (*Id.* at 159, para. 12). Barbour also attached signed affidavits from Melvin Roberts, Lola Roberts, and William Roberts, each dated May 4, 2001. (*Id.* at 161–68). He offered the affidavits as "proof in his initial pleading of [Lt.] Davis and [Det.] Carmichael abusing suspects during interrogation." (*Id.* at 153, para. 10). Barbour argued that the affidavits "sufficiently corroborate [his] assertion that his confession was the product of the same type of abusive practices." (*Id.*). Each affiant described experiencing similar law enforcement abuse that Barbour had alleged in the aftermath of the murder. (*See* doc. 70-15 at 14–21).

On May 14, 2001, Judge McCooey found that Barbour's motion to reopen his Rule 32 proceedings was a postconviction petition and denied it as successive and time barred under Rule 32.2(b)-(c). (Doc. 484-16 at 33–55). Barbour's execution remained set for May 25. On May 18, 2001, Mr. Kendall and Ms. Gohara filed a motion for stay of execution in the Alabama Supreme Court. On May 21, 2001, Barbour appealed Judge McCooey's order to the ACCA. (Doc. 70-15 at 107–200; doc. 70-16 at 1–36).

## I.    Barbour's Federal Habeas Proceedings

Also on May 21, 2001, Barbour initiated the present action in this Court by filing a petition for writ of habeas corpus, a motion for stay of execution, and a motion for preservation of DNA evidence. (Docs. 1, 3, 4). Barbour's eighty-four-page petition listed

the following claims:  (A) he is not guilty of the crimes and modern DNA testing of the serological evidence recovered from Mrs. Roberts' body, if he should be allowed to use it, would prove it; (B) the failure to disclose police records showing that Det. Carmichael and Lt. Davis used coercive and abusive interrogation tactics violated the Eighth and Fourteenth Amendments under *Brady*; (C) the admission of Barbour's May 1, 1992, confessions at trial violated the Eighth and Fourteenth Amendments; (D) the failure at trial to remove a veniremember who expressed bias against Barbour because her husband was a police officer who was familiar with the case violated the Fourteenth Amendment; (E) the removal of a veniremember because of her general discomfort imposing the death penalty violated the Eighth and Fourteenth Amendments; (F) a claim based upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000) that Barbour's death sentence must be vacated because the judge, not the jury, made findings of fact that rendered him eligible for the death penalty; (G) the trial court's refusal to consider a letter from Mrs. Roberts' family asking for a sentence of life in prison without parole violated the Eighth and Fourteenth Amendments; (H) Alabama's method of execution via the electric chair violates the Eighth and Fourteenth Amendments; (I) the denial of a right to counsel in postconviction cases violated the Fourteenth Amendment; and (J) ineffective assistance of trial counsel violated the Sixth and Fourteenth Amendments. (Doc. 1).  Barbour attached the same affidavit he had attached to his Motion to Reopen the Rule 32 Proceedings, in which he stated, "I did not rob, rape or murder Mrs. Roberts, and to the best of my knowledge, neither did Christopher Hester or Michael Mitchell.  I believe if DNA testing is able to identify the source of the semen accurately, it will find that none of us assaulted or harmed Mrs. Roberts

on the night of her death." (Doc. 1-4 at 3, para. 12).   Barbour also attached the same affidavits from Melvin, Lola, and William, as well as one from Cedric Evans, in which they complained about abuse from MPD officers during the murder investigation. (Docs. 1-5, 1-6, 1-7, 1-8).[21]  He urged this Court to allow him to retest the serological evidence from the crime scene, supported again by the affidavit from Mr. Neufeld of the Innocence Project. (Doc. 1-9).

The next day, the Respondent filed a motion to dismiss the petition for failure to file within the one-year statute of limitations for federal habeas corpus proceedings set forth in 28 U.S.C. § 2244(d)(1). (Doc. 6).  The Respondent argued that, according to § 2244(d)(1):

> [T]he federal statute of limitations began to run on June 24, 1996, the day the United States Supreme Court denied certiorari, [in his direct appeal] and, according to 28 U.S.C. § 2254(d)(2), was tolled [until] March 4, 1997, the day Barbour filed his Rule 32 petition.  Between June 24, 1996, and March 4, 1997, 254 days were subtracted from Barbour's one-year habeas corpus statute of limitations.  Barbour's habeas corpus statute of limitations began to run again when the denial of his Rule 32 petition became final.  This event occurred on June 2, 1998, the day after the time for filing Barbour's notice of appeal in the [ACCA] had lapsed.  After deducting 254 days from Barbour's original 365-day (or one year) statute of limitations, . . . Barbour had 111 days from June 3, 1998, the day after the time for filing his notice of appeal to the [ACCA] lapsed, to timely file a federal habeas petition.  [Thus,] [t]he statute of limitations lapsed on Barbour's federal habeas corpus claim on September 22, 1998.  Barbour did not file a habeas petition until May 21, 2001, approximately 20 months after the one-year time period.  Therefore, habeas corpus review is no longer available to him.

---

[21]  As the Court explained in its *Schlup* opinion, Lola, William, and Evans later testified in these proceedings that "they did not read their respective declarations or affidavits before signing them; the declarations and affidavits were not entirely accurate; members of Barbour's legal team had not been forthcoming about their representation of Barbour; and an investigator on Barbour's legal team, Richard Reyna, had given them money on multiple occasions. (*See, e.g.*, doc. 440 at 84:18–85:23, 88:5–6, 105:7–24) (William's testimony); (*id.* at 130:21–131:20) (Lola's testimony); (doc. 302-4 at 35:16–38:15) (Evans' testimony)." (Doc. 473 at 68 n.41 (citations and parentheticals in original)).

(*Id.* at 6).  The Respondent also opposed Barbour's motion to stay his execution. (Doc. 7).

After a brief hearing the following day, District Judge Myron Thompson granted a stay of execution, finding that, in light of "the limited record and time available, the court c[ould] not conclude that Barbour's petition is patently meritless or barred by the statute of limitations." (Doc. 9 at 27 (order granting stay of execution); *see also* doc. 8 (hearing minutes)).

In June 2001, Magistrate Judge Susan R. Walker issued a report and recommendation finding that Barbour's petition was a mixed petition containing both exhausted and unexhausted claims and recommending that the Court "afford [Barbour] a reasonable opportunity to amend his petition strike his unexhausted claims," and "upon amendment," to hold it in abeyance to allow for the exhaustion of claims that Barbour raised in his successive Rule 32 petition. (Doc. 21 at 7).  Magistrate Judge Walker recommended that Barbour be ordered to promptly advise this Court when the state court had resolved his Rule 32 proceedings. (*Id.*).

Regarding Barbour's motion to preserve evidence, Magistrate Judge Walker ordered the Respondent to find out if crime scene "blood and semen" evidence still remained in the State's custody. (Doc. 22).  In response to that inquiry, the Respondent told the Court that, although the Montgomery County DA's Office and the ADFS both told the Respondent that they no longer had any evidence from Barbour's case, the Respondent had identified a box in the MPD's possession that contained crime scene evidence, including "several items which could be 'blood and semen evidence.'" (Doc. 33 at 2, para. 4).  In March 2003, Magistrate Judge Walker granted Barbour's motion to preserve

evidence "to the extent that the physical evidence in the custody of the [MPD] shall be preserved and maintained in its original form[.]" (Doc. 48 at 2). Magistrate Judge Walker reasoned that it was necessary to grant the motion "so that the evidence can be available should the court determine that it is probative of the statute of limitations issue or should the court determine that this action is properly before the court and that the evidence is probative of any issue to be decided on the merits." (*Id.*).

In June 2004, the ACCA affirmed the Rule 32 Court's decision on his Motion to Reopen the Rule 32 Proceedings, which deemed Barbour's motion successive and time barred, stating in part:

> There was no evidence presented at trial pointing to Barbour as the person who raped Thelma Roberts. Instead, all of the evidence—including his own confessions—established that Barbour's participation in the rape was limited to holding Roberts on the floor while Hester raped her. Accordingly, there is no need for postconviction DNA testing in this case; such testing would have no relevance. Barbour now seeks to recant his previous confessions. However, because he is procedurally barred from collaterally attacking those confessions, Barbour's attempt to obtain DNA testing appears to be his rather ingenuous way of attempting to circumvent the procedural bar of Rules 32.2(a)(4) and 32.2(b), which would prohibit further review of the admissibility of his confessions. The purpose of DNA testing is to exonerate a wrongfully convicted defendant. It should not be used as a method to circumvent procedural bars whose purpose is to prohibit a petitioner from relitigating claims over and over again.

*Barbour v. State*, 903 So. 2d 858, 867 (Ala. Crim. App. 2004). The Alabama Supreme Court denied Barbour's petition for certiorari, and a certificate of judgment issued on January 7, 2005. *See id.*

Back in this Court, on January 14, 2005, Barbour filed a notice that he had exhausted all of his state court remedies, and he moved to amend his federal habeas petition to include

the newly exhausted claims. (Doc. 49). The Respondent again moved to dismiss any amended petition that Barbour might file for untimeliness because Barbour failed to file his federal habeas corpus petition by the September 1998 deadline. (Doc. 51).

Magistrate Judge Walker granted Barbour's motion to amend his petition, but she also ordered the parties to brief the issue of whether AEDPA's statute of limitations should be equitably or statutorily tolled to save Barbour's petition from being time barred, and whether Barbour could make a credible claim of actual innocence to excuse the time bar and permit review of his underlying claims. (Docs. 58, 80). The parties thereafter briefed Barbour's Second Amended Petition (*see* docs. 59, 70, 72), Barbour's actual innocence claim (*see* docs. 68, 73, 76, 78, 93, 97), and "whether the principles of statutory tolling and equitable tolling based upon extraordinary circumstances . . . might operate to save [Barbour's Second Amended Petition] from being barred by the statute of limitations" (doc. 80 at 1; *see also* docs. 81, 84, 87, 93, 97).

On March 1, 2007, Magistrate Judge Walker recommended that Barbour's Second Amended Petition be dismissed with prejudice as untimely filed, concluding that Barbour had not satisfied the *Schlup* standard for an actual innocence gateway claim. (Doc. 98). She considered the evidence proffered by Barbour—that DNA evidence at trial excluding Hester as the source of the semen was inconsistent with his confession in which he stated that Hester was the rapist; that affidavits from William, Lola, and Melvin Roberts, as well as Cedric Evans, all claiming to have been mistreated by police, demonstrated that his confession was coerced; and that his confession contained internal inconsistencies and could not be reconciled with the crime scene evidence. (*Id.* at 18–21, 27–34). However,

she found that the evidence did not demonstrate that "it is more likely tha[n] not that no reasonable juror viewing the record as a whole would lack reasonable doubt." (*Id.* at 34) (quoting *House v. Bell*, 547 U.S. 518, 554 (2006)). She refused Barbour's request to retest the DNA crime scene evidence, noting that Barbour had not demonstrated good cause because he merely speculated that if the evidence were retested, it could identify a third party other than Hester or himself that raped the victim. (*Id.* at 31–34).

In the ensuing nine years, the case remained relatively inactive, except for another motion filed by Barbour to preserve and test DNA evidence, supported by an amicus brief from the Innocence Project, as well as other pleadings concerning discovery of DNA evidence and supplemental authority. (*See* docs. 102, 102-1, 132, 142).

In July 2016, the case was reassigned to then-Chief District Judge W. Keith Watkins. (Doc. 144). The case remained relatively inactive for the next two years. Then, in August 2018, this case was reassigned to the undersigned district judge. (Doc. 151). In the month following reassignment, Barbour moved to supplement the record with "new evidence that [came] to light" that he said supported his motion for DNA testing and his actual innocence. (Doc. 153 at 1; *see also* doc. 155). Barbour attached a report from Dr. Richard Leo ("Dr. Leo"), a law professor, on "police-induced false confessions." (Doc. 155-1). The report stated that Dr. Leo had evaluated the police interrogation and Barbour's statement from May 1, 1992, interviewed Barbour, examined case materials, and concluded that Barbour's "confession statements . . . contain[ed] several indicia of unreliability that are the hallmarks of false and/or unreliable confessions." (*Id.* at 28, para. 7). Additionally, Barbour attached new unsworn declarations from William and Lola Roberts, Lakeisha

Hall, and Niquita Smith that largely concerned the circumstances on the night of Mrs. Roberts' rape and murder, including Tyrone Jackson's whereabouts and behavior, and speculated that Tyrone Jackson and his brother Cedric Evans were involved in Mrs. Roberts' murder. (Doc. 155-2).

In the same motion regarding new evidence, Barbour also informed the Court that his counsel had DNA testing performed in 2010 on Tyrone Jackson and in 2017 on Cedric Evans, and those tests determined that Jackson's DNA could be a match to the DNA in the semen recovered from Mrs. Roberts' body. (Doc. 155 at 11). Barbour again requested access to the semen evidence from the crime scene that was in the MPD's custody so that more advanced DNA tests could be performed. (Doc. 153 at 11 n.11).[22]

---

[22] The sequence of events leading to Barbour's counsel being able to discover Tyrone Jackson and Cedric Evans' DNA profiles is as follows:

On May 20, 2003, a Lauderdale County, Alabama jury convicted Jackson of capital murder and sentenced him to life imprisonment without the possibility of parole. According to the ACCA in his subsequent appeal, "Jackson beat and stabbed Monique Vaughn in her home on the evening of October 21, 2001, when apparently, Vaughn rebuffed his sexual advances." *See Jerry Tyrone Jackson v. State*, CR-02-2280, slip op. at 1 (Ala. Crim. App. Nov. 19, 2004); (doc. 213-3 at 2). According to the ADFS's autopsy report, Ms. Vaughn suffered multiple stab wounds, including penetrating wounds to her left breast and chest and wounds to her head, abdomen, and hands. (Doc. 265-3 at 2). Ms. Vaughn also suffered blunt force trauma to the head. (*Id.*). Jackson's DNA was collected during those proceedings. (Doc. 295-2; doc. 295-3 at 3).

On September 3, 2003, approximately two months after Jackson was placed at Kilby Correctional Facility, Barbour's counsel, Ms. Gohara, visited him. (*See* doc. 313-1). During this visit, she obtained a saliva sample from Jackson by having him lick and seal an envelope containing a letter from Jackson. (Doc. 434 at 42:17–43:22, 58:22–59:12; doc. 473 at 26).

On July 15, 2010, Barbour's counsel sent the envelope containing the dried saliva from Jackson that Ms. Gohara had collected in 2003 to Gary C. Harmor ("Mr. Harmor") at the Serological Research Institute ("SERI"). (Doc. 313 at 4–5). Mr. Harmor conducted a comparative analysis of Jackson's saliva sample with the DNA results detailed in the June 3, 1992, ADFS report authored by Mr. Huys. On August 19, 2010, Mr. Harmor provided Barbour's counsel with a report concluding that Mr. Jackson's DNA type is 1.2, 4. (Doc. 313-1 at 3). Noting that the June 3, 1992 ADFS report found "[t]he possible DQalpha types [of the semen donor] are 4; 3, 4; 1.2, 4; or 1.1, 4[,]" Mr. Harmor concluded that Jackson could be the donor of the semen on the vaginal swabs. (*Id.* at 4). He recommended that the vaginal swabs collected from Mrs. Roberts be submitted for modern DNA testing to further identify the source. (*Id.*).

Given the age of the case, this Court met with the parties and ordered briefing on Barbour's request for discovery and AEDPA's one-year limitation period in cases involving claims of actual innocence like this one, where application of the time bar might result in a "miscarriage of justice." (*See* docs. 160, 161, 162). The Respondent continued to oppose discovery. (Doc. 164; *see also* docs. 163, 165 (Barbour's briefing)).

In November 2020, Magistrate Judge Walker withdrew and vacated her still-pending report and recommendation that had recommended dismissal of this action as time barred. (Doc. 167).

On March 30, 2021, this Court ruled that Barbour had established good cause for the Court to order limited discovery in the form of DNA testing of all crime scene evidence in the MPD's possession with "current, state-of-the-art technology," and denied without prejudice the Respondent's motion to dismiss Barbour's Second Amended Petition as time-barred. (Doc. 168).

The parties disagreed on where the evidence should be retested. The Respondent preferred the Mobile Regional Laboratory in Alabama, which is a part of the ADFS, while Barbour preferred the Forensic Analytical Crime Laboratory ("FACL") in Hayward, California, a private DNA laboratory that specialized in testing old, degraded and

---

Evans, who is presently incarcerated, disclosed during his deposition in this case that he voluntarily provided a DNA sample at some point to someone who approached him on Barbour's behalf. (Doc. 302-4 at 41:2–44:2). On March 20, 2017, Barbour's counsel sent an oral buccal swab from Evans to Mr. Harmor at SERI to conduct a comparative analysis of Evans' sample with the DQalpha results detailed in the June 3, 1992 ADFS report. (Doc. 313 at 5). "On May 15, 2017, Mr. Harmor provided counsel with a report concluding that Evans is a DQalpha type 2,4.1, and 'therefore cannot be a donor of the semen on the vaginal swabs.'" (*Id.*) (citing doc. 313-2 at 4). Evans testified during his deposition in 2022 that he had just recently notified that he was "cleared." (Doc. 302-4 at 41:23–42:23).

complicated evidence.  In June 2021, after much back and forth (*see* docs. 171, 173, 174, 176, 177, 179, 182), this Court ordered that the evidence be tested at FACL. (Docs. 175, 180).

In July 2021, the MPD shipped a box of crime scene evidence to FACL where it was tested by Alan Keel ("Mr. Keel"), FACL's lead DNA analyst. (Docs. 183, 184, 185). Mr. Keel started with the vaginal swab from Mrs. Roberts' body, and discovered that Barbour, Hester, and Melvin Roberts were all eliminated as the source of the semen on that swab. (Doc. 184 at 1–2).  Mr. Keel prepared a report describing the DNA profile found on the vaginal swab. (Doc. 185 at 1, para. 2).  Mr. Keel forwarded that report to Acadiana Criminalistics Laboratory to run comparisons of DNA results against the FBI's Combined DNA Index System ("CODIS"). (*Id.* at 1, para. 3).  On October 7, 2021, the Acadiana lab issued a report stating that the source of the semen recovered from the vaginal swab of Mrs. Roberts' body matched the DNA profile of Jerry Tyrone Jackson, who was incarcerated. (Doc. 190-1).  Pursuant to the FBI's CODIS Operational Procedures Manual, the Respondent collected a new DNA reference sample from Jackson and provided it to Mr. Keel to confirm the match. (*See* doc. 202 at 2–3).  Mr. Keel later tested the MPD evidence, including an anal swab, a can of Indian Spirit-brand air freshener spray,[23] a large

---

[23]  In one of the parties' joint status reports filed during this DNA testing process, the parties referred to a "beer can found at the crime scene" that Mr. Keel wanted to test. (Doc. 184 at 2 ("Mr. Keel recommends testing the knife presumed to be the murder weapon, pajama bottoms of Mrs. Roberts, and a beer can found at the crime scene. Respondents consent to the proposed testing of Ms. Roberts' pajamas, the knife, and the beer can.")).  This reference to a "beer" can was in error; the parties do not dispute that the police found no beer cans at the crime scene.  Indeed, Mr. Keel's supplemental report does not mention a beer can. (*See generally* doc. 213; doc. 213-1).  The Court assumes the parties were referring to the can of Indian Spirit-brand air freshener spray that was retrieved from the crime scene and tested by Mr. Keel. (*See, e.g.*, doc. 213-1 at 2).

kitchen knife that was presumed to be the murder weapon, and blue pajama pants. (*See* doc. 187 at 2; doc. 213-1 at 8). In his January 7, 2022 supplemental laboratory report, Mr. Keel reported that DNA test results showed that Jackson was the sole source of semen on the vaginal and anal swabs. (Doc. 213-1 at 2). Based on analysis of biological evidence on the pajama pants, he said "[i]t is likely a son of Thelma and Melvin Roberts is the habitual wearer/owner of the blue pajama pants." (*Id.*). He further opined: "The testing of the large kitchen knife was not informative due to the poor quality of the recovered DNA." (*Id.*). No DNA was recovered from the Indian Spirit air spray can. (*Id.*). Although the original inventory report of crime scene and rape kit evidence included fingernail clippings from Mrs. Roberts, they were apparently lost at some point before the MPD sent the evidence to FACL. (*Id.*; *see also* doc. 201 at 2).

At the Court's request, the parties submitted position papers addressing the DNA testing. The Respondent argued that the DNA results did not conclusively exonerate Barbour because they merely proved was that Jackson deposited semen inside of Mrs. Roberts within a 24-to-72-hour time frame before her death. (Doc. 211). In support, the Respondent attached the affidavit of Jason Kokoszka, Ph.D. ("Dr. Kokoszka"), the Forensic Biology Discipline Chief and the Statewide DNA Technical Leader for the ADFS. (Doc. 211-1). Dr. Kokoszka explained that "[s]perm cells will persist within the vagina for approximately 3 days, within the anal cavity for approximately 1 day, and within the oral cavity for approximately 6 hours." (*Id.* at 4). The Respondent thus argued that the DNA results did not necessarily place Jackson at the crime scene when Mrs. Roberts was

murdered, show that Jackson sexually assaulted Mrs. Roberts, or show that Hester did *not* rape Mrs. Roberts.

The Respondent also argued that, despite the implication of the DNA results, Barbour's confession was not the only evidence available at the time to establish his guilt. In support, the Respondent attached an affidavit signed and dated January 27, 2022, from Angela Stikes,[24] in which she described her memory of being inside Mrs. Roberts' home on the night of the murder. (Doc. 211-2). The Respondent also attached the transcript of Hester's plea colloquy, in which he testified that he, Barbour, and Stikes entered Mrs. Roberts' home on the evening of the murder to burglarize it. (Doc. 211-3 at 5–6).

Barbour's position papers argued that the identification of Jackson as the sole contributor of semen inside Mrs. Roberts' body discredited the State's entire theory of the case at trial: that Barbour, Hester, and Mitchell alone were involved in the crime. (Docs. 213, 214). Barbour also argued that the Respondent's new theory that Jackson and Mrs. Roberts could have had consensual sex in the days prior to her death was pure speculation, not scientifically sound, and contradicted the theory of the crime that the State presented at Barbour's trial. Barbour emphasized that Jackson's DNA was also the only DNA found in the semen from the anal swab, and Dr. Kokoszka had stated that "sperm cells persist . . . within the anal cavity for approximately one day." (Doc. 214 at 15). Barbour also pointed out that Mr. Keel had found a substantial amount of sperm on the anal swab, which indicated that the semen entered Mrs. Roberts' anal cavity contemporaneously with

---

[24] Stikes' name is now Angela Carmelle Stikes Boschan. (Doc. 211-2).

her time of death.  Engaging in normal hygienic practices, such as cleaning oneself after defecation or bathing, Mr. Keel explained, would have reduced the amount of sperm in the anal cavity.

Regarding Stikes' affidavit, Barbour argued that she could not be trusted because when police questioned her in 1993 about the murder, they hypnotized her, and in any event, her recollection of events was inconsistent with crime scene evidence.  In support, he cited a previously undisclosed May 20, 2001 declaration from Stikes, which had been obtained by Barbour's counsel.  Stikes' declaration stated:

> 1.    I was questioned by Detective Danny Carmichael and a black detective named Michael in 1992.
>
> 2.    Detective Carmichael told me I was in a lot of trouble.  Detective Carmichael placed a pile of paper in front of me and told me that Chris Barbour had confessed to murder and implicated me. Detective Carmichael did not [] let me read the confession, but he showed me my name on some of the pages. Detective Carmichael said that a cell mate of Chris Barbour had said that Chris Barbour mentioned my name as being there that night.
>
> 2.    The black detective Michael told me that I was an accessory to murder, but he could charge me as an accessory to robbery.
>
> 3.    Detective Carmichael showed me pictures of a dead body and asked me if I remembered it.
>
> 4.    One of the detectives told me they know I was in the house, in the doorway, and that I was the one who got sick in front of the house, implicating that my fingerprints were in the house.
>
> 5.    I was questioned again in 1993 by Detective Carmichael, Detective Johnston, who is the black detective Michael, and another person who worked for the police department. The third guy tried to hypnotize me. I got real relaxed and cried and then gagged. I felt like I remembered more than I did before that time.

(Doc. 214-3) (numbering in original).

Barbour moved for an evidentiary hearing on his actual innocence gateway claim, arguing that he could meet the *Schlup* standard so that this Court could review his habeas petition on the merits. (Doc. 330). Before the hearing, both parties requested and were permitted to conduct additional discovery. (Docs. 223, 224, 226, 227, 230). The parties engaged in discovery throughout 2022, producing thousands of pages of documents and conducting over twenty depositions. In April 2022, the Respondent produced bench notes and worksheets underlying the ADFS's June 3, 1992 DNA report, including photographs taken in 1992 of the HLA DQalpha test strips used to test the semen, and the original test strips. (*See* doc. 295-5). Once they received these bench notes and worksheets, Barbour's counsel submitted them to their experts, Mr. Keel with FACL and Mr. Harmor with SERI, who eventually opined that these materials showed that both Barbour and Hester should have been conclusively excluded as the source of the semen on the vaginal swab at the time of Barbour's trial. (*See* doc. 295 at 26).[25]

Barbour filed a Third Amended Petition on April 17, 2023, to include new claims based upon information learned during discovery in this case. (Doc. 349). The Court conducted a four-day evidentiary hearing on June 20, 28, 29, and 30, 2023, to determine whether Barbour had presented sufficient evidence of his innocence to pass through the *Schlup* gateway and excuse the untimeliness of his petition ("the *Schlup* hearing"). (*See* docs. 436, 438, 439, 440, 462). During the hearing, the following witnesses testified about DNA testing: Mr. Keel with FACL, who had retested the crime scene evidence in 2021;

---

[25] Mr. Keel's and Mr. Harmor's testimonies are discussed in more detail *infra* in the Court's analysis of Barbour's *Brady* subclaim.

Angelo Della Manna, the ADFS's Director; Dr. Kokoszka with the ADFS; Laura Wendell, the Section Chief in the ADFS's Montgomery laboratory; and Mr. Harmor, the DNA analyst at SERI who had tested Evans' and Jackson's saliva in 2010 and 2017. Additionally, the Court heard dueling expert testimony from Barbour's polygraph expert, Dr. Charles R. Honts, and from the Respondent's rebuttal expert, Charles Edward Slupski, regarding polygraph examinations, their scoring, and whether Barbour failed his May 1 polygraph examination. The Court also heard dueling expert testimony from Barbour's expert, Dr. Leo, and from the Respondent's rebuttal expert, Dr. Glen King, concerning whether Barbour was coerced into falsely confessing to murder. All of the expert witnesses were also deposed and provided reports. William, Melvin, and Lola Roberts testified. Additionally, the Court heard testimony from the following MFD and MPD officers involved in investigating Mrs. Roberts' murder: Kenneth Baldwin, Lt. Davis, Inv. Thomas, Michael Gantt, and John Gallups. At the time of the hearing, Det. Carmichael was deceased. Finally, the Court heard from others who knew Barbour around the time of the murders: Michael Braswell, Adam Bollaert, James Mann, and James Newman. The Court also admitted the deposition testimony of Lakeisha Hall; William Roberts; Lola Roberts; Melvin Roberts; Cedric Evans; Jerry Tyrone Jackson, who was appointed counsel (*see* docs. 353, 476); Niquita Smith, who was at that time deceased; and Randy McNeill, one of the prosecutors in Barbour's trial.[26]

---

[26] In its Opinion after the hearing, this Court described in detail the substance of most of these witnesses' testimonies and will not restate them here. (*See* doc. 473 at 34–63). To the extent any hearing testimony is relevant to Barbour's constitutional claims, the Court will address it in its consideration of each claim.

The parties filed lengthy post-hearing briefs, and the Respondent renewed his motion to dismiss this action as untimely filed. (*See* docs. 449, 450, 452, 453).  On August 16, 2024, this Court issued an opinion and order finding that Barbour had met the *Schlup* standard for an actual innocence gateway claim and denying the Respondent's motion to dismiss ("*Schlup* opinion"). (Doc. 473).  The Court found as fact that the sole male DNA contributor on the vaginal and anal swabs from Mrs. Roberts' body was Jerry Tyrone Jackson. (*Id*. at 70).  The Court further found that based on all the evidence, old and new, and in light of the prosecution's theory at trial, reasonable jurors likely would have reasonable doubt about Barbour's guilt and would not find him guilty. (*Id*. at 99–100).  The Court's decision was based on significant evidence which both undermined the prosecution's theory at trial and Barbour's confession, and indicated that a third party— Tyrone Jackson—may have committed the crime.  As the Court explained, the prosecution's theory at trial, consistent with Barbour's confessions, was that Mrs. Roberts' rape and murder occurred contemporaneously, and three people were involved in the crime: Barbour, Mitchell, and Hester.  Chiefly, the Court relied on "the recent DNA evidence revealing that Tyrone Jackson—who Barbour does not mention in his confession—is the sole source of male DNA recovered from Mrs. Roberts' body, and expert testimony that Jackson must have ejaculated inside of Mrs. Roberts soon before she died." (*Id.* at 97–

98).[27]  The Court also relied on evidence of "Jackson's prior threats towards Mrs. Roberts; his disappearance from a party the night of Mrs. Roberts' murder; and his 'jittery,' 'shaking,' and apologetic demeanor upon his return." (Doc. 473 at 98).  The Court further relied on evidence that sometime before Mrs. Roberts' murder, Jackson was arrested for rape, and since 2003, Jackson "has been serving a life sentence for stabbing another woman to death in her home after she rebuffed his sexual advances." (*Id.*).  The Court also considered how the crime scene evidence was inconsistent with Barbour's confession, "including how Barbour never mentioned putting a plastic bag over Mrs. Roberts' head, and how no beer cans were found at the crime scene and Mrs. Roberts had no alcohol in her blood"; and how "when Hester pleaded guilty to Mrs. Roberts' murder, he told the judge a different story about how the crime was committed and who was involved." (*Id.*).[28] The Court further found that "reasonable, fully informed jurors would likely find the

---

[27]  The Court also considered and rejected the Respondent's theory that the DNA evidence merely placed Jackson with Mrs. Roberts "at some time twenty-four hours before her murder" but did not place him "inside her home at the time she was killed." (Doc. 450 at 147).  As indicated above, the Court found that, based on the expert testimony, sexual contact between Mrs. Roberts and Jackson occurred in close proximity to her death.  The Respondent suggested that after Mrs. Roberts and Jackson had sex, Hester raped Mrs. Roberts before Barbour killed her but left no DNA behind.  The Court explained that, to accept the Respondent's theory that Jackson and Mrs. Roberts merely had sexual contact before Hester raped her, "reasonable jurors would have to accept that neither penetration, nor Mrs. Roberts' engaging in normal life activities after sexual contact with Jackson, nor Mrs. Roberts' metabolic and catabolic functions, separately or together, were sufficient to eliminate Jackson's semen from Mrs. Roberts' body, and that Hester left no DNA behind." (Doc. 473 at 86).  The Court found that reasonable jurors would doubt the veracity of this theory based on the physical evidence, DNA test results, expert testimony, and common sense.

[28]  The Court finds noteworthy the manner in which Barbour described the knife in his videotaped statement. When asked by officers how big the knife was, Barbour responded that it was about eight inches.  When asked to demonstrate, he responded that he did not know how big eight inches would be. (Doc. 462-114 (video of Barbour's confession, with Barbour's statement about how big the knife was occurring around the 52-minute mark based on the timestamp overlaying the video)).

objective, unrefuted DNA evidence more probative than the other evidence of Barbour's guilt, including the statements of Hester, Newman, and Stikes." (Doc. 473 at 99).

Thereafter, the Court met with the parties again (*see* docs. 477, 480) and allowed the parties to conduct additional discovery (doc. 488), and the parties briefed Barbour's Third Amended Petition. (Docs. 484, 485, 500, 514, 515).  In his brief, Barbour stated that he "decided to winnow the habeas claims he now seeks to advance" in the interest of avoiding any further delay of the resolution of his federal habeas case. (Doc. 500 at 20). As such, he "affirmatively abandon[ed]" all of the claims that he raised in his Third Amended Petition except for the following five claims:  (i) a claim pursuant to *Napue*, based on false representations as to Hester acting as the rapist (part of Claim B in the Third Amended Petition); (ii) a *Brady* violation based on the State's failure to disclose the bench notes underlying the ADFS's June 1992 DNA report (part of Claim B); (iii) an ineffectiveness claim based on trial counsel's failure to prepare for or make use of DNA-related evidence (Claim I); (iv) a due process violation based on custodial statements being wrongfully admitted (Claim C); and (v) a freestanding actual innocence claim (Claim A). (*Id.* at 20–21).  Barbour stated that he is not requesting a further evidentiary hearing at this juncture, but he reserved the right to request additional discovery and an evidentiary hearing if that becomes necessary. (*Id.* at 93).  Briefing concluded on February 27, 2025. Thereafter, the Court ordered the parties to attempt mediation (doc. 519), which they did, albeit unsuccessfully (docs. 524, 525).

# IV.  STANDARDS OF REVIEW

A federal court may issue a writ of habeas corpus for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  In other words, this Court's habeas review is limited to federal questions. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).  "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

In reviewing state court proceedings, federal courts apply different standards of review depending on whether the petitioner properly presented his claim to the state courts and whether the state courts addressed the claim.

## A.    Exhaustion and Procedural Default

A petitioner in state custody must exhaust the remedies "available" to him in the state courts before he can succeed on his claim in a federal habeas corpus action. 28 U.S.C. § 2254(b)(1).  A remedy is "available" if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c).  The exhaustion requirement generally permits federal courts to consider only those claims that the petitioner has marshalled through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  This process includes filing a petition for discretionary review in the highest court of the state. *See id.* "[A]n issue is exhausted if 'the reasonable reader would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in

state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (second alteration in original) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)).  Even if exhaustion principles bar relief on a claim, an underlying lack of merit may provide an independent basis for denying the writ. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (per curiam).

A habeas petitioner who fails to properly present a claim to the state court and who therefore loses the right to raise the claim within state procedures is said to have "procedurally defaulted" the claim and is no longer able to raise it in either state or federal court. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (explaining that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance").  However, procedural default is not an absolute bar to federal habeas relief.  To overcome a procedural default, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Under the first avenue, attorney negligence generally is not cause to excuse procedural default. *Id.* at 752–53.  However, "[a]ttorney error that constitutes ineffective assistance of counsel" *is* such cause. *Id.* at 753–54.  Attorney error may also supply cause for procedural default "when a State requires a prisoner to raise an ineffective-assistance-

of-trial-counsel claim in a collateral proceeding," but the prisoner did not have effective counsel in his first collateral proceeding. *See Martinez*, 566 U.S. at 14; *see also Trevino v. Thaler*, 569 U.S. 413, 429 (2013). As for "actual prejudice," a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original).

Under the second avenue for overcoming procedural default, a "fundamental miscarriage of justice" occurs only when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 321, 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To meet this standard, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.*

## B.    AEDPA Review of State Court Decisions

When a state prisoner petitions a federal court for a writ of habeas corpus on grounds that were considered and rejected by the state courts, review is governed by AEDPA. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under AEDPA, a petitioner is not entitled to habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the

adjudication of that claim either:  (1) resulted in a decision which was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, or (2) resulted in a decision which was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 404–05). Under the "contrary to" clause, a federal court may grant relief if the state court "applies a rule that contradicts the governing law set forth" in United States Supreme Court cases, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405–06; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003).  A state court's failure to cite governing Supreme Court authority does not, *per se*, establish that the state court's decision is "contrary to" clearly established Supreme Court precedent—"a state court need not even be aware of [the relevant] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell*, 540 U.S. at 16 (citation omitted).

Under the "unreasonable application" clause, a federal court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  A federal court making this inquiry should ask whether the state court's application of clearly established

Supreme Court precedent was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010) (citation omitted); *Wiggins*, 539 U.S. at 520–21.  An "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins*, 539 U.S. at 520.

The Supreme Court has summarized these two clauses in simple terms:  "[A] state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  A legal principle is "clearly established" for AEDPA purposes if it was found in the holdings—as opposed to the dicta—of a Supreme Court decision that existed at the time of the relevant state court decision. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (emphasizing that AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established'").

AEDPA also significantly restricts the scope of federal habeas review of state court findings of fact.  A federal court cannot contradict state court factual findings merely because it "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Rather, the state court must have reached an "unreasonable

determination of the facts in light of the evidence presented in the State court proceeding" in order for a federal court to grant habeas relief on that basis. 28 U.S.C. § 2254(d)(2). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), that is not sufficient grounds for a federal habeas court to supersede the state court's findings. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). The state court's factual findings are "presumed to be correct," and the petitioner has the burden of rebutting these findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[29]

Deference alone, of course, does not end the inquiry. *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable."). However, by setting forth necessary predicates before state court judgments may be set aside, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013).

## C.    *De Novo* Review

For any claims properly presented to the state courts but left unaddressed, this Court conducts *de novo* review. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). If reviewed *de novo*, a fact pleading standard is applied. *See* 28 U.S.C. § 2242 (requiring a petition for writ of habeas corpus to "allege the facts concerning

---

[29] The precise interplay between sections 2254(d)(2) and (e)(1) remains subject to debate. *See Collins*, 546 U.S. at 339.

the applicant's commitment or detention").  Similarly, Rule 2(c)(2) of the *Rules Governing Section 2254 Cases in the United States District Courts* also requires a petitioner to "state the facts supporting each ground" in the petition. *See also Mayle v. Felix*, 545 U.S. 644, 656 (2005) (acknowledging this particularity requirement).

## D.    Consideration of New Evidence

AEDPA generally precludes a petitioner from expanding the state court record. *See* 28 U.S.C. § 2254(e)(2).  However, the limitations on new evidence set forth in § 2254(e)(2) do not apply unless the petitioner "failed to develop the factual basis of a claim in State court proceedings." *Id.*  As the Supreme Court has instructed, there is no "failure to develop" facts in state court as contemplated by subdivision (e)(2) "unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432.  Accordingly, a petitioner cannot be "at fault" for failing to develop a claim in state court where "the prosecution concealed the facts." *Id.* at 434–35; *see id.* at 432 ("[A] person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance."); *see also Banks v. Dretke*, 540 U.S. 668, 692–98 (2004) (explaining that, as a result of events and circumstances "external to the defense"—namely, the State's withholding as to the informant status of a key State's witness—Mr. Banks was excused of any failure to factually substantiate his *Brady* claim in state court); *Thompson v. Lumpkin*, 141 S. Ct. 977, 977 (2021) (Kagan, J., concurring in the denial of the petition for certiorari) ("[I]f an applicant's claim went 'undeveloped in state court' because of something other than his own neglect—most typically, because of 'the prosecution['s] conceal[ment of] the facts'—

then § 2254(e)(2)'s restriction of evidentiary hearings would not apply. . . .  In that case, the habeas petitioner does not have to meet the section's stringent demands." (citing *Williams*, 529 U.S. at 430–31, 434–35)).

In addition, even when 28 U.S.C. § 2254(e)(2) does apply, AEDPA provides a statutory exception which allows federal courts to consider new evidence under certain circumstances.  Pursuant to this exception, a petitioner may present new evidence to the federal court where he can show that his claim relies on a new, retroactive constitutional rule, or a factual predicate that could not have been previously discovered, *see id.* § 2254(e)(2)(A); and the facts underlying the claim would show "by clear and convincing evidence" that but for constitutional error, no reasonable factfinder would have voted to convict, *see id.* § 2254(e)(2)(B); *see also Shoop v. Twyford*, 596 U.S. 811, 819–20 (2022) (recognizing that "state prisoners may occasionally submit new evidence in federal court," and discussing the provisions of subdivision (e) which allow them to do so).

## V.  DISCUSSION

The Court's discussion will proceed in five parts.  First, the Court addresses Barbour's claim that the State failed to disclose DNA bench notes to defense counsel in contravention of its obligations under *Brady*.  Second, the Court addresses Barbour's claim that the State endorsed and failed to correct Barbour's false statements that Hester raped Mrs. Roberts in violation of Barbour's due process rights pursuant to *Napue* and *Giglio*.  Third, the Court addresses the claim that Barbour's trial counsel were constitutionally ineffective for failing to adequately investigate and prepare for the DNA evidence before trial.  Fourth, the Court addresses Barbour's claim that the trial court erred in admitting his

confession at trial because it was coerced and not voluntary.  Finally, the Court addresses Barbour's freestanding actual innocence claim under *Herrera*.  The Court does not address the claims that Barbour abandoned.

A.    **Barbour's Due Process Claims Regarding the State's Nondisclosure of Evidence and Failure to Correct False Evidence (Claim B in the Third Amended Petition)**

Barbour contends that the State violated his due process rights in two separate ways at trial.  He claims that the State withheld from his defense counsel certain materials underlying the ADFS's DNA report:  bench notes that included photographs of the HLA DQalpha test strips used to test the semen recovered from Mrs. Roberts' body. (Doc. 349 at 51–54, paras. 110–20).  Barbour argues that this withholding violated *Brady*, in which the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  Barbour asserts that the Respondent did not provide the bench notes to Barbour until court-ordered discovery in this case and that, based upon his DNA experts' testimony at the *Schlup* hearing, the bench notes show that the ADFS's report was flawed because it did not conclusively exclude Barbour *and* Hester as the sources of the semen when it should have.  Barbour argues that if his defense counsel had received the bench notes, they could have retained their own DNA expert to examine them and use the information gleaned to impeach Barbour's confession.

Barbour also claims that the State repeatedly told the jury that the version of events he recounted in his confession—in particular, that Hester raped Mrs. Roberts—was true, even though the State knew it was false, because the State possessed the ADFS's DNA report showing that Hester was not the source of the semen found in Mrs. Roberts' body. (Doc. 349 at 59–66, paras. 130–46). Barbour argues that in so doing, the State violated its constitutional obligation to correct false evidence as described in *Napue*, 360 U.S. at 269, in which the Supreme Court held that a conviction that is knowingly "obtained through use of false evidence" violates the Fourteenth Amendment's Due Process Clause. (Doc. 349 at 50, para. 109 (also citing *Miller v. Pate*, 386 U.S. 1, 6 (1967) (upholding a *Napue* claim where "[t]he prosecution deliberately misrepresented the truth" about forensic evidence in its opening and closing statements and cross-examination))).

Before addressing each of these subclaims, the Court makes the following observations about the standards by which it may consider these claims and the facts that it may take into account in considering them.

The Respondent argues that this Court cannot consider these claims because this is the first time Barbour has raised them; Barbour never provided the state courts an opportunity to consider these claims; it is too late for him to now return to the state courts to litigate these claims; and thus, the claims are procedurally defaulted under AEDPA. (*See* doc. 485 at 36–41, paras. 91, 100, 104) (citing 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question

presented.")); *Coleman*, 501 U.S. at 735 n.1; ALA. R. CRIM. P. 32.1(e), 32.2(b), and 32.2(c))).

In response, Barbour cites this Court's *Schlup* opinion, which found that he passed through the *Schlup* actual innocence gateway and established that he satisfied the miscarriage-of-justice exception to the procedural default doctrine. (Doc. 500 at 21, 26). Barbour emphasizes that the *Schlup* actual innocence gateway applies regardless of whether a petitioner's constitutional claim is untimely or procedurally defaulted based upon failure to exhaust the claim. *See McQuiggin v. Perkins*, 569 U.S. 383, 386, 392–93 (2013). Barbour further argues that, not only must this Court consider these claims, but this Court must consider them *de novo* because, since he never raised them in the state courts, there is no prior state court decision-making to which this Court must defer. (*See* doc. 500 at 22, 26). Finally, with particular regard to the *Brady* subclaim, Barbour urges this Court to consider the evidence he presented during the *Schlup* proceedings because his earlier failure to develop the claim's factual basis was not due to any fault of his own but was instead due to the State's concealment of those facts. (*See id.*).

The Respondent counters that even though *Schlup* allows federal habeas petitioners who passed through the actual innocence gateway to obtain merits review of otherwise procedurally defaulted constitutional claims, "this equitable relief does not allow Barbour carte blanche to raise any constitutional claim he desires" because "*Schlup* is not a vehicle for state prisoners to develop and raise *new* constitutional claims in federal court." (Doc. 514 at 29) (emphasis added)). The Respondent contends that if this Court were to consider Barbour's *Napue* and *Brady* claims, Barbour would have completely "bypass[ed] state

court review" and urges this Court to find that "[e]ven state prisoners who have a pending § 2254 petition must develop the record and exhaust their claims where state remedies are available." (*Id.*). Presumably the Respondent implies that once Barbour realized that he could use evidence presented during the *Schlup* proceedings to create *Napue* and *Brady* claims, he should have filed another Rule 32 petition in the state courts in order make an effort to exhaust the claims and develop a proper state court record for review rather than simply amending his habeas petition in this Court. (*See id.* at 30). In failing to return to state court first, the Respondent argues, Barbour attempts to "circumvent such review of his state conviction and effectively receive a new trial in federal habeas." (*Id.*). Following this line of argument to its logical conclusion, the Respondent cites Alabama Rule Of Criminal Procedure 32.1(e), which allows a defendant to initiate a collateral proceeding based upon newly discovered material facts in limited circumstances, and Alabama Rule of Criminal Procedure 32.2(c), which requires that such a petition be filed within six months after discovery of the new facts. According to the Respondent, the claims are procedurally defaulted because Barbour did not file another Rule 32 petition within six months after discovering the new facts underlying the *Brady* and *Napue* claims.

The Respondent has not cited any authority or offered any reason why the *Schlup* actual innocence gateway would not apply to claims developed during a petitioner's federal habeas proceedings. To "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," *Schlup*, 513 U.S. at 324, the Supreme Court established a miscarriage-of-justice exception, arising from a prisoner's factual innocence, to excuse a federal habeas

petitioner's procedural default of a claim in federal court.  The *Schlup* Court reiterated that "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" 513 U.S. at 320–21 (quoting *Murray*, 477 U.S. at 495).

*Schlup* formulated a specific rule to implement this general principle.  It held that a prisoner asserting innocence as a gateway to reach the merits of defaulted claims must establish that, in light of new, reliable evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. This rule "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).  In *McQuiggin*, the Supreme Court observed that it had applied the "miscarriage of justice exception to overcome various procedural defaults," including "failure to observe state procedural rules." 569 U.S. at 392–93 (first citing *Coleman*, 501 U.S. at 750; then citing *Murray*, 477 U.S. at 495–96).  The *McQuiggin* Court held that "actual innocence, if proved, serves as a gateway through which a [habeas] petitioner may pass" to overcome AEDPA's statute of limitations. *Id.* at 386.

Thus, recognizing the "paramount importance of avoiding the injustice of executing one who is actually innocent," *Schlup* and its progeny allow a federal habeas petitioner to "raise[] a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims." *E.g.*, *Schlup*, 513 U.S. at 326–27.  This premise applies equally regardless of whether a constitutional claim is untimely or is procedurally defaulted. *See McQuiggin*, 569 U.S. at 386, 392–93.

Thus, *Schlup* itself creates no restrictions, temporal or otherwise, regarding the constitutional claims that a court may review pursuant to the actual innocence gateway. To the contrary, courts have relied upon *Schlup* to excuse a petitioner's procedural default of claims that, like Barbour's *Napue* and *Brady* claims, were developed during § 2254 proceedings. For example, in *House v. Bell*, on remand after the Supreme Court's *Schlup* determination, the district court considered "the merits [of] the claims that were procedurally defaulted," including amended claims "based upon evidence that was developed at the evidentiary hearing on the actual innocence claim." 2007 WL 4568444, at *2 (E.D. Tenn. Dec. 20, 2007); *see also Wolfe v. Clarke*, 691 F.3d 410, 414, 417, 426 (4th Cir. 2012) (relying exclusively on evidence disclosed during "§ 2254 proceedings" to affirm the district court's finding of a *Brady* violation, which the district court considered after finding that the petitioner satisfied *Schlup*); *Hanson v. Baker*, 766 F. App'x 501, 504 (9th Cir. 2019) (rejecting the state's argument that the district court "err[ed] in considering evidence adduced at [the petitioner's] hearing on his gateway innocence claim to decide the merits of" the petitioner's constitutional claim).[30]

Accordingly, the Court agrees with Barbour that these claims are not procedurally defaulted, that this Court may consider them *de novo*, and that this Court may consider evidence presented during the *Schlup* proceedings in support of Barbour's *Brady* subclaim. The Court now turns to the *Brady* subclaim.

---

[30] Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

### 1. Barbour's *Brady* Subclaim

To establish a *Brady* violation, a defendant must show that (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching" ("favorability"); (2) the favorable evidence was suppressed by the State, either willfully or inadvertently ("suppression"); and (3) the defendant suffered prejudice as a result of the suppression ("materiality"). *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The question is whether, in the evidence's absence, the petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A petitioner need not prove that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35. Rather, the petitioner need only demonstrate "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

As indicated above, Barbour argues the prosecution violated his due process rights pursuant to *Brady* because it withheld from defense counsel the bench notes underlying Mr. Huys' DNA report. According to Barbour's experts, the bench notes establish that the DNA testing conclusively excluded Hester *and* Barbour as a source of the semen recovered from Mrs. Roberts' body. Barbour further argues that the prosecution's failure to turn over this evidence prejudiced him because it impeaches his confession, the only evidence of guilt presented at trial and which the prosecution repeatedly emphasized to the jury was

evidence of guilt. (*See, e.g.*, doc. 70-4 at 77:8–13 (Mr. McNeill's opening statement summarizing Barbour's confession)); (*id.* at 77:23–25 (Mr. McNeill telling the jurors during opening that they are going "to see this confession on videotape" and "see this as [Barbour] is telling the story")); (doc. 70-5 at 144:3–4, 146:24–25, 149:7–11 (Mr. McNeill's co-counsel stating in closing that Barbour told "everything that happened in gory and graphic detail"; reminding the jurors that they "saw his video confession"; and finally stating that Barbour "and his cohorts performed the acts as they have been told to you and described to you and shown to you, not only through witnesses[,] but through his own mouth and his statement and confession")).

The facts relevant to Barbour's *Brady* subclaim arise out of Mr. Huys' DNA report and the 2022 revelation of bench notes underlying Mr. Huys' report, and are set forth in further detail below.

### a. Mr. Huys' DNA Report

As explained above, Mr. Huys was the prosecution's DNA expert at Barbour's trial.[31] In the jury's presence, Mr. Huys explained DNA testing in general terms and testified that a DQalpha test was performed on the serological material collected from Mrs. Roberts. (Doc. 70-5 at 63–65). Mr. Huys clarified that the DQalpha test could not produce results as specific as a DNA fingerprint test could. (*Id.* at 68). After this testimony, Barbour's counsel objected, stating: "Your Honor, if this is not a specific identifier, we object to it coming into evidence." (*Id.* at 69:2–3). At that point, Judge Gordon recessed

---

[31] *See supra* pages 50–59.

the trial and conducted an *in camera* hearing with counsel and Mr. Huys where the court and counsel questioned Mr. Huys about his report. (*Id.* at 69–80). Mr. Huys explained that testing of the vaginal swabs collected from Mrs. Roberts showed four DNA characteristics, known as "alleles" in genetic terminology: 1.1, 3, 4, and that a 1.2 was inferred, but that the ADFS could not determine whether the 1.2 was present because of the nature of the test. (*Id.* at 73–74). He explained that Mrs. Roberts contained the traits 1.1 and 3, so the 4 allele had to come from the semen. (*Id.* at 74). He said that both Hester's and Barbour's samples contained a 4 allele. (*Id.*). But, he said that since testing of Hester's sample showed that he also had a 2 characteristic, and since that characteristic was not present in the vaginal swabs tested, the test results spoke "very strongly against Mr. Hester being the source of the semen." (*Id.* at 75). He also said that, since Barbour's sample showed that he also had the 1.1 allele, which was present in the vaginal swab, Barbour was within the approximately one-third of the white male population that could have been the source of the semen present. (*Id.* at 74–75). Finally, he said that Melvin Roberts was excluded due to his combination of genetic traits. (*Id.* at 76).

At the conclusion of the *in camera* hearing, Judge Gordon ruled that the State could present the DNA test results to the jury. (*Id.* at 80). However, when the trial resumed, neither the prosecutor nor Barbour's defense counsel questioned Mr. Huys about what the DNA test results were. Thus, although Judge Gordon and the attorneys knew from the *in camera* hearing what the DNA test results established, the jury was unaware of this testimony. In essence, the jury heard only that the rape kit evidence was DNA tested.

### b. Bench notes underlying Mr. Huys' report

Despite filing pretrial discovery motions to inspect and test physical evidence, Barbour's counsel never received any of the bench notes or worksheets underlying Mr. Huys' report until court-ordered discovery in this case. On April 27, 2022, the Respondent disclosed to Barbour for the first time the bench notes that were prepared before Mr. Huys memorialized the ADFS's DQalpha test results in the June 1992 report. (*See* doc. 295-5). The bench notes included a photo of the DQalpha test strips and the actual test strips. Once he received the bench notes in April 2022, Barbour and his counsel provided them to two experts: Mr. Keel at FACL, who had conducted the DNA testing of the vaginal swabs and other crime scene evidence in 2021, and Mr. Harmor at SERI, who had conducted the DNA testing of Tyrone Jackson's and Cedric Evans' saliva in 2010 and 2017. Both experts submitted declarations regarding their findings about these bench notes (doc. 295-4 (Mr. Harmor); doc. 295-9 (Mr. Keel)), and both testified at the *Schlup* hearing (doc. 436 at 5–132 (Mr. Keel), 134–188 (Mr. Harmor)). The Respondent's expert, ADFS Director Angelo Della Manna ("Mr. Della Manna"), also analyzed the bench notes and provided an opinion.

### i. Mr. Keel's and Mr. Harmor's opinions

At the *Schlup* hearing, Mr. Keel explained to this Court how DQalpha testing works. DQalpha is "a single gene that has several different allelic forms that one can inherit from [one's] parents." (Doc. 436 at 18:24–19:1). Because of this variety of alleles—which includes alleles numbered 1.1, 1.2, 1.3, 2, 3, and 4—DQalpha testing "can discriminate between any two people chosen at random about 94 percent of the time." (*Id*. at 19:1–4, 20:3–6). To conduct DQalpha testing, forensic analysts utilize test strips. (*Id*. at 19:17–

22).   The test strips have dots that correspond to the various DQalpha alleles and, "depending on the alleles that a person possesses or their DQalpha type," will turn blue when exposed to amplified DNA. (*Id.* at 19:22–24).   However, where the DNA sample has more than one contributor, "the intensity of the color of the dots will vary depending upon the ratio of the DNAs in the mixture." (*Id.* at 21:8–9).   That is, "if the ratio is skewed" such that one person accounts for a significant majority of the mixture and the other accounts for a minority, "the blue color intensity will reflect that difference, and some of the dots will be very much darker than the other dots." (*Id.* at 21:15–19).   Forensic analysts can use the difference in dot intensity to "sort out the potential allelic types of the various contributors" to a DNA sample. (*Id.* at 23:21–23).

After independently reviewing the photographs of the test strips, Mr. Keel and Mr. Harmor both concluded that, contrary to Mr. Huys' June 1992 ADFS report, the source of the sperm DNA is DQalpha type 1.2, 4, which *definitively* excluded Barbour as a contributor based on his distinct DQalpha type and confirmed that Hester and Melvin Roberts were also "absolutely eliminated as potential semen donors." (*Id.* at 32:4–9 (Mr. Keel); *see id.* at 160:6-11 (Mr. Harmor); *see also id.* at 32:10–13 (Mr. Keel describing the ADFS's conclusion as "simply wrong"); *id.* at 159:22–25 (Mr. Harmor stating he "wouldn't agree with [the ADFS's] conclusion" that "there were four possible combinations of genetic traits of the semen contributor")).   Both experts identified the presence of 1.1, 1.2, 3, and 4 alleles in the test strips but noted that the blue dots indicating the presence of 1.1 and 3 alleles were markedly less intense than those indicating the presence of 1.2 and 4 alleles. (*Id.* at 31:5–32:5, 159:5–13).   Based on this review of dot

intensity, they testified that the 1.1 and 3 alleles were attributable to Mrs. Roberts, and the source of the sperm DNA was DQalpha type 1.2, 4. (*Id.* at 31:5–8, 32:4–5, 159:9–20). They thus stated that in Mr. Huys' June 1992 ADFS report, he failed to properly consider dot intensity and thus failed to properly narrow the genetic traits of the semen contributor—instead concluding that the semen source's genetic traits could be "(4), (3, 4), (1.2, 4) or (1.1, 4)." (*See* doc. 295-7 at 5).

Further, Mr. Keel and Mr. Harmor explained that any qualified analyst in 1992 would have considered dot intensity and concluded that the semen source's genetic traits were 1.2, 4 and, in turn, definitively excluded Barbour (who possessed a 1.1, 4) and Hester (who possessed a 2, 4) as potential contributors. (*See* doc. 295-4 at 4–5 (Mr. Harmor stating: "I am confident that any qualified DNA analyst in 1992 would also reach the same interpretation."); doc. 436 at 161:21–23 (same); *see also* doc. 295-9 at 3–5, paras. 6–8 (Mr. Keel stating: "Had [the test strips] been presented to me as an expert at the time of trial, I would have eliminated Mr. Barbour, Mr. Hester, and Mr. Roberts as potential contributors." (emphasis omitted))).  In sum, Mr. Keel's and Mr. Harmor's point was that any typical qualified analyst reviewing the DQalpha test strips in 1992 would have found the data best explained by two contributors, considered dot intensity, and then excluded Barbour and Hester as the semen's source.

### ii.  *Mr. Della Manna's opinions*

At the *Schlup* hearing, Mr. Della Manna testified that he disagreed with Mr. Harmor's conclusion that any qualified DNA analyst in 1992 would have considered dot intensity, opining that DNA analysts in 1992 did *not* typically interpret intensities on the

dot blot test strips "especially on deceased victims."[32] (Doc. 440 at 220:5–13). Mr. Della Manna explained that with a deceased victim, a DNA analyst would not "know the history over the last three days" and would have "no ability to ascertain the number of contributors using just DQalpha." (*Id.* at 220:14–25; 221:1). Mr. Della Manna also stated that Mr. Keel's opinion that the DQalpha testing was misinterpreted assumes that there were only two contributors even though in the 1990s, such an assumption could not be made when the victim was deceased and DQalpha testing was the only testing available. (*Id.* at 221:17– 25; 222; 223; 224:1–4). He also disagreed that Barbour should have been excluded because not only could the number of contributors not be assumed, given that Mrs. Roberts was deceased, but the test strip also showed "1.1, 3, and 4 dots lighting up, and Ms. Roberts and [] Barbour both share those collection of traits that would be included in that." (*Id.* at 223:6–12). Thus, according to Mr. Della Manna, Barbour could not have been excluded, and Hester could not be "positively eliminated" as a contributor in the 1992 mixed sample. (*Id.* at 227:13–23).

### c. Analysis

Relying upon Mr. Keel's and Mr. Harmor's testimonies, Barbour argues that, because the State did not disclose the bench notes underlying the ADFS report until 2022, the flaws in the report were not clear at the time of trial in 1993. Barbour argues that because he failed to consider dot intensity, Mr. Huys incorrectly concluded that Barbour could have been the source of the semen because his DQalpha type (1.1, 4) matched one

---

[32] However, the ADFS manual from 1992 instructed analysts to consider dot intensity. (*See* doc. 462-10 at 21).

of the four possible DQalpha types the ADFS identified in its report, and that because Hester possessed a 4 allele, he could not be conclusively eliminated. (*See* doc. 295-6 at 28:5–15 (Mr. Huys' deposition testimony during the *Schlup* proceedings)).  Barbour contends that Mr. Huys' previously withheld bench notes show that these determinations are incorrect, and Barbour and Hester were both conclusively excluded based on the DNA testing done at the time of trial.  Barbour further argues that Mr. Della Manna's opinion that it was not customary for analysts in 1992 to consider dot intensity is not credible because the ADFS's own manual from 1992 instructed analysts to consider dot intensity. (*See* doc. 462-10 at 21 ("Interpretation of a strip is based on the presence or absence of dots *and the relative intensity of the dots*.")* (emphasis added)).

Barbour argues that he satisfies all three *Brady* elements.  First, Barbour argues that the bench notes were favorable to the defense because, according to Mr. Keel's and Mr. Harmor's testimonies at the *Schlup* hearing, the bench notes indisputably excluded both Barbour and Hester as the source of the semen, which undermines Barbour's confession identifying Hester as the rapist.  Second, Barbour contends that the prosecution suppressed the bench notes, despite his counsel filing several pretrial motions for discovery of materials which would have encompassed them.  Third, Barbour argues that the bench notes were material because if his counsel had had access to the bench notes, they could have presented expert testimony to the jury in line with Mr. Harmor's and Mr. Keel's findings that neither Barbour nor Hester were the source of the semen, which would have demonstrated the falsity of Barbour's confession—the only evidence of guilt presented at

Barbour's trial—and would have eliminated any inference that Barbour was the rapist and his confession was otherwise true.

The Respondent first counters that, because the ADFS was not a part of the prosecution team, the prosecution never "possessed" the bench notes such that they were required to turn them over to defense counsel. The Respondent also argues that the bench notes were not material because Mr. Della Manna opined that analysts in 1992 did *not* typically interpret dot intensity, and that contrary to Mr. Keel's and Mr. Harmor's opinions, the test strips do not conclusively exclude Barbour or Hester. The Respondent does not argue that the bench notes were not suppressed or that they were not favorable.

### i. Whether the prosecution "possessed" the bench notes

The Court begins with the Respondent's argument that the prosecution never "possessed" the bench notes. Under *Brady*, the prosecution has a duty to learn of and disclose "any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. This encompasses anyone on the "prosecution team, which includes both investigative and prosecutorial personnel," *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (citation omitted), "whether or not the prosecutor knew of the existence of the evidence if the evidence was in the possession of the government arm or generally provided only to governmental entities," *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) (citation omitted). Because there is "no per se rule to determine whether information possessed by one government entity should be imputed to another," a "case-by-case analysis of the extent of interaction and cooperation between"

the government entities must be conducted. *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979)).

In support of his contention that the ADFS is an independent agency not affiliated with either the prosecution or the defense in a case, the Respondent points to the expert testimony at the *Schlup* hearing by Mr. Della Manna and the ADFS's Forensic Biology Discipline Chief Dr. Kokoszka. Dr. Kokoszka described the ADFS as "an independent state agency . . . not affiliated with a prosecutor's office, with the Attorney General's office, with a sheriff's office or a police department," stating: "We're an independent state agency which is tasked with providing scientific services in criminal matters within the state of Alabama. We serve approximately 450 different law enforcement agencies within our state." (Doc. 436 at 195:3–9). Mr. Della Manna similarly testified that the ADFS is not a part of any other law enforcement entity within the state, that it is an "independent state-level agency" that is "not affiliated with a prosecutor's office or defense counsel," and that "[w]e simply independently conduct our examinations upon any criminal act, any evidence associated with a criminal act that may occur within the boundaries of this state as well as some federal cases, and then report those results to the stakeholders in the case and then provide testimony as needed." (Doc. 440 at 191:17–25, 192:1).

On the other hand, Barbour counters that the ADFS's authorizing legislation provides the Attorney General with the authority to appoint the ADFS's director, suggesting collaboration between the two entities. *See* ALA. CODE § 36-18-1. In addition, Barbour says, the Governor, whose authority includes setting execution dates in Alabama, plays a role in certifying the director's appointment and has the sole authority to remove

the director. *See id.*  Indeed, Mr. Della Manna testified that he was appointed by the Attorney General and "confirmed or approved by the State Personnel Director and Governor Ivey." (Doc. 440 at 186:19–22; 192:2–3).

The Eleventh Circuit has not directly addressed whether a state crime lab is ordinarily part of the prosecution team.  However, the Court's analysis focuses on the government entity's role in a particular case, and the ADFS worked at the direction of the prosecution here. *See Moon*, 285 F.3d at 1309.  The specific facts in this case reflect that the ADFS played an extensive investigatory role on behalf of the prosecution.  First, at the time of Barbour's case, the ADFS solely assisted the prosecution.  Ms. Holt, a former ADFS forensic examiner involved in Barbour's case, explained in her deposition during the *Schlup* proceedings that in that time frame, the ADFS tested evidence only at the behest of law enforcement. (*See* doc. 300-2 at 14 (containing pages 45–48; at 48:7–10, 18–22), 15 (containing pages 49–52, at 49:3–14) (explaining that any request for testing from a defendant "would go through the DA's office" because "we wouldn't want to in any way infringe on his or her ability to prosecute their case")).  Indeed, from shortly after Mrs. Roberts' murder in March 1992 to Barbour's trial in June 1993, the ADFS received numerous evidentiary items to test to aid the investigation.  The ADFS then sent its final reports regarding those items directly to law enforcement officers assisting with the prosecution—not to the defense. (*See* doc. 295-7 at 2).  This was consistent with the ADFS's practice at the time of Barbour's case. (*See* doc. 300-2 at 14 (containing pages 45–48; at 45:6–7 (Ms. Holt stating:  "All of [the ADFS's] reports go to the district attorney as well as the submitting agency.")))  For example, the ADFS tested numerous pieces of

forensic evidence in Mrs. Roberts' case and, in so doing, discovered a "Caucasian pubic hair" on the trace sheet in which Mrs. Roberts was wrapped. (Doc. 1-3 at 43). According to Det. Carmichael, the ADFS had "[e]xtensive talks" with law enforcement about the finding. (*Id.*). The ADFS also provided significant assistance to the State's prosecution of Barbour at trial. *See Moon*, 285 F.3d at 1309. For example, the Respondent produced the DA's file in these proceedings, which included the following handwritten note dated June 8, 1993:

> THINGS TO DO:
> . . .
> - Call Huys in Birmingham of DFS? – Explanation of DNA Tests on [Defendant] & Co-[Defendant], Hester
> - Christopher Barbour -- included
> - Hester, -- not the source of semen

(Doc. 500-1 at 2; doc. 459-2 at 43:13–14 (Mr. McNeill testifying at his deposition that he thinks his co-counsel wrote that note)). The note suggests that a member of the DA's office had a call with Mr. Huys regarding an "[e]xplanation of [the] DNA [t]ests" on June 8, 1993, just days before Barbour's trial began. And both Ms. Holt, a forensic scientist at the ADFS, and Mr. Huys testified as witnesses for the prosecution at Barbour's trial. (Doc. 70-5 at 11, 58). In sum, this record shows that the ADFS was a part of the prosecution team in this case, and thus, the prosecution had a duty to learn about and disclose to the defense the bench notes underlying the ADFS's DNA report.

### ii. Whether the bench notes were "favorable"

Since the prosecution suppressed the bench notes, the Court turns to whether the bench notes were favorable to the defense. The Respondent does not respond to Barbour's

113

argument that the bench notes were favorable and has thus forfeited any opposition to it. *See United States v. Ardley*, 242 F.3d 989, 990 (11th Cir. 2001) ("[I]ssues and contentions not timely raised in the briefs are deemed abandoned."). In any event, the record supports Barbour's argument that the bench notes were favorable because they were both impeaching and exculpatory. *See Strickler*, 527 U.S. at 281. The bench notes, if interpreted by DNA analysts retained by Barbour's defense counsel, would have elicited expert testimony that both Barbour and Hester were conclusively excluded as the semen's source and thus call into question the only direct evidence of Barbour's guilt: his confession, in which he claimed that Hester raped Mrs. Roberts.

### iii.  Whether the bench notes were "material"

Finally, the Court finds that the bench notes were material. Again, had the prosecution disclosed the bench notes prior to trial, Barbour's trial counsel could have secured and presented expert testimony to the jury that Barbour and Hester were conclusively excluded as sources of the semen. *Cf. Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1353 (11th Cir. 2011) ("In determining the impact of the State's action in suppressing favorable evidence, courts should consider how the defense's knowledge of the withheld information would have impacted not just the evidence presented at trial, but also the strategies, tactics, and defenses that the defense could have developed and presented to the trier of fact."). The record supports a finding that the bench notes, especially the test strips, would have prompted defense counsel to seek out a DNA expert; indeed, as evidenced by the exchange during the *in camera* hearing, *see supra* at pages 52–59, Mr. Riggs appreciated the relevance of physical evidence such as semen and pubic hair

and suggested that something was "wrong" with the DNA testing, given that the pubic hair did not belong to Barbour but Mr. Huys' DNA report did not exclude Barbour. Expert testimony conclusively excluding Barbour and Hester as the semen source would have seriously undermined the veracity of Barbour's confession, the only direct evidence of his guilt, in two important respects: (1) it would undermine Barbour's claim that Hester raped Mrs. Roberts, and (2) it would eliminate the possible inference that Barbour lied when he identified Hester as the rapist to conceal that *Barbour* was the rapist, but that his confession was otherwise true—which could not be accomplished based only on Mr. Huys' report because the report did not exclude Barbour. In turn, this revelation could have prompted defense counsel to pursue a different trial strategy focused on undermining the credibility of Barbour's confession. In addition to the bench notes, counsel could have pointed out other inconsistencies between the confession and the crime scene evidence, including that no alcohol was found in Mrs. Roberts' blood and no beer cans were found at the scene, despite Barbour's claim that Mrs. Roberts drank beer with them. The prosecution's case was built around Barbour's confession, and the prosecutors repeatedly emphasized it to the jury. Thus, because the undisclosed evidence impeaches the confession's credibility, it would have "put the whole case in such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435.

The Court finds the Fifth Circuit's decision in *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) (per curiam), persuasive and instructive on the materiality issue. In *Floyd*, the defendant, who is white, was found guilty of murder after he confessed to fatally stabbing

the male victim after they had shared drinks and had sex. *Id.* at 148, 150–52.[33]  A detective testified at trial that the defendant's confession was credible because glasses of whiskey were found on either side of the victim's bed[34] and the position of the victim's body "corroborated 'perfectly' the descriptions" in the defendant's confession. *Floyd*, 894 F.3d at 151.  A detective also testified that the victim's friend stated that the victim "frequently had sexual relations with both black and white males." *Id.* at 159.  Additionally, a witness testified that the defendant made incriminating statements linking him to the victim's murder. *Id.* at 150.

After his trial, the defendant discovered pretrial fingerprint-comparison results revealing that neither the defendant's nor the victim's fingerprints were on the drinking glass next to the victim's bed, and evidence that the victim's friend had actually told the detective that the victim had a "distinct sexual preference for black males." *Id.* at 152, 159. The Fifth Circuit held that the fingerprint-comparison results and the friend's statement had been suppressed by the prosecution and were favorable, material evidence under *Brady*. *See id.* at 162–67 (finding that the state court had unreasonably applied clearly established Federal law under AEDPA in reaching the opposite conclusion).  Regarding materiality, the court explained that the defendant's incriminating statements, including his confession, were the only evidence of guilt, and that this evidence was "contradicted by

---

[33]  The defendant was also charged with murder in connection with the fatal stabbing of another male under similar circumstances; however, the defendant was acquitted on that charge. *Id.* at 148–52.

[34]  The court noted that this testimony was erroneous because the crime scene technician's report established that only one glass was found in the victim's bedroom; the other glass and the whiskey bottle were found in the kitchen. *Id.* at 151.

the suppressed evidence." *Id.* at 166. The court reasoned that the fingerprint-comparison results undermined the defendant's confession where he said that he and the victim shared a drink, and they impeached the detective's testimony that physical evidence, particularly the glasses of whiskey, corroborated the confession. *Id.* The court further explained that "although the fingerprint-comparison results do not conclusively establish that [the defendant] was not present" at the crime scene, "any such contention would . . . misapply the relevant standard for materiality." *Id.* at 164. The court similarly reasoned that the friend's undisclosed statement—that the victim had a distinct sexual preference for Black males, which the defendant was not—impeached the detective's trial testimony that the victim frequently had sex with both Black and white males. *Id.* at 166. "In the light of the withheld evidence undermining the only evidence supporting [the defendant's] guilt," the court concluded that the evidence was reasonably likely to affect the defendant's trial. *Id.* at 167.

Similar to *Floyd*, the only direct evidence of guilt presented at Barbour's trial was his confession, in which he identified Hester as the rapist. The bench notes—which, according to Barbour's experts, conclusively exclude both Hester and Barbour as the source of the semen—undermine Barbour's confession naming Hester as the rapist. Not only that, but the exclusion of Barbour also eliminates any inference that he lied about the identity of the rapist to conceal the fact that *he* committed the rape. Although the bench notes "do not conclusively establish that [Barbour] was not present" at the crime scene, "any such contention would . . . misapply the relevant standard for materiality," *see id.* at 164, which does *not* require "demonstration by a preponderance that disclosure of the

suppressed evidence would have resulted ultimately in [Barbour's] acquittal," *Kyles*, 514 U.S. at 434.  Instead, it requires a showing that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See id.* at 435.  "In light of the withheld evidence undermining the only evidence supporting [his] guilt," Barbour has made such a showing. *See Floyd*, 894 F.3d at 167.

The Respondent offers various reasons why the jury may have discounted the undisclosed evidence, and thus that it is not material.  For example, the Respondent highlights Mr. Della Manna's opinions that it was *not* customary for analysts in 1992 to consider dot intensity,[35] and that the bench notes and test strips do not conclusively exclude Barbour or Hester as Mr. Keel and Mr. Harmor claim.  "That merely leaves [the Court] to speculate about which of [the evidence] the jury would have believed." *See Smith v. Cain*, 565 U.S. 73, 76 (2012).  While the jury *could* have disbelieved the undisclosed evidence, or could have continued to believe Barbour's confession, the Court lacks "confidence that [the jury] *would* have done so." *See id.* (emphasis in original); *Floyd*, 894 F.3d at 167; *see also Phillips v. Valentine*, 826 F. App'x 447, 449, 464 (6th Cir. 2020) (finding a *Brady* violation where the state suppressed an X-ray of the victim's skull because, had the X-ray been disclosed, "the course of [the] trial would likely have been quite different" and might have "turned into a 'battle of the experts,'" which was "different enough from what actually happened to 'undermine[] confidence in the outcome of the trial'" (quoting *Kyles*, 514 U.S. at 434)).

---

[35]  As indicated above, ADFS policy in 1992 instructed analysts to consider dot intensity.

For these reasons, Barbour has established a reasonable probability that, had the State disclosed the bench notes, the result of his trial would have been different. *See Bagley*, 473 U.S. at 682.[36]  Accordingly, he is entitled to habeas relief on this claim.

## 2.    Barbour's *Napue/Giglio* Subclaim[37]

In *Giglio*, the Supreme Court summarized the evolution of the Fourteenth Amendment's prohibition on the prosecution's presentation of false evidence:

> As long ago as *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 342, 79 L. Ed. 791 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in *Pyle v. Kansas*, 317 U.S. 213, 63 S. Ct. 177, 87 L. Ed. 214 (1942). In *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L.Ed.2d 1217 (1959), we said, '(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id.*, at 269, 79 S. Ct., at 1177. Thereafter *Brady v. Maryland*, 373 U.S., at 87, 83 S. Ct., at 1197, held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' . . . When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. *Napue, supra*, at 269, 79 S. Ct., at 1177. We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' *United States v. Keogh*, 391 F.2d 138, 148 (CA2 1968).  A finding of materiality of the evidence is required under *Brady*, *supra*, at 87, 83 S. Ct., at 1196, 10 L.Ed.2d 215. A new trial is required

---

[36]  In addition to the *Schlup* actual innocence gateway/miscarriage of justice exception excusing Barbour's procedural default of this claim, there is also cause and prejudice flowing from the prosecution's suppression of the evidence (cause) and the evidence's materiality (prejudice).  "[C]ause and prejudice parallel two of the three components of the alleged *Brady* violation itself"—suppression and materiality. *Strickler*, 527 U.S. at 282; *see also Rossell v. Macon SP Warden*, 2023 WL 34103, at *3 (11th Cir. Jan. 4, 2023) ("The suppression of evidence constitutes cause for the failure to assert the *Brady* claim in the state courts," and "[p]rejudice exists if the suppressed evidence was material for *Brady* purposes." (citing *Strickler*, 527 U.S. at 282)).

[37]  Barbour's Third Amended Petition lists this subclaim as "i," but it appears that it should have been listed as "ii." (*See* doc. 349 at 59).

> if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .' *Napue*, *supra*, at 271, 79 S. Ct., at 1178.

405 U.S. at 153–54 (some citations omitted). To establish a *Giglio* violation under *Napue*'s principles, a habeas petitioner must prove that the prosecution knowingly used false evidence or "knowingly allowed it 'to go uncorrected when it appear[ed]'"; and that such use was material, *i.e.*, that the false evidence "may have had an effect on the outcome of the trial." *Glossip v. Oklahoma*, 604 U.S. ---, 145 S. Ct. 612, 626 (Feb. 25, 2025) (alteration in original) (quoting *Napue*, 360 U.S. at 269, 272); *see also Guzman*, 663 F.3d at 1348 (quoting *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008)). "[T]his materiality standard requires 'the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Glossip*, 145 S. Ct. at 627 (second alteration in original) (quoting *Bagley*, 473 U.S. at 680 n.9). This materiality standard "is 'more defense-friendly' than *Brady*'s." *Guzman*, 663 F.3d at 1348 (quoting *Hammond v. Hall*, 586 F.3d 1289, 1306 n.4 (11th Cir. 2009)).

Barbour argues that he has established both elements of a *Napue/Giglio* claim. As to the first element—knowingly presenting false evidence—Barbour claims that the prosecution knowingly used and in fact affirmatively capitalized on false evidence—his confession—in obtaining his conviction. *See DeMarco v. United States*, 928 F.2d 1074, 1076–77 (11th Cir. 1991) (finding prosecutorial misconduct warranted a new trial where the prosecutor not only adopted false testimony but "capitalized on it" in closing argument). In support, Barbour states that in both its opening and closing statements, the prosecution emphasized to the jury that Barbour's confession, where he stated that only

Hester raped Mrs. Roberts, was an accurate account of the crime and evidence of Barbour's guilt. Indeed, in his opening statement, Mr. McNeill summarized Barbour's confession to the jury as follows:

> Mr. Barbour then states that at that moment he grabbed the left leg of Ms. Roberts and the left arm. Mike Mitchell grabbed the right leg and right arm. And they spread her open because Chris Hester, and excuse my language, said I'm going to f[---] you bitch. And they helped, according to his statement, Chris Hester rape Thelma Roberts.

(Doc. 70-4 at 77:8–13). And later in his opening statement, Mr. McNeill continued: "And you are going to see this confession on videotape. And you are going to get to see this as [Barbour] is telling the story." (*Id.* at 77:23–25). Additionally, Mr. McNeill's co-counsel stated in closing: "Christopher Barbour told Lieutenant Davis everything that happened in gory and graphic detail," reminding the jurors, "[y]ou saw his video confession, and you heard the tape," and finally stating that Barbour "and his cohorts performed the acts as they have been told to you and described to you and shown to you, not only through witnesses[,] but through his own mouth and his statement and confession." (Doc. 70-5 at 144:3–4, 146:24–25, 149:7–11). Barbour further contends that despite knowing that DNA evidence excluded Hester as the semen source, the prosecution failed to correct the portion of Barbour's confession where he claimed Hester raped Mrs. Roberts and instead endorsed Barbour's confession—the only evidence of guilt—as accurate.

The Respondent counters that, at most, Barbour's statement that Hester raped Mrs. Roberts "contradicted or was inconsistent with the DNA test results" and that the DNA results "did not show . . . that Hester did not actually sexually assault [Mrs.] Roberts," suggesting that Hester may have raped Mrs. Roberts without leaving any DNA behind.

(Doc. 514 at 32–33). The Respondent also argues that the prosecution could have still believed Barbour's confession, despite the DNA results, because the prosecution was aware of several witnesses, including Nicki Langley, Angela Stikes, and Adam Bollaert, who placed Barbour and Hester at the crime scene. The Respondent contends that given these witnesses' statements, the prosecution could have believed that at least parts of Barbour's confession were accurate.

The Supreme Court's recent decision in *Glossip*, 145 S. Ct. 612, is instructive. *See id.* at 626 (concluding that the habeas petitioner was entitled to a new trial because the prosecution violated its constitutional obligation to correct false testimony under *Napue*). In *Glossip*, the prosecution's star witness, Justin Sneed, testified that the petitioner, Richard Glossip, offered Sneed "thousands of dollars" to murder Barry Van Treese. *See id.* at 618. Although the prosecution knew that a jailhouse psychiatrist had diagnosed Sneed with bipolar disorder and had prescribed him lithium, the prosecution "allowed Sneed falsely to testify at [Glossip's] trial that he had never seen a psychiatrist" and had been prescribed the lithium after asking for Sudafed for a cold. *Id.* at 618, 627. The Supreme Court concluded that the prosecution's failure to correct Sneed's testimony at trial violated *Napue*. *See id.* at 626–30. First, the Supreme Court concluded that, based on records disclosed during Glossip's state postconviction proceedings showing that the prosecution knew that Sneed had been prescribed lithium for bipolar disorder, Sneed's testimony was

false and the prosecution knowingly failed to correct it. *Id.* at 627.[38]  Second, the Supreme

Court concluded that Sneed's false testimony was material, explaining that "Sneed's

testimony was the only direct evidence of Glossip's guilt" and thus the jury's assessment

of Sneed's credibility "was necessarily determinative." *Glossip*, 145 S. Ct. at 628.

Assuming for argument's sake that parts of Barbour's confession were true, that is

not dispositive of his *Napue* claim. *Cf. Glossip*, 145 S. Ct. at 618, 627 (analyzing the falsity

of the witness's testimony about seeing a psychiatrist and being prescribed lithium, not all

of his testimony).  The relevant questions are whether Barbour's statement that Hester

raped Mrs. Roberts was false, and whether the prosecutor knew the statement was false.

The answer to both questions is yes.  Indeed, this Court has already concluded that "the

trial court, the prosecutor, and Barbour's lawyers (but not the jury) knew at Barbour's trial

that his confession was inaccurate to the extent he claimed that Hester raped Mrs. Roberts,

based on Mr. Huys' testimony excluding Hester as the source of male DNA." (Doc. 473 at

78 (*Schlup* opinion)).  The record supports this conclusion.  The Respondent admits in his

answer to the Third Amended Petition that pretrial DNA testing determined that "Hester

was not a contributor to the sample collected" from Mrs. Roberts (*see* doc. 485 at 24, para.

44), and he acknowledges that the prosecution possessed Mr. Huys' DNA report before

trial (*see* doc. 514 at 32).  Moreover, contemporaneous trial records show that the

prosecution knew Hester was not a source of the semen.  For example, Mr. McNeill's notes

---

[38] Oklahoma's Attorney General joined Glossip in asserting a *Napue* error, conceding both that Sneed's testimony was false and the prosecution knowingly failed to correct it. *Id.* at 627.  The Supreme Court found that the record supported the confession of error. *Id.*

from June 8, 1993—approximately two weeks before Barbour's trial—state: "Hester not the source of semen." (Doc. 459-8 at 38). In this litigation, Mr. McNeill testified that, before Barbour's trial, he understood Mr. Huys' report to mean that "the semen could not have belonged to Hester." (Doc. 459-2 at 42:18–19).[39]  Similarly, Mr. Gunter, Mr. McNeill's predecessor in prosecuting both Hester and Barbour's cases,[40] told the court during Hester's preliminary hearing a year before Barbour's trial that Mr. Huys' DNA report did not implicate Hester. (Doc. 337-4 at 19:8–13 (after Hester's counsel stated, "I want Judge Miller to know that Chris Hester is not implicated in that forensic report at all," Mr. Gunter confirmed, "Well I can state to the court that he's not.")).[41]  Also, during the *in camera* hearing at Barbour's trial, Mr. Huys explained it was "highly unlikely" that Hester was a contributor to the semen. (Doc. 70-5 at 74:19–20).[42]

---

[39] The relevant portion of Mr. McNeill's deposition testimony is as follows:

> Q. And what did you understand Mr. Huys to have found with regard to Mr. Hester and Mr. Barbour?
> A. That the semen could not have belonged to Hester. It would have been more consistent belonging to Barbour.
> Q. So it could not have been Hester's?
> A. Correct.

(Doc. 459-2 at 42:15–22).

[40] Because they were both prosecutors in the Montgomery County DA's office, Mr. Gunter's knowledge is attributable to Mr. McNeill. *Cf. Giglio*, 405 U.S. at 154 (explaining that the prosecutor's office "is an entity" and that one prosecutor's statement is attributable to the office).

[41] The prosecutor's knowledge that Hester was not the rapist is further evidenced by the way in which Hester was prosecuted: he was allowed to plead guilty based on a different narrative in which he neither raped Mrs. Roberts nor was involved in any rape.

[42] Although Mr. Huys opined that it was highly unlikely rather than impossible, it is clear that the prosecution concluded that Hester had been excluded.

The Court finds unpersuasive the Respondent's contention that the prosecution did not knowingly use false evidence because it could have suspected that Hester sexually assaulted Mrs. Roberts without leaving any DNA behind. The fundamental problem with the Respondent's position is that DNA *was* left behind. Thus, for the Respondent's position to make sense, it would mean that Mrs. Roberts first had sexual intercourse with a man who left his DNA behind, and was later raped by Hester who left no DNA behind *and* did not disturb the first man's DNA. Even in 1993, this theory would have defied logic and common sense. Based on the record and consistent with its previous conclusions, the Court again concludes that Barbour's confession was false insofar as he stated that Hester raped Mrs. Roberts. Because the prosecution knew that it was false, yet repeatedly told the jury that it was true, Barbour has met *Napue*'s first element.[43]

Barbour has also established that the false evidence was material, *Napue*'s second element. For a *Napue* claim, "[e]vidence can be material even if it 'goes only to the credibility of the witness.'" *Glossip*, 145 S. Ct. at 628 (quoting *Napue*, 360 U.S. at 269). The Court agrees with Barbour that, had the jury heard that it could not be true that Hester

---

[43] Further, it does not appear to make a difference that Barbour's defense counsel *also* knew, based on Mr. Huys' report, that Hester could not have raped Mrs. Roberts but did not object at any point after the prosecution referenced that part of Barbour's confession. In *Glossip*, the Supreme Court rejected the theory that a *Napue* claim fails because the prosecution could not have knowingly concealed something that the defendant already knew. *See* 145 S. Ct. at 630. During Glossip's state postconviction proceedings, the Oklahoma Court of Criminal Appeals had held that there was no *Napue* violation "because the defense 'was aware or should have been aware that Sneed was taking lithium at the time of trial,' and the prosecution could not have 'knowingly concealed' something the defense already knew." *Id.* (quoting *Glossip v. State*, 529 P.3d 218, 226 (Okla. Crim. App. 2023)). The Supreme Court held that the state appellate court's decision was a "mistaken interpretation of *Napue*" because, among other things, the "Due Process Clause imposes 'the responsibility and duty to correct' false testimony on 'representatives of the State,'" not on defense counsel." *Id.* (quoting *Napue*, 360 U.S. at 269–70 (other quotation marks omitted)).

raped Mrs. Roberts, as Barbour stated in his confession, there is a reasonable likelihood that the jury would have discredited Barbour's confession and would not have convicted him, since there was no other physical evidence or eyewitness testimony presented to the jury linking Barbour to the crime. As in *Glossip*, "[b]ecause [Barbour's confession] was the only direct evidence of [Barbour's] guilt of capital murder, the jury's assessment of [Barbour's] credibility was necessarily determinative here. Besides [Barbour], no other witness and no physical evidence established that [Barbour committed the] murder. Thus, the jury could convict [Barbour] only if it believed [Barbour]." *See id.* at 628. The Court cannot assume that the jury would have believed Barbour no matter what, since the materiality analysis "asks what a reasonable decisionmaker would have done with the new evidence." *See id.* at 629. The Respondent does not respond to Barbour's argument that the evidence was material, and he thus forfeits any opposition to it. *See Ardley*, 242 F.3d at 990 ("[I]ssues and contentions not timely raised in the briefs are deemed abandoned."). Moreover, because the Respondent failed altogether to address materiality, it follows that he has not "prove[n] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *See Glossip*, 145 S. Ct. at 627 (quoting *Bagley*, 473 U.S. at 680, n.9 (1985)). In sum, Barbour has shown that the prosecution's knowing use of false evidence "may have had an effect on the outcome of the trial," *see Napue*, 360 U.S. at 272, and he is entitled to habeas relief on this claim.

Even if Barbour could not succeed on his *Napue* claim when considered individually—although the Court concludes that he can—the Court concludes in the alternative that the cumulative effect of the *Napue* and *Brady* violations establish

constitutional infirmity in his trial. *Cf. Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1348–49 (11th Cir. 2009) (remanding to the district court to engage in a cumulative effects analysis of six pieces of evidence that each survived the other prongs of the *Brady* analysis by being found to be both favorable and suppressed, but not found to be material on their own). This Court's research has not revealed any binding caselaw addressing whether the Court may (or must) consider the cumulative effects of *Brady* and *Napue* evidence, as opposed to just *Brady* evidence. However, several circuits analyze *Napue* and *Brady* errors cumulatively, although they differ on the appropriate standard. For example, the Second Circuit concluded that courts should consider *Napue* and *Brady* evidence collectively under the *Napue* standard when the undisclosed *Brady* material casts light on the falsity of the *Napue* material. *See United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997). Taking a different approach, the Ninth Circuit concluded that courts should "first consider the *Napue* violations collectively" under the *Napue* standard, and if they "are not material standing alone," then the court should "consider all of the *Napue* and *Brady* violations collectively" under the *Brady* standard. *See Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008). The Fourth Circuit, combining aspects of the Second Circuit's and Ninth Circuit's approaches, held that "a court considering the cumulative materiality of *Brady* and *Napue* claims must (1) evaluate, pursuant to the *Napue* standard, the cumulative materiality of the *Napue* evidence and any *Brady* evidence tending to show the falsity of the testimony at issue in the *Napue* claims; and (2) evaluate, pursuant to the *Brady* standard, the cumulative materiality of all of the *Napue* and *Brady* evidence." *Juniper v. Davis*, 74

F.4th 196, 213 (4th Cir. 2023) (also explaining that "if it is evident that the petitioner would succeed at step (2), there is no need to jump through the hoop of the step (1) analysis").

Additionally, in *Glossip*, where the Supreme Court found a *Napue* violation, the Court concluded that "additional conduct by the prosecution further undermine[d] confidence in the verdict," including the revelation of documents containing details "not previously turned over to the defense." 145 S. Ct. at 629. The Supreme Court explained that "[b]ecause prejudice analysis requires a 'cumulative evaluation' of all the evidence, whether or not that evidence is before the Court in the form of an independent claim for relief," the documents "reinforce[d]" the Court's conclusion that "the *Napue* error . . . prejudiced the defense." *Id.* (quoting *Kyles*, 514 U.S. at 441). This dicta further supports the conclusion that the Court should undertake a cumulative evaluation of the *Napue* and *Brady* evidence.

The Court finds persuasive the decisions which endorse analyzing the cumulative effect of *Napue* and *Brady* violations under the *Brady* standard, and the Court finds this approach consistent with the Supreme Court's recent decision in *Glossip*. Considering this authority, the Court also concludes that the *Brady* and *Napue* violations, taken *together*, satisfy materiality under the *Brady* standard because they demonstrate the falsity of (at least parts of) Barbour's confession, which was the only evidence of guilt presented at trial, such that there is a reasonable probability that these errors cumulatively had an impact on the outcome of Barbour's trial. *See Kyles*, 514 U.S. at 433–34. Indeed, the suppressed bench notes underlying the *Brady* claim, which conclusively eliminate Hester and Barbour as sources of the semen and which the Court determined were in the prosecution's

possession at the time of Barbour's trial, bolster Barbour's *Napue* claim because the notes both (1) elucidate the falsity of Barbour's statement—endorsed by the prosecution—that Hester was the rapist, and the prosecution's knowledge that the statement was false; and (2) amplify the prejudicial effect of the prosecution's repeated invocations of Barbour's confession as credible evidence of his guilt. And as explained above, the bench notes further underscore the materiality of the false evidence that Hester was the rapist because they eliminate any inference that Barbour blamed Hester to conceal that *Barbour* was the rapist.

For these reasons, the Court finds that the prosecution's knowing use of false evidence violated Barbour's Fourteenth Amendment rights, and he is entitled to habeas relief on this claim.

## B.    Barbour's Ineffective Assistance of Counsel Claim (Claim I in the Third Amended Petition)

Barbour also alleges that Mr. Riggs and Mr. Heard rendered ineffective assistance of counsel because they failed to consult their own DNA expert, failed to ensure that they understood the DNA report submitted by the ADFS, and failed to cross-examine Mr. Huys to elicit testimony that Hester was likely not the source of the semen found inside Mrs. Roberts' body. (Doc. 349 at 83, para. 186; 84–88, paras. 192–201). Barbour argues that these failings amounted to ineffective assistance of counsel. Barbour does not rely on new evidence presented to this Court during the *Schlup* proceedings to support this claim but bases it purely on the state court record. (*See* doc. 500 at 59–63).

The Respondent first contends that this claim is procedurally defaulted because Barbour never presented it to the state courts. (Doc. 485 at 52, paras. 135–36 (citing 28 U.S.C. § 2254(c)).  The Respondent is correct that Barbour did not present this claim's "particular legal basis and specific factual foundation" to the state courts. *See Pope*, 680 F.3d at 1286.  Barbour's Rule 32 petition alleged ineffective assistance of trial counsel on numerous grounds, including that Mr. Riggs and Heard failed to cross-examine Mr. Huys, along with several other witnesses, but he made no further specific allegations about their actions regarding their making an effort to better understand the DNA evidence. (*See* doc. 484-12 at 123–29).[44]  The State's response to the allegation about cross-examination was that Barbour had not pled any facts in support of how failing to call those witnesses prejudiced Barbour. (Doc. 484-12 at 167).  At Barbour's Rule 32 evidentiary hearing, Mr. Espy called Mr. Riggs and Mr. Heard to testify about their representation of Barbour at trial, but Mr. Espy did not question them about this claim. (*See* doc. 70-11 at 152–54, 168–72).  Judge Gordon's order denying Barbour's Rule 32 petition did not address his allegation that Mr. Riggs and Mr. Heard should have cross-examined Mr. Huys specifically. (Doc. 484-12 at 211–12).  Regarding the other witnesses Barbour claimed should have been subjected to cross-examination, Judge Gordon found that since Barbour did not call any of these witnesses at the evidentiary hearing, he had not proven that his counsel was ineffective in that regard.  (*Id.*).  Even if it could be said that Barbour raised a

---

[44] Barbour also alleged in his Rule 32 petition that the trial court violated his due process rights by allowing Mr. Huys to testify that he conducted DNA tests on the semen collected from Mrs. Roberts' body but never clarify whether the evidence linked Barbour to the rape.  Barbour alleges that "the only reasonable conclusion the jury could draw from Mr. Huys' appearance and testimony was that there was powerful scientific evidence against" him. (Doc. 70-11 at 84).

similar enough claim in his Rule 32 petition, he did not exhaust that claim because he did not appeal the Rule 32 Court's denial of his petition to the ACCA.

Regardless, even if Barbour did not exhaust this claim in the state courts, for the reasons explained in the previous section, this Court's finding that Barbour has met the actual innocence gateway standard under *Schlup* excuses the procedural default of this claim, and this Court reviews the claim *de novo*.

The Supreme Court has recognized that the Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *See Powell v. Alabama*, 287 U.S. 45, 71–73 (1932); *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938); *Gideon v. Wainwright*, 372 U.S. 335, 343–45 (1963). The "right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland*, 466 U.S. at 684. In *Strickland*, the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

To satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688); *Williams*, 529 U.S. at 390–

91.  The defendant has the burden of proof and must overcome a strong presumption that his trial counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687–88, 690–91.  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding that the proper analysis under *Strickland*'s performance prong is an objective review of the "'reasonableness of counsel's performance under prevailing professional norms,' . . . which includes a context-dependent consideration of the challenged conduct as seen 'from the counsel's perspective at the time'" (quoting *Strickland*, 466 U.S. at 688–89)).  "Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one; 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688–89).

To satisfy the "prejudice" prong, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome"

of the proceeding. *Strickland*, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

A habeas petitioner has the burden to prove both prongs of the *Strickland* standard by a preponderance of the evidence. *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir. 2010); *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995).

*Strickland* itself concerned the duty to investigate, which Barbour claims his counsel breached in this case.  There, the Court held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also id.* at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Barbour argues that his counsel's performance was deficient for several reasons. Barbour first points out that Mr. Riggs complained when he was first appointed that the compensation allowed by the state was so minimal that it resulted in attorneys being virtually unable to render competent representation, asked for additional attorneys' fees,

and asked to be excused from the case. (*See* doc. 70-2 at 20–21).[45]  When questioned about this at Barbour's Rule 32 evidentiary hearing, Mr. Riggs acknowledged that he did not feel completely comfortable being asked to take on Barbour's case. (Doc. 70-11 at 154:14–20).

Second, Barbour argues that Mr. Riggs and Mr. Heard should have, but did not, consult their own DNA expert prior to trial.  Third, Barbour argues that the transcript from Judge Gordon's *in camera* hearing during his trial, where the ADFS's DNA report was discussed, shows that Mr. Riggs and Mr. Heard were not prepared for the DNA evidence. Barbour asserts that Mr. Riggs had not reviewed Mr. Huys' report prior to trial, citing Mr. Riggs' comment that he did not have a copy of it and Mr. Riggs' remark that he "wouldn't have known what it was if [he] looked at it." (Doc. 70-5 at 73:12–13).  Barbour also asserts that Mr. Riggs did not make an effort to understand the DNA testing, referring to Mr. Riggs' acknowledgement during the *in camera* hearing that he didn't "understand all the scientific end of" Mr. Huys' report (*id.* at 75:5–6), and his statement, "There is something wrong with this testing. And I don't know enough about it to know what it is[]" (*id.* at 79:24–25, 80:1).  Based on these circumstances, Barbour contends that his counsel breached the duty to investigate as required in *Strickland*.

Fourth, Barbour argues that Mr. Riggs should have cross-examined Mr. Huys to elicit his testimony that Hester was likely not the source of the semen, and his failure to do so could not have been strategic because Mr. Riggs' previous comments indicating his

---

[45]  Barbour continued to argue on direct appeal and in his Rule 32 proceedings that Alabama's cap on compensation for court-appointed attorneys is unconstitutional. (*See* doc. 70-8 at 194–200 (direct appeal brief); doc. 484-12 at 27–28 (Rule 32 petition)).

confusion about the DNA testing show that he had not engaged in a complete investigation. *Strickland*, 466 U.S. at 690–91. As a result, Barbour emphasizes, although the jury heard that semen recovered from Mrs. Roberts' body was DNA tested, it never learned that the State's DNA expert had determined that Hester was highly unlikely to have been the source of the semen. In Barbour's view, this omission prejudiced him because the jury heard Mr. Riggs object to the presentation of the DNA evidence and were then dismissed, and upon their return, they realized that no such DNA evidence was actually presented. Barbour surmises that the jury's obvious inference would have been that the DNA testing was harmful to Barbour, and Barbour's counsel had found some way to exclude it. On the other hand, Barbour asserts, if counsel had prepared for Mr. Huys' testimony and then conducted an effective cross-examination, the jury would have learned that the State's theory of the case—that Hester raped Mrs. Roberts while Barbour aided and abetted—was contradicted by its own scientific evidence that Hester's semen was not found at the scene.

The Respondent accuses Barbour of cherry-picking excerpts from the trial transcript to support his assertions that his counsel did not adequately understand or investigate the DNA evidence, and that a comprehensive review belies Barbour's assertions.[46] The Respondent further points out that since Barbour did not challenge his counsel's representation on this specific ground during his Rule 32 proceedings, these alleged facts were not developed and addressed below, and so Barbour can only speculate that his counsel's decision not to cross-examine Mr. Huys was based on a lack of preparation rather

---

[46] The Court quoted this portion of the trial transcript in the background and procedural history section of this Opinion. *See supra* pages 52–59.

than strategic.  Additionally, the Respondent argues that Barbour has not shown that his counsel's decision not to pursue and highlight the DNA test results was unreasonable under the circumstances, considering that Mr. Riggs and Mr. Heard were faced with defending a brutal capital murder by a defendant who confessed regarding how he had committed the crime with two other men, and the DNA results did not exclude Barbour. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); *see also Florida v. Nixon*, 543 U.S. 175, 190–91 (2004) ("[T]he gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus.").

Considering the record in its entirety, the Court finds that Barbour has not demonstrated that his counsel's performance was constitutionally deficient.  To the extent Barbour argues his counsel were ineffective because they failed to consult with or hire a DNA expert before trial, the Court is not persuaded.  At the time of Barbour's trial, the only DNA results available to counsel were in Mr. Huys' report, which showed that Hester was excluded (or very likely excluded), but that Barbour was not excluded.  Importantly, Barbour's counsel did not have access to the bench notes.  Barbour does not sufficiently explain how a DNA expert could have developed relevant testimony using the information that counsel had at the time of trial.  Based on the information available at trial, including the available DNA evidence, it was not unreasonable for Barbour's attorney to pursue other defense strategies and not engage a DNA expert.  And as explained further below, Barbour's trial counsel pursued several defense strategies, including filing multiple

motions to suppress his confession, requesting competency evaluations, and consulting with various experts.

The record demonstrates that, in light of what they knew at the time, Mr. Riggs and Mr. Heard ably discharged their responsibilities as court-appointed lawyers for Barbour. Although both lawyers had been practicing in the civil arena prior to Barbour's trial, both were experienced in trying criminal cases. (*See* doc. 70-11 at 153:16–154:5, 156:9–159:20, 171:16–25–71, 172:22–173:9 (Rule 32 evidentiary hearing transcript)). And although Mr. Riggs unsuccessfully advocated for additional attorneys' fees and initially asked to withdraw, he and Mr. Heard nevertheless vigorously pursued a defense for Barbour, which, considering that he had confessed to a brutal stabbing, centered on emphasizing his psychological problems in hopes of mitigating the damage of that confession. Mr. Riggs and Mr. Heard both further testified at that hearing that they had a good relationship with Barbour; that they would have investigated anything that Barbour had asked to them to investigate; that they advised Barbour about the kinds of evidence that they could present at both phases of his trial; that they consulted with experts such as a psychologist, a neurologist in hopes of formulating an insanity defense, and a polygraph expert; and that they met with Barbour's family, friends, and former employers. (*Id.* at 161:11–164:16, 165:24–167:13, 175:20–176:4, 177:1–186:4).

Mr. Riggs and Mr. Heard also filed numerous pretrial motions, including motions to suppress evidence, to have Barbour evaluated for competency to stand trial and to determine his mental state at the time of the offense, to view the crime scene, for discovery, and for access to funds for experts. (Doc. 70-2 at 5–7 (case action summary)). Mr. Riggs

and Mr. Heard thoroughly litigated their motion to suppress Barbour's confession. They first argued that forcing Barbour to take the polygraph "nickel and dime[d]" him into confessing to the crime, as Mr. Heard described at the suppression hearing. (Doc. 70-7 at 78:25—79:1–9 (suppression hearing testimony); doc. 70-2 at 25 (motion to suppress)). In support, they questioned Lt. McKee, who conducted the polygraph examination (*see* doc. 70-7 at 146:17–156:4, 158:1–163:7, 163:23–164:18); questioned Lt. Davis, who obtained the confession from Barbour (*see id.* at 116:16–143:6, 145:8–23); and even successfully qualified Dr. Slattery as an expert on the limited issue of whether a polygraph test was a type of psychological coercion (*see id.* at 179:9–196:21). Later, they argued that the abuse suffered by Barbour at the hands of Det. Carmichael and Lt. Davis rendered his confession involuntary, which they supported with Barbour's own testimony and Barbour's grandfather's testimony describing what Barbour told him in terms of how the officers treated him. (*See* doc. 70-2 at 68–69 (opinion denying motion)). They even sought, unsuccessfully, to have the State furnish the names and locations of every person who had been interrogated by Det. Carmichael and later charged with a felony within the past two years. (*Id.* at 59–61 (motion to suppress)). Although Judge Gordon denied the motion to suppress, counsel were undeterred, raising the issue of the involuntariness of Barbour's statements again on the first morning of trial. That time, they took a different approach: arguing that the videotaping of Barbour's statement, as well as the fact that Barbour was fed a large meal and allowed to tour the fire station immediately before making the statement, was done with the intent to disguise his remorse over the crime. (Doc. 70-2 at 136–38 (motion to suppress); doc. 70-4 at 2:7–5:25 (trial transcript)). They also were

138

successful in having Barbour's May 29 un-counseled statement suppressed. (Doc. 70-4 at 60:17–63:5).

Mr. Riggs and Mr. Heard litigated the issue of Barbour's competency and psychological condition with similar vigor, having him evaluated by Dr. Kirkland twice, first regarding the arson charges and again on the capital murder charges. They called Barbour's grandfather to testify as to Barbour's emotional troubles during a pretrial hearing, and at the sentencing phase, they offered testimony from his grandfather, his father, his grandmother, and Dr. Slattery, to make the same points. Again, considering what Mr. Riggs and Mr. Heard knew at the time, it was not unreasonable for them to pursue these defense strategies rather than seek out a DNA expert.

Barbour also asserts that his counsel did not even attempt to understand the importance of the DNA evidence. However, when viewed in its entirety, the trial transcript shows otherwise. (*See* doc. 70-5 at 61:1–62:19, 66:11–68:3, 69:2–80:3). As Mr. Huys began testifying at trial before the jury was recessed, Mr. Riggs asked several questions of Mr. Huys and attempted to have the DNA test results excluded. (*Id.* at 61:1–13, 66:11–68:3). Specifically, Mr. Riggs asked Mr. Huys whether DNA testing was controversial and unreliable (*id.* at 61:1–4), and Mr. Riggs got Mr. Huys to admit that less than ten percent of the time, the results of his DNA tests were not able to be reported because he did not achieve an exact duplicate between the test and the quality control sample (*id.* at 66:11–67:7). Then, Mr. Riggs moved to have the ADFS's DNA testing excluded because it could not specifically identify the source of the semen. (*Id.* at 69:2–3). Mr. Riggs' off the cuff remark outside the presence of the jury that he "wouldn't have known" what he was looking

at if he had the DNA report in front of him should not be construed to mean that Mr. Riggs did not understand the report. To the contrary, Mr. Riggs indicated his understanding that the DNA results did nothing more than place Barbour within the roughly 33% of white males who shared the same DNA as that recovered from the semen. (*Id.* at 69:22–70:8, 75:5–16). And although he commented at one point that he did not understand "the scientific end of it" (*id.* at 75:5–6), Mr. Riggs clearly understood enough to challenge the admission of the testing, stating: "If it points to one in three, which is the basic premise I understand we are operating on here, that is a whole lot less probability. And I don't think that []rises to the point of being evidence." (*Id.* at 76:1–4). Mr. Heard also engaged with Mr. Huys and Judge Gordon during the *in camera* hearing, arguing that any value of the evidence would be outweighed by its prejudicial effect to Barbour. (*Id.* at 78:15–17).

Barbour also has not overcome the strong presumption that his counsel's decision not to cross-examine Mr. Huys was strategic. *See Darden v. Wainwright*, 477 U.S. 168, 185–86 (1986). The decision whether to cross-examine a witness is "a tactical one well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). As the Supreme Court has explained, cross-examination can "expose defects in an expert's presentation," giving the jury reasons to "doubt . . . the State's theory [of the case]." *Harrington*, 562 U.S. at 111. But a reasonable attorney could conclude that certain cross-examination might do more harm than good. During the *in camera* hearing, Judge Gordon expressed reservations about the reliability of DNA testing and stated that he had not confronted DNA testing in a trial before. (Doc. 70-5 at 70:9–72:9, 70:18–20 ("[M]y

concerns are sometimes that when all the jury hears is it is something that could have happened, it begins to border on speculation.")).  Mr. Riggs and Mr. Heard could have taken a cue from Judge Gordon and reasonably determined that having Mr. Huys explain the results of his testing would confuse the jury, or worse:  since the results did not eliminate Barbour as the source of the semen, the jury might infer that Barbour lied in the parts of his confession where he said Hester raped Mrs. Roberts to obscure the fact that *Barbour* had raped her, but that his confession was otherwise true.  Accordingly, Mr. Riggs and Mr. Heard reasonably concluded that cross-examining Mr. Huys might have been detrimental to Barbour's defense, and their failure to cross-examine Mr. Huys does not amount to constitutionally ineffective assistance.

In sum, on this record and considering what Barbour's counsel knew at the time, the Court is not convinced that "no competent counsel would have taken the action[s] that [Barbour's] counsel did take." *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315).  Having concluded that Barbour has not met his burden of establishing that his counsel's performance was deficient, the Court need not consider whether he was prejudiced.  Barbour is not entitled to relief on his ineffective assistance of counsel claim.

## C.    Barbour's Involuntary Confession Claim (Claim C in the Third Amended Petition)

Barbour alleges that the trial court deprived him of a fair trial when it declined to suppress his May 1 confession because it was coerced and not voluntarily made, and he argues that the state courts' prior rejection of this claim resulted in decisions that are contrary to law and unreasonable under AEDPA. (Doc. 349 at 66–72, paras. 147–60).

Barbour acknowledges that review of this claim is governed by 28 U.S.C. § 2254(d) because there is a state court decision on the merits. (Doc. 500 at 71–72).  Indeed, Barbour exhausted this claim through one round of the state appellate review process by raising it before the trial court in a motion to suppress, on direct appeal to the ACCA, and within a petition for certiorari to the Alabama Supreme Court.[47]  Accordingly, § 2254(d) requires that Barbour demonstrate that state courts' denial of this claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  Only if he meets that burden can Barbour obtain *de novo* review of this claim. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when a state court's decision is unreasonable under § 2254(d), "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires").

Additionally, Barbour acknowledges that this Court must limit its consideration of facts relevant to this claim to those before the state courts at the time. (*See* doc. 500 at 72 (Barbour "does not ask this Court to unsettle or expand the state court factual record in conducting th[is] analysis")); *see also Pope v. Sec'y Fla. Dep't of Corr.*, 752 F.3d 1254, 1262 (11th Cir. 2014) ("[A] federal court must determine whether a habeas petitioner has satisfied [§] 2254(d) based only on the 'record that was before the state court that adjudicated the claim on the merits.'" (quoting *Pinholster*, 563 U.S. at 180)).  Thus,

---

[47]  And when Barbour raised the claim again in his Rule 32 petition, Judge Gordon ultimately denied it as procedurally barred because it was raised and considered on direct appeal. (Doc. 484-12 at 204).

although Barbour has presented evidence in support of this claim throughout these federal proceedings, the Court does not consider it in resolving this claim.

Thus, the Court turns to the state courts' analysis of this claim. As noted previously, Mr. Riggs and Mr. Heard moved pretrial to suppress the confessions that Barbour gave to Lt. Davis and Det. Carmichael on May 1, 1992. (Doc. 70-2 at 25–26). Judge Gordon conducted the suppression hearing over four days: August 21, November 4, December 14, and December 29, 1992. (Doc. 70-7 at 17–53 (August), 76–85 (November), 87–99 (December 14), 101–205 (December 29)). At the November hearing, Barbour's counsel claimed that he was "nickel and dime[d]" into confessing to murder after being forced to take the polygraph examination. (*Id.* at 78:25–79:9). At the continuation of the hearing on December 14, Barbour's counsel told the court that Barbour had just revealed to them that Det. Carmichael and Lt. Davis physically assaulted and threatened Barbour into confessing. (*Id.* at 89:15–90:2). The prosecution then told the court that the FBI was, at the time, investigating the MPD for using physical abuse to induce confessions. (*Id.* at 93:12–17). On December 29, Barbour testified regarding instances of being slapped and threatened by Lt. Davis and Det. Carmichael. (*Id.* at 166:12–178:23). Barbour's grandfather, John Brown, also testified that Barbour told him that "Carmichael did beat up on him." (*Id.* at 198:3–4). Mr. Brown further testified that an unidentified person had told him that Det. Carmichael had made statements that "he could beat a person half to death and not even as much as leave a bruise place on him." (*Id.* at 199:1–8). Mr. Riggs represented to the court that he worked on a previous case in which there were similar allegations that Det. Carmichael used physical violence to obtain a confession. (*Id.* at

143

202:10–19).  However, Lt. Davis also testified at the suppression hearing and denied abusing or threatening Barbour. (*Id.* at 113:10–18, 115:25–116:9).  Lt. McKee testified about the circumstances under which Barbour was given the polygraph and similarly denied abuse. (*Id.* at 156:19–157:2).

Judge Gordon denied the motion to suppress on January 13, 1993, finding that Barbour had not demonstrated that his confession was the product of abuse. (Doc. 70-2 at 68–69).  At trial, Barbour's confession was admitted into evidence and was the State's basis for urging the jury to convict Barbour. (Docs. 70-4 at 195:22–196:16; 70-5 at 89–90).

Barbour challenged Judge Gordon's ruling on appeal.  The ACCA analyzed and ultimately rejected the claim, as follows:

> Barbour further contends that the court erred in denying his motion to suppress his videotaped confession. Specifically, Barbour contends that he was manipulated and deceived into confessing to the killing of Thelma Roberts.
>
> The general rule is that "'extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is on the State to prove that the confession was made voluntarily.'" *Ex parte Weeks*, 531 So. 2d 643, 644 (Ala. 1988), quoting *Ex parte Callahan*, 471 So. 2d 463, 464 (Ala. 1985). 'Before an accused's confession can be received into evidence, the state must show that the statement was voluntary, that the accused was read his *Miranda* rights, and that he waived them.' *Franklin v. State*, 621 So. 2d 364 (Ala. Cr. App. 1992). . . .
>
> *A.M. v. State*, 623 So. 2d 421, 424 (Ala. Cr. App. 1993).
>
> Barbour contends that his confession was involuntary. "[T]he voluntariness of a confession need be established only by a preponderance of the evidence . . . ." *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). . . . A trial court's ruling that a statement was voluntary will not be reversed unless it is "manifestly contrary to the

great weight of the evidence." *Malone v. State*, 452 So. 2d 1386, 1389 (Ala. Cr. App. 1984).

The facts relating to Barbour's confession are as follows: Lieutenant William Davis, chief investigator for the Montgomery Fire Department, testified that he talked with Barbour on May 1, 1992, after Barbour had become a suspect in a series of fires that had been set at Winn-Dixie grocery stores. Davis asked Barbour to take a polygraph test concerning those fires. Barbour agreed to do so. Before the polygraph test was administered, Barbour became a suspect in the arson at Thelma Robert[s'] house on Manley Drive. Before Barbour took the polygraph test, Davis notified him that the polygraph test would concern the fire set on Manley Drive and not the Winn-Dixie fires. Barbour consented to take the polygraph test. The person who administered the test to Barbour told Davis that Barbour had not been truthful when answering one of the questions. Barbour was then taken to another fire station and was read his rights. He made a statement at that time. After giving his statement, Barbour said that he was hungry and he was given a meal. After Barbour ate, he gave a statement, which was tape-recorded. Davis then notified Detective Danny Carmichael of the Montgomery Police Department and Barbour was transported to the Montgomery police station. Barbour was taken to a video room where he made a videotaped confession. Davis and Carmichael testified that during this whole exchange with Barbour no one coerced Barbour, used physical force against him, promised him anything, or threatened him in any way in order to get him to make a statement.

Assistant Chief John McKee of the Montgomery Fire Department testified that he administered the polygraph test to Barbour. Barbour signed a consent to take the polygraph test, which was received into evidence, and a *Miranda* waiver form before taking the test. McKee testified that during the test Barbour was not questioned about the murder on Manley Drive but that he was questioned about the fire set on Manley Drive. McKee stated that after Barbour completed the polygraph test he told Barbour that he felt that Barbour had not been truthful in his response to one of the questions.

Barbour testified for the limited purpose of establishing the circumstances surrounding his confession. He testified that during the interview that resulted in his confession Detective Carmichael slapped him five times and that Lieutenant Davis threatened him. He further stated that he was told that he did not have to take the polygraph test but that he felt forced to do so.

Barbour's main argument at trial concerning the confession was that he was psychologically and physically coerced to confess.

"In *Johnson v. State*, (Fla. App.) 1964, 166 So. 2d 798, the court stated:

> "'Perhaps the most frequent instances of a jury being advised of a defendant's having taken a lie detector test are in cases involving confessions or admissions procured in anticipation of, during or subsequent to administration of a lie detector examination. It is well established that the mere fact that a lie detector examination may have been involved in procuring a confession does not render the confession inadmissible. (citing cases) However, if the defendant is forced to submit to the examination or if the methods of examination are such as to constitute actual or psychological coercion the resulting confession may well be found involuntary.'"

*Grace v. State*, 48 Ala. App. 507, 509, 266 So. 2d 310, 312, cert. denied, 289 Ala. 744, 266 So. 2d 316 (1972). (Emphasis added.)

We must look at the "totality of the circumstances" surrounding the confession to determine if it is voluntary. *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.E.2d 433 (1969); *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

> "The question of whether a confession was obtained by coercion or improper inducement can be determined only by examination of all the attendant circumstances. *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.E.2d 433 (1969); *Wallace* [v. *State*, 290 Ala. 201, 275 So. 2d 634 (1973) ]. Each case must stand or fall on its own merits for the constitutional inquiry into the issue of voluntariness requires more than a mere 'color-matching of cases.' *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). The true test of determining whether extrajudicial confessions are involuntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Elliott v. State*, 338 So. 2d 483 (Ala. Cr. App. 1976)."

*Eakes v. State*, 387 So. 2d 855, 859 (Ala. Cr. App. 1978).

As the Alabama Supreme Court stated in *Ex parte Hill*, 557 So. 2d 838, 841 (Ala. 1989):

146

"This Court has long recognized that confessions or statements obtained by violence, or threats of violence, are per se involuntary and therefore inadmissible. *Redd v. State*, 69 Ala. 255 (1881). Other direct means of inducing confessions involving psychological, rather than physical, manipulation, such as offers of benefits, rewards, or immunity have also been held to be unconstitutional. *See, e.g., Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) . . . . The use of those techniques has led courts to deem the resulting confessions to be coerced, and therefore in violation of the defendant's Fifth and Sixth Amendment rights. *See, e.g., Spano*, 360 U.S. at 323–24, 79 S.Ct. at 1207–08, 3 L.Ed.2d at 1271–72 . . . . However, more subtle forms of psychological manipulation, such as trickery or deception by the police, have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary. Instead, the trial judge must examine the totality of the circumstances surrounding the statement to determine its voluntariness. *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969)."

The trial court made a finding of fact that the statement was voluntary. That finding, when based on conflicting evidence, is to be given considerable deference by this court. "Where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960).

Of importance in this case is the fact that Barbour's confession was videotaped and that the videotape of the confession was made a part of the record on appeal. This court thus has the rare opportunity of viewing an appellant's demeanor when he made his confession. After reviewing the videotaped confession, we conclude that there is no indication that Barbour was coerced in any way to make the statement to police or that he had been physically abused before making the statement. Barbour was extremely cooperative, calm, and articulate. He even drew diagrams of the interior of the victim's house. Further, he did not appear despondent at any time during the hour-long confession. The court did not err in allowing the videotaped confession to be received into evidence.

*Barbour*, 673 So. 2d at 465–67 (footnote and some citations omitted). Because the

Alabama Supreme Court affirmed without explanation, *see Ex Parte Barbour*, 673 So. 2d

473, this Court "look[s] through" the Alabama Supreme Court's decision to the opinion of

the ACCA as the last reasoned state-court decision. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (holding that "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale").

The Fifth Amendment prohibits the use of a confession against a criminal defendant unless the confession was voluntary. *See United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005) (citing *Bram v. United States*, 168 U.S. 532, 542 (1897)). A confession is voluntary only if "it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000) (quoting *Dunkins v. Thigpen*, 854 F.2d 394, 398 (11th Cir. 1988)). In assessing whether a confession was voluntary, a court must consider "all of the surrounding circumstances." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (quoting *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983)). These circumstances include, but are not limited to, "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003).

Barbour first argues that the ACCA violated clearly established Federal law when it stated that "the trial court made a finding of fact that the statement was voluntary," *see Barbour*, 673 So. 2d at 467, and noted that "[w]here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact," *id.* (quoting *Blackburn*, 361 U.S. at 208). Barbour contends that this statement by the ACCA violated *Miller v. Fenton*, in which the Supreme Court held that § 2254(d), which requires federal courts in habeas corpus proceedings to presume that state courts' "factual" findings are correct, is

inapplicable to the issue of the voluntariness of a confession. 474 U.S. 104, 110 (1985). *Miller* held that "the ultimate issue of 'voluntariness' is a legal question requiring independent federal review." *Id.*  Even if Barbour is correct that the ACCA should not have stated that it was giving deference to the trial court's "finding of fact" that Barbour's statement was voluntary, and should have instead conducted an independent review of whether Barbour's statement was voluntary, a review of the next paragraph of the ACCA's decision reveals that it did conduct an independent review:  the ACCA stated that it had reviewed the video of the confession because it had been made a part of the record on appeal and made its own determination that Barbour's confession was voluntary. *See Barbour*, 673 So. 2d at 467.  Thus, any error on this discrete issue was harmless.  The ACCA also restated the facts underlying Barbour's claim that his confession was coerced, including describing the suppression hearing testimony, something that it could have avoided doing if it were merely adopting the trial court's voluntariness finding.

Barbour also argues that the ACCA put too much emphasis on the video, in which the ACCA noted that Barbour appeared "cooperative, calm, and articulate," and disregarded multiple other circumstances of coercion and abuse, such as the interrogations that Barbour was subjected to prior to May 1 that were never recorded, the circumstances surrounding his polygraph examination, and the evidence presented at the suppression hearing suggesting that he was subjected to violence and threats.  In other words, Barbour argues that while the ACCA identified the correct legal principal—that a court must determine voluntariness using a totality of the circumstances analysis—the ACCA

unreasonably applied that principle to the facts under § 2254(d)(1) and, in doing so, also unreasonably determined the facts under § 2254(d)(1).

The Court does not take lightly Barbour's allegations of serious verbal and physical abuse by law enforcement. Barbour claimed that Lt. Davis threatened to beat him "with[in] an inch of [his] life." (Doc. 70-7 at 168:18–19). He further claimed that Det. Carmichael slapped him "approximately four or five times" the first time he was brought in for questioning. (*Id.* at 172:22–173:3). He said that he was not informed that he would be questioned about the murder during his polygraph examination until he arrived at the police station for the test. (*Id.* at 169:17–170:4). He testified that he feared that if he did not talk, "[he] would be slapped again or something of that nature." (*Id.* at 176:7–9).[48]

Yet, Supreme Court precedent prevents this Court from overturning a state court's decision merely because it finds that the decision was incorrect or because it would have reached a different conclusion. *See Schriro*, 550 U.S. at 473; *Williams*, 529 U.S. at 410. Indeed, this Court must refrain from granting habeas relief as long as the state court's decision was objectively reasonable. *See McDaniel*, 558 U.S. at 132–33. Here, the video was sufficient evidence from which the ACCA could reasonably conclude that Barbour's confession was not coerced. A court need not list every fact that it considered in reaching a decision, and the record before the ACCA demonstrated that Barbour testified that on the

---

[48] Barbour's allegations are corroborated by, for example, Melvin's testimony in this action that the day Mrs. Roberts' body was discovered, police took him to the police station and handcuffed him to a chair for approximately twelve hours, during which officers refused his requests to go the bathroom; that while he was handcuffed to a chair, Det. Carmichael kicked him in the chest so hard the chair slid across the floor; and that Det. Carmichael and other officers kept "slapping" and "beating on" Melvin, calling him the "N" word, and saying "you know you did it." (Doc. 284-3 at 68:18–72:12 (Melvin's deposition testimony)). The Court acknowledges that Melvin's testimony was not before the state courts.

day of his confession, he was not hit or tortured, was not yelled at or threatened, and was informed of his right to remain silent and to have counsel present. (Doc. 70-7 at 175:3–76:20).  Lt. Davis and Lt. McKee denied that violence or threats were used, and it was not unreasonable for the ACCA to assign little weight to Mr. Riggs' memory of another allegation of abuse made by a former client or the talk of the FBI investigation into the MPD.  It was also not objectively unreasonable that the trial court found Barbour's grandfather's statements to be somewhat vague or that it gave Dr. Slattery's testimony little weight, considering he was not a polygraph examiner and had not examined Barbour. These credibility determinations are "presumed to be correct" on AEDPA review, and Barbour has not rebutted them "by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1).[49]

In sum, even if this Court were to find differently in the first instance, the Court cannot say that the ACCA's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dixon*, 565 U.S. at 24 (quoting *Harrington*, 562 U.S. at 103).  Barbour's submissions are insufficient to overcome the deference to which the state court's ruling on this claim is entitled.  On AEDPA review, Barbour is not entitled to federal habeas relief on this claim.

---

[49]  Barbour also suggests that the ACCA should have considered Det. Carmichael's police reports from the investigation, in which he wrote that Barbour "is a whimpie little thing, and scares real easy," as part of the totality of the circumstances of whether his confession was involuntary. (*See* doc. 70-13 at 131–32). However, Barbour has not shown that either the trial court or the ACCA had the police reports before them.

D.    **Barbour's Freestanding Actual Innocence Claim (Claim A in the Third Amended Petition)**

Barbour's final claim is that the DNA test results establish that he did not commit capital murder. (Doc. 349 at 41–50, paras. 92–107).  Thus, he argues that his continued confinement and planned execution are unconstitutional.[50]

In *Herrera*, the Supreme Court assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417.  The Supreme Court further stated that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*  In subsequent decisions, the Supreme Court provided additional guidance on how a petitioner might satisfy this "extraordinarily high" standard:  a federal habeas court must be "convinced that [] new facts unquestionably establish [the petitioner's] innocence," *Schlup*, 513 U.S. at 317, which "requires more convincing proof of innocence than *Schlup*," *House*, 547 U.S. at 555.  In *House*, the Supreme Court concluded that the petitioner's new evidence satisfied *Schlup* but fell short of "whatever burden a hypothetical freestanding innocence claim would require." *Id.* at 555.  In that case, the petitioner provided evidence "call[ing] into question" "the central forensic proof connecting [him] to the crime." *Id.* at 554.  However, the Court concluded that it was "not

---

[50] Although the Respondent initially contended that this claim is procedurally defaulted like the others because Barbour never raised it until his Third Amended Petition (*see* doc. 485 at 33–35, paras. 84–87), the Respondent appears to have forfeited that argument by not raising it in his brief and responding to the argument on the merits.  In any event, the procedural default is excused by virtue of Barbour passing through the *Schlup* actual innocence gateway.

a case of conclusive exoneration" because "[s]ome aspects of the State's evidence," including eyewitness testimony placing the petitioner near the victim's body, "still support[ed] an inference of guilt." *Id.* at 553–54.

As recently as 2013, the Supreme Court reiterated that it has never held that a prisoner is "entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin*, 569 U.S. at 392. Nor has the Eleventh Circuit. *See, e.g.*, *Raulerson v. Warden*, 928 F.3d 987, 1004 (11th Cir. 2019). Moreover, the Eleventh Circuit has noted that the Supreme Court has "never decided what the precise burden of proof for a freestanding actual innocence claim would be." *Mize v. Hall*, 532 F.3d 1184, 1195 (11th Cir. 2008).

In this case, the Court need not determine whether a freestanding claim of actual innocence is viable on federal habeas review or whether Barbour has demonstrated that he meets "whatever burden a hypothetical freestanding actual innocence claim would require." *House*, 547 U.S. at 555. The Court in *Herrera* theorized that a truly persuasive demonstration of "actual innocence" might warrant federal relief only "if there were no state avenue open to process such a claim." 506 U.S. at 417. Because the Court grants habeas relief to Barbour on his *Brady* and *Napue* claims, he will receive a new trial. Thus, there will be a state avenue open to Barbour to process his claim that he is innocent, and he may argue as much to a jury. Accordingly, Barbour's freestanding actual innocence claim is due to be denied as moot.

## VI. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a § 2254 habeas corpus petition, the petitioner must obtain a Certificate of Appealability ("COA"). *Miller-El v.*

*Johnson*, 537 U.S. 322, 335–36 (2003); 28 U.S.C. § 2253(c)(2). Thus, this Court is required to issue or deny a COA when entering a final order, such as this one, that is adverse to a federal habeas petitioner. *See Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*. A COA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (parenthetical in original) (quoting *Slack*, 529 U.S. at 484). "The petitioner need not show he will ultimately succeed on appeal, for '[t]he question is the debatability of the underlying constitutional claim[s], not the resolution of that debate.'" *Lott v. Att'y Gen., Fla.*, 594 F.3d 1296, 1301 (11th Cir. 2010) (alterations in original) (quoting *Miller-El*, 537 U.S. at 342).

The Court concludes that, regarding Barbour's ineffective assistance of counsel and coerced confession claims (Claims I and C in the Third Amended Petition), jurists of reason could debate whether these claims should have been resolved in a different manner, and the issues presented are adequate to deserve encouragement to proceed further. Thus, the Court will grant a COA on those claims. Regarding the actual innocence claim (Claim A in the Third Amended Petition), which this Court denies as moot, jurists of reason would not find debatable the Court's assessment of that claim. Thus, Barbour is not entitled to a COA on that claim.

# VII.  CONCLUSION

Accordingly, for the reasons stated, and for good cause, it is

ORDERED as follows:

1.     Barbour's Third Amended Petition (doc. 349) is GRANTED IN PART and DENIED IN PART as follows:

> a.  Habeas relief on Barbour's *Napue* and *Brady* claims (subclaims i and ii of Claim B) is GRANTED;

> b.  Habeas relief on Barbour's ineffective assistance of counsel claim (Claim I) and coerced confession claim (Claim C) is DENIED;

> c.  Barbour's actual innocence claim (Claim A) is DENIED as MOOT;

> d.  Habeas relief on the remaining claims raised in the Third Amended Petition (doc. 349) is DENIED because Barbour abandoned those claims;

2.     The Court GRANTS Barbour a certificate of appealability on his ineffective assistance of counsel and coerced confession claims (Claims I and C);

3.     The Court DENIES Barbour a certificate of appealability on his freestanding actual innocence claim (Claim A).

An appropriate Final Judgment will be entered contemporaneously herewith.

DONE this 22nd day of August, 2025.


_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE